**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No. 22-cr-392 (DLF)** |
| | **:** | |
| | **:** | |
| **ABU AGILA MOHAMMAD** | **:** | |
| **MAS'UD KHEIR AL-MARIMI,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

**UNITED STATES' SUPPLEMENTAL FILING IN SUPPORT OF ITS MOTION TO
AFFORD VICTIMS OF THE BOMBING OF PAN AM FLIGHT 103 REMOTE VIDEO
AND TELEPHONIC ACCESS TO COURT PROCEEDINGS IN THIS CASE**

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia (hereinafter, "the government"), respectfully submits this supplemental

information in accordance with the Court's June 18, 2004, and September 18, 2024, Minute Orders,

and the Court's October 16, 2024 Order, concerning the "United States' Motion to Afford Victims

of the Bombing of Pan Am Flight 103 Remote Video and Telephonic Access to Court Proceedings

in this Case," ECF 51.[1]

I.      **BACKGROUND**

On June 18, 2024, the Court ordered the government to "(1) finalize its list of individuals

who meet the statutory definition of victim and wish to have access to court proceedings and (2)

provide the Court with the total number of victims and geographic locations for each victim (city,

town, or general geographic location) to assist the Court in making 'reasonable efforts' to provide

---

[1] The government incorporates its original Motion (ECF 51) by reference herein, as well as the facts, legal arguments, and the entirety of the "United States' Reply in Support of [its] Motion" ("Reply Motion") as well, which was filed on June 24, 2024. ECF 54.

remote access to victims.  Act to provide Remote Access to court Proceedings for Victims of the 1988 Bombing of Pan Am Flight 103 over Lockerbie, Scotland, Pub. L. No. 118-37, 138 Stat. 11."

### Victim Notification System

In response to the Court's mandate, the government first reviewed existing victim information contained in the Victim Notification System ("VNS").[2]  VNS is the Department of Justice's primary electronic system for retaining victim data in criminal cases, including information such as an individual's name and e-mail address.  As a system, however, VNS does not contain enough information for a user to determine whether an individual would qualify as a "victim" in this specific case, under the broadly phrased statutory definition found in Public Law No. 118-37(a)(1)(B), 138 Stat.11.  In addition, in a case such as this where victims may have submitted their information to the FBI many years ago, VNS does not necessarily provide accurate information concerning an individual's current geographic location.  Thus, the VNS database proved to be an inadequate vehicle for compiling the information needed by this Court. *"Declaration of Benjamin B. Shannon,"* Victim Outreach Strategy and Support Program Manager, FBI-Victim Services Division (referred to and incorporated by reference as **Exhibit 1**, the *"Shannon Declaration"*) at ℙ 5.

### Victim Access Questionnaire

Thus, the trial team determined that it was necessary to collaborate with the Federal Bureau of Investigation's Victim Services Division ("FBI-VSD") to determine an accurate way to gather

---

[2] VNS provides victims of federal crime with information regarding their case as it proceeds through the criminal justice system. The agencies participating in VNS include the Federal Bureau of Investigation ("FBI"), U.S. Attorney's Offices ("USAO's"), and other Department of Justice components.  VNS is the primary electronic system for retaining victim data in criminal cases. The project is funded through the Crime Victims Fund managed by the Office for Victims of Crime. The Executive Office for the United States Attorneys is the lead agency for this project. *Id.*

the information needed by the Court.  The FBI-VSD and the trial team designed the *"Victim Access Questionnaire"* (VAQ) for use in obtaining the requisite information.  ***See also* Exhibit 1-1** "VAQ" (PDF Copy).  The VAQ was designed to enable the government to gather information from victim-respondents, including each victim's connection to the case, information about whether they wished to view or listen to the trial and other court proceedings, their Personal Identification Information (PII) (*e.g.*, dates of birth, address), their geographic location, and information concerning the existence of any medical and/or logistical hardships.  ***See* Exhibit 1**, Shannon Declaration, ¶ ¶ 6, 7.

### Government's Outreach Efforts to Victims

The trial team and FBI-VSD undertook the following outreach efforts concerning victims: (1) posted messages to complete the VAQ on the FBI's case website; (2) sent repeated messages via VNS encouraging victims to fill out the VAQ; (3) asked victims, victim groups, and the Scottish authorities to urge other victims to complete the VAQ; and (4) held two virtual webinars for victims to explain the definition of who qualified as a "victim" under PL 118-37 and to encourage victims to sign up for VNS messages and to fill out the VAQ.  *See* **Exhibit 1**, Shannon Declaration, ¶ 8. In addition to the government's efforts, the British Broadcasting Company (BBC) published a story informing the public about the new U.S. law specific to this case providing access to victim family members in the United Kingdom and elsewhere and conveying the need to register as a victim and to complete a victim questionnaire in time to ensure that they had access to the Court's proceedings.[3]  *Id*. at ¶ 9.

---

[3] The government did not request or solicit the article that was published by the BBC.

## II.   <u>VAQ DATA OBTAINED</u>

The data generated by the VAQ is attached to the Shannon Declaration, referred to as **Exhibit 1-2** "Accumulated Victim Data" and incorporated herein.[4] *See* Shannon Declaration ⁋ 10. A total of 417 victim-respondents responded to some or all of the VAQ questions: 244 victim-respondents from 29 states and the District of Columbia in the United States, and 173 victim-respondents from nine foreign countries dispersed geographically around the globe. **Exhibit 1**, Shannon Declaration, ⁋ 10. The summary of the data was compiled as of October 21, 2024. *Id*. at ⁋ 11. While these numbers may change over time,[5] the larger conceptual arguments about the data will remain the same.

### VAQ and Results -- Victims Are Dispersed Both Globally and Throughout the Entire United States

As the Shannon Declaration indicates, in response to the "threshold question of geographic location," of the **417** victim-respondents to the VAQ, **173** victims were from foreign countries, with 164 spread out inside the United Kingdom (throughout Scotland and the United Kingdom),

---

[4] Certain PII and information that is not relevant to the Court's analysis has been deleted from Exhibit 1-2 for privacy purposes, to include the full names, addresses, dates of birth, and e-mail addresses of the VAQ respondents. Their geographic location to include city, state, country, and their answers to the some of the VAQ questions, were retained in **Exhibit 1-2,** which we have attached to this filing. The government will provide a version of this data in Excel format to the Court and counsel. The Excel spreadsheet will include the answers to Questions 7 and 8, some of which may be identifying when read in conjunction with questions like city, state, country, and relationship to a victim. Non-identifying summaries of the responses to Questions 7 and 8 are also attached hereto as Exhibits 1-4 and 1-5, respectively.

[5] As noted in its Reply Motion, the government's efforts to identify individuals who meet the statutory definition of a "victim" under the Pan Am Flight 103 legislation will not result in a "final" list, as the government will be hard-pressed to turn away a victim heretofore unknown, who then later comes forward seeking the status to which they are statutorily entitled, and requests access to the proceedings. ECF 54, n. 3.

two from The Netherlands, and one each respectively from seven other countries: Spain, Czech Republic, Ireland, Canada, Mozambique, Australia, and Jamaica.  The geographic location of these overseas respondents is diverse.  *See* **Exhibit 1**, Shannon Declaration, ℙ 12a.  *See* **Exhibit 1-3**, "Interactive Google Map of Victims Globally and Throughout the United States."[6]

In the United States, victim-respondents to the VAQ numbered **244** from 29 states and the District of Columbia, and were spread out geographically, with victims located in states such as Washington, California, Arizona, Hawaii, Florida, Texas, Michigan, Minnesota, and Utah.  **See Exhibit 1,** Shannon Declaration, ℙ 12b. *See* **Exhibit 1-3,** "Interactive Google Map of Victims Globally and Throughout the United States."

**Victims Prefer Video/Audio Access to Trial Proceedings Via Virtual Weblink or App**

Other data obtained indicated that when victim-respondents were asked about whether they sought access to attend the trial in person (**Exhibit 1-2,** Data), **143** victim-respondents said, "yes" while **181** victim-responded "no."  Shannon Declaration, ℙ 13.[7]  When the answers to the totality

---

[6] To visually assist this Court, the government created three interactive Google Earth files, which include inter-active features that allow users to explore and interact with the map in ways that static maps cannot, by listing "pink" geographic locations, plotted to the city level, for each victim who responded to the VAQ (in the United States and overseas).  Users can hover over markers or shapes to see additional details.  The Interactive Google Earth Files enable the Court to visualize three different sets of data: (1) the victims worldwide and in the United States (in pink); (2) all U.S. Courthouses superimposed (in blue); and (3) all U.S. Embassies and U.S. Consulates superimposed located within countries (in white).  For certain city locations the Court may be able to hover the icon, to truly see the number of points of interest for that specific location.  For example, clicking on the pin for Detroit, Michigan, reveals that three victims and a federal courthouse are in that city.  Should the Court need assistance in accessing these Google Earth features, undersigned counsel is available to assist the Court or Court staff, which could be done in the presence of defense counsel.

[7] As noted above, not all victim-respondents answered all of the questions on the VAQ.  As a result, for any given question, there may be a different number of victim-respondents than for other questions.

of the VAQ are considered, the vast majority of the 181 victims who answered "no" still had an interest in participating in the proceedings, although not in person.

For example, Question 4 asked victims their preference to gain access to the trial proceedings if they were held virtually only (*i.e.*, they could watch and listen but not have to travel to court) if a Weblink or an application ("app") were made available to them to observe the trial and/or other court proceedings. **Of 325 individuals who answered question 4, 305 victims, or approximately 94% indicated "yes," that they would be interested in that type of access to the trial proceedings.** 20 responded "no." *See* Declaration ¶ 14a-c.

**Victim Preference for Virtual Audio Access to Trial Proceedings**

As described in the Shannon Declaration, the victims were asked about their preference concerning attending the trial proceedings if a toll-free number, a weblink or app was made available to listen to the trial and/or other court proceeding, and whether they would be interested in listening to the trial and/or the other proceedings virtually. Exhibit 1, Shannon Declaration at ¶ 15. **Of 323 individuals who answered Question number 5 (Exhibit 1-2), 267 victims, or approximately 83%, responded "yes" that they would listen to the trial and/or the proceedings virtually if given that option**; 56 indicated "no" to this option. *Id*. at ¶ 15a-c.

Thus, the victims' responses to questions 4 and 5 of the VAQ demonstrate an explicit preference to be able to access the proceedings in this case virtually.

**Physical/Medical Hardships or Logistical Limitations Travel to/from Fixed-Sites**

Question number 6 of the VAQ (**Exhibit 1-1**), asked victims if the trial and/or other court proceedings were made available for "remote viewing at a fixed location," such as a courthouse, embassy, or a police station within 50 miles (80 km) of their home, whether they would be interested in traveling to that location. **165** indicated "no." Shannon Declaration, ¶¶ 17a-b, 18, a-

6

c, 19.  The written answers that the victims provided to questions number 7 and 8 shed light on the hardships that the victims believe that they face concerning these responses.

Question number 7 of the VAQ asked whether victims had physical/medical hardships or limitations that would make it difficult for the victims to travel to/from a courthouse, embassy, or police station to watch a closed-circuit broadcast of the trial and/or other court proceeding.  The VAQ permitted, but did not require, victims to offer a narrative response.  A complete listing of the respondent's concerns about their physical and medical hardships is contained in **Exhibit 1-4.** Shannon Declaration ⁋ 19.  Examples include:

> "I am being treated for stage 4 metastatic colon cancer at Memorial Sloan Kettering in NYC and cannot travel far from there or my home in New Jersey."

> "I am a solo parent of three children and paying for childcare for them, to go view trial is not in my budget. Additionally, the added time off work to travel would be too much. lost income."

> "I am in the U.K."

> "No…but my wife is recovering from a lymphoma and other ailments."

> "Yes, I'm 91 years old. In September…2024…I will be 92. I'm disabled (wheelchair bound) and can no longer travel."

> "I suffer from C-PTSD [Complex-PTSD] and have a hearing impairment."

> "I have childcare/transportation responsibilities that would make it very difficult, and may not allow, for me to travel to another location to watch a close-circuit broadcast."

> "Travel is difficult for me due to my arthritis."

> "I live in Honolulu, Hawaii and I am 89 years old."

> "Yes, I am totally bed-bound."

> "Yes, we all have PTSD and shouldn't be forced to travel to a public location to view the trial we should be able to watch the trial and grieve privately from our homes regardless of our proximity to D.C."

Question number 8 asked victims if they had any reason to believe that they would logistically be unable to physically travel to or from home to a courthouse, embassy, or police station to watch a closed-circuit television broadcast of the trial and/or other court proceedings if viewing were to be made available in that type of venue. *See* Shannon Declaration, **Exhibit 1-2** (Data); *see also*, Shannon Declaration **Exhibit, 1-5** (Victim Comments from Data for Question Number 8). ¶ 20. Victims providing responses explained why they would have logistical hardships and could not travel to view the proceedings at fixed remote sites. *Id*. ¶ 20. Examples highlighting their difficulties include:

"Yes, my child is medically complex and the COVID risk for that child from an in person viewing is too high."

"No, but virtual will mean not taking off work, so it will allow me to actually follow all of it, as opposed to only occasionally being able to attend. It's a massive difference for me."

"I would be unable to travel."

"I'm 89 and unable to travel. My husband…will be 92…in September…He's disabled, and I'm his caregiver."

"Yes, my age and disabilities make travel impossible for me."

"Yes, I am physically/medically handicapped and can only drive distances less than 15 miles, round trip, daily."

"I do not have a car."

"It's possible that we would not be able to travel based on age, ability, and medical conditions at the time of the trial. Today, we can both walk, but a fall can change that ability in a second."

"No, I do not have physical problems…I would prefer to be in person in the court in the states…but if the only option is to watch the trial here in the Netherlands, then I accept that."

"I suffer from anxiety."

"I can travel but have Parkinson's disease and chronic pain from spinal degenerative disc disease which may limit how long…"

"Yes, unfortunately, due to assisting an RAF pathologist at the ice-rink changing room in a number of post-mortems, I have severe PTSD and would not be able to watch [the trial] in the company of others."

"I would not travel to a remote venue."

"I would note that the ICC provided a live stream of video during their trial, and I was very happy to follow along two decades ago."

"50 miles travel [would be] too far, have a child to collect from primary school."

"I have childcare/transportation responsibilities that would make it very difficult and may not allow for me to travel to another location to watch a closed-circuit broadcast."

"Yes, I have little children…[difficult]"

As the Court can see from the responses to questions number 7 and 8, a significant number of the victims do not have the capabilities — physically, emotionally, logistically, or financially – to travel to fixed-site locations to observe the trial proceedings.

## III.    **ARGUMENT**

### A.  A Fixed-Site Access Approach Poses an Unworkable Quagmire for the Court

The defense has argued that the Court should employ a fixed-site type of option and suggests that victims be required to travel to approximately 60 federal courthouses in the United States, plus additional U.S. Embassies or Consulates overseas, in order to be monitored in-person by government personnel while they observe trial and other court proceedings.  This plan is logistically unreasonable, unfeasible, impractical, and unworkable.

First, as demonstrated by the VAQ data, the geographic distribution of the victims would make administration of fixed sites impracticable.  A view of the Google Earth Files of the geographic locations of victims in the United States and globally (in pink) (**Exhibit 1-3)**, with U.S.

9

Federal Courthouses[8] (in blue), U.S. Embassies and U.S. Consulates (in white) superimposed onto their actual geographic locations, visually demonstrates the impracticality and unrealistic nature of employing a fixed-site approach to providing victim access to the proceedings.  *See* Shannon Declaration, ¶17c; *see also* **Exhibit 1-3.**  The visual display of the Google Earth Files requires some explanation, as the static view is different from the dynamic/interactive view.  *See infra* at n. 6.  For example, in Edinburgh, Scotland, or in Detroit, Michigan, in the static view, there appears to be one victim assigned to each city, but when each tab is clicked, there could appear to be 2-3 or more victims to each city dispersed in different distances and not in any close connection to the nearest Federal Courthouse or a U.S. Consulate.

Likewise, for example, there are 164 victims in the U.K, and many throughout Scotland and the entirety of the United Kingdom.  With only one U.S. Embassy located in London and one U.S. Consulate in Edinburgh, and the victims spread all throughout the U.K., it would be nearly impossible for the large number of victims even in this one country to participate in the proceedings of this case based on their actual locations.  Trying to locate the closest U.S. Embassies or Consulates to the victims located in Australia, Jamaica, The Netherlands, Czech Republic, Mozambique, Spain, Ireland, and Canada would be an even more daunting task.

Congress passed the Pan Am Flight 103 Victim Access legislation to be applicable to victims "regardless of their location."  In reviewing the data, it is evident that a fixed-site approach presents nearly insurmountable challenges.  The victims are geographically dispersed such that requiring them to travel to fixed sites would present a significant hardship to the victims.  At the same time, fixed sites would provide almost no economy of scale for the Court and the government

---

[8] The government was unable to locate a definitive source for all U.S. Federal Courthouse locations.  As a result, the government used data located on the internet that it believes may be overinclusive, in that it may include locations of former U.S. Federal Courthouses.

administering access: many fixed sites would have only a few victims in attendance, and the Courthouse and government personnel necessary to implement and monitor the proceedings would be overwhelming.  By contrast, direct remote visual and/or audio access to trial or other court proceedings could be administered from a single location and monitored by government personnel remotely.

Second, the disparity in time zones would make the administration of fixed sites unfeasible because the majority of the victims identified in the VAQ reside outside of the time zone in which the trial will take place.  For the purposes of this illustration, the government assumes that Court will start each day at 9:00 a.m. and conclude each day by 5:00 p.m., Monday through Friday.  If a victim lives on the west coast in California, and a fixed-site courthouse approach were utilized, court staff would have to be employed to open court earlier than 6:00 a.m. in order to have victims screened/cleared to come into a room to watch the proceedings starting at 6:00 a.m. CST/9:00 EST. Likewise, if a victim in Hawaii wanted to attend, a viewing location in federal court would have to open at 2:00 a.m. (6 hours earlier than EST) to properly prepare the victims to watch the proceedings at 3:00 a.m. in Hawaii.  If a victim in the United Kingdom wanted to participate, a government employee in an Embassy or Consulate would need to be able to open a secure room at around 2:00 p.m. (6 hours ahead of 8:00 a.m. to prepare for 9:00 a.m.), but when court closes each day at 5:00 p.m., the time in the United Kingdom will be 11:00 p.m.  To then require Embassy/Consulate staff and victims to stay each day past midnight, to travel home, and to do so all over again, each day, would be unworkable, unreasonable, unsafe, and logistically impossible to accomplish.  This does not even account for the victims located in Mozambique, Australia, or other time zones.

By contrast, direct remote audio and/or visual access to the trial and other court proceedings via Zoom for Government ("ZFG") platform could be administered from a single location in Washington, D.C. during typical Court hours and monitored remotely by government personnel. The proceedings would be broadcast to only those victims authorized to receive them, and in such a manner that the victims would be informed that recording and rebroadcasting was illegal. The victims' identities would be verified prior to accessing the proceedings remotely; and it would be up to each victim to choose when and whether to access the proceedings. Such a solution would not require the Court and the government to devote additional resources to monitor each fixed site. ECF 54 at 7-12 ("Government Proposal Adequately Safeguards the Integrity of the Court's Proceedings").

Thus, the data collected by the VAQ bolsters the argument already made by the government that having fixed sites set up at several dozen federal courthouses in the United States, with additional viewing sites abroad at U.S. Embassies or Consulates, is impracticable and would not accomplish the purpose of the statute passed to afford all victims in this case remote access to the court proceedings, regardless of their location. ECF 52 at 10-11.

**B. ZFG Video and Audio Platform is the Most Secure and Reasonable Plan for the Court to Implement Concerning Direct Victim Access to the Proceedings**

Based on the foregoing discussion, we request that this Court provide victims – regardless of their location domestically and globally – direct access to the trial and other court proceedings using the existing U.S. Federal District Court ZFG platform in the District of Columbia. As the government has previously argued, *see generally* ECFs 51, 52, 54, ZFG is the most secure, sensible, logistical, and reasonable means by which this Court can provide access while protecting the integrity of the Court's proceedings, ensuring the safety of the parties and witnesses, and comporting with Public Law No. 118-37 that Congress passed to apply only in this specific case.

The defense recognizes the secure "nature of a Zoom broadcast means that there is no highly specialized equipment necessary…that the broadcast need not take place in a courtroom…" ECF 52 at 10-11.

Notably, even if a fixed-site approach were used, the Court would be using ZFG as the platform for the broadcast. The key difference, other than the practical difficulties noted above, is how the monitoring would work. The government has described above and in its prior briefs and attachments how, under the government's approach, the monitoring would be centralized, allowing the government and the Court to take swift action to cut off any unauthorized participants and/or any participants who attempt to violate the Court's rules prohibiting retransmission. The audio watermark technology under the ZFG platform would allow Zoom to assist the Court in identifying the account from which any rebroadcast media was recorded, even "if someone records the meeting, with either a separate microphone or 3rd party [application] and shares the audio file without permission." ECF 51-1 at 6; ECF 54 at 9.

Zoom has recommended that the Court enable watermarking for all video, content, and audio. The video watermark feature superimposes an image, consisting of a meeting participant's email address, onto the shared content they are viewing and over their video. The audio watermark, or audio signature, is an inaudible watermark of a user's personal information embedded in the audio that is played through the receiving user's speakers by the client receiving audio from Zoom meeting servers. This means that if someone records the meeting and shares the audio file without permission, Zoom can assist with determining which participant was responsible. ECF 51-1, Attachment A.

If any user – or anyone they illicitly allowed to be in the same room as them, out of view of the monitors – were to record the proceedings using a separate device, that watermarked email

13

address would be visible in the recording. *Id.* In contrast, the fixed-site approach would take away this centralized monitoring ability and outsource it to numerous court staff and/or embassy personnel at more than 60 locations who would not be under the direct control of this Court or the government's team working on this case. In other words, the government's ZFG proposed approach maximizes the Court's ability to enforce security concerns, whereas the fixed-site approach – with the vast number of fixed sites that would be needed here – would minimize the ability to consistently enforce security concerns.

Moreover, the VAQ data suggests that the ability to listen (via ZFG audio) to the proceedings is more important to many victims than the ability to watch the proceedings. Many of the victims have had the opportunity to attend the trial of Abdelbaset al-Megrahi and Lamen Khalifah Fhimah at Camp Zeist in 2000, but they are all now 24 years older, and, as their responses to Questions 7 and 8 explain, they face many more physical and medical limitations and hardships than ever before. During the Megrahi criminal appeal, these same victims were given an opportunity to listen to the Scottish Crown Office's defense of the Megrahi Appeal before a three Scottish Judge Panel in or around 2020-2021. Those proceedings, which were highly publicized in nature, were shared via secure audio link with the victims and certain individuals, and no known security violations occurred. The ability to listen to those proceedings brought comfort to many of these victims. Given this track record, this Court should not have any reasonable concerns about these victims engaging in indecorous behavior or violations of Court rules. And, even in the unlikely event that a violation occurs, the Court still maintains its power to hold any potential violator in contempt as the Court always has the capacity to do in any such situation.

To the extent that the Court has security concerns about transmitting (some or all) images from court proceedings via ZFG to individual verified victims, rather than to fixed sites, the

government suggests that the Court could consider providing audio access, rather than video access, to the trial and other court proceedings using the ZFG platform to individual verified victims. Audio access would ensure the rights of victims to gain meaningful access to these proceedings, while at the same time providing additional security for the trial in that the images of witnesses and Court personnel would not be broadcast as part of the access. The audio ZFG option would permit the Court to maintain control of the security of the proceedings by restricting access to the proceedings to only those individuals who meet the definition of a victim and set forth by Congress and verified by the government.

In sum, as set forth in the government's prior submissions, three separate ZFG platform proposals put forth by the ZFG representative will satisfy the court's security concerns and can be used by ZFG to meet the Court's Minute Order considerations in providing video and audio access to the victims in this case. ECF 51, ECF 51-1. *See* Declaration of Josh Parecki, Zoom Chief Compliance Officer, Head of Trust and Safety, dated May 31, 2024.

## CONCLUSION

Requiring these victims to travel to fixed sites would be unreasonable and serve as a *de facto* exclusion of a large number of victims in this case given the geographic disparity of the victim group. These families have suffered for more than three decades. This attack was the largest terror attack on the United States before September 11, 2001. 190 U.S. innocent citizens were killed. 43 UK nationals were killed, and it remains the single-most deadly terror attack in UK history. An entire city block in Lockerbie, Scotland, disintegrated into a burning inferno in seconds as the fuselage fell on the sleepy town at a time when everyone seemed to be sitting down to dinner and/or watching television. The devastation across the countryside left a crime scene for 862 square miles, or the entire width of Scotland.

Congress responded to the unique needs of the victims in this case by passing Pub. L. No. 118-37.  The law passed by Congress applies only to this case.  Given the death and destruction left by this bombing, and the palpable trauma and pain of the multiple victims spread globally throughout the world, one can only hope that another law like this one will never be needed again. Reasonable efforts to provide victims with remote access necessarily involves providing them with direct remote audio and/or video access to the trial and other court proceedings with the necessary safeguards for all parties involved, as outlined in the government's original motion.  ECF 51.

Based on the foregoing, and for any additional reasons as may be cited at a hearing on this motion, the government respectfully requests that the Court make the proceedings in this matter directly available to verified victims via the Zoom for Government platform.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

GREGG A. MAISEL
D.C. Bar No. 447902
Chief, National Security Section

***/s/ JEROME J. TERESINSKI***
JEROME J. TERESINSKI (PA Bar No. 66235)
Special Assistant United States Attorney
ERIK M. KENERSON (OH Bar No. 82960)
BRITTANY KEIL (D.C. Bar No. 500054)
Assistant United States Attorneys
National Security Section
United States Attorney's Office
601 D Street N.W.
Washington, D.C. 20530
(202) 252-7201
Erik.Kenerson@usdoj.gov

KATHLEEN CAMPBELL (MD Bar No. 9812170031)
JENNIFER BURKE (MD Bar No. 9706250061)
Trial Attorneys
Counter Terrorism Section
National Security Division
950 Pennsylvania Avenue N.W.
Washington, D.C. 20530

17