**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **No. 22-cr-392 (DLF)** |
| | ) | |
| **ABU AGILA MOHAMMAD** | ) | |
| **MAS'UD KHEIR AL-MARIMI,** | ) | |
| **Defendant.** | ) | |

### DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

The defendant, Abu Agila Mohammad Mas'ud Kheir Al-Marimi, respectfully moves the Court for an order suppressing statements allegedly made by him while he was detained in post-revolution Libya. The government claims Mr. Al-Marimi and others were interviewed more than a decade ago at an unidentified special facility. Mr. Al-Marimi's interview purportedly yielded a written statement that describes his participation in the bombing of Pan American World Airways Flight 103 ("Pan Am 103") in December 1988.

Prior to the interview, amidst a climate of anger and retaliation against those associated or thought to be associated with the former regime, Mr. Al-Marimi was abducted by armed men, separated from his family, held incommunicado in an unofficial prison facility, and denied procedural rights. While in custody, he saw others who had been beaten and abused. Eventually, masked men told him what he had to say and threatened him and his family if he did not comply. Mr. Al-Marimi vividly recalls the psychological coercion he experienced.

1

Key aspects of Mr. Al-Marimi's account are corroborated by his family, as well as independent reporting and human rights investigations that chronicle how Libyan authorities—before and after the 2011 revolution—engaged in routine and systematic abductions, forced disappearances, torture of detainees, and extrajudicial killings. When presented with similar evidence of coercion, courts have found custodial statements involuntary and inadmissible under the Fifth Amendment, whether the statements were made in the United States or abroad. This Court should do the same here and order the suppression of Mr. Marimi's alleged statements.

The defense requests an evidentiary hearing on this motion.

## BACKGROUND[1]

*A. Libya's dictatorship falls, starting a chaotic period.*

In February 2011, long-simmering civil unrest in Libya erupted into a violent uprising against the authoritarian regime of Muammar Qaddafi. A series of escalating protests led to the mobilization of rebel groups across the country and the formation of a transitional government to coordinate them. Following several months of conflict, the loyalist forces were defeated, and Qaddafi was captured and killed in October 2011.

Qaddafi had ruled Libya with an iron fist for over forty years. His regime was characterized by "systematic, state-sanctioned human rights violations" and political oppression. U.S. Dep't of State, Bureau of Democracy, Human Rights & Labor,

---

[1] The caselaw does not require any preliminary evidentiary showing to justify a hearing on a motion to suppress a coerced statement. Accordingly, this motion relies on a proffer of the evidence the defense anticipates would be adduced at a hearing.

*Country Reports on Human Rights Practices for 2012 – Libya* ("2012 HR Report") https://2009-2017.state.gov/documents/organization/204585.pdf, at 1. During this period, an "extensive security apparatus" operated "a multilayered, pervasive surveillance system" that allowed the regime to control the population through "extrajudicial killing and intimidation," torture, and arbitrary arrest and detention. U.S. Dept' of State, Bureau of Democracy, Human Rights & Labor, *Country Reports on Human Rights Practices for 2000 – Libya* ("2000 HR Report"), https://2009-2017.state.gov/j/drl/rls/hrrpt/2000/nea/802.htm, at 1–2.

In the aftermath of the 2011 revolution, no central military emerged to exercise authority on behalf of the nascent government, and Libya remained divided amongst competing regional militias. *See* 2012 HR Report, at 1. This tenuous situation eventually devolved into a second civil war. In 2020, the competing factions agreed to a ceasefire and a plan to create a unified government. However, national elections did not take place as scheduled and a stalemate has instead persisted between rival powers that control over different regions of the country.

In short, since 2011, Libya has experienced a political and humanitarian crisis with widespread human rights abuses. Incidents of "arbitrary and unlawful killings by government and nonstate actors[,]" forced disappearances, arbitrary detention, and torture continue to occur. *See* U.S. Dep't of State, Bureau of Democracy, Human Rights & Labor, *2023 Country Reports on Human Rights Practices: Libya* ("2023 HR Report"), https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/libya/, at 1–3.

> B. *Mr. Al-Marimi is abducted, separated from his family, and detained without process.*

According to the government, Mr. Al-Marimi worked as a technical operative in Libya's External Security Organization under the Qaddafi regime. When the regime fell, he and others associated with the prior government found their lives upended and endangered. Real or suspected Qaddafi supporters became targets for retaliation, including arbitrary and unlawful detention, torture, and execution. 2012 HR Report, at 2 (noting "[p]rimary targets included [Qaddafi] soldiers or supporters," "dark-skinned Libyans, [and] former members of the security forces"); *id.* at 5 ("Abuses against detainees, particularly alleged [Qaddafi] loyalists . . . , were similarly reported at other militia-run facilities throughout the country."). In both government and nongovernment facilities run by militias, such "detainees and prisoners were reportedly tortured and abused." *Id.* at 5.

During this chaotic period, Mr. Al-Marimi received a call from his son that men were at his house looking for him. The men had not given their names or said who they were with. Mr. Al-Marimi rushed home, worried for his family's safety. When he arrived, he saw several unfamiliar cars outside his house. A man in civilian clothes approached him and said they wanted him to come with them. Mr. Al-Marimi did not feel he could decline; he could see some of the men were armed. At that time, no one in Libya would have said "no."

So, Mr. Al-Marimi left his keys with his son and went with the men. When he asked if he could bring his medication, the men refused—he would be gone only for a "short" time. Inside one of the cars, Mr. Al-Marimi was placed between two men

4

armed with Kalashnikovs and handguns. A third man in the front passenger seat was similarly armed. The men did not speak to Mr. Al-Marimi on the drive. Along the way, Mr. Al-Marimi saw bodies in the streets.

Once they arrived at their destination, Mr. Al-Marimi was ushered inside. It was chaos. He recalls seeing people who had been beaten, and others crying on the floors. Armed guards in civilian clothes milled about, and no one seemed to be in charge. Screams echoed down the halls. A person had been handcuffed to a railing on a staircase, his arms held above his head. Mr Al-Marimi's abductors moved him past these scenes to the second floor, where they left him. He did not see them again.

Mr. Al-Marimi anticipates submitting testimony from witnesses to his arrest from his home in Tripoli by armed militia members in civilian clothes.

### C. Mr. Al-Marimi is interviewed by an agent of one of the factions competing for control of Libya and allegedly admits to his role in the bombing of Pan Am 103.

The government alleges Mr. Al-Marimi was interviewed during his detention. According to the government, the interviewer received law enforcement training at some time under Qaddafi's rule and had conducted other interviews. Following Mr. Al-Marimi's abduction, the interviewer was tasked with interviewing him and others about potential offenses. Supposedly, during a single interview session, Mr. Al-Marimi detailed his participation in violent operations including the bombing of Pan Am 103. The interviewer drafted a written document, which Mr. Al-Marimi signed after confirming its accuracy. Due to the security situation in Libya, the interviewer kept the statement to himself for years. It later made its way to American prosecutors.

By the interviewer's account—as proffered by the government—Mr. Al-Marimi gave his statement voluntarily and without coercion. The interviewer denies threatening or abusing Mr. Al-Marimi. He is expected to testify that Mr. Al-Marimi appeared healthy, relaxed, well fed, and dressed in clean clothes when he arrived for the interview and was free to decline to be interviewed or to stop the questioning at any time.

Whether this account is accurate, the interviewer was unaware of all the coercive circumstances that led Mr. Al-Marimi to be in his presence. After Mr. Al-Marimi's abductors left him, Mr. Al-Marimi found himself alone in a small room. Eventually, three men in civilian clothes entered the room. They were not armed, but they wore face coverings and did not identify themselves. Mr. Al-Marimi could not determine if they were police, army, or something else, but, based on all his observations, he was certain they were revolutionaries. The men confirmed Mr. Al-Marimi's identity. Then, they gave him gave a paper and asked him to read it.

The single, handwritten sheet began with an order that Mr. Al-Marimi confess to the Lockerbie incident, as well as another terrorist attack. Mr. Al-Marimi was surprised and put the paper down. The men told him to keep reading, and he complied, reading over details about the incidents. The men told him this day or the next, someone would come to ask questions, and he was to answer based on the content of the paper. The men were rough with their words. They asked him what he thought of the paper, and he said he had nothing to do with it. They told him he had to answer the questions with what was on the paper, otherwise bad things would

happen to him or his family. They told him the paper would be taken from him after a time, and they left without explaining why he was being told to make a statement, or who ordered it.

Mr. Al-Marimi felt he had no choice but to comply. He had ample reason to fear for himself; before his seizure, he had personally witnessed beatings in other prisons. But he was more afraid for his family. He had six children and felt they still had lives left to live. If he resisted, his children could be assaulted or killed. He personally knew about a friend's daughter who had been shot before his abduction, and about other incidents reported in the news and through word of mouth. So, based on his captors' threats and his fear of retaliation, Mr. Al-Marimi resolved to comply and began to memorize the things on the paper.

The next day, in the evening, another masked man came to retrieve the paper. Later, Mr. Al-Marimi was escorted to a larger room. He was not allowed to leave on his own. Eventually, a guard opened the door, and another man entered. This man did not appear to be armed, and he did not wear a face covering. Mr. Al-Marimi had never seen him before. The man sat on the opposite side of a table from Mr. Al-Marimi. The man did not identify himself or ask if Mr. Al-Marimi needed food or the restroom. He simply sat down and began to ask questions. "You were involved in the Lockerbie bombing and went to Malta? Is this true?" Mr. Al-Marimi answered based on the paper: "Yes, it's true." All the questions were leading. The man wrote as he asked the questions. Mr. Al-Marimi remembers feeling frightened of the man due to the earlier threats, and he was afraid if he declined to answer or made a mistake,

harm would befall him or his family. At one point, Mr. Al-Marimi asked to contact his family. The man said no.

At the end, the man had written a statement. He never allowed Mr. Al-Marimi to read it. He told Mr. Al-Marimi to sign it, then called for the guards and for someone to come get Mr. Al-Marimi.

Mr. Al-Marimi's isolation continued for roughly a month after his interview. Throughout this period, he was held incommunicado. He was prevented from speaking to his family or anyone outside and couldn't warn them or confirm that they were safe. His family remembers his disappearance and prolonged and unexplained absence. They also recall the climate of fear in post-revolution Libya and the pervasive threat of retaliation against those believed to have worked for Qaddafi.

> D. *Government and independent reporting document the inhumane treatment of detainees in Libya before, during, and after the 2011 revolution.*

In the decades preceding the 2011 Libyan revolution, under Qaddafi's rule, arbitrary, indefinite, and inhumane detention were commonplace. U.S. Inst. of Peace, *Prisons and Detention in Libya* ("*Prisons and Detention*") (Sept. 2, 2016), https://www.usip.org/publications/2016/09/prisons-and-detention-libya, at 6 ("During the [Qaddafi] regime, harsh detention policies, arbitrary detention, and reports of serious and systematic human rights abuses came to characterize the prison system."); 2000 HR Report, at 4 ("Security forces arbitrarily arrest and detain citizens. By law the Government may hold detainees incommunicado for unlimited periods."). "Dissidents were arbitrarily arrested and held for years without charge, and often for long periods in incommunicado detention. Torture of those in custody

was rampant." Human Rights Watch (HRW), *Delivered Into Enemy Hands: US-Led Abuse and Rendition of Opponents to Gaddafi's Libya* ("*Delivered Into Enemy Hands*") (Sept. 5, 2012), https://www.hrw.org/report/2012/09/05/delivered-enemy-hands/us-led-abuse-and-rendition-opponents-gaddafis-libya.

Despite difficulties accessing detainees, there was widespread international recognition that Libyan security personnel "routinely torture[d] prisoners during interrogations or for punishment. "2000 HR Report, at 3.

> Methods of torture reportedly include[d]:  Chaining to a wall for hours, clubbing, applying electric shock, applying corkscrews to the back, pouring lemon juice on open wounds, breaking fingers and allowing the joints to heal without medical care, suffocating with plastic bags, depriving of food and water, hanging by the wrists, suspending from a pole inserted between the knees and elbows, burning with cigarettes, attacking with dogs, and beating on the soles of the feet.

*Id.* Abuses were not limited to those in custody. The regime commonly "harassed, threatened, and detained" family members of regime opponents. HRW, *Delivered Into Enemy Hands.*

The prison environment and legal system contributed to the psychological pressures detainees faced. "Prison conditions reportedly [were] poor" across the board, with detainees "held in cruel, inhuman, or degrading conditions, and denied adequate medical care[.]" 2000 HR Report, at 4. Moreover, many political, economic, and criminal offenses were punishable by death, and in 1997, the regime declared that an "individual's entire family was to be considered guilty" if any member of the family was found guilty of an offense. *Id.* at 4–5. In other words, the threat of death or harm to one's family provided powerful leverage for security personnel. "On many

occasions, the executions were carried out in public and broadcast on television." HRW, *Delivered Into Enemy Hands*.

Following the 2011 revolution, observers hoped for an end to these practices. However, both during and after the civil war, arbitrary and indefinite detention, torture, inhumane treatment of prisoners, and extrajudicial killings continued and may have worsened in the power vacuum. 2012 HR Report, at 1 ("The most significant human rights problems during the year resulted from the absence of effective justice and security institutions following the collapse of the previous dictatorial regime. There was . . . little progress in addressing the former regime's abuses.").

After the "wholesale collapse of policing institutions across the country," the various armed groups that had toppled the regime haphazardly took on law enforcement and security functions. *See* U.S. Inst. of Peace, *Policing Libya: Form And Function Of Policing Since the 2011 Revolution* (Aug. 25, 2016), https://www.usip.org/publications/2016/08/policing-libya-form-and-function-policing-2011-revolution, at 3; *Prisons and Detention*, at 7 (describing the "new arrangement" in which revolutionary armed groups asserted substantial or total control of prison facilities). The result was a prison and detention system "in chaos" with unsanctioned facilities operated by various groups unable to provide adequate sanitation, medical care, or protection to prisoners often regarded as "enemies" in the post-conflict environment. *Prisons and Detention*, at 3.

Detainees were often held at "makeshift facilities" including schools, former military sites, private homes, and even a soccer club. 2012 HR Report, at 6. Such

impromptu prisons suffered from "consistent problems included overcrowding, poor ventilation, the lack of necessities such as mattresses, and poor access to hygiene and health care." *Id.* "Many prisons and detention centers were outside of central government control, and the conditions in some prisons and detention centers were harsh to the point of being life threatening." *Id.*

Throughout this period, the U.S. State Department continued to note incidents of "arbitrary and unlawful killings . . . ; kidnappings; torture and other cruel, inhuman or degrading treatment or punishment; harsh and life-threatening conditions in detention and prison facilities . . . ; arbitrary arrest and detention; lengthy pretrial detention;" and more. *Id.* at 1–2; *see id.* at 2–10 (detailing reported incidents). Libya's prisons "quickly became overcrowded" as armed groups rounded up prisoners, often without following appropriate arrest procedures or collecting evidence. *Prisons and Detention*, at 8.

In a twist on a tactic used by the Qaddafi regime "to intimidate and frighten the opposition[,]" recorded "confessions" by detainees were televised. Hanan Salah, HRW, *Libya's Justice Pandemonium* (April 14, 2014), https://www.hrw.org/news/2014/04/14/libyas-justice-pandemonium. Some of those "caught and made to 'confess' to serious crimes" by the Libyan security forces were "under visible duress"; human rights observers feared the same remained true during the transitional period. *Id.* (noting "widespread ill-treatment of detainees in facilities across Libya, which has resulted in deaths in custody").

11

A few specific incidents demonstrate the abuses that were commonplace during this transitional period. In its 2012 Human Rights Report for Libya, the State Department identified "at least 21 killings during the year in Benghazi alone of current and former security officials." 2012 HR Report, at 3. Nowhere felt safe, as officers were assassinated in broad daylight as they left mosques. *See id.* In Misrata, "militias captured and disarmed" persons connected to Qaddafi, beat them, and then "executed them at the Mahari hotel in Sirte, where 53 bodies were found[.]" *Id.* Those taken into custody were not necessarily spared; in just one month, "three detainees died . . . as a direct result of torture, and at least seven other persons were tortured in the Zaroug detention facility in Misrata." *Id.* at 5. "Reported abuses included beatings with belts, sticks, rifles, and hoses; administration of electric shocks; burns inflicted by boiling water, heated metal, or cigarettes; mock executions; suspension from metal bars; and rape." *Id.*

On another occasion, again in Misrata, security personnel removed a detainee from a detention facility "for questioning. He never returned." HRW, *Libya: New Government Should End Illegal Detention* (Nov. 16, 2012), https://www.hrw.org/news/2012/11/16/libya-new-government-should-end-illegal-detention. According to his death certificate, he died due to "beating with heavy blunt objects on various parts of the body, head and extremities." *Id.*

And in September 2011, human rights investigators identified pervasive abuses at Libyan detention facilities, including several facilities located on the Matiga air base. HRW, *Libya: Cease Arbitrary Arrests, Abuse of Detainees* (Sept. 30,

2011), https://www.hrw.org/news/2011/09/30/libya-cease-arbitrary-arrests-abuse-detainees. Through site visits and interviews with more than 50 detainees, investigators uncovered evidence of electric-shock torture, beatings, threats of "slaughter," and other abuses designed to elicit confessions. *Id.* None of the detainees said they had been able to speak with a lawyer or brought before a judge. *Id.* Most had been arbitrarily arrested either because of their dark skin color or "on mere suspicion that they fought for [Qaddafi] or were complicit with the government." *Id.* While facility conditions varied, overcrowding and insufficient food were common problems, along with inadequate ventilation. *Id.*

Problems with political instability and violence persist in Libya today. So, too, do problems with prisons and detention practices. 2023 HR Report, at 5–15 (finding routine torture and abuse of detainees by "criminal and nonstate armed groups controlling extralegal facilities[,]" as well as "abusive" conditions of detention).

## LEGAL STANDARD

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. Amend. V. The privilege against compelled self-incrimination applies to any statement made during a period of custodial interrogation. *United States v. Straker*, 800 F.3d 570, 613–14 (D.C. Cir. 2015) (citing *Miranda v. Arizona*, 384 U.S. 436, 460 (1966)). Such a statement is inadmissible for any purpose "if under the totality of the circumstances it was

13

involuntarily obtained."[2] *United States v. Reed*, 522 F.3d 354, 358–59 (D.C. Cir. 2008) (quoting *United States v. Bradshaw*, 935 F.2d 295, 299 (D.C. Cir. 1991)).

This rule applies equally to statements made during interrogations in foreign countries: such statements are inadmissible if they were involuntary. *Straker*, 800 F.3d at 614 & n.16; *see also Bram v. United States*, 168 U.S. 532 (1897) (reversing conviction based on coerced foreign confession under the Fifth Amendment's Self-Incrimination Clause); *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 177, 200 (2d Cir. 2008) ("[I]n order to be admitted in our courts, inculpatory statements obtained overseas by foreign officials must have been made voluntarily."); *Brulay v. United States*, 383 F.2d 345, 349 n.5 (9th Cir. 1967) ("[I]f the statement is not voluntarily given, whether given to a United States or foreign officer[]—the defendant has been compelled to be a witness against himself when the statement is admitted.").

Coerced confessions, whether foreign or domestic, run contrary to "fundamental principles of liberty and justice which lie at the base of all our civil and political institutions." *Brown v. Mississippi*, 297 U.S. 278, 286 (1936); *see also Lyons v. Oklahoma*, 322 U.S. 596, 605 (1944) ("A coerced confession is offensive to basic

---

[2] The Fifth Amendment's prohibition against the use of involuntary confessions derives from both the Self-Incrimination Clause and the Due Process Clause. *United States v. Powe*, 591 F.2d 833, 838 n.5 (D.C. Cir. 1978). "[A] defendant raising the issue . . . is free to call upon either right in support of a challenge to the admissibility of a confession." *Id.*; *see, e.g., United States v. Karake*, 443 F. Supp. 2d 8, 50 (D.D.C. 2006) (conducting voluntariness analysis under Due Process Clause for foreign confession using same standard provided below); *United States v. Abu Ali*, 528 F.3d 210, 232 (4th Cir. 2008) (same).

standards of justice . . . because declarations procured by torture are not premises from which a civilized forum will infer guilt."). "The rack and torture chamber may not be substituted for the witness stand." *Brown*, 297 U.S. at 285–86.

This foundational principle "is distinct from the question of whether the confession is accurate or reliable." *Karake*, 443 F. Supp. 2d at 50 (citing *United States v. Raddatz*, 447 U.S. 667, 678 (1980)). "[O]urs is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth." *Id.* (quoting *Rogers v. Richmond*, 365 U.S. 534, 540–41 (1961)). Still, courts have recognized the reliability concerns inherent to coerced confessions are "another legitimate reason" to suppress such statements. *Id.* at 50–51. "When a criminal suspect is subjected to a coercive interrogation and then confesses or incriminates someone else, courts may properly exclude such inculpatory statements because of their 'probable unreliability' and the concomitant 'likelihood that the confession is untrue.'" *Al-Qurashi v. Obama*, 733 F. Supp. 2d 69, 78 (D.D.C. 2010) (first quoting *Jackson v. Denno*, 378 U.S. 368, 386 (1964), then quoting *Linkletter v. Walker*, 381 U.S. 618, 638 (1965)).

Voluntariness turns on whether "'the defendant's will was overborne' when he gave the statement" or "whether the statement was a 'product of an essentially free and unconstrained choice by its maker.'" *United States v. Murdock*, 667 F.3d 1302, 1305 (D.C. Cir. 2012) (first quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973), then quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)). "The line of

15

distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession." *Culombe*, 367 U.S. at 602.

In applying this standard, courts consider the totality of the circumstances, including the characteristics of the accused and the details of the interrogation. *Schneckloth*, 412 U.S. at 226. Important considerations include the defendant's "age, education, the length of detention, whether the defendant was advised of his rights, and the nature of the questioning." *Murdock*, 667 F.3d at 1305–06; *see also In re terrorist bombings*, 552 F.3d at 213 (stating courts "must examine the totality of the circumstances. Specifically, these circumstances include 1) the accused's characteristics, 2) the conditions of the interrogation, and 3) the conduct of the police") (quoting *Parsad v. Greiner*, 337 F.3d 175, 183 (2d Cir. 2003)).

The most obvious form of coercion is "the use of physical punishment," such as actual violence against the suspect or "the deprivation of food or sleep." *Schneckloth*, 412 U.S. at 226. But "coercion can be mental as well as physical, and . . . the blood of the accused is not the only hallmark of an unconstitutional inquisition." *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960). Other "forms of coercion, including psychological torture, as well as the conditions of confinement have been considered by courts in their assessment of the voluntariness of the statements." *Karake*, 443 F. Supp. 3d at 51–52 (collecting cases).

Accounting for both the physical and psychological dimensions of coercion, one court identified the following factors as relevant to the voluntariness analysis:

16

- actual violence against the suspect;

- credible threats of violence against the suspect, or against the suspect's family members, loved ones, or friends;

- other threats, such as economic or reputational threats;

- deprivation of food, water, medicine, sleep, clothing, or protection from the elements;

- the length of the interrogation(s), and the length of confinement generally;

- being moved from place to place and being questioned by different persons, thus causing disorientation;

- being held incommunicado;

- broken promises, such as specific promises of nonprosecution;

- police trickery or deception;

- appeals to religious beliefs;

- age, sex, and race (often in comparison to the interrogators);

- mental impairment (both permanent, such as a learning disability, and transient, such as being intoxicated or under the influence); and

- prior experience with the police.

*United States v. O'Neal*, No. 15-CR-353-WJM, 2018 WL 3145523, at *13 (D. Colo. June 27, 2018) (citing 2 Wayne R. LaFave *et al.*, Criminal Procedure § 6.2(c) (4th ed., Dec. 2017 update)), *aff'd*, 796 F. App'x 513 (10th Cir. 2019).

The government bears the burden of showing that a defendant's statements were voluntary. *Karake*, 443 F. Supp. 2d at 49–50; *Lego v. Twomey*, 404 U.S. 477, 489 (1972) (When "a confession challenged as involuntary is sought to be used against a criminal defendant at his trial . . . the prosecution must prove by at least a preponderance of the evidence that the confession was voluntary.").

17

## ARGUMENT

Any statement Mr. Al-Marimi provided while he was detained incommunicado in post-revolution Libya was involuntary. The totality of the circumstances here supports the conclusion that his "will was overborne" when he sat down with the interviewer and supposedly confessed. *Murdock*, 667 F.3d at 1305 (quoting *Schneckloth*, 412 U.S. at 226). Mr. Al-Marimi was abducted from his home, in front of his son, by armed men. For several days, he was held incommunicado in an unnerving environment, surrounded by signs of physical violence. His captors made threats against him and his family that turned on his willingness to confess.

These circumstances cannot be separated from the context of post-revolution Libya. The Qaddafi regime had a decades-long history of torturing and executing detainees and their families without process. In the chaotic aftermath of the civil war, different groups used the same tactics at unofficial facilities like the one Mr. Al-Marimi was taken to, often targeting those who may have worked under the former regime—men like Mr. Al-Marimi. In this context, the choice Mr. Al-Marimi faced was clear: submit or you and your family will face retribution. Any statement he made was the product of coercion.

Coerced statements are inadmissible under the Fifth Amendment's Self-Incrimination Clause. They have no place in a process-driven legal system, and they are inherently unreliable. Of course, it is not Mr. Al-Marimi's burden to establish that his statements were involuntary. It is the government's burden to establish that any statement he made was voluntary and not the result of coercion. As noted earlier, it

appears that the testimony of the interviewer will do little to address the evidence of involuntariness, as his interaction with Mr. Al-Marimi was limited to the meeting in which he took the statement and he may have had no knowledge of the preceding circumstances. Because the government will not be able to establish the voluntariness of Mr. Al-Marimi's alleged statements, the Court should order them suppressed.

### A. Threat and Expectation of Violence

Short of actual violence, "credible threats of violence against the suspect" may have the greatest potential to overcome a person's will. *See O'Neal*, 2018 WL 3145523, at *13. A threat of physical violence "by the custodian of a prisoner during a detention serves no lawful purpose, invalidates confessions that otherwise would be convincing, and is universally condemned by the law. When present, there is no need to weigh or measure its effects on the will of the individual victim." *Stein v. New York*, 346 U.S. 156, 182 (1953), *overruled in part on other grounds by Jackson v. Denno*, 378 U.S. 368 (1963). Accordingly, evidence of threats related to an interrogation often is dispositive as to involuntariness, and always provides significant support that a statement was coerced. *See, e.g.*, *Arizona v. Fulminante*, 499 U.S. 279, 287–88 (1991) ("[I]t was fear of physical violence, absent protection from [the Government agent], which motivated Fulminante to confess."); *Payne v. Arkansas*, 356 U.S. 560, 561 (1958) (finding confession was coerced by promise that the officer would thereafter protect the accused from a violent mob); *Little v. United States*, 125 A.3d 1119, 1127–28 (D.C. 2015) (finding confession involuntary based "particularly upon the detectives'

19

threatening statements about the possibility Mr. Little would be sexually assaulted in jail if he did not confess").

The same holds true when threats were made "against the suspect's family members, loved ones, or friends[.]" *O'Neal*, 2018 WL 3145523, at *13; *see also Brown v. Horell*, 644 F.3d 969, 979–80 (9th Cir. 2011) (disparaging "confessions extracted through threats or promises relating to a suspect's children"). The desire to spare loved ones from harm can be just as powerful as a person's own fear of pain and holds a similar potential to "impair a suspect's capacity for self control, making his confession involuntary." *United States v. Tingle*, 658 F.2d 1332, 1336 (9th Cir. 1981) (finding confession involuntary police "prey[ed] upon the maternal instinct and inculcate[d] fear in a mother that she will not see her child in order to elicit 'cooperation'")). For that reason, courts have suppressed statements when, for example, a "friend or relative [i]s improperly detained or threatened as the means whereby the confession was involuntarily extracted." *Ferguson v. Boyd*, 566 F.2d 873, 878 n.7 (4th Cir. 1977); *see also, e.g., Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) (finding confession involuntary when police told the defendant that "state financial aid for her infant children would be cut off, and her children taken from her, if she did not 'cooperate'").

Mr. Al-Marimi was threatened before he gave his alleged confession. There was no ambiguity to it: his masked captors told him bad things would happen to him and his family if he did not answer questions using the information they provided him. Mr. Al-Marimi complied with their instructions out of fear—fear for himself, and for

20

his children. He understood that his family's lives would be in danger if he refused what was asked of him.

Mr. Al-Marimi's fears were reasonable given what had led up to his meeting with the three men, as well as the general state of Libya at the time. Mr. Al-Marimi had been abducted from his home by unidentified men armed with rifles and pistols. He had seen bodies in the street on his way to an unofficial prison facility, and once there, he witnessed a terrifying preview of the abuses that could follow if he angered his captors. These circumstances lent credence to his captors' threats. So, too, did Mr. Al-Marimi's knowledge of the human rights abuses that occurred under Qaddafi, abuses that continued after the regime fell. Men like Mr. Al-Marimi were being targeted by militia groups, and he had reason to believe his family might be targeted as well. *See* Kim Sengupta & Solomon Hughes, *Leaked UN report reveals torture, lynchings and abuse in post-Gaddafi Libya*, The Independent (Nov. 24, 2011), https://www.independent.co.uk/news/world/africa/leaked-un-report-reveals-torture-lynchings-and-abuse-in-postgaddafi-libya-6266636.html ("Of particular worry was the fate of women being held for alleged links with the regime, often due to family connections, sometimes with their children locked up alongside them.").

Just as "an alleged child murderer" in prison would fear "physical harm at the hands of other inmates," *Fulminante*, 499 U.S. at 286, or a Black man accused of killing a white man in Jim Crow-era Arkansas would fear mob violence, *Payne*, 356 U.S. at 564–65, so would a Libyan who allegedly worked for Qaddafi have feared retaliation against himself and his family in post-revolution Libya. Mr. Al-Marimi's

captors exploited his fear and made threats to secure his confession, whether his interviewer was aware of it or not. His statements should be excluded.

### B. *Incommunicado Detention*

Mr. Al-Marimi's will was eroded further by his separation from his family and the outside world, and the understanding that his incommunicado detention would continue until a time determined by his captors.

Isolation is a powerful tool to wear down resistance. *See In re Terrorist Bombings*, 552 F.3d at 214 (noting incommunicado detention is a "significant" data point in the totality-of-the-circumstances analysis). A person "who has been cut off from the moral support of friends and relatives" is less capable of resisting an interrogation. *Blackburn*, 361 U.S. at 206; *see also Haynes v. Washington*, 373 U.S. 503, 514 (1963) (stating "secret and incommunicado detention and interrogation [] are devices adapted and used to extort confessions from suspects").

Courts have found periods of incommunicado custody as short as a few hours to contribute to the involuntariness of a statement. *Karake*, 443 F. Supp. 3d at 51–52 (citing *Wainwright v. LaSalle*, 414 F.2d 1235, 1237–39 (5th Cir. 1969)); *see also Blackburn*, 361 U.S. at 207–08 (statement involuntary due in part to "eight-to-nine-hour sustained interrogation" of a mentally ill defendant and "the absence of [] friends, relatives, or legal counsel"); *Haynes*, 373 U.S. at 514 (holding confession after 16-hour interrogation was involuntary based on the "threat of continued incommunicado detention" if the suspect did not confess and the "promise of communication with and access to his family" if he did); *United States v. Williams*,

258 F. Supp. 3d 633, 639–40 (D. Md. 2017) (holding statement involuntary when defendant "was kept in isolation and prohibited from communicating with counsel" for approximately 16 hours before two-hour interrogation). Naturally, the longer the period of incommunicado detention, the greater coercive effect it may have.

The coercive effects of isolation are strengthened when a prisoner believes his ability to communicate with the outside world depends on his compliance. For example, the Supreme Court concluded a confession was involuntary after a 16-hour detention during which the defendant was "permitted neither to make phone calls nor to have any visitors." *Haynes*, 373 U.S. at 505. After repeated requests by the defendant to call an attorney or his wife, police told the defendant that "he would not be allowed to call unless and until he 'cooperated' with police and gave them a written and signed confession admitting participation" in the crime. *Id.* at 504. The Supreme Court held the confession was involuntary because "the petitioner was alone in the hands of the police, with no one to advise or aid him" and was threatened with continued "incommunicado detention" if he did not write a statement. *Id.* at 514. His isolation and the related threats created "an atmosphere of substantial coercion and inducement" that overbore his will. *Id.* at 514.

Mr. Al-Marimi was isolated for days before he allegedly confessed. During this period, he had no contact with the outside world. He was afraid for his family, with no way to protect them, warn them, or verify that they were safe. Alone, Mr. Al-Marimi had no reason to doubt his captors' threats and no support to draw on to help him resist. And the obvious conclusion, given his situation, was that he would remain

23

isolated until he followed instructions and confessed. In light of this psychological pressure, nothing Mr. Al-Marimi said—nothing he was instructed to say—was voluntary. *Cf. Haynes*, 373 U.S. at 514; *Payne* 356 U.S. at 563 (defendant "was held incommunicado without any charge against him" for approximately two days "without counsel, advisor or friend being permitted to see him").

### C. Oppressive Conditions of Confinement

Other conditions of Mr. Al-Marimi's confinement also wore down his resistance. A "substantial body of scientific literature" describes the effects of "prolonged and extreme stress" that can result from inhumane treatment. *Mohammed v. Obama*, 704 F. Supp. 2d 1, 26–28 (D.D.C. 2009). Psychological coercion can take many forms, and a wide variety of oppressive conditions have led courts to conclude statements were involuntary. *See, e.g., id.* at 26–27 (defendant deprived of food and sleep, summarily moved by his captors, and forced to listen to "the screams of other prisoners while locked in a pitch-black cell"); *Anam v. Obama*, 696 F. Supp. 2d 1, 5–6 (D.D.C. 2010) (darkness and constant loud music interrupted only by "the screams of other prisoners"); *Arnett v. Lewis*, 870 F. Supp. 1514, 1523–25, 1541 (D. Az. 1994) (inadequate plumbing and heating, irregular bathing opportunities, Spartan and unsanitary housing, poor nutrition, and lack of clean water).

Mr. Al-Marimi was held in a makeshift prison, without cohesive organization or any leadership to appeal to. The building was not designed or organized to provide food, clothing, proper sleeping quarters or restrooms, or other basic necessities to detainees. And the environment, with ongoing screaming from other detainees, was

24

frightening. Mr. Al-Marimi's experience is consistent with the extensive independent reporting from both government and international sources that cataloged the deficiencies in Libya's makeshift prisons following the revolution, albeit with facts unique to his facility. *See, e.g.*, 2012 HR Report, at 6; *Prisons and Detention*, at 3. The time Mr. Al-Marimi spent at his impromptu jail contributed to his alleged willingness to confess.

### D. Lack of Process

Finally, Mr. Al-Marimi did not receive any of the procedural safeguards taken for granted in the United States before he allegedly confessed. He was not apprised of any rights he may have had. Certainly, he was not given anything equivalent to a *Miranda* warning. He did not have the opportunity to speak to counsel before or during the interview. He was not informed of the basis on which he was being detained, or who had ordered or approved his detention. He was not promptly presented before any neutral party or judicial officer. And there was no legal mechanism by which he could challenge his detention or object to his captors' conduct.

While the failure during a foreign interrogation to provide the legal protections required by U.S. law does not *per se* make related statements involuntary, courts consider "the absence of these protections as one factor in the totality of circumstances" analysis. *Abu Ali*, 528 F.3d at 233. The failure of Mr. Al-Marimi's captors to grant him any procedural protections may be unsurprising, but it adds further support to the conclusion that his alleged confession was involuntary.

25

## CONCLUSION

"[R]egardless of the origin—*i.e.*, domestic or foreign—of a statement, it cannot be admitted at trial in the United States if the statement was 'compelled.'" *United States v. Allen*, 864 F.3d 63, 82 (2d Cir. 2017) (quoting *In re Terrorist Bombings*, 552 F.3d at 199). The circumstances of Mr. Al-Marimi's arrest, incommunicado detention, and captivity in a system well known for human rights abuses – including some personally witnessed by him – render any statement he made during his Libyan captivity inadmissible.

Respectfully submitted,

Geremy C. Kamens,
Federal Public Defender

By: _____/s/_____
Whitney E.C. Minter
Va. Bar # 47193
Assistant Federal Public Defender
Attorney for Mr. Al-Marimi
1650 King Street, Suite 500
Alexandria, Virginia  22314
(703) 600-0800 (telephone)
(703) 600-0880 (facsimile)
whitney_minter@fd.org (email)

26