**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 22-cr-392 (DLF) |
| | ) | |
| ABU AGILA MOHAMMAD | ) | |
| MAS'UD KHEIR AL-MARIMI, | ) | |
| Defendant. | ) | |

**DEFENDANT'S OPPOSITION TO GOVERNMENT'S**
**MOTIONS *IN LIMINE* TO PERMIT RULE 404(b) EVIDENCE AND FOR**
**RULINGS ON HEARSAY EXCEPTIONS**

The government seeks permission to present evidence of Mr. Al-Marimi's speculative involvement in the La Belle Discotheque terrorist bombing, which preceded the offenses charged in this case by several years, as well as advance rulings that foreign documents related to the La Belle investigation are admissible under the hearsay rules. ECF No. 147. The defense opposes both requests.

First, the La Belle evidence is inadmissible under Rules 402, 403, and 404(b) of the Federal Rules of Evidence. Presenting circumstantial evidence of Mr. Al-Marimi's involvement in the La Belle bombing invites a trial within a trial and will necessarily confuse the jury and distract it from the issues in this case, which are already numerous and complex. The government also fails to identify a suitable purpose under Rule 404(b). The ones it proposes either involve a forbidden propensity inference, are not supported by the evidence at issue, or are better served by other evidence that relates directly to the charged offenses. Ultimately, the government is asking to present evidence of a different unproven crime with the hope that the jury

1

will link the crimes and, thus, Mr. Al-Marimi's involvement—or, at least, that the jury will have its passions enflamed by testimony about another attack against U.S. citizens.

Second, the government's hearsay arguments fall short. The government has failed to show that the documents and their provenance are trustworthy or reliable. The foreign agency that created the documents was not as neutral and mechanical in gathering and recording information as the government contends. As one would expect in a totalitarian society, the agency's goals often were overtly political, causing scholars to question and caution the use of surviving records. Moreover, each document poses a double hearsay problem: even if one of the hearsay exceptions might apply to the documents themselves, the government has not established that the same is true for the second hearsay layer. The government's failure to produce the original records, despite producing others, calls the trustworthiness of this information further into doubt. Finally, the government has not provided adequate foundation for either document, and the defense's ability to test the evidence is severely limited by the passage of time and the unavailability of knowledgeable witnesses.

The Court should deny the government's requests.

## BACKGROUND

The government has charged Mr. Al-Marimi with offenses related to the bombing of Pan American World Airways Flight 103 (Pan Am 103) in 1988. It alleges he "built the bomb on behalf of the Libyan government." ECF 147, at 3. The

2

government's case relies on a statement Mr. Al-Marimi allegedly made more than a decade ago in Libya, under coercive conditions. *See* ECF 159.

The same statement also describes Mr. Al-Marimi's supposed involvement in a different bombing several years prior to Pan Am 103—the April 5, 1986 bombing at the La Belle Discotheque nightclub in West Germany. ECF 147, at 3–4. The government thus asserts Mr. Al-Marimi also made the bomb used in the La Belle bombing and plans to present related evidence to bolster its case with respect to Pan Am 103, though it has not charged Mr. Al-Marimi with crimes related to La Belle.

Regarding the La Belle bombing, the government forecasts presenting evidence of Mr. Al-Marimi's statement, as well as testimony from survivors and first responders, testimony from a historian about the relationship between Libya and the United States in the 1980s, and two purported historical documents that the government believes support Mr. Al-Marimi's presence in East Germany in April 1986. *Id.* at 5. The two documents are a 1986 "Visitors List" of Libyan visa requests for persons to visit East Germany and an investigative report (the "Hotel Report") that states two Libyan men stayed at the Interhotel Metropol in early April 1986. Both documents refer to an individual who used a name and passport number that matches information an individual allegedly used to visit Malta years later prior to the bombing of Pan Am Flight 103.

According to the government, both documents were created by the East German Ministry for State Security (*Ministerium für Staatssicherheit* or "Stasi") and subsequently archived and produced by the Federal Commissioner for the Records of

3

the State Security Service of the former German Democratic Republic (*Der Bundesbeauftragte für die Unterlagen des Staatssicherheitsdienstes der ehemaligen Deutschen Demokratischen Republik* or "BStU").[1] The government has not submitted any certification regarding the provenance of the documents, though three witnesses have attested that the documents are or appear to be documents prepared by the Stasi in the 1980s. It is not clear from the government's motion, for example, whether the government independently requested or retrieved the documents from the BStU archives or obtained them from a third party who had done so, or when the retrieval occurred.

Identical declarations from Wulf-Ingo Hoffman and Roland Ernst state the two men worked for the Stasi's Main Department II/15 in 1986. That department was responsible for counterespionage and foreign embassies. As part of their work, they had access to "certain records belonging to the Foreign Ministry[,]" including visa requests from foreign governments. They "recognize" the Visitors List as being "compiled from visa requests" received by the Foreign Ministry. Despite having no firsthand familiarity with the information on the Visitors List, Hoffman and Ernst are "confident" that the entries on the list were "based on the original visa requests from the government of Libya (or photocopies of those requests)." Each states the Stasi "took great care to accurately record information in documents like these."

---

[1] The BStU, sometimes called the *Stasi-Unterlagen-Behörde* or Stasi Records Agency, merged into the German Federal Archives or *Bundesarchiv* in June 2021.

A separate declaration from Andreas Erhard Jahn states that in 1986 Mr. Jahn worked for the Stasi's Main Department XXII/8, which was responsible for counterterrorism. As part of his work, he received information from Department VI, which was responsible for hotels "frequented by foreigners." Department VI had access to registration cards filled out by guests at the hotels at check-in. It also had access to copies of passports presented by guests during check-in. Mr. Jahn states he was "always careful to record [] accurately" information obtained from Department VI. He recognizes the Hotel Report as an excerpt from a file he authored. While he does not remember the things documented in the report, he is "confident" the information is accurate and sourced from "the hotel's registration cards and/or copies of the guests' passports." He further states the report "was created for intelligence purposes" and not "for use in court."

Notably, neither the Visitors List nor the Hotel Report is the original source of the factual information the government seeks to rely on. The government states it could not locate the relevant original visa requests, so it intends to rely on the Visitors List as a secondary source that catalogued such requests. Likewise, the government could not locate the original hotel records, so it intends to rely on a single paragraph in an unrelated investigative file that happened to note a hotel room's occupants on the specific night.

**LAW AND ARGUMENT**

I.    **Rule 404(b) Evidence**

  A.  **Legal Standard**

Federal Rule of Evidence 404(b) provides, "Evidence of any other crime, wrong,

5

or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). It "is axiomatic that 'a defendant must be tried for what he did, not for who he is[.]'" *United States v. Brown*, 597 F.3d 399, 404 (D.C. Cir. 2010) (quoting *United States v. Linares*, 367 F.3d 941, 945 (D.C. Cir. 2004)). Such evidence "may be admissible for another purpose," however, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Restated, Rule 404(b) "prohibits the introduction of evidence of extrinsic acts that might adversely reflect on the actor's character, unless that evidence bears upon a relevant issue in the case[.]" *Huddleston v. United States*, 485 U.S. 681, 685 (1988).

Courts conduct a multi-step analysis to determine whether Rule 404(b) evidence is properly admitted. *United States v. Bowie*, 232 F.3d 923, 930 (D.C. Cir. 2000); *United States v. Green*, 149 F.4th 733, 752–54 (D.C. Cir. 2025) (breaking analysis down into three steps: relevance, propensity, and risk of unfair prejudice). The first step focuses on relevance and "requires that the evidence be probative of some material issue other than character."[2] *United States v. Clarke*, 24 F.3d 257, 264 (D.C. Cir. 1994).

As part of the relevance inquiry, courts must consider whether "a reasonable

---

[2] Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Generally, relevant evidence is admissible, and irrelevant evidence is not. Fed. R. Evid. 402.

jury could find by a preponderance of the evidence that the defendant, and not someone else, was responsible for the" uncharged conduct. *United States v. Burwell*, 642 F.3d 1062, 1066 (D.C. Cir. 2011), *reh'g en banc granted, judgment vacated* (Oct. 12, 2011), *opinion reinstated and aff'd*, 690 F.3d 500 (D.C. Cir. 2012) (citing *Huddleston*, 485 U.S. at 690). This is so because the relevance of other-act evidence is conditional on the other act connecting to the defendant and the charged crimes in a way that serves a non-propensity purpose. *Id.*; *see* Fed. R. Evid. 104(b). The government may not "parade past the jury a litany of potentially prejudicial similar acts that have been established or connected to the defendant only by unsubstantiated innuendo." *Huddleston*, 485 U.S. at 689.

If the evidence is probative of a non-propensity purpose, the next question is whether it is admissible under Rule 403. *Clarke*, 24 F.3d at 264. Even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see Bowie*, 232 F.3d at 930 (citing *Old Chief v. United States*, 519 U.S. 172, 179 (1997)). "Unfair prejudice . . . means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *United States v. Ring*, 706 F.3d 460, 472 (D.C. Cir. 2013).

The "strength of the evidence establishing the similar act is one of the factors the court may consider when conducting the Rule 403 balancing." *Huddleston*, 485 U.S. at 690 n.6. Likewise, the availability and probative utility of available

"evidentiary alternatives" must inform the "probative value" of evidence under Rule 403. *Old Chief v. United States*, 519 U.S. 172, 184 (1997) (noting the "availability of other means of proof" is an appropriate consideration); *see also* Fed. R. Evid. 404, advisory committee's notes (referring to "the availability of other means of proof" as an important consideration under Rule 403); *Linares*, 367 F.3d at 946–48 (holding prior-act evidence inadmissible when the asserted purposes—knowing possession and absence of mistake—were not at issue).

### B. The La Belle evidence is irrelevant and inadmissible propensity evidence.

Despite the weakness of the evidence that Mr. Al-Marimi participated in the La Belle bombing, the government argues such evidence corroborates his alleged confession and is probative of his motive, knowledge, intent, and identity.

### 1. A reasonable jury could not find Mr. Al-Marimi was involved in the La Belle bombing, with or without his alleged statement.

As an initial matter, even assuming that the proffered exhibits were the direct evidence the government argues it is, the only evidence of Mr. Al-Marimi's involvement in the La Belle bombing are his alleged confession and—assuming the Stasi documents are accurate—a request for a visa and a hotel reservation that show a Libyan with a similar name (but a different listed birth year)[3] was in East Berlin at the time. From these meager offerings, no reasonable jury could find Mr. Al-Marimi was involved by a preponderance of the evidence.

The Stasi documents do not provide compelling evidence on their own. They

---

[3] The Stasi documents list the person's birth year as 1943, while Mr. Al-Marimi's alleged statement identifies his birth year as 1951.

8

are secondary documents that state *other* documents recorded completely innocent events: that a man using certain information had a visa requested by the Libyan government and stayed at a certain hotel in April 1986. Even if the jury were to conclude (1) the primary information was accurately recorded and (2) the Stasi accurately copied the primary information on two separate occasions, it would have no basis to conclude (3) the man in question was Mr. Al-Marimi or (4) the man was involved in the La Belle bombing. Only the alleged confession connects Mr. Al-Marimi to the La Belle bombing and the Stasi evidence.

But the confession has its own issues. Besides Mr. Al-Marimi's voluntariness challenge, there are significant issues that undermine the statement's reliability. As stated in his motion to suppress his statement, Mr. Al-Marimi was unduly influenced to make any statement. The timing is also highly suspect. For decades, no one suspected Mr. Al-Marimi's involvement in the La Belle bombing, despite the successful prosecution of four other conspirators.[4] Yet he suddenly confesses, amidst a civil war, after which, his confession is kept hidden for years while he is detained for unrelated reasons? The statement only surfaced after other evidence was discovered and publicly reported by third parties. The jury would have to overlook all of this, as well as the significant credibility issues with Mr. Al-Marimi's supposed

---

[4] *See* Philipp Hoffmann, *The "La Belle" Trial: The Sentencing of a Terrorist Bomber Under the German Penal Code*, 6:3 German Law Journal 667 (2005), https://www.cambridge.org/core/services/aop-cambridge-core/content/view/638F1C46D2E56DF245B6CB9F541591C3/S2071832200013857a.pdf/the-la-belle-trial-the-sentencing-of-a-terrorist-bomber-under-the-german-penal-code.pdf (no mention of Mr. Al-Marimi's involvement).

interviewer, to credit the statement and find that Mr. Al-Marimi was involved in the La Belle bombing. Because no reasonable jury could do so, the Court should deny the government's motion.

### 2. Corroboration

The government argues the La Belle evidence serves to corroborate Mr. Al-Marimi's alleged statement, which discussed both the La Belle bombing and the Pan Am 103 bombing. ECF 147, at 7. It intends to show that "various details" in the statement are "corroborated by substantial extrinsic evidence[,]" including Mr. Al-Marimi's supposed visit to East Berlin in April 1986. *Id.*

The government is correct that the D.C. Circuit has held "evidence of other crimes or acts is admissible to corroborate evidence that itself has as legitimate non-propensity purpose." *Bowie*, 232 F.3d at 933. *Bowie*, of course, involved a "prior" bad act that preceded the charged incident by less than a month and concerned the same bundle of counterfeit currency the defendant was charged with possessing. *Id.* at 926. The D.C. Circuit subsequently clarified that corroboration "does not provide a separate basis for admitting evidence." *Linares*, 367 F.3d at 949. Instead, "prior-acts evidence must corroborate other evidence by proving a proper element, such as intent or identity." *Id.*; *see also United States v. Bailey*, 319 F.3d 514, 520 (D.C. Cir. 2003) ("The label 'corroboration' thus merely invites a closer look at exactly how the evidence may be probative.").

There are three problems with the government's corroboration argument. First, it assumes that the La Belle portions of Mr. Al-Marimi's alleged statement are themselves admissible for some other non-propensity purpose. *Linares* and *Bailey*

10

make clear that corroboration for the sake of corroboration is not appropriate under Rule 404(b); rather, the statements being corroborated must be independently relevant and admissible for some valid purpose. The government cannot offer the Stasi documents to corroborate the La Belle confession if the La Belle confession does not itself serve a permissible function. For the reasons explained in the following sections, it does not.

Second, and relatedly, the La Belle evidence is focused on a portion of Mr. Al-Marimi's alleged statement that does not concern the charged events. When the statement being corroborated is directly relevant to the charged crime, as in *Bowie*, the non-propensity purpose is clear—e.g., a defendant's admission that he purchased the counterfeit currency he is charged with possessing helps establish possession, and corroborating evidence that he possessed similar counterfeit currency after the claimed purchase makes that admission more likely to be true. But here, the government seeks to corroborate portions of the alleged confession that have nothing to do with the charged crimes. Besides failing to support a valid non-propensity purpose, that approach greatly reduces the probative value of the corroborating evidence. Certainly, if a suspect confessed to a crime and, in the process, stated he was married, the government could not then admit highly prejudicial evidence of a prior domestic assault simply to corroborate the marriage. So too here, where the highly prejudicial La Belle evidence is extraneous to the Pan Am 103 allegations.

To be sure, the government asserts that *any* portion of a statement that can be proven true makes the rest of the statement more likely to be true, but that does not

logically follow. Contrast this situation to *Navarette v. California*, 573 U.S. 393, 398 (2014), which the government cites for the proposition that a person "who is proved to tell the truth about some things is more likely to tell the truth about other things[.]" ECF 147, at 7–8. The Supreme Court's statement was not about people generally, but rather about informants who communicate information to law enforcement about future events. *Navarette*, 573 U.S. at 398 (discussing *Alabama v. White*, 496 U.S. 325 (1990)). In that context, the informant's ability to accurately predict the suspect's future behavior—such as driving a particular vehicle to a particular location—demonstrates "a special familiarity with [the suspect's] affairs" that makes it more likely the informant has "access to reliable information" about claimed criminal activity. *Id.* If the informant has access to reliable information, his statements should be corroborated by investigation; if he does not, his statements should be false.

Here, conversely, Mr. Al-Marimi's alleged statement postdates the events it describes. Whether it was an authentic confession, a coerced regurgitation, or prepared independently from Mr. Al-Marimi and only later associated with him, one would expect the information in it to be accurate. Even assuming the government can establish that the events described in the statement took place, that is hardly proof that Mr. Al-Marimi was involved, considering such details would have been known to his Libyan captors (if not the general public) by the time the statement was made available to the United States. In other words, corroboration does not necessarily make the confession more plausible, since the statement's alignment to reality can be explained in other ways that do not implicate Mr. Al-Marimi.

Finally, the government's corroboration argument is circular. It intends the Stasi documents to bolster the reliability of the La Belle confession, but as explained above, it needs the La Belle confession to connect the Stasi documents to Mr. Al-Marimi. Because this closed loop is not linked to the Pan Am 103 allegations, it is not admissible for this purpose.

### 3. Motive

The government claims Mr. Al-Marimi's motive was following orders from his superiors, and that his orders ultimately were motivated by "Libyan leader Muammar Qaddafi's quest for vengeance against the United States." ECF 147, at 10. It argues his involvement in the La Belle bombing helps establish his status as a Libyan security operative because the bombing was similarly ordered by his superiors (per the alleged statement) and provides "critical backdrop" for why Pan Am 103 was targeted as part of an alleged escalation of hostilities between the two nations. *Id.*

Motive is not an element of the charged offenses. As such, prior-act evidence "is allowed to show motive only when motive is in turn relevant to establish an element of the offense that is a material issue." *United States v. Brown*, 880 F.2d 1012, 1014 (9th Cir. 1989) (citing treatise). For example, motive evidence might rebut a claim that an act was done for some contrary but legally permissible purpose—a motive of revenge rebuts a claim of self-defense—or it might help establish identity when the motive is unique to an individual. *See id.* at 1014–15. And, as the government notes, in conspiracy cases, motive evidence can help establish the relationship between the parties and the nature of the criminal agreement that is of central importance to conspiracy offenses. *See, e.g.*, *United States v. Escobar-de Jesus*,

13

187 F.3d 148, 169 (1st Cir. 1999).

The government has not charged Mr. Al-Marimi with conspiracy, and it fails to identify a material issue related to motive. The government does not need to establish that Mr. Al-Marimi acted on orders from a superior. Neither is the alleged motive is not in any way unique to him, such that it might establish his identity; any Libyan soldier would have the same drive to obey orders. And the government's theory about the escalating hostilities between Libya and the United States does not require Mr. Al-Marimi to have been involved in an earlier incident along that chain of events; to the extent such evidence might be admissible as background to Pan Am 103, its logic does not turn on the personal involvement of any one person.

### 4. Knowledge and Identity

The government argues that the La Belle evidence is probative of Mr. Al-Marimi's knowledge and skill in bombmaking. ECF 147, at 11–12. Separately, it argues *modus operandi* evidence that shows a defendant committed similar crimes during a similar timeframe may be admitted to show "a distinctive pattern of conduct [] probative of identity." *Id.* at 13. The government reasons that Mr. Al-Marimi's involvement in the La Belle bombing would support his identity as "a bombmaker for the Libyan government," and that similarities between the events—the intended targets, the materials used, the bombing method, and the use of the same passport number and demographic details as was later used by someone to travel to Malta in connection with the Pan Am 103 bombing—help establish that it was Mr. Al-Marimi who committed the alleged conduct. *Id.*

Evidence of knowledge, identity, and *modus operandi* is relevant to the extent

14

that it shows the defendant, and not someone else, committed the charged crimes. Specialized or uncommon knowledge or distinctive traits in common with an earlier crime that can be connected to the defendant support such an inference. Here, however, a critical link is missing from the chain of inferences, and it can only be filled by propensity reasoning.

What the government needs to show is that Mr. Al-Marimi is the person connected to the Pan Am 103 bombing—it must prove he was the bombmaker. What the La Belle evidence shows is that another, arguably similar bombing occurred. But it does not show that Mr. Al-Marimi was the individual involved; apart from the problematic statement, the La Belle evidence does not draw a line between Mr. Al-Marimi and the La Belle bombing or between Mr. Al-Marimi and Pan Am 103.  Put differently, the proffered evidence does not prove the identify of who committed the La Belle bombing. It simply shows that another bombing was committed. So, drawing comparisons between the Pam Am 103 incident and the La Belle incident do not put the jury any closer to knowing the identity of the person who committed either.

Separately, *modus operandi* evidence "must be unique; 'the Government must establish not only that the extrinsic act bears some peculiar or striking similarity to the charged crimes, but also that it is the defendant's trademark, so unusual and distinctive as to be like a signature.'" *Burwell*, 642 F.3d at 1067 (quoting *United States v. Crowder*, 87 F.3d 1405, 1413 (D.C. Cir. 1996), *rev'd on other grounds*, 519 U.S. 1087 (1997)). Thus, for example, "the naked use of violence and weapons, without more, does not rise to the level of similarity necessary to make [] other crimes

15

evidence relevant to identity." *Id.* The two bombings here were separated by years and involved different alleged participants, some of whom have already been convicted. Moreover, they targeted different groups (nightclub attendees, including American soldiers, vs. cross-Atlantic airline travelers) in different ways (a nightclub in a foreign country vs. a flight bound for the United States). It is only at a high level of generality that the two events blur together—the bombing of Americans. But that level of similarly falls short of what is required and diminishes whatever marginal probative value such evidence might have.

### 5. Intent

The government argues a prior instance of a bomb being used against civilians is probative of the bombmaker's intent that a different bomb be used for the same purpose. ECF 147, at 12. It cites *United States v. Harrison*, 679 F.2d 942, 948 (D.C. Cir. 1982), for the proposition that a "continuous course of dealing" can be probative of a person's intent on a given occasion.

"Evidence of a similar act must meet a threshold level of similarity in order to be admissible to prove intent," even if "exact congruence" is not required. *United States v. Long*, 328 F.3d 655, 661 (D.C. Cir. 2003). "What matters is that the evidence be relevant 'to show a pattern of operation that would suggest intent' and that tends to undermine the defendant's innocent explanation." *Id.* (quoting treatise). Courts consider, among other factors, the temporal proximity between the events. *United States v. Slough*, 22 F. Supp. 3d 16, 21–22 (D.D.C. 2014) (citing *Jankins v. TDC Mgmt. Corp.*, 21 F.3d 436, 441 (D.C. Cir. 1994)).

Far from a continuous course of dealing like the string of drug dealing at issue

16

in *Harrison*, here the government identifies only two incidents in which bombs they claim were connected to Mr. Al-Marimi were used against civilian targets. The government's language that "his bombs were being used to commit terror attacks" implies a longer history, but none exists. Whereas it may be reasonable to infer that a person who regularly deals drugs did so knowingly and intentionally, it does not follow in the same way that a person who on one occasion learned after the fact that a device he made had harmed civilians would understand on a different occasion, two years later and in a different country, that a different device would be used against a civilian aircraft. *See United States v. Trenkler*, 61 F.3d 45, 56 n.19 (1st Cir. 1995) (rejecting intent as a grounds for the admission of prior bombmaking when the incidents were sufficiently distinct such that the relevance "depend[ed] heavily on an inference of propensity") (citing *United States v. Lynn*, 856 F.2d 430 (1st Cir. 1988)).

### C. The La Belle evidence is inadmissible under Rule 403.

The government argues the risk of unfair prejudice is slight because the most compelling evidence of Mr. Al-Marimi's participation in the La Belle bombing is his alleged statement, which also described his participation in Pan Am 103. ECF 147, at 14–15. It reasons the jury is not likely to separate the two supposed confessions, and if it believes only one, it is more likely to believe the Pan Am 103 confession because most of the government's trial presentation will focus on that event. *Id.*

The government's abbreviated analysis does not approach the kind of robust scrutiny required under Rule 403. First, the government seems to focus exclusively on Mr. Al-Marimi's alleged statement, ignoring possible prejudice from the other La Belle evidence it intends to adduce. By focusing on the statement in isolation, the

17

government skips over the prejudicial effects of testimony from a survivor of the La Belle bombing, first responders, an expert historian, and the Stasi documents themselves that the government believes link the man who traveled to East Berlin in April 1986 and the man who traveled to Malta in December 1988. While Pan Am 103 will no doubt provide the bulk of the evidence at trial, if this evidence is admitted, the jury will hear more than enough about La Belle to risk improper propensity inferences and other prejudice.

To start, courts long have recognized the power of propensity evidence and its prejudicial effects, which are "far from theoretical." *Linares*, 367 F.3d at 945. There is an ever-present danger that such evidence "will weigh too much with the jury" and "overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." *Id.* (quoting *Michelson v. United States*, 335 U.S. 469, 475–76 (1948)). "It subtly permits the trier of fact to reward the good man [and] to punish the bad man because of their respective characters despite what the evidence in the case shows actually happened." Fed. R. Evid. 404, advisory committee notes.

It is hard to imagine what could be more prejudicial than evidence a defendant was involved in *more than one* terrorist bombing against the citizens of the nation that is prosecuting him. If the jury credits the government's claims that Mr. Al-Marimi was involved in the La Belle bombing, there is an unavoidable risk that it will rely on that finding to conclude he also was involved in the Pan Am 103 bombing. Moreover, it may seek to punish him for La Belle regardless of the strength of the

18

evidence of the Pan Am 103 bombing, believing it unjust that he should go free even if the government fails to prove the charged offenses.

Forbidden propensity inferences are only one of the evils that Rule 403 considers. The La Belle evidence also risks misleading the jury and confusing the issues. Prior-act evidence generally "tends to distract the trier of fact from the main question of what actually happened on the particular occasion." Fed. R. Evid. 404, advisory committee notes. But the risk is particularly acute when the prior act is both an incident of international intrigue, subject to decades of speculation about the involvement of various groups, and—unlike the Pan Am 103 bombing—will be presented through the firsthand accounts of witnesses who survived the attack. The jury is very likely to lose sight of the charges and their elements and get wrapped up in the La Belle bombing.

Finally, evidence of a second terrorist attack against Americans doubles the risk that the jury could have its passions enflamed and seek to punish the person in front of them even if his guilt is not proven beyond a reasonable doubt.

On the other side of the Rule 403 scales, the need for the La Belle evidence is slight, since each arguable non-propensity purpose can be better achieved with evidence that is directly related to the charged incident. The jury does not need to hear about an East Berlin hotel stay in April 1986 to corroborate Mr. Al-Marimi's statement, for example, when it will hear evidence about his alleged travels and the use of the suitcase bomb in December 1988. Likewise, Mr. Al-Marimi's alleged confession to Pan Am 103, assuming it is admitted, provides a direct statement of his

19

intent and motive with respect to the bombing, so circumstantial evidence related to a prior act of terrorism would have only marginal probative utility on those points. For every non-propensity purpose the government claims, it has Pan Am 103 evidence that will dwarf the probative value of the La Belle evidence.[5]

And while the above analysis considers the La Belle evidence at a high level of generality, Rule 403 "requires a fact-intensive, context-specific inquiry" that considers each type of contested evidence on an individual basis. *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008). Even if the Court admits some of the La Belle evidence, it should not admit all of it. Testimony from a surviving victim and first responders runs a far greater risk of enflaming the jury's passions than do decades-old documents, and such evidence has absolutely no bearing on any of the government's proposed purposes under Rule 404(b). While victim and first responder testimony might sometimes be appropriate when it relates to a charged offense, it is entirely inappropriate when it does not.

Whatever slight probative value such evidence might have for non-propensity reasons, its prejudicial effects are clear and unavoidable, regardless of any limiting instructions.

## II.    Hearsay Exceptions

The government's second request is for an advance ruling that the hotel

---

[5] As explained above, the La Belle evidence is only weakly probative, even without considering its relative strength. Both the strength of the evidence that the defendant committed the uncharged act and the degree to which it is probative of a material issue matter under Rule 403. *See Bowie*, 232 F.3d at 933 n.7 (stating concerns about directness and significance of corroborating Rule 404(b) evidence "are properly addressed through Rule 403").

20

information, Visitor's List, and two related supporting documents fall under at least one of the exceptions to the rule against hearsay—specifically, that they are either business records, public records, ancient documents, or subject to the residual exception. The government has not met its burden to establish that the documents are sufficiently reliable or trustworthy to meet the requirements for any of these hearsay exceptions.

## A.  Legal Standard

Hearsay is "a statement that . . . the declarant does not make while testifying at the current trial or hearing[] and . . . a party offers in evidence to prove the truth of the matter asserted in the statement. Fed. R. Evid. 801(c). It is inadmissible unless permitted by a federal statute, the Federal Rules of Evidence, or some other applicable authority. Fed. R. Evid. 802. When a statement constitutes "hearsay within hearsay . . . each part of the combined statements" must conform to an exception to the hearsay rule to be admissible. Fed. R. Evid. 805.

The defense generally agrees that the hearsay rules focus on the reliability and necessity of the evidence, and it does not dispute the government's recitation of the rules applicable to the four exceptions at issue. *See* ECF 147, at 16–20.

To authenticate an item of evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Specific rules provide for the authentication of foreign business records, foreign public records, and ancient documents. *See* 18 U.S.C. § 3505 (business); Fed. R. Evid. 901(b)(8) (ancient); Fed. R. Evid. 902(3) (public).

## B.  Ancient documents

The ancient documents exception is justified by the belief that "age affords assurance that the writing antedates the present controversy." Fed. R. Evid. 803, advisory committee's notes. That justification is not present in this case. While it will often be true that ancient writings predate present controversies, the Stasi documents were prepared within two weeks of the La Belle bombing. Because there was an immediate interest in investigating the attack and identifying those responsible, particularly East Germany's intelligence agency, the increased reliability that typically comes with age and distance does not extend to the Stasi documents. They do not predate this controversy.

Turning to the requirements to authenticate an ancient document, the government asserts that the Stasi documents were stored in the BStU archives and, thus, satisfy Rule 901(b)(8). But the government has not offered any evidence regarding the provenance of the Stasi documents. Its witnesses exclusively discuss the ultimate origin of the documents—the Stasi—and not their proximate origin. There is no information available, for example, about where the documents were found before they were turned over to the archive; when the archive acquired them; how they were stored; whether they were ever moved, and how often; who had access to them; how often they were accessed; when the request was made for their production related to this case; who made that request; and so on. Indeed, the government intends to show that the documents presented resemble those kept at the BStU, but direct evidence that that is where they were recovered from remains another missing link. More is required to bypass the rule against hearsay,

22

particularly when the acquisition and storage of the documents in question was haphazard at best. *See* Annalisa Quinn, *Piecing Together the History of Stasi Spying*, The New York Times (Aug. 12, 2021), https://www.nytimes.com/2021/08/10/arts/design/stasi-archive-puzzle.html ("Much of the material was unsalvageable, burned or shredded into tiny pieces."); Wilson Center, *Operation "Denver": KGB and Stasi Disinformation regarding AIDS* (July 22, 2019), https://www.wilsoncenter.org/blog-post/operation-denver-kgb-and-stasi-disinformation-regarding-aids (noting "90 percent of the HVA's files were destroyed or otherwise disappeared in the years 1989–90").

Ancient documents also remain subject to double hearsay requirements, such that each layer of hearsay needs its own hearsay exception for the statement to be admissible. *See Langbord v. U.S. Dep't of Treasury*, 832 F.3d 170, 189–91 (3d Cir. 2016) (addressing Secret Service reports from the 1930s and 1940s and the applicability of the ancient documents exception). This is so because the ancient documents exception "is based on a rationale that the authenticated ancient documents bear certain indicia of trustworthiness" that do not automatically extend to "hearsay statements contained therein," since there is no guarantee that included hearsay statements are themselves accurate as opposed to having been misheard or mistranscribed. *Id.* at 190; *see also United States v. Habteyes*, 356 F. Supp. 3d 573, 586 n.6 (E.D. Va. 2018) (noting the courts of appeals agree "that the ancient documents exception applies only to 'first-level hearsay' statements within the ancient document and that under Rule 805 any hearsay within hearsay . . . must

satisfy an independent hearsay exception"). Since the government has not produced the original primary records the Stasi documents were based on, it cannot take advantage of the ancient documents exception for both layers.

### C.  Public records

The government contends the Stasi documents "were generated by an official arm of the East German government as part of its duties to observe and report on matters affecting the security of the state." ECF 147, at 25. Unlike with the other foreign documents it contends are foreign records, *see* ECF 148, the government has not provided any certification from a foreign official to that effect (and it cannot do so, since the East German government no longer exists). Instead, it offers only the three declarations from former Stasi officers.

The declarations fail to establish that the Stasi documents were created pursuant to official duties under a legal duty to report. Regarding the Visitors List, Hoffman and Ernst do not claim that Main Department II/15 was required prepare lists of visa requests from Libya or any other nation. Rather, they state the Foreign Ministry routinely received such requests, and that Main Department II/15 had access to those records. But access is not the same as a duty to review and copy. Indeed, Hoffman and Ernst also do not state that visa lists were routinely or officially prepared, why *this* list was prepared, or what criteria may have been used to determine when such a list would be prepared. They merely offer their belief that the Stasi writ large took care to accurately record information in "documents like these."

At the same time, it is highly likely the Stasi officials who prepared these documents were engaged in nonroutine investigative work such that the documents

24

fall into the law-enforcement carveout. Again, the Stasi documents were both created close in time to the La Belle bombing. The government acknowledges the Stasi "served an investigatory function in East Germany," ECF 147, at 26, but that is quite an understatement. Even a cursory investigation of East German history reveals the Stasi served as a one-stop shop for every conceivable law enforcement function, including the investigation of crimes and thought crimes. *See generally* Uwe Spiekermann, *The Stasi and the HV A: Contemporary Research and Contemporary Resonance*, 52:9 Bulletin of the German Historical Institute 11, 14 (2014), https://www.ghi-dc.org/fileadmin/publications/Bulletin_Supplement/Supplement_9/supp9.pdf ("The Stasi was no ordinary intelligence service but a political police with its own remand prisons, its own investigation apparatus, with enforcement employees, and with its own judge and prosecutors working in its service."). This truth is apparent from the Hotel Report; it is a small excerpt from a 244-page dossier about a suspected foreign agent *under investigation for posing a threat to the state*. ECF 147, at 22–23.

### D. Double hearsay and business records

The government argues the Stasi documents are derivative of other public or business records—the underlying primary visa requests and hotel registration cards—and that the exemplars of those types of documents are admissible under those hearsay exceptions. *See* ECF 147, at 26–28.

It is true that each of the Stasi documents has at least two layers of hearsay. The Visitors List purportedly states that Libyan visa requests were submitted with the recorded information. ECF 147, at 21. The Visitors List itself was not the original

25

record that such a request was made—i.e., the visa request itself, or a writing that the individual in question had sought a visa. Likewise, the Hotel Report states that hotel registration cards and/or passports provided at check-in by two men contained specific names and numbers. Each document, then, is a secondary report of primary information. To be admissible, both layers of hearsay must qualify for an exception. Fed. R. Evid. 805; *see United States v. El-Mezain*, 664 F. 3d 467, 497–501 (5th Cir. 2011) (noting a foreign intelligence document was unreliable in part because it contained "apparent double hearsay because it referred to unnamed 'Western Sources,' 'security experts,' and 'western security organizations'").

The government's witnesses are not qualified to certify the primary documents as business records. *See United States v. Doyle*, 130 F.3d 523, 546 (2d Cir. 1997) ("The Senior Inspector in the Customs Department [of Malta] could not possibly testify as to the practices of the private businesses that generated the documents filed with the Customs Department."). Certainly, they try to; Hoffman and Ernst state the Foreign Ministry routinely received visa requests, and Jahn states hotel registration cards were routinely made and kept. But none of the men worked for the entities that created the primary records, or even the Stasi department that first received them, and there is no basis to conclude they have the requisite knowledge to credibility assert such records comply with the rule's requirements.

When disputed evidence lies "at the intersection of . . . business and government records," courts have declined "judicially to forge a new, hybrid exception to the hearsay rule by combining these two distinct varieties of admissible hearsay[.]"

26

*Id.* at 547. In *Doyle*, the Second Circuit considered "documents collected by, but not generated by, the government of Malta." *Id.*at 545. The documents had been generated by private companies and filed with the Maltese Customs Department, and thereafter offered by the government at trial with only a certification of authenticity from a Maltese official. *Id.* The court concluded the records lacked the foundational information necessary to qualify for the business-records exception—no qualified witness had testified about the practices of the private businesses that generated the documents. *Id.* at 546. The Maltese official could not do so. *Id.* And while no such foundation was required under the public-records exception, the documents did not qualify for that exception either because "there was no showing of procedures that assure the documents are reliable, of any standards applied to the recordation of the documents, or of any monitoring by Malta of their accuracy." *Id.* at 547. Ultimately, the court declined to sanction the government's "failing to offer a witness who could present the foundation necessary for the admission of the documents under the business records exception" by letting the documents in through a back door. *Id.*

So too here, where the government has not even provided any official certification of the Stasi documents' authenticity. The Court should reject the government's arguments about the primary documents.

### E. Residual exception and general lack of trustworthiness

Last, the government argues the residual exception would cover the Stasi documents even if no other exception does. ECF 147, at 28–30. But its arguments are simply a repeat of its contentions under the other exceptions.

27

"[T]he legislative history of the [residual hearsay] exception indicates that it should be applied sparingly." *United States v. Slatten*, 865 F.3d 767, 807 (D.C. Cir. 2017) (quoting *S.E.C. v. First City. Fin. Corp.*, 890 F.2d 1215, 1225 (D.C. Cir. 1989)). "[P]erfunctory citations to Rule 807 are insufficient to satisfy the 'extremely narrow' residual hearsay exception, which 'requires testimony to be very important and very reliable.'" *Pietrangelo v. Refresh Club, Inc.*, No. 18-CV-1943, 2023 WL 6388880, at *10 (D.D.C. Sept. 29, 2023) (quoting *Slatten*, 865 F.3d 767, 807 (D.C. Cir. 2017)). The residual exception applies "only in the most 'exceptional circumstances[.]'" *Slatten*, 865 F.3d at 807 (quoting *United States v. Kim*, 595 F.2d 755, 765 (D.C. Cir. 1979)).

As discussed above, the documents' age does not add to their trustworthiness, and issues surround the documents' provenance. But a few additional points bear emphasis. The government plays up the bureaucratic aspects of the documents—that they were supposedly prepared by officials with careful attention to detail and the goal of an accurate accounting of seemingly banal events. Those characteristics might apply if the documents at issue were the primary sources of the information the government intends to use, but those documents are not offered. Instead, the government offers documents prepared by intelligence officers with motives that logically extended beyond the simple recording of accurate information. Indeed, some academics have questioned the reliability of the Stasi records, given the organization's expressly political aims and the incentives of the investigators. *See, e.g.*, Miwako Okabe, *The uncertainty and value of the Stasi files*, Politiikasta (March 28, 2018), https://politiikasta.fi/en/the-uncertainty-and-value-of-the-stasi-files-2/

28

(observing "the Stasi records show their misunderstandings and manipulation of personal information" and must be used only with an appreciation of their "unreliability").

The government's failure to provide the relevant primary documents is salient for another reason: other primary records from the era exist. Indeed, the government was able to track down what appears to be an original Libyan visa request from the same period, and it argues that bolsters the reliability of the Visitors List in general because those records align. But the continued existence of *certain* original records raises the question of why the *relevant* original records could not be located. If the Stasi's recordkeeping and the subsequent process of archiving its records were as comprehensive and trustworthy as the government claims, then it is a major problem that the relevant records are missing. If, conversely, those processes were less robust, then the secondary records the government has produced in reliance on those processes are less reliable as a result.

In *United States v. El-Mezain*, 664 F. 3d 467, 497–501 (5th Cir. 2011), the court concluded foreign records were inadmissible under the residual hearsay exception and rejected the government's proposed analogy to public records. The records in question were seized from the Palestinian Authority and concerned the activities and financing of Hamas. *Id.* at 499. The court therefore found "the guarantee of trustworthiness associated with a public agency merely recording its own actions is not present." *Id.* Moreover, nothing was "known about the circumstances under which the documents were created, the duty of the authors to prepare such documents, the

29

procedures and methods used to reach the stated conclusions and . . . the identities of the authors." *Id.* Unlike other seized-document cases where a witness testified about foundational matters like the handwriting, symbols, and codes on such documents and the duties of authors to accurately record information, all that was known was that the records "were found in the possession of the [Palestinian Authority]." *Id.* at 500.

While the government has provided slightly more information about the Stasi documents, including identifying the author of the Hotel Records, its submissions fall short along the same lines as in *El-Mezain.* The Court is left with "conclusory assertions amounting to classic hearsay and [few] facts from which to divine the documents' reliability." *Id.* at 500. There is much to gain "from further adversarial testing" about the documents' provenance, *see id.*, the no sound basis to admit the Stasi records under Rule 807.

## CONCLUSION

The La Belle evidence is irrelevant and unduly prejudicial, and the Stasi documents are unreliable hearsay. The Court should deny the government's requests.

Respectfully submitted,

Geremy C. Kamens,
Federal Public Defender

By: _____/s/_____
Whitney E.C. Minter
Va. Bar # 47193
Brooke Sealy Rupert
Va. Bar #79729
Assistant Federal Public Defender
Attorney for Mr. Al-Marimi
1650 King Street, Suite 500
Alexandria, Virginia   22314
(703) 600-0855 (telephone)
(703) 600-0880 (facsimile)
Whitney_Minter@fd.org (email)

Laura Koenig
Va. Bar #86840
Assistant Federal Public Defender
Attorney for Mr. Al-Marimi
701 E. Broad Street, Suite 3600
Richmond, Virginia  23219
(804) 343-0800 (telephone)
(804) 648-5033 (facsimile)
Laura_Koenig@fd.org (email)