**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 22-cr-392 (DLF)** |
| | : | |
| **ABU AGILA MOHAMMAD** | : | |
| **MAS'UD KHEIR AL-MARIMI,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S REPLY IN SUPPORT OF**
**MOTIONS *IN LIMINE* TO PERMIT RULE 404(b) EVIDENCE AND**
**FOR RULINGS ON HEARSAY EXCEPTIONS**

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, respectfully submits this Reply in support of its motions *in limine*

regarding the bombing of the La Belle Discotheque [ECF 147]. For the reasons that follow, the

Court should grant the motions.

**I.      RULE 404(b) IS SATISFIED.**

**A.  A reasonable jury could believe the defendant's admission.**

The defense contends that "no reasonable jury could find Mr. Al-Marimi was involved [in

the La Belle bombing] by a preponderance of the evidence." ECF 174 at 8. But the defendant's

confession standing alone is enough to satisfy Rule 104(b), which is a "flexible" standard. *United*

*States v. LaVictor*, 848 F.3d 428, 449 (6th Cir. 2017).

Attempting to discount the confession, the defense references the voluntariness arguments

from their recently filed motion to suppress, ECF 159. The government has already thoroughly

responded to these in its response to that motion, ECF 163; and incorporates those arguments here.

The evidence at the suppression hearing and at trial will establish that the statement was voluntary

and will demonstrate that there are no significant "credibility issues" on the part of the Libyan

interviewer. But even if there were, courts do not "weigh[] credibility" when determining whether Rule 104(b)'s threshold requirement is met for the admission of Rule 404(b) evidence. *See Huddleston v. United States*, 485 U.S. 681, 689 (1988).

The defense also argues that the timing of the confession to the La Belle bombing is "highly suspect." ECF 174 at 9. On this point, we first note that it is not accurate that "no one suspected Mr. Al-Marimi's involvement in the La Belle bombing" in the decades before he made his confession. *Id.* In fact, by the time of the La Belle trial in Germany, one of the defendants in that prosecution had given a statement describing "Abuagela Kher," an explosives expert with the Libyan intelligence service, who came to Berlin to participate in the bombing.[1] But it is nonetheless true that the defendant's possible involvement was not widely publicized – and that is exactly the point. The Libyan authorities had no reason or basis for falsely implicating the defendant in the crime.

The corroborating Stasi records fortify the conclusion that a reasonable juror could find by a preponderance of the evidence that the defendant took part in the La Belle bombing. The evidentiary standard for admitting the evidence under Rule 404(b) is therefore satisfied.

**B. The La Belle evidence is relevant as corroboration.**

As explained in the government's opening brief, the La Belle evidence serves as powerful corroboration of the defendant's statement. *See* ECF 147 at 7-10. In arguing against this theory of relevance, the defense is wrong for several reasons.

First, they treat the statement as divisible, but it is one contiguous piece of evidence. The defendant did not make two separate confessions on two separate occasions; instead, his

---

[1] The government's discovery productions have included this individual's statements and related materials.

admissions about La Belle and Pan Am Flight 103 were part of a single statement in which he recounted his overall curriculum vitae as an intelligence operative. To conceal this fact by excising or redacting portions of the statement would mislead the jury and prejudice the government. As argued in the government's response to the motion to suppress, ECF 163, the length of the statement, the variety of episodes addressed in it, the inclusion of relatively banal personal and professional details, and the inclusion of negative responses to some questions, are all critical context for evaluating the reliability of the Pan Am Flight 103 admission. Even if there were not extrinsic evidence corroborating La Belle, therefore, it would be necessary to put the entire statement before the jury.

Next, the defense puts undue weight on *United States v Bailey* and *United States v. Linares*, which involved radically different (and weaker) theories of corroboration than what the government is arguing here. See ECF 174 at 10-11 (citing *Bailey*, 319 F.3d 514, 520 (D.C. Cir. 2003); and *Linares*, 367 F.3d 941, 945 (D.C. Cir. 2004)). In both those cases, the prior-act evidence was argued to "corroborate" witnesses whose testimony had nothing to do with prior acts. *See Bailey*, 319 F.3d at 520 (uncharged drug transactions ostensibly "corroborated" witness testimony about entirely different drug transactions, which were themselves uncharged);[2] *Linares*, 367 F.3d 941 at 948 (uncharged firearm possession ostensibly "corroborated" witnesses who testified only about subsequent charged firearm possession). Faced with that unbounded theory, the D.C. Circuit understandably explained that a naked assertion of "corroboration" cannot be used to circumvent the rule against propensity evidence. To determine the viability of any theory of Rule 404(b)

---

[2] Even on these facts, the court in *Bailey* found some corroborative value in the uncharged acts, albeit not enough to survive Rule 403 balancing. *See Bailey*, 319 F.3d at 520.

corroboration, "the court must determine what is being corroborated and how." *Bailey*, 319 F.3d at 520.

Here, like in *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000), the evidence being corroborated is the defendant's own statement that constitutes direct evidence of the charged offense. And the theory of corroboration does not depend on propensity, as shown by the following hypothetical: If, along with confessing to bombing Pan Am Flight 103, the defendant had claimed to have traveled to East Berlin with Shadi in 1986 for a sightseeing tour, the Stasi records would still be just as relevant to establish that the statement is the defendant's genuine admission and not a fabrication. Propensity would play no part in this reasoning.

Or take the hypothetical offered by the defense, of a suspect who "stated he was married," ECF 174 at 11. The defense asserts it would be improper to "admit highly prejudicial evidence of a prior domestic assault simply to corroborate the marriage." *Id.* Maybe so, but imagine instead that the suspect stated he was married at a specific venue on a specific date with a specific best man, and the government could offer documentary proof of those details' accuracy. It would be entirely proper to use such evidence to refute an allegation that the suspect had been forced to deliver a confession that had been fabricated wholesale by strangers. Thus, what makes the "domestic assault" evidence objectionable is not that the fact of the marriage is "extraneous," but rather that danger of prejudice would outweigh the probative value of the corroboration – a different issue altogether. *See* Fed. R. Evid. 403; *United States v. Tan*, 254 F.3d 1204, 1208 (10th Cir. 2001) ("Rule 404(b) and Rule 403 each pose separate and distinct questions").

Faced with the common-sense point that accuracy on some facts suggests accuracy overall, the defense attempts to distinguish this case from others where informants have provided information about future events. *See* ECF 174 at 12. But when informants give statements about

the future, they do so based on their knowledge of past facts. For example, a "prediction" that drugs could be found at a location is usually just another way of saying the informant knows that drugs were there in the very recent past. Whatever the tense of the statement being corroborated, the same logic holds. Just like trustworthy informants, the defendant here has "a special familiarity with,"[3] and "access to reliable information" about, a person involved in criminal activity – the person just happens to be him. ECF 174 at 12 (quoting *Navarette v. California*, 572 U.S. 393, 398 (2014)).

Finally, although the defense posits that "the statement's alignment to reality can be explained in other ways that do not implicate Mr. Al-Marimi," ECF 174 at 12, they do not say how. Regardless, even if the defense could offer some other possible explanation for the statement's accurate details, that would not change the fact that the statement's truthfulness is the most likely explanation.

For all these reasons, the La Belle evidence is relevant for the non-propensity purpose of corroborating the defendant's statement.

**C. The La Belle evidence is relevant for other Rule 404(b) purposes.**

As previously argued, part from its relevance as corroboration, the defendant's involvement in the La Belle bombing serves other non-propensity purposes. *See* ECF 147 at 10-13.

1. Motive

The defense observes that "[m]otive is not an element of the charged offenses." ECF 174 at 13. But "[m]otive is always relevant in a criminal case, even if it is not an element of the crime."

---

[3] This "special familiarity" is key. The government is not asserting "that *any* portion of a statement that can be proven true makes the rest of the statement more likely to be true," ECF 174 at 11; we freely acknowledge that confirmation of detail that is already common knowledge, like the fact that Qaddafi was in charge of Libya at the time of the bombings, would have little or no corroborative value.

*United States v. Sanford Ltd.*, 878 F. Supp. 2d 137, 145 (D.D.C. 2012) (quoting *United States v. Hill*, 643 F.3d 807, 843 (11th Cir.2011)); *see also United States v. Day*, 591 F.2d 861, 874 (D.C. Cir. 1978) ("Motive is a state of mind that is shown… as a circumstance showing the probability of appropriate ensuing action (and) it is always relevant." (quoting 1 Wigmore on Evidence s 118 at 558, 561 (3d ed. 1940))). The defendant's motive to kill Americans makes it more likely that the defendant bombed Pan Am Flight 103.Therefore, even under the non-binding case relied on by the defense, the La Belle evidence serves a permissible Rule 404(b) purpose in that it helps "establish a motive to commit the crime charged, not simply a propensity to engage in criminal activity." *United States v. Brown*, 880 F.2d 1012, 1015 (9th Cir. 1989).

The same goes for the defendant's association with Libyan intelligence for the purpose of conducting operations against Americans. It does not matter that there is no conspiracy charge and therefore no formal requirement to prove an agreement. The fact of the defendant's status as an operative for the External Security Organization ("ESO"), and the nature of that employment, are still fundamental to the government's theory of the case. The La Belle evidence helps prove those facts. *See* ECF 147 at 10-11.

2. <u>Knowledge</u>

As previously argued, a prior episode of bombmaking demonstrates the "knowledge and skill" of making bombs, a technical ability most people do not possess. ECF 147 at 11-12 (citing *United States v. Trenkler*, 61 F.3d 45, 48 (1st Cir. 1995); *United States v. Barrett*, 539 F.2d 244, 248 (1st Cir. 1976); *United States v. Garcia*, 880 F.2d 1277, 1278 (11th Cir. 1989)). The defense does not appear to dispute this logic. Their only response is that the reasoning is inapplicable here because "the proffered evidence does not prove the identity of who committed the La Belle bombing." ECF 174 at 15. But the defendant's identity as the La Belle bomb technician is readily

established by his own corroborated admission. The La Belle evidence is therefore admissible for

the purpose of establishing the defendant's knowledge and skill in bombmaking.

      3.  Identity

A person with a particular name, year of birth,[4] and Libyan passport number happens to

have traveled from Libya to East Germany in 1986 and to Malta in 1988 on dates corresponding

with major terrorist attacks against Americans by Libyan operatives in those countries. Even

without more, this is either an extraordinary coincidence or strongly suggestive of the person's

involvement in both attacks.

That is exactly the scenario presented here, except with the addition of further evidence

including the defendant's confession. The La Belle evidence, and particularly the Stasi records

with their matching demographic data, helps establish that the person who gave the statement in

2012 is the same person who traveled to Malta in December 1988. And the fact that the defendant's

East Berlin trip corresponds with the La Belle bombing helps establish his identity as the Pan Am

Flight 103 bombmaker, because it discounts the possibility that the timing of his Malta trip was an

unlucky coincidence.

It bears noting that these identity arguments do not rely on a pure *modus operandi* theory.

Nonetheless, as the government has already argued, the bombings share substantial similarities.

*See* ECF 147 at 13. The commonality is not merely "the naked use of violence and weapons," ECF

174 at 15-16 (quoting *United States v. Burwell*, 642 F.3d 1062, 1066 (D.C. Cir. 2011)), nor "the

bombing of Americans," *id.* It is much more detailed: both bombings shared similar revenge-

oriented motives, similar operational planning by the ESO, similar exploitation of Libya's overseas

---

[4] The defense notes that the Maltese and German documents show a birth year that is different from the one on the defendant's statement. The government is aware that different sources have variously listed the defendant's birth years as 1951, 1954, and 1943. *See* ECF 163 at 26 n.10.

presence in third countries, similarly constructed explosive devices, and similarly clandestine methods of infiltrating the bombs.

####    4.    Intent

The defendant's statement establishes that, as an ESO operative for the Qaddafi government, he participated in "a number of operations" to advance the interests of Libya against its adversaries. *See* ECF 163 at 13-15 (government's response to motion to suppress, summarizing statement). This "continuous course of conduct," spanning years, is highly probative of the defendant's violent intent on the specific occasion of the bombing of Pan Am Flight 103. *See* ECF 147 at 12 (citing *United States v. Harrison*, 679 F.2d 942, 948 (D.C. Cir. 1982)).

The defense argues otherwise, disputing that "a person who on one occasion learned after the fact that a device he made had harmed civilians would understand on a different occasion, two years later and in a different country, that a different device would be used against a civilian aircraft." ECF 174 at 17. Even granting the dubious premise that the defendant only "learned [what the La Belle bomb was for] after the fact," any sentient person who saw the result would understand, even two years later, that his suitcase bomb was not destined for use in a mining project or pyrotechnics display.[5] *See* ECF 147 at 4 (quoting defendant's statement that, after learning of La Belle explosion, "I understood that this was the target for which the explosive charge had been prepared"). Accordingly, the government should be permitted to use the La Belle evidence to refute any "innocent explanation" that the defense might argue or that a juror might hypothesize.

---

[5] The case cited by the defense, *United States v. Trenkler*, 61 F.3d 45 (1st Cir. 1995), affirmed the use of a prior bombmaking as relevant to proving identity (discussed at length in the body of the opinion) as well as knowledge and skill (treated cursorily in a footnote as "[o]bviously" relevant). *Id.* at 52-56, 56 n.19. The court found that the "government [had] not clearly articulate[d]" a non-propensity theory of intent. *Id.* Here, we have.

**D. The La Belle evidence passes Rule 403 balancing.**

Contrary to the defense's arguments, the limited evidence the government proposes to offer on the La Belle bombing would not offend Rule 403.

As a general matter, Rule 404(b) evidence can give rise to a risk of unfair prejudice in two related ways. First, a jury might conclude that a defendant committed the "other act" and use that finding to infer that the defendant had a propensity for crime and was therefore more likely to have committed the charged offense. Second, a jury might conclude that a defendant committed the "other act" and decide that he consequently deserves to be punished irrespective of whether he committed the charged offense.

As already explained, ECF 147 at 14-15, neither of those dangers are present here because the best evidence for the defendant's involvement in the La Belle is identical with the best evidence for his involvement in the Pan Am Flight 103 bombing. In a single statement – indeed, within a single sentence – the defendant confessed to both attacks. *See* ECF 147 at 4 (quoting defendant's statement that he "participated in a number of operations, among them the Berlin night club bombing and the Lockerbie airliner bombing"). The jury either will credit this statement or they will not, but they are exceedingly unlikely to credit the La Belle admission without simultaneously crediting the Pan Am Flight 103 admission.

The other evidence, such as eyewitness testimony[6] and historical background, poses no risk of causing a propensity inference because none of it independently implicates the defendant in the attack. Even the Stasi records, though they are specific to the defendant, are not inculpatory on their face: there is nothing inherently wrongful about traveling to East Belin or staying in a

---

[6] The government also anticipates introducing photographs of the scene through the testimony of a first responder and/or victim.

hotel there. None of that poses any risk of "subtly permit[ting] the trier of fact" to conclude that the defendant is a "bad man" who need to be punished for his character.

Nor is there any weight to the defense concerns that the jury will get "wrapped up" in the supposed "international intrigue" and "decades of speculation" surrounding La Belle. ECF 19. The government intends to put on a concise and straightforward factual presentation establishing that the bombing took place and that the defendant was in East Berlin when it happened. The defense is, of course, entitled to present any admissible evidence about the possibility of alternate perpetrators, or otherwise seek to muddy the waters in ways consistent with the rules of evidence and trial practice. But absent that, the La Belle evidence will involve no "international intrigue," and any juror who has partaken in "decades of speculation" about the event will rightly be excused during *voir dire*.

Meanwhile, the probative value of the La Belle evidence is high. That much is even clearer now than it was when the government filed its opening brief. The defense has since taken the position that the defendant had "nothing to do with" the events described in the statement, the content of which was fed to him by anonymous masked men and then extracted from him through leading questions during a sham interview. *See generally* ECF 159 at 6. To refute this account, the government should be given every opportunity to show that the statement constitutes the defendant's genuine admission based on his actual experience.

By arguing that the government "does not need" the Berlin travel corroboration because it already has the Malta travel corroboration, the defense appears to concede the soundness of the government's basic theory of corroboration. But when it comes to corroboration, the amount matters: a statement that accords with the defendant's travel history on two separate, otherwise-

unrelated occasions is more reliable than a statement that lines up with only one prior trip. The former is far more difficult to chalk up to fabrication or coincidence.

Finally, the government agrees that Rule 403 "requires a fact-intensive, context-specific inquiry." ECF 174 at 20 (quoting *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008)). For that reason, the Court should rule now that the government may present La Belle evidence as a general matter, but it can defer rulings on the full specifics (*e.g.*, which eyewitnesses may testify, how many photos may be shown, etc.) until closer to trial.

## II.    THE HEARSAY EXCEPTIONS APPLY.

### A.  The government will establish the provenance of the documents.

The defense argues that "the government has not offered any evidence regarding the provenance of the Stasi documents." ECF 174 at 22. For purposes of this motion, the below factual proffer will resolve any question whether the government's proffered exhibits came from "a place where, if authentic, [they] would likely be." Fed. R. Evid. 901(8)(B).

The records were obtained from the German authorities pursuant to a mutual legal assistance ("MLA") request from the United States.[7] They were retrieved by the German authorities from the Stasi archives which, as noted in the government's opening brief, are "governed by a comprehensive statute that 'regulates the registration, safekeeping, administration and use' of Stasi records to, among other things, 'ensure and promote the historical, political, and juridical reappraisal of the activities of the State Security Service.'"  ECF 147 at 24

---

[7] By way of background, the records had previously been provided to Scottish authorities pursuant to an earlier request by them. The MLA request from the U.S. government asked the German authorities to provide the same documents that had already been provided to the Scottish authorities.

The records were accompanied by cover letters[8] from the Stasi archives that explain in detail the searches that were conducted as well as their positive or negative results. For example, in one twelve-page letter, the archives reported (among other things) that no entries were found for the persons "Abouagele Masoud" or "Abdul Hakim Shadi" in the "central persons card index," but that entries for each of those persons were found in the "decentralized" card index of Main Department XXII.[9] The letter goes on to explain that those individuals' cards were tagged with the term "Flunder," which (as explained in the government's opening brief, ECF 147 at 22) is one of the codenames for the file that contained the Hotel Report. The documents provided under the cover letter include copies of the index cards, a copy of the "Flunder/Rinde" file, and other materials. The accompanying documentation, therefore, not only establishes that the documents proximately originated from Germany's official Stasi archive, but also provides extensive detail how the archive handled the request that led to their production.

As further confirmation of the documents' provenance, each one is stamped with "BSTU" followed by a page number, indicating that they came from the Federal Commissioner for the Records of the State Security Service of the former German Democratic Republic (Der Bundesbeauftragte für die Unterlagen des Staatssicherheitsdienstes der ehemaligen Deutschen Demokratischen Republik, or "BStU").

At trial, the government will present evidence sufficient to support the jury's finding that the documents are, in fact, genuine Stasi records. *See* Fed. R. Evid. 104(b).

---

[8] Produced in discovery with beginning bates numbers Sensitive-USAO-000022497; -000030204; and -000022011.

[9] In a system akin to a pre-digital library card catalog, the Stasi used index cards to keep track of the subjects reported on in the files. There was a central agency-wide index as well as separate indices for different departments.

**B. The Stasi had no reason to falsify records about the defendant's travel.**

The defense makes several related points meant to cast doubt on the reliability of the documents. They all fail, for reasons that boil down to the Stasi's lack of any incentive to create internal records that falsely implicated the defendant in the La Belle bombing.

First, in the context of the ancient documents rule, the defense notes that "the documents were prepared within two weeks of the La Belle bombing." ECF 174 at 22. Likewise, when discussing the residual exception, the defense reiterates that "the documents' age does not add to their trustworthiness." But the relevant question is not whether the documents predate the general "controversy" of the bombing, but whether they predate any controversy over the defendant's involvement in it. If the defendant had been charged with the offense in that timeframe, or even suspected as a perpetrator, the defense's argument would have more purchase. But he was not, which is why the mentions of the defendant in the reports appears to be wholly incidental – to call him a bit player in the reports would be generous. Because the records long predate any accusation that the defendant was part of the La Belle bombing, their age greatly enhances their reliability on the factual point for which they are being offered.[10]

Similarly, the defense disputes the documents' reliability as public records because "the Stasi served as a one-stop shop for every conceivable law enforcement function, including the investigation of crimes and thought crimes." ECF 174 at 25. That observation, while true, is beside the point.

---

[10] Also on the ancient documents point, the defense notes the existence of "double hearsay." ECF 174 at 23. "Courts have disagreed about whether the multiple-hearsay rule applies to statements made in ancient documents." *Langbord v. United States Dep't of Treasury*, 832 F.3d 170, 189 (3d Cir. 2016). This Court need not pick sides in that debate, because the primary sources underlying the Visitors List and Hotel Report were themselves excepted hearsay as a public record and a business record, respectively. *See* ECF 147 at 26-28. They were also ancient documents in their own right.

Let there be no confusion: the Stasi operated a ruthless system of surveillance and repression that, among other things, imposed brutal punishment on dissenters. The government here does not seek to minimize that reality. But the Stasi system served multiple purposes: partly to *punish* those it disfavored, and partly to *prevent* perceived harms from befalling the state. The distinction between punishment and prevention is important: When trying to make a case against an identified party, there is both the motive and the means to fabricate evidence. But when trying to prevent or mitigate harm, a declarant has every incentive to be accurate. That is especially so when the documents in question are generated for internal rather than external use. *See* Ex. 608-c (declaration explaining Hotel Report was "created for intelligence purposes," not "for use in court"). Hence, the fact that the defendant's hotel stay appears in "a small excerpt from a 244-page dossier about a suspected foreign agent *under investigation for posing a threat to the state,*" ECF 174 at 25, makes it more reliable, not less. No conceivable counterespionage purpose would be served by inserting false details about the defendant into the "Rinde/Flunder" file.

Finally, when disputing the documents' authenticity, the defense observes that the Stasi archives are an imperfect remnant of the agency's full original holdings. *See* ECF 174 at 23. It is true that many Stasi records have been lost to time. Most importantly, during the collapse of the East German government, the Stasi rushed to destroy internal records.[11] Largely as a result of that attempted coverup, efforts are still underway to restore and catalogue the voluminous records that survived.[12] Hence it is not surprising that certain "relevant original records," such as the visa

---

[11] *See generally, e.g.*, Stasi Records Archive, "The Reconstruction of Torn Documents," *available at* https://www.bundesarchiv.de/en/stasi-records-archive/the-reconstruction-of-torn-documents/ ("They were executing destruction orders designed to erase any traces of unlawful actions and information about people's identities. But they also got rid of everyday records of the Ministry.").

[12] *Id.* (describing challenge of "reassembling documents that had been torn up by hand" and "stuffed into a total of 16,000 bags").

requests for the defendant and Shadi, "could not be located." ECF 174 at 29 (emphasis removed). But neither the Stasi's attempts to purge the historical record, nor the archivists' still-ongoing efforts to process the materials, provide any reason to suspect that fabricated records have been introduced into the archives. In particular, creating convincing fake records about the defendant's travels in 1986 would not only be very difficult, it would also serve no conceivable purpose for anyone in a position to do it.

In sum, the timing and purpose of the documents' creation support their reliability, and nothing about their provenance arouses suspicion that they are fabricated.

**C. None of the cases cited by the defense support exclusion.**

In arguing for exclusion of the Stasi documents, the defense relies in part on *United States v. El-Mezain*. *See* ECF 174 at 29-30 (citing 664 F. 3d 467, 497–501 (5th Cir. 2011)). But that case involved totally dissimilar facts, and every point weighing against admission in *El-Mezain* weighs in favor here.

To begin, the documents at issue in *El-Mezain* did not convey mundane, concrete facts like a person's hotel residence. Instead, they expressed vague, inculpatory, and conclusory statements about entities being "a financial resource for Hamas," having "relations with" a Hamas-linked group, and being "associated with the Hamas movement." *El-Mezain*, 664 F.3d at 497. The Fifth Circuit found that these "conclusions… are not the kind of objective factual matters we have found to be reliable under Rule 803(8)(B) when reported as a matter of course," and noted further that the conclusions were "reached through unknown means." *Id.* at 499. Here, we propose to offer facts, not conclusions, and we have shown where those facts came from.

Moreover, in *El-Mezain*, the documents in question had been seized by the Israeli military from the headquarters of the Palestinian authority. *Id.* at 497. Given that provenance, "there [was] nothing known about the circumstances under which the documents were created, the duty of the

authors to prepare such documents, the procedures and methods used to reach the stated conclusions, and, in the case of two of the documents, the identities of the authors." *Id.* at 499. Here, by contrast, the documents were provided through formal channels by East German's successor government in response to a routine MLA request. And given the corresponding declarations, a great deal is known about the relevant circumstances, procedures, and methods of the documents' creation – all of which enhance, rather than diminish, their reliability. If anything, then, the Fifth Circuit's reasoning in *El-Mezain* would favor admission of the Stasi records here.

The defense also cites *United States v. Doyle* in arguing that admission of the Stasi documents would "forge a new, hybrid exception to the hearsay rule by combining these two distinct varieties of admissible hearsay." ECF 174 at 26 (quoting 130 F.3d 523, 547 (2d Cir. 1997). The most important problem with *Doyle* is that the court there did not consider the admissibility of the records under the residual exception. That basis of admission was unavailable because the government failed to provide the required notice. *See id.* at 546 n. 17 (citing Fed. R. Evid. 804(24), the predecessor to Rule 807). Had the residual exception been available, the result may well have been different, since the entire purpose of that rule is to give courts the ability to create "new" exceptions in appropriate circumstances. The fact that evidence lies "at the intersection of two traditionally reliable types of hearsay evidence," *id.* at 547, does not disqualify it, as Rule 807's 2019 amendment made clear. *See* Fed. R. Evid. 807, committee note to 2019 amendment ("This [amendment] clarifies that a court assessing guarantees of trustworthiness may consider whether the statement is a 'near-miss' of one of the Rule 803 or 804 exceptions."). Indeed, when a piece of evidence is a "near miss" from two different hearsay exceptions, admission is especially appropriate, since the statement bears multiple of the traditionally recognized indicia of reliability.

16

In any event, the facts of *Doyle* were much different from the facts here. The documents in *Doyle* were submitted by private parties to Maltese customs, and attested to by a customs official who "could not possibly testify as to the practices of the private businesses that generated the documents" *Doyle*, 130 F.3d at 546. In other words, nothing was known about how the information in the documents came to be recorded there. Here, by contrast, a former Stasi employee has attested that the hotel's registration cards were filled out by guests at the time of check-in, kept in the course of the hotel's regularly conducted business, and made as a regular practice of that business. *See* Ex. 608-c. Moreover, the Court can consult an example of one such card and see that it virtually speaks for itself as a routine record of a hotel's operations in the predigital age. *See* ECF 147 at 23.

## III.    CONCLUSION

For the reasons above, the Court should (1) permit the government to offer evidence about the La Belle Discotheque bombing under Rule 404(b); and (2) issue the pretrial evidentiary rulings requested in the defendant's opening brief.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:    */s/ Conor Mulroe*
CONOR MULROE (NY Bar No. 5289640)
ERIK M. KENERSON (OH Bar No. 82960)
BRITTANY KEIL (D.C. Bar No. 500054)
Assistant United States Attorneys
JEROME J. TERESINSKI (PA Bar No. 66235)
Special Assistant United States Attorney
601 D Street NW, Washington, D.C. 20530
(202) 740-4595 // Conor.Mulroe@usdoj.gov

KATHLEEN CAMPBELL (MD Bar No. 9812170031)
JENNIFER BURKE (MD Bar No. 9706250061)
Trial Attorneys, Counter Terrorism Section
National Security Division
950 Pennsylvania Avenue NW, Washington, D.C. 20530