UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | Case No. 22-cr-392 (DLF) |
| | : | |
| **ABU AGILA MOHAMMAD MAS'UD KHEIR AL-MARIMI,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SUPPLEMENTAL BRIEF IN SUPPORT OF
MOTION TO ADMIT FOREIGN RECORDS**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this supplemental brief in support of its Motion to Admit Foreign Records [ECF 148]. This pleading addresses the questions posed in the Court's minute order of November 7, 2025.

1. **Level of Detail.**

Section 3505 provides in mandatory terms that foreign business records "*shall not* be excluded as evidence by the hearsay rule if a foreign certification attests" to four points. 18 U.S.C. § 3505(a)(1) (emphasis added). The certifications submitted by the government, *e.g.*, Ex. 1007-c, attest to precisely those four points. By the plain terms of the statute, therefore, the government's certifications contain sufficient detail to satisfy the requirements of § 3505.

To be sure, Congress could have chosen to require more. For example, the statute could have been written to require that foreign certifications "attest to particularized facts sufficient to support a finding that" each of the four criteria for admissibility are satisfied. But that was not the approach taken, and for good reason: the entire purpose of the statute was "to streamline the admission" of foreign records, not "to add technical roadblocks" to their admission. *United States*

*v. Strickland*, 935 F.2d 822, 831 (7th Cir. 1991); *see also United States v. Hing Shair Chan*, 680 F. Supp. 521, 523 (E.D.N.Y. 1988) ("The purpose of the law is to create 'a simple, inexpensive substitute for the cumbersome and expensive procedures presently required for the admission of foreign business records.'" (quoting H.R. Rep. No. 98–907, at 3 (1984))); *United States v. Garcia Abrego*, 141 F.3d 142, 177 (5th Cir. 1998) ("[T]he purpose of the legislation is to make foreign-kept business records more readily admissible into evidence in criminal trials in United States courts." (quoting H.R. Rep. No. 98–907, at 2)).

Consistent with the statute's text and purpose, courts applying § 3505 have routinely confirmed that a standard business certificate – that is, one that attests to the statute's requirements without providing supporting detail – is sufficient to make the corresponding records admissible. *See, e.g.*, *United States v. Miller*, 830 F.2d 1073, 1077 (9th Cir. 1987) (certificate sufficient that attested to "the authenticity and accuracy of the records and that they were kept in the ordinary course of business and prepared at or around the time the events occurred by a person familiar with those matters or on the basis of information given by such a person"); *Hing Shair Chan*, 680 F. Supp. at 524 (certificate sufficient that attested the records "were made at or near the time of the occurrence of the matters set forth therein by or from information transmitted by a person with knowledge of those matters, they were kept in the course of a regularly conducted business activity[,] and keeping such records was a regular practice of the [business]" (internal quotation marks omitted)).

Likewise, in the analogous context of domestic business records offered under Rule 803(6),[1] it is well established that "certificates from a records custodian that 'track the language

---

[1] "Congress based § 3505 on Rule 803(6) and instructed courts to interpret 'the language in subsection (a)(1)(A), (B), (C), and (D)… in the same manner as the comparable language in

2

of Rule 803(6) nearly word for word' render the records self-authenticating." *United States v. Ayelotan*, 917 F.3d 394, 402 (5th Cir. 2019) (quoting *Wilson v. Zapata Off-Shore Co.*, 939 F.2d 260, 272 (5th Cir. 1991)). Courts have accordingly rejected arguments based on the purported "boilerplate and conclusory" nature of standard business certifications, explaining that "the authority clearly supports that affidavits may simply track the elements of Rule 803(6)." *United States v. Hagen*, no. 3:19-cr-146, 2021 WL 2292410, at *2 (N.D. Tex. June 3, 2021) (citing *United States v. Towns*, 718 F.3d 404, 409 (5th Cir. 2013); *Sheppard v. Liberty Mut. Ins. Co.*, no. 16-cv-2401, 2017 WL 480601, at *4 (E.D. La. Feb. 2, 2017); *JPMorgan Chase Bank, N.A. v. Classic Home Fin., Inc.*, No. CIV.A. H-10-1358, 2012 WL 201533, at *5 (S.D. Tex. Jan. 23, 2012), *aff'd*, 548 F. App'x 205 (5th Cir. 2013); *Kast v. Greater New Orleans Expressway Comm'n*, 719 F. Supp. 2d 662, 668 (E.D. La. 2010)).

The government is aware of only two counterexamples, both of which are distinguishable. In *United States v. Ekiyor*, the court found that a standard records certificate was insufficient to establish the admissibility of an airline "baggage log" that, because its contents related solely to the defendant, appeared to have been "prepared at the request of the Government for the specific purpose of introducing it at Defendant's criminal trial." 90 F. Supp. 3d 735, 741 (E.D. Mich. 2015). The court held that the records might still be admissible if the government established that "the information in the baggage log consists solely of a subset of a larger underlying database that [the airline] keeps in the course of its regularly conducted activities," but found that the business certifications accompanying the records were insufficient to support that conclusion. *Id.* at 742-43.

---

Rule 803(6) is interpreted.'" *United States v. Al-Imam*, 382 F. Supp. 3d 51, 58 (D.D.C. 2019) (quoting H.R. Rep. 98-907, at 3 (1984)).

Similarly, in *United States v. Browne*, the court relied on *Ekivor* to initially deny admission of PayPal records where the standard certification seemed to be contradicted by the records' facial appearance of having been prepared for purposes of the criminal trial. 606 F. Supp. 3d 106, 110 (D.N.J. 2022). But the court later ruled the records admissible after receiving an amended certification attesting that the information "was recorded at or near the time a user logs into PayPal in the normal course of PayPal's business and are maintained and stored in PayPal's system in the routine course of its business." *Id.* at 111. Based on the opinion's description,[2] this amendment does not appear to have meaningfully increased the certificate's level of detail; it simply clarified (in conclusory fashion) a point that was not self-evident to the court: that the information in question were created when the data was first generated, not when the company pulled that data in response to a law enforcement request.

Even assuming arguendo that the courts' reasoning in *Ekivor* and *Browne* was sound, that reasoning is inapplicable here. The documents at issue here were "facially prepared in the normal course of business," not created at the specific request of law enforcement. *Browne*, 606 F. Supp. 3d at 110. Accordingly, even these outlier district-court cases would not have found fault with the level of detail in the standard records certifications the government has submitted here.[3]

---

[2] Undersigned counsel consulted the pleadings on Pacer, but the amended certificate was submitted under seal and was not immediately available.

[3] The possible exception is Exhibit 1301, a document from the Toshiba Corporation listing which of the company's stereo models used a certain component. The list appears to have been computer-generated, drawn from an electronic database that included numerous other models that did not use the component. *See* ECF 183 at 8 (government's Reply, discussing this exhibit). But the fact that Ex. 1301 may reflect information drawn from a broader set of data does not make it inadmissible. *See, e.g.*, *U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*, 576 F.3d 1040, 1043 (9th Cir. 2009) ("[E]vidence that has been compiled from a computer database is also admissible as a business record, provided it meets the criteria of Rule 803(6)."). Even if the printout was made at the request of government investigators, that fact "does not deprive the printout[] of its business-record character." *United States v. Fujii*, 301 F.3d 535, 539 (7th Cir. 2002) (citing *United States v. Briscoe*, 896 F.2d 1476, 1494 n. 13 (7th Cir. 1990)).

According, the level of detail in the government's proposed certifications is sufficient to admit records under 18 U.S.C. § 3505.

**2. Malta videos.**

It follows from the discussion above that, if an exhibit includes a facially sufficient certification that attests to the certifier's qualifications (*e.g.*, identifying the position within the company and affirming that "by reason of my position [I] am authorized and qualified to make this attestation"), no further details or extrinsic evidence of those qualifications need be presented. Regardless, in this case the evidence supports the witnesses' affirmations that their respective positions make them qualified to sign the certifications. In particular, with respect to the Malta witnesses whose recent interviews were videorecorded, the recordings establish the following:

*S.A.* was, in 1988, a production manager in charge of design for Eagle Knitwear, a family-owned clothing business (3:00). Although he was not directly involved in sales, he was familiar with that aspect the company's business practices and recognized the sales records shown to him, which were signed by family members (e.g., 6:35: "Yes, yes, I remember this; it is old, very, very old… This signature is my dad's signature, for sure; that's Norman's,… and that's my father's signature as well."). When asked whether it was the type of document the company would make in the normal course of business, S.A. immediately responded in the affirmative, and made a humorous comment about the messiness of the black carbon paper they used to use (6:57). Among other things, S.A. displayed familiarity with the "style numbers" that were used to identify the various types of garments made by the company and which appeared in the records that he certified (e.g., 9:27).

*A.A.* was employed for 42 years at Eagle Knitwear (3:37). He held a series of positions there, starting at the bottom and rising to become Production Manager, Operations Director, and

5

ultimately the Chairman of the company (4:00 – 4:47). Having held such central roles in a small family-owned company, A.A. was readily able to recognize the documents put before him and attest to their status as business records, using the word "definitely" in response to the prosecutor's questions (e.g., 6:22, 6:50).

**F.F.** was a shareholder and the Sales Director for Universal Import & Export Ltd., which supplied materials to clothing factories in Malta. His responses to questions indicate that he was involved directly in the sales activities that generated the business records that he ultimately certified. For example, when handed one of the document, he immediately replied to the effect of "Yes, this is copy of an order sent, orders.. placed with us" (4:12). When shown another document relating to clothing sales, F.F. recognized it and went so far as to volunteer an explanation of the tariff implications: "In fact… the company abroad would have to send this document, which is a European document, so that they will not pay duty" (6:53).

**A.Bu.** worked at Johnson's Clothing for 25 years, including working for the co-owner and General Manager (video 2 at 3:00, 8:40). He was personally responsible for generating the type of documents at issue: "This was what was due to go into production. We used to receive orders from the customers, from our clients, and then I compile the information [gesturing at document], see what they [ia] as a style, you know, 'cause there were a lot of styles… So, I prepare this, and then I would forward it to [ia] to make it [ia]…. This was entirely under my responsibility." (video 1 at 8:05). When asked whether making such records was a regular part of the company's business, he confirmed it was: "It was for all the orders that we [ia], all of the orders with no exception" (video 2 at 1:38).

**A.G.** was a Production Manager at Underwear Ltd. During his recent interview by U.S. investigators, like many of the other witnesses, he affirmed that his prior statements and testimony

in the Scottish investigation and trial were accurate (2:45).[4] When presented with a document, A.G. immediately recognized it as one of the company's invoices, pointing out the logo and letterhead (5:10). His familiarity was evident from his ability to recite details about the listed products based on their model numbers: when asked about "196," he responded, "That was t-shirt. I remember… 586? That was a t-shirt as well. Those I remember…. The 196 was a t-shirt, and the 586 was a t-shirt as well, but lighter material. Those I remember." (7:45). A.G. then confirmed that such invoices were used in the usual course of business. He clarified that he personally did not fill out the forms, but when the prosecutor asked whether the company did, he replied "yes, yes, yes, yes." (8:15).

*P.M.* worked for a family clothing company with duties relating to sales and purchases (3:05). In that position, he was aware that the company regularly issued invoices (4:25) and he readily identified various invoices that were shown to him, including one in handwriting that he recognized as his sister's (4:25, 5:17, 6:00, 6:28). P.M.'s prior statements to Police Scotland provide further detail, including that he held the position of Director; that the company "only s[old] our product locally to Malta retailers," including Mary's House; and that he had access to, and would attempt to retrieve, invoices of sales of a certain model of pajama to that customer in 1988. (Statement produced as HS-USAO-00050231). A subsequent statement confirms that P.M. did, in fact, provide those invoices to Police Scotland. (Statement produced as HS-USAO-00050237).

*A.D.* joined Air Malta in 1974 and worked in various locations, including in Libya prior to 1988 and then in Malta beginning in mid-1988 (3:30). His roles included serving as Duty Manager,

---

[4] In one of the statements from February of 1990, produced at HS-USAO-00050270, A.G. stated that he had been a Production Manager for 5 years and had been in training for the job for 3 years before that. He then provided a detailed description of the company's business operations, including its practice of supplying Abanderado brand garments to "Big Ben," a wholesaler on Malta. An invoice for one such sale to Big Ben is the exhibit A.G. certified, Exhibit 715.

7

a job that involved administration and supervising other employees (4:50). This work caused him to interact with various Air Malta documents (6:10). Consistent with that experience, A.D. promptly recognized documents that were shown to him during the interview (*e.g.*, 6:35: "Passenger list… it's a checked-in passenger list."; 9:35: "Yes... the same, manifest.").

      *A.Bo.* is currently employed by Air Malta as Company Secretary, a position that involves giving legal advice. At the time of his interview, he had been at the company for ten years. That means A.Bo. was not employed at Air Malta during the time the records in question were generated; however, by virtue of his position he is aware of the company's recordkeeping system and its retention policies, and he is familiar with a company project, occasioned by an office move in 2012, to archive old Air Malta documents. Notwithstanding that the documents in question predate his tenure, A.Bo.'s responses to the documents made clear they were still of a type familiar to him. When handed Exhibit 806, he identified it almost instantly: "This is the 'G.D.,' insurance, 'General Declaration.'" (10:20). As he looked over the document, he thought out loud as he continued to recognize it: "And usually there are people on the G.D. list… um [reading], exactly, it lists the crew." (10:29 *et seq.*). He also commented on the features that supported his belief that the document was an Air Malta business record from the time, including the fact that it was typewritten, the presence of a period-specific Air Malta logo, the presence of Air Malta's former address, and the fact that he recognized the format of the passenger manifest: "This hasn't changed much, to be honest. We are still using [ia], many airlines are still using these basic systems." (11:13-12:00). When asked about an acronym appearing on the record, A.Bo. explained its meaning, and volunteered an explanation of another of the document's terms. (12:18). In short, he showed that he was amply familiar with the types of documents he certified and the way they were used by Air Malta.

8

*F.B.* was a front-office manager at the Holiday Inn in Malta (1:43, 3:15). When asked whether he was familiar with the hotel's recordkeeping practices at the time of his employment, he responded in the affirmative (10:10). He recognized the documents that were shown to him and readily affirmed that they were kept routinely in the course of the hotel's business (*e.g.*, 4:50).

*S.S.* worked at the Holiday Inn as a receptionist and night manager and auditor (3:12). By virtue of his employment, he was familiar with the registration cards that the hotel used in 1988 (4:40). Among other things, S.S. recognized the various Holiday Inn records that were shown to him and demonstrated his familiarity with them by, for example, explaining the process by which they would be generated (*e.g.*, 12:25, discussing a registration card: "This is typically what would have been filled in, typically by the receptionist, alternatively by the auditor. The details would go in, as are written here… And we would stamp it as well, as here we see by the machine [mimics stamp by striking table with palm] we just do that… that is a machine that we'd use to show the time.").

*D.V.* was an office manager for Libyan Arab Airlines, where he worked for 15 years (video 1 at 15:45). His familiarity with the airline's recordkeeping practices is evident from his responses to the questions posed and documents shown to him. For example, when shown a flight manifest with handwritten passenger names, D.V. responded that his recollection was that flight manifests were computerized; the prosecutor then flipped the page, showing a computer printout, and D.V. immediately responded, "ah, that's it, that's it, that's it." (video 1 at 13:40). His memory of the documents' use in the regular course of the airline's business was sufficiently vivid that he offered comments on how the photocopied exhibits differed in cosmetic appearance from the originals from that era (*e.g.*, video 2 at 4:55, responding to question whether the document "looks like" a

9

flight manifest: "Yes, yes, it *is* a flight manifest… They were rather bigger than that; at that time I think we had the big green paper [mimics sound of 1980s-vintage computer printer]").

*A.C.* was a Manager/Director for Yorkie Clothing, a family-owned clothing business. When interviewed by the U.S. investigators, A.C. made explicit reference to his prior statement to Police Statement[5] -- "I told them, I can tell you" – and then immediately began recounting how he'd previously explained that, for example, "every trouser at that time had a number," the purpose of which was to "prevent cheating," and that the records were "part of an order" that had been "sold to Mary's place" (3:24 *et seq.*). When the U.S. prosecutor presented him with a document, A.C. immediately recognized it as "a record of the cutting room" and went on to explain what the various numbers on the document meant (12:20).

### 3. Testimony about Scottish record-keeping and storage practices.

As argued in the government's Reply brief, ECF 183 at 4-5, the reliability of the records in question is enhanced by the procedures followed by the Scottish authorities in collecting and storing the evidence. At trial, the government anticipates presenting testimony on that topic, likely from a Scottish official familiar with the overall investigation and with the evidence-logging procedures followed.

---

[5] Like those of many of the other Malta certifiers, A.C.'s prior statements to Police Scotland that sheds even more light on his qualifications. For example, in a statement from September of 1989, produced as HS-USAO-00011523, A.C. explained: "I am a Manager of Yorkie Clothing, UB 17B, San Gwan Industrial Estate, Birkirkara, Malta. This is a family business owned by my father. The name Yorkie Clothing is unique to my father's clothing factory in Malta. I have worked in the clothing factory for 9 years full time, and I am familiar with all aspects of the factory from administration to the ordering of material and manufacture of clothing."

### 4. Exhibits without Scottish certifications.

In their opposition to the government's motion, the defense noted that many of the government's proffered exhibits included original Scottish certificates but some do not, and that, where such certificates are absent, that absence "mak[es] it particularly important that the current certifying witness is qualified and knowledgeable about the original recordkeeping and provenance." ECF 173 at 11. Contrary to the defense's suggestion, the absence of an original Scottish certification does not make any of these records unreliable.

It bears noting that § 3505 addresses distinct issues, which are related but should not be conflated. The first is authenticity (required by Rule 901(a)): whether the exhibit in question is genuinely a record from the relevant business, without regard to its status as excepted hearsay. The second is hearsay-exceptedness (required by Rule 802): whether the document, assuming its authenticity, meets the qualifications to be admitted for the truth of matters asserted therein. Section 3505 provides that a valid certification resolves both these requirements, covering hearsay at subsections (a)(1)(A)-(D) and authenticity at subsection (a)(2). Accordingly, just like in the domestic-records context, often "the authenticity analysis is merged into the business record analysis without formal focus on the question" *In re Vee Vinhnee*, 336 B.R. 437, 444 (B.A.P. 9th Cir. 2005).

Still, the issues are conceptually distinct, and that distinction matters here because the defense's argument about missing Scottish certificates bears only on whether the exhibits are authentic – not whether, if authentic, the exhibits are admissible as excepted hearsay because of the reliability of the businesses' recordkeeping practices. Put differently, the absence of an "original" Scottish certificate would only be relevant if one hypothesized that a certifying witness in 2024 recognized a document as being the type of record that was kept in the ordinary course of

11

his company's business, not realizing that it was actually a fabrication or that it had been tampered with to alter its contents.[6]

The government maintains that the § 3505 certificates' attestations of authenticity are dispositive. Indeed, that is the statute's unambiguous mandate: "A foreign certification under this section *shall authenticate* such record or duplicate." 18 U.S.C. § 3505(a)(2) (emphasis added). That conclusion accords with the general rule that, when offering business records or any other exhibits, the proponent need not "conclusively prove[] their authenticity" but only make a "showing 'permit[ting] a reasonable juror to find that the evidence is what its proponent claims.'" *United States v. Khatallah*, 41 F.4th 608, 623 (D.C. Cir. 2022) (quoting *United States v. Blackwell*, 694 F.2d 1325, 1330 (D.C. Cir. 1982)).

The defense's suggestion, that the lack of Scottish certificates undercuts authenticity, seems akin to the argument by the defendant in *United States v. Al-Imam*, that unless the § 3505 certifying witnesses have "have first-hand knowledge of how the records were acquired or whether they were doctored in the interim," they "could not attest that they were duplicates." 382 F. Supp. 3d 51, 57 (D.D.C. 2019). In *Al-Imam*, Judge Cooper rejected that argument as resting on an overly "rigid" reading of § 3505. *Id.* The rule does not demand "near-metaphysical certainty" of the kind that would come from requiring that the certifier "printed or copied the records from the business's files herself." *Id.* at 59. Instead, it was enough that the certifier's "intimate familiarity with the system, combined with indicia on the records themselves, led him to conclude that the records were indeed duplicates," *id.* at 59, even if he lacked firsthand knowledge of where the records came from or whether they might have been tampered with before being presented to him.

---

[6] In this farfetched scenario, one might wonder why the fabricators did not create a forged certificate to accompany the forged document.

The reasoning of *Al-Imam* applies fully here. If anything, this is an easier case, because it lacks the "unusual, if not extraordinary" circumstances of *Al-Imam*/*Khatallah*. *Id.* at 59. The fact that a document was obtained proximately from the Scottish authorities is a point in favor of its authenticity, regardless of whether includes an original Scottish certificate, because that provenance means the Scottish authorities have maintained secure custody of the document over the decades since its original acquisition, logging and storing it according to a rigorous system of standardized recordkeeping. On this point it bears noting that the original Scottish prosecution underwent years of appeals and other postconviction proceedings and remains active from the perspective of the Scottish authorities[7] — all of which provides a strong incentive for the Scottish authorities to handle the evidence with the utmost care.

To be clear, none of the above discussion is to suggest that the defense is foreclosed from attacking the documents' authenticity at trial, where "[t]he jury retains the power to determine what weight to give evidence in light of any questions concerning its authenticity." *Khatallah*, 41 F.4th at 623 (quoting 31 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure Evidence § 7104 (2d ed. April 2022 update)). But because the threshold showing of authenticity has been made, any such arguments will "go to the *weight* of the evidence — not to its *admissibility*." *Id.* (quoting *United States v. Tin Yat Chin*, 371 F.3d 31, 38 (2d Cir. 2004)).

---

[7] *See, e.g.*, "Statement from the Lord Advocate marking 35 years since the Lockerbie bombing" (Dec. 21, 2023), *available at* https://www.copfs.gov.uk/about-copfs/news/statement-from-the-lord-advocate-marking-35-years-since-the-lockerbie-bombing/ (stating, among other things, that Police Scotland "continue[s] working closely with the Crown Office and Procurator Fiscal Service, and in the US with colleagues from the FBI and the Department of Justice, on both the investigation and supporting the ongoing prosecution in the US courts").

### 5. Second-layer hearsay.

As to Exhibit 1009, once the accompanying police report is removed, the government is aware of no remaining second-layer hearsay within the document.

As to Exhibits 1013 and 1024,[8] which both consist of internal Pan Am "telex" messages,[9] we offer the following further explanation of why any embedded statements are not being offered for the truth of what is being asserted:

Exhibit 1013 is a message sent in March of 1998 from a senior Pan Am corporate employee responsible for security. It conveys the company's decision to adopt a practice whereby "interline" checked baggage (that is, checked baggage belonging to passengers transferring onto a Pan Am flight from a flight operated by a different airline) would be x-rayed prior to loading. As conveyed in the telex, Pan Am had concluded that this procedure meant they no longer had to follow the time-consuming alternative protocol whereby, if an interline passenger failed to board the flight, his or her checked bags would be removed from the plane and/or physically searched, delaying the flight's departure. Hence the emphatic directive: "IN THE EVENT OF A NO[-]SHOW INTERLINE PAX [passenger] AND HIS BAG IS ALREADY LOAD[ED] IN THE BELLY [of the plane,] WE GO!!!!!" This policy decision is relevant because it helps establish that an unaccompanied bag could be transferred in Frankfurt from an Air Malta flight to a Pan Am flight without being detected, as long as it passed x-ray screening.[10]

---

[8] The defense objected on hearsay-within-hearsay grounds to Exhibits 1009, 1013, and *1024*, but the Court's minute order requested additional argument on Exhibits 1009, 1013, and *1014*. Presuming this to be a typo, the government addresses Exhibit 1024 in this pleading but will be prepared to address Exhibit 1014 at the hearing if the Court has questions about that document.

[9] Telex is a once-common means of communication that can be thought of as a precursor to email. It was a means of sending and receiving text-only messages over telephone lines.

[10] Of note, the defendant explained in his confession: "[T]he detonator and the timer for the explosion had been hidden inside the case in a clever way which made them difficult to detect.

14

Exhibit 1024 consists of a series of internal Pan Am telexes sent on or about December 8, 1988, conveying instructions for what steps employees should take in response to the so-called "Helsinki Warning."[11] These included, for example, subjecting all Finnish passengers boarding in Helsinki to enhanced questioning and screening. The relevance of this exhibit is to refute potential defense arguments regarding the Helsinki Warning. (If the defense does not raise the Helsinki Warning, the government is unlikely to offer Exhibit 1024.)

In the case of both exhibits, the messages were sent were months or weeks before the bombing of Pan Am Flight 103, so they are not being offered to prove the truth of any then-existing facts being asserted. Rather, they are relevant for their effect on the listener; ultimately, the on-the-ground security personnel responsible for conducting Pan Am's operations in accordance with the policies being communicated. The analysis would be different for a hypothetical post-bombing telex that asserted "We x-rayed all the interline bags in Frankfurt on December 21." But here the telexes' relevance is in their future-oriented directives, and "a command is not hearsay because it is not an assertion of fact." *United States v. White*, 639 F.3d 331, 337 (7th Cir. 2011) (citing *United States v. Murphy*, 193 F.3d 1, 5 (1st Cir. 1999))). Additionally and alternatively, the forward-looking statements in the telexes are admissible under Fed. R. Evid. 803(3) as statements of Pan Am's then-existing plans and intentions. *Cf. Mun. Revenue Serv., Inc. v. Xspand, Inc.*, 700 F. Supp. 2d 692, 706 (M.D. Pa. 2010) (holding that Rule 803(3) allows admission of statements by

---

This was done by placing them carefully next to metallic parts of the case. As for the plastic [explosive] substance, the scanner will not show that at all."

[11] The "Helsinki Warning" was a security bulletin issued by the Federal Aviation Administration on December 7, 1988, in response to an anonymous telephone call placed to the U.S. Embassy in Helsinki, Finland, on December 5, 1988. The caller stated that sometime within the next two weeks, a Finnish woman would carry a bomb on board a Pan Am aircraft flying from Frankfurt to the United States.

individuals to prove "the motives underlying the business decisions of the entities that they represent").

To the extent the telexes incidentally contain factual assertions (such as in Exhibit 1013, "FAA R SALIZAR [an official of the Federal Aviation Administration] HAS GRANTED X RAY AS AND [*sic*] ALTERNATIVE TO SEARCHING PASS[ENGER] BAGGAGE"), those portions pose no risk of prejudicing the defendant. The government would not object to a limiting instruction that directs the jury to consider the exhibits only for specified purposes.

### 6. Swiss records

The government has requested an update regarding the Swiss authorities' expected timeline for providing the outstanding certificates, but has not received a response as of the time of this filing. If more information becomes available by the time of the status conference, the government will provide it.

The government would propose that, if and when the Court is prepared to rule on documents from countries other than Switzerland, it issue that ruling and reserve on the question of the Swiss records until the government submits the certificates.

## CONCLUSION

At the upcoming status conference, the government will be prepared to answer any further questions on the above points or any other aspects of its motion to admit foreign records. Following any such argument, the government's motion should be granted.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:     */s/ Conor Mulroe*
       CONOR MULROE (NY Bar No. 5289640)
       ERIK M. KENERSON (OH Bar No. 82960)
       BRITTANY KEIL (D.C. Bar No. 500054)
       Assistant United States Attorneys
       JEROME J. TERESINSKI (PA Bar No. 66235)
       Special Assistant United States Attorney
       601 D Street NW, Washington, D.C. 20530
       (202) 740-4595 // Conor.Mulroe@usdoj.gov

       KATHLEEN CAMPBELL (MD Bar No. 9812170031)
       JENNIFER BURKE (MD Bar No. 9706250061)
       Trial Attorneys, Counter Terrorism Section
       National Security Division
       950 Pennsylvania Avenue NW, Washington, D.C. 20530