BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          .
                                   .  Case Number 22-cr-392
          Plaintiff,               .
                                   .
     vs.                           .
                                   .
ABU AGILA MOHAMMAD MAS'UD          .  Washington, D.C.
KHEIR AL-MARIMI,                   .  November 12, 2025
                                   .  2:16 p.m.
          Defendant.               .
- - - - - - - - - - - - - - - - -


PUBLIC TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE DABNEY L. FRIEDRICH
UNITED STATES DISTRICT JUDGE



APPEARANCES:

For the United States:        BRITTANY KEIL, AUSA
                              ERIK KENERSON, AUSA
                              CONOR MULROE, AUSA
                              United States Attorney's Office
                              601 D Street Northwest
                              Washington, D.C. 20579

                              JEROME TERESINSKI, AUSA
                              United States Attorney's Office
                              801 West Superior Avenue
                              Suite 400
                              Cleveland, Ohio 44113

                              KATHLEEN CAMPBELL, ESQ.
                              United States Department of Justice
                              National Security Division
                              950 Pennsylvania Avenue Northwest
                              Washington, D.C. 20530


                    -- continued --

APPEARANCES (CONTINUED):

For the Defendant:             WHITNEY MINTER, AFPD
                               BROOKE RUPERT, AFPD
                               Federal Public Defender's Office
                               1650 King Street
                               Suite 500
                               Alexandria, Virginia 22314

                               LAURA KOENIG, AFPD
                               Federal Public Defender's Office
                               701 East Broad Street
                               Suite 3600
                               Richmond, Virginia 23219


Official Court Reporter:       SARA A. WICK, RPR, CRR
                               333 Constitution Avenue Northwest
                               Room 4704-B
                               Washington, D.C. 20001
                               202-354-3284


Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

(Call to order of the court.)

COURTROOM DEPUTY:  Your Honor, we are now calling for the record Criminal Action 22-3892, United States of America versus Abu Agila Mohammed Mas'ud Kheir Al-Marimi.

Your Honor, for the record, the interpreters were previously sworn.

If the parties, beginning with the government, would please approach the lecturn and state their appearances for the record.

MS. KEIL:  Good morning, Your Honor.  Brittany Keil for the United States, along with my co-counsels Conor Mulroe, Kathleen Campbell, Erik Kenerson, and Jerome Teresinski appearing by Zoom.

THE COURT:  Good afternoon, everyone.

MR. TERESINSKI:  Good afternoon, Your Honor.

MS. MINTER:  Good afternoon, Your Honor.  Whitney Minter and Brooke Rupert on behalf of Mr. Al-Marimi.

Your Honor, Ms. Koenig had intended to be here.  She was ordered back to the courtroom to resolve some further matters on a hearing in Richmond, and I don't think she's going to be able to make it.  But I would ask if she could possibly join the hearing remotely, as Mr. Teresinski has.  She does have the link and will join as she's available with the Court's permission.

THE COURT:  Okay.  That's fine.  And just --
consistent with earlier hearings, the defendant does consent for

attorneys to appear remotely for these status hearings; correct?

MS. MINTER:  Yes, Your Honor.

THE COURT:  All right.  She can join in as available.

MS. MINTER:  Thank you, Your Honor.

THE COURT:  All right.  So this is a status hearing to discuss a number of issues relating to the upcoming Rule 15 depositions and various pending motions.  I will rule today on the government's motion to permit live remote testimony during trial.  I will not rule on the other pending motions for which I'm still awaiting briefing.

I suspect that there will be a need to address some matters relating to CIPA and the forthcoming motion to suppress under seal.

Finally, I do want to discuss the trial date at some point, whether we do that at the end of the public proceeding or go into sealed proceeding and then back into a public proceeding, but I think that should wait until the end.

I understand the victims are on the line on the WebEx platform, which I understand is incorporated into the Court's Zoom platform, and this was done so that attorneys for both sides could participate in the status hearing.  And so the Court granted that with the defendant's consent to allow that to happen.

Moving forward, assuming there are no technical issues today or security issues today, I will approve the Zoom platform

to be used for status hearings and only status hearings so that the attorneys can attend and participate remotely where necessary.

But as I understand it, the government -- consistent with earlier discussions, the government will continue to operate the WebEx platform for the victims; is that correct?

MR. TERESINSKI:  Yes, it is, Your Honor.

THE COURT:  All right.  Just to reiterate the conclusions drawn in the December 2024 memorandum opinion on the victims' access, there will not be remote access available during evidentiary hearings and trial.  And so I do want to talk about the upcoming motion to suppress and what steps the government has taken to ensure that the victims can access those proceedings through secured sites around the world and in the U.S.

Any clarification from either side on what the Court has said regarding status hearings versus evidentiary hearings and trial?

Just to be clear, where there's a need for an attorney to appear remotely where they have a speaking role, I think it makes sense to use the Zoom platform.  Otherwise, I think we use the WebEx platform as we did last status hearing.

Does that make sense to everyone?  Okay.  All right.

Let's start with the Rule 15 depositions.  To the extent there are aspects that can be discussed on the open record, let

me first hear from the government on that issue.

MS. KEIL:  Yes, Your Honor.  Good afternoon.

Just one housekeeping matter, Your Honor.  As you know, there were multiple issues the Court wanted to discuss today. So you will likely see multiple of the attorneys up here --

THE COURT:  That's fine.

MS. KEIL:  --- discussing each one of them.

As regards the Rule 15 depositions, sort of starting chronologically, what we can say on the open record for the upcoming deposition that is currently scheduled in the next week, we have communicated with chambers about start times.  I believe the Court is prepared to start at 9:00 a.m. each day and run for four to five hours, depending on the witness's availability.

We do have the videographers and the court reporters all lined up on-site in that location.  We would -- speaking of Zoom, we do plan -- so we have the videographers to record the deposition, but the attorneys there will need to communicate with the attorneys in the courtroom, as well as Your Honor, to make rulings.

So we were curious if the Court would be willing to use the Zoom for Government platform for those communications just amongst the parties.  If not, the videographers do have a platform, it's actually also Zoom, that we can contract with them to do, but it might be smoother if we use the Court's Zoom

for Government.

THE COURT:  Well, I want to talk to our IT people, and I will get back to you if not today, first thing tomorrow.

Is that sufficient?

MS. KEIL:  Absolutely, Your Honor.  Thank you.

We also -- we have shared with the defense digital versions of the government's exhibits that it intends to discuss with the witness.  The government would like to share those digital exhibits with the Court as well.  The government is happy to provide a digital binder to chambers if the Court is -- if the Court is willing.  There's a large number of exhibits.  So it's a little too bulky to do in print.

THE COURT:  How many exhibits are we talking about for this deposition?

MS. KEIL:  Well, the government is going to have many ready.  Let's just say some of the -- it could be -- the ones that the government has ready is in the hundreds.  The government does not expect to identify or introduce nearly that many.  But to have on hand, the government would like to provide those the Court.

THE COURT:  So the deposition will start Monday morning at 9:00?

MS. KEIL:  Yes.

THE COURT:  And how many days does the government anticipate this deposition to take?

MS. KEIL:  The government hopes it does not take all five days.  The plan is to be done next week so that there's no --

THE COURT:  It will need to be done.  All right?  I cannot go into the following week.

MS. KEIL:  Absolutely.

THE COURT:  But it's possible it will be shorter than five days?

MS. KEIL:  We are all hopeful, yes.

THE COURT:  Okay.  I know there is a motion relating to the expert issue.  That's something that can happen in realtime; right?  It's not something we need to address today, either in open hearing or under seal?

MS. KEIL:  That's what the government is hoping, that the Court will rule throughout the deposition.

THE COURT:  All right.  With respect to the second deposition that's going to be coming up, we can talk about that more under seal, but I'm interested in how we're going to fit that deposition in with the motion to suppress and how we will set a start date for -- we've got a lot going on that week.

MS. KEIL:  Yes, Your Honor.  You are jumping ahead all over my agenda, Your Honor.  I would note that that is absolutely right.  We have been talking with the defense about putting a date on the calendar for the motion to suppress, on the public calendar.

THE COURT:  What date are you proposing for that?

MS. KEIL:  We've been discussing.  I think we are cognizant that whatever date we put, there may be victims making travel arrangements.  So we don't want to start it too late or too early.  But the defense has indicated they feel fairly comfortable that that Wednesday, December 17, would be an appropriate amount of time to conduct the motion to suppress that Wednesday, Thursday, and Friday, if we started it on Wednesday.  So we would ask for the 17th.

THE COURT:  And I will be able to complete the deposition that I'm doing earlier in the week by Wednesday?

MS. KEIL:  That's the hope, Your Honor, yes.

THE COURT:  Well, whatever it is, I've got the week.

MS. KEIL:  We completely understand.  We know.  Yes.

THE COURT:  So I would encourage you all to be optimistic about when you are ready to start the motion to suppress, because if there's a need to delay it a little bit, better that than victims not realizing that the motion to suppress hearing is beginning.

MS. KEIL:  Exactly.  Yes, Your Honor.  So that's why we've been going back and forth on whether we should ask for the 16th or the 17th.  And I will let the defense speak to their thoughts on the timing.  But based on -- and we can talk more about this under seal later, perhaps.

THE COURT:  Okay.

MS. KEIL:  We will also be asking for a status hearing the week of December 1st to sort of solidify all the logistics for that week.

THE COURT:  Okay.  I don't want to get ahead of us, but you all be thinking about this.  The Court is also going to want a motions hearing on a lot of these pending motions.  And I know there's briefing forthcoming, as I will discuss in a moment.  They're very intertwined.  I appreciate the government wants a ruling on the 404(b) motion yesterday, but I'm going to need to consider these as a whole.

MS. KEIL:  Yes, Your Honor.

THE COURT:  So that's something that we will get to in a moment.  But I don't know whether that's something that is realistic to try to fit in in early December, but be thinking about that during this hearing, whether it's that or January.

MS. KEIL:  Yes, Your Honor.

THE COURT:  Okay.

MS. KEIL:  One more logistical question for next week, Your Honor.  We would ask the Court to issue a come-up for the defendant to be in the courtroom.

THE COURT:  For next week?

MS. KEIL:  Yes.

THE COURT:  We can do that.  I will make sure my courtroom deputy is aware of that.  We will need to do that this week.

MS. KEIL:  Thank you, Your Honor.

THE COURT:  Okay.  Has the government taken the necessary steps to have the locations open overseas and in the U.S. for the suppression hearing?

MS. KEIL:  I will defer to Mr. Teresinski on that issue, as he is the subject matter expert.

THE COURT:  Okay.  Mr. Teresinski?

MR. TERESINSKI:  Good afternoon, Your Honor.  How are you?

THE COURT:  Fine.  Thank you.  How are you?

MR. TERESINSKI:  Okay.  You want to address that now? We'd be happy to.

Obviously, Your Honor, we have just endured the longest shutdown in U.S. history.  Hopefully, it will be over today, if they get it together and sign whatever they need to sign.  But that's also impacted our ability to deal with being able to do what we need to do in terms of things overseas.  And so that has sort of hamstrung us a little bit in terms of the shutdown caused unintended consequences with furloughs.  We couldn't have dedicated the people that we needed to in order to go overseas, to go to fixed sites, to do what we need to do.

We have an idea of where they're going to be.  That's not an issue.  The issue is really, you know, just sort of getting the nuts and bolts in place.  We don't anticipate that being too complicated.  It's just those are the realities of what we've

been dealing with.

THE COURT: So the government -- just to be clear, the government will not have remote viewing sites for the victims overseas?

MR. TERESINSKI: No, we're not saying that. We do think we will. We're hoping to. We're believing that -- that's our intent. We are trying to do that, at least a couple in the United Kingdom, possibly throughout Europe. It all depends again on what we're able to accomplish, given sort of the hurdle that we were just thrown.

THE COURT: Just to be clear, if those sites are open, consistent with the Court's December 2024 opinion and subsequent discussions, there would be U.S. personnel who are there to check identifications, certifications, electronics? All of those precautions would be in place as well; correct?

MR. TERESINSKI: Correct. I understand.

THE COURT: So you're hopeful -- am I hearing you right that you are hopeful that there will be overseas sites, but you don't yet have them set up? Is that what you are saying?

MR. TERESINSKI: We don't have them set up, no, Your Honor.

THE COURT: But you're working to do that, and you are hopeful that you will be able to do that in time for the December 17 suppression hearing?

MR. TERESINSKI:  That might be a tall order.  I don't know the answer to that question.  I'm -- it's a very difficult thing to predict on that regard, I'm going to say, difficult question to answer.

THE COURT:  But you are trying to do that?

MR. TERESINSKI:  Of course; of course.  We're trying.  We are trying our best.

THE COURT:  And you will notify victims and keep them apprised of what their options are in terms of viewing that hearing, whether it be overseas, in a remote location, or here in the U.S.?

MR. TERESINSKI:  That's correct, Your Honor.  We have identified -- we are in the process of also identifying locations at U.S. Attorney's Offices throughout the country, again as we've promised to do in our previous pleadings.

THE COURT:  Okay.

MR. TERESINSKI:  So the difficulties we've had really are dealing with the furloughed situation, the ability to enter into contracts.  Those are the things that are problematic.

THE COURT:  I understand.  I just want to make sure we're complying with the statute.  So to the extent practicable, a location shall be made available without regard to location.  So it sounds like you're moving in that direction.

I would just ask, for the benefit of the victims, that they be kept apprised in this process so they can plan accordingly.

I imagine they have travel arrangements to make, and the holidays are coming up.  So I would just ask that you keep the lines of communication open and clear with them.

MR. TERESINSKI:  Absolutely.  We do that all the time. We're very adept at doing that with this victim group.  We've been working with them for years.

One of the things I did want to pass thanks for in terms of the lapel mics, I thank the Court for doing that.  I think that was very helpful on the victims' end.

THE COURT:  And to the extent the victims have difficulty hearing me or the attorneys or any other aspect of this hearing, I do encourage them to notify the Department of Justice so that we in the courtroom are aware that they're unable to hear clearly or see clearly, as the case might be.

MR. TERESINSKI:  Just so you know, I can confirm what Your Honor has said earlier, that we've been able to successfully integrate the two platforms today, which is great, both the Court's Zoom platform with the WebEx platform, and be monitored and secured.

THE COURT:  That's great.  I'm awaiting feedback from our IT people, but I'm cautiously optimistic, again at least for status hearings, that this will work prospectively.

MR. TERESINSKI:  And I believe so as well.  And as I said, we're going to do our best for December.  I plan on doing this, though, for the Court, if it's okay with the Court, maybe

an update to the Court maybe in the next two or three weeks.

THE COURT:  By a filing?

MR. TERESINSKI:  Yes.

THE COURT:  That would be great.

Can we move on to the motion to suppress, to the extent we can discuss anything more?  Should we save the rest of that for sealed hearing?

MS. KEIL:  I think if we're going to discuss any more details, wait for the under-seal portion, Your Honor.

THE COURT:  All right.  Ms. Minter?

MS. MINTER:  Thank you, Your Honor.

If I could raise one logistical issue with respect to the deposition that's expected to take place next week.

I can tell the Court it's unprecedented for our office to be in the position of having some counsel in the courtroom and some counsel with the witness being deposed.

We have discussed amongst ourselves, and I think we believe that communication through our own private Teams messaging would be the best way for counsel to confer in realtime during the hearing.  We could obviously also ask to recess, whereby Ms. Rupert and I could step outside, as could Ms. Koenig.  But that seems cumbersome for small sort of one-off --

THE COURT:  Agreed.  But I want you to have the ability to do both if needed.  So I will accommodate that.

But are you asking for permission to use your own internal

Teams?

MS. MINTER:  Yes, Your Honor.  If -- Ms. Koenig and other members of our defense team plan to be present in the courtroom, if they would have the ability to access Teams.  I know that's not traditional during a court hearing.

THE COURT:  Understood.  I'm going to ask that the two sides work together with IT to run these issues by.  They all seem like reasonable requests to me, but both the request for our Zoom as opposed to the -- whoever the people are who are running the deposition, their Zoom and the defense request for access to Teams, all of this seems reasonable, but I don't have the logistical knowledge to know what the potential hick-ups may be.  So I would ask that you all consult.  But as far as I'm concerned, both are okay if they don't cause issues internally.

MS. MINTER:  I appreciate that, Your Honor.  And I am likewise not the best person to consult with on IT issues.  But my understanding from our team is that as long as we have access to WiFi, and our IT folks have said they can provide us with a hot spot if necessary, I think we can be self-sufficient with respect to communicating that way.

THE COURT:  We probably need to loop in the marshals with this as well potentially.

MS. MINTER:  Perhaps, Your Honor.

THE COURT:  I mean, this is attorney to attorney, so I think it's fine, but just something for everyone to think about

on the front end.

MS. MINTER:  Certainly, Your Honor.  But as long, I think, as we have the Court's permission, I think we're able to manage that aspect of it.

THE COURT:  And you will be overseas, Ms. Minter?

MS. MINTER:  Yes, ma'am.  And just to note for the Court, it appears Ms. Koenig has joined us.

THE COURT:  Welcome, Ms. Koenig.

MS. KOENIG:  Thank you, Your Honor.  I apologize for my tardiness.

THE COURT:  No problem.

Moving on, as I said, we will discuss the trial date at the end.  What I would like to talk about next is a potential date for a hearing at which the Court could hear any additional argument on the 404(b) issue, which is, I believe, fully briefed, as well as some of the foreign records issues which are tied in, particularly the two documents relating to the 404(b) issue.

And Ms. Minter, I wanted to ask you, if the Court were to end up -- and I'm not prejudging this in any way.  But if the Court were to deny the motion to suppress the statement, I think I read something in one of your responses to the motion that suggests that you would also be moving to admit redacted versions of the statement?  And if so, is there any reason why that issue can't be briefed as well?

MS. MINTER:  Your Honor, I may defer to Ms. Koenig to answer further.  Because of sort of the tumult in the trial team, it was briefed by one individual, filed by another, and Ms. Koenig thankfully picked up the ball and ran with respect to the reply.

THE COURT:  Understood.

MS. MINTER:  I think the issue the Court is referring to is the notion that even if the Court were to admit the statement at issue, that it would certainly not be appropriate to admit it in its entirety.

THE COURT:  Well, I don't know.  That's the issue. The defense has suggested it would not be.

MS. MINTER:  Yes, Your Honor.  There could be other reasons for -- there could be other arguments against admissibility that don't necessarily relate to what's been raised.

THE COURT:  But some would potentially -- what I'm most focused on is the part that would overlap with the 404(b) motion.

MS. MINTER:  Understood, Your Honor.

I certainly do think it is something that could be taken up by the Court ahead of time.  I don't -- I would not say at this point that it has been fully briefed, and we would ask the Court for the opportunity to brief and argue that issue.  But I do think it could be brought up ahead of time.

But I would defer to Ms. Koenig if she has anything to add.

THE COURT:  Ms. Koenig, can you give me your thoughts on that issue?

MS. KOENIG:  Yes, Your Honor.

The briefing that we had submitted was about the current sealing, and as we indicated in the briefing, we're not saying that it needs to remain sealed for all time, but at least until we would get to trial, our position is that it should remain under seal.

THE COURT:  And I'm not talking about the sealing of the statement right now.  What I'm talking about is you filed a motion to suppress the statement in full.

MS. KOENIG:  Yes.

THE COURT:  If the Court were, following a hearing -- and I don't mean in any way to prejudge the issue.  But if the Court were to find that the statement can be admitted, would the defense then raise a separate argument that the statement should be admitted in part and redacted in some ways?  And if so, is there any reason why that can't be briefed now?

MS. KOENIG:  No, I think it can be briefed now, Your Honor.

THE COURT:  How long would the defense need to file a motion on that issue?

MS. KOENIG:  I think it would be informed by what happens at our hearing on the suppression.  So I would ask that

we could brief it some time no earlier than January.

THE COURT:  All right.  Well, that's -- you weren't here at the beginning of the hearing when I was making the point that the motion to admit 404(b) evidence, the motion to admit the statement, the motion to admit at least certain foreign records, and the motion -- a future motion to admit a redacted form of the statement all seem very intertwined to the Court and difficult.

Yes, I can certainly make a ruling on the motion to suppress.  And whether it's a voluntary statement that can come in, I can make that determination.

But at the same time, if we wait for the Court to rule on that before you all begin to start briefing that, we're looking at a ruling on all of these issues in -- well into the new year.

So what I'm asking is whether -- I know you're short on manpower.  So I'm not trying to jam you, but I don't know that I want to wait until the ruling to brief that at all.  I might permit you to supplement it, but at least some initial briefing on whether the statement would be admitted only in a redacted form would be helpful.

MS. KOENIG:  And I guess I wasn't trying to imply that we would wait until the Court had issued a decision, but more wait until after we have presented evidence at least at the hearing in December on that.  I think that would be informative, at least from my perspective, on that.  But if the Court needs

briefing on that before, we can make it happen.

THE COURT:  All right.  Well, why don't we circle back to this in the sealed hearing where I can understand in a little more detail what the defense's position is.

All right.  Let's talk a little bit about the foreign records.  Again, I know this is an issue that the defense has asked to file supplemental briefing on.  I had put out the minute order requesting additional information.  The government filed a supplemental brief today which I have cursorily reviewed.

I am not going to rule on any of these issues while the briefing is incomplete, but I would like to discuss briefly this motion, because I think it might inform the briefing going forward and might be helpful to the government to have a sense of where the Court does have concerns.  Again, I've not formally ruled.  I will not rule.  But I would like to go through some of the key issues that were raised.

Who on the government's side is most familiar with the foreign records?  All right.  You are, Mr. Mulroe?

MR. MULROE:  Good afternoon, Your Honor.  Conor Mulroe for the United States.

THE COURT:  Mr. Mulroe, as I understand it with respect to the certifications which the defense has argued are boilerplate, you have given me some authority to support your position with respect to those certifications.  I want to hear

some from the defense on that.

What about with respect to the particular challenges that the defense has raised to certain custodians, the lawyer for Air Malta and the office manager with the Libyan airline?  Help me understand why the lawyer is the qualified witness for these records.  Typically, the lawyer is not the more document certification witness.

MR. MULROE:  Certainly, Your Honor.

So the individual in question is somebody whose recorded interview we summarized in our reply brief in the section that corresponds with that part of the argument.  I think he actually came up twice in the response brief.  His initials are A.B.  And we summarized a bit of his interview in the supplemental pleading that we filed this morning.

I think it's significant to note that he is a lawyer by profession, but his position at the company, I think the interview makes clear, is not limited to giving legal advice to officers of the company.  He's got sort of a broader corporate role than that, and that role does relate specifically to documents.

THE COURT:  And that would hold true for not just the insurance documents but, say, the airline's may-fly list?

MR. MULROE:  Your Honor, I believe so.  I think that the way -- and I appreciate Your Honor doesn't have the recording in front of you.  We can certainly submit that for

chambers to review.

THE COURT:  I know.  I really don't want to review all these recordings.  I want the parties to bring to me what they disagree about.  I just don't have time to listen to all these recordings unless I must.

MR. MULROE:  And so I think that argument from the defense as to that certifier was that he expressed uncertainty about whether he recognized the documents.  I think there are two things about his interview that show that there is no uncertainty and there is no reason to question his qualifications.

The first is that the way he describes his role at the company makes clear that his familiarity with their recordkeeping was in fact broad enough to qualify him to certify different categories of documents.  And so he talks about how he works at the company, he's in the management.  He was familiar with their retention policies that apply to all types of documents.  He was familiar with a project the company undertook when they changed offices to make sure that historical old documents, like the type we have here, were properly archived.

And so just taking in general terms his role at the business, it really is not limited to very specific sort of legal categories of documents.  It is broader than that.  That's point number 1.

Point number 2, the other thing that the recording makes

very evident is that his ability to qualify different types of documents is made clear by the way he responds to those documents when the interviewers put them before him. And so separate and apart from his general qualifications, you can see in the way that he reacts to particular documents that he is familiar with them. And so they would put a page in front of him, and he would immediately say yes, this is such and such, this is so and so, kind of making an affirmative showing of his familiarity with those types of records.

Then I think just as importantly, there are other times in the interview where they put documents before him that notwithstanding the fact that they had Air Malta sort of insignia on them, and he picks them up and looks at them and says in full candor "this isn't the type of thing that I'm very familiar with."

So I think especially given his refusal to just across the board qualify everything, the Court would be very safe to find that he is qualified to speak to the things that he did.

THE COURT: So is the government's position that the Court can rely on these videos and these interviews in assessing the admissibility of the documents?

MR. MULROE: Our position is that the Court can rely.

THE COURT: Were these conducted under penalty of perjury?

MR. MULROE: I'm sorry?

THE COURT:  The interviews, were these sworn?

MR. MULROE:  Let me just confer briefly.

So the witnesses were not sworn at the beginning of the interview.  However, the certifications that the witnesses completed at the end of the interview did attest that they were making the declaration, you know -- consistent with the statute 3505, they were making the written certification under pain of criminal punishment.

I think relevant to the Malta issue, there was a Maltese police officer in the room when these interviews were taking place and when the certifications were executed.

THE COURT:  All right.  With respect to the Libyan airline office manager and the different check marks, I don't know that I'm -- I haven't ruled, but I don't know that I'm particularly concerned about the check marks.  But presumably, it wouldn't be a heavy lift for the government to get a new certification without check marks on them, if the Court were concerned about that.  I'm going to hear from the defense about it.

MR. MULROE:  Yeah, so I certainly would still rely on all our arguments in the papers as to why those check marks are not a cause for concern.  I don't want to make any representations with too much confidence about how easy it would be for us to do that.  The process of obtaining these certificates in the first place involved, as always with

international coordination, formal requests pursuant to treaty being put through the Office of International Affairs.  And then to get these certificates, actually, members of the prosecution team flew over there and scheduled the interview and actually met with these folks in person.

So I won't say that it would be impossible for us to have a new certification sort of completed by proxy by Maltese authorities without our direct involvement, but it is something that we would have to look into and could potentially be a more than minimal lift.

THE COURT:  All right.  Am I understanding you correctly with respect to the lawyer to say that the aspects of the interview that you think are relevant for the Court to assess in determining whether he is an appropriate custodian for these records, that the portion of the interview is laid out in your reply sufficiently?

MR. MULROE:  Your Honor, I believe in the reply, as well as in the supplemental pleading.  And I can pull them up and get the pin cites, but it was addressed in two different places.

THE COURT:  So there's not more in the interview substantively that you think the Court could or should rely on in determining whether he's an appropriate custodial witness?

MR. MULROE:  I think our position is that what's laid out in the briefing we've already submitted ought to be

sufficient.  I would ask just that after the hearing we have a chance to go back and look.  If there's anything else we think might sort of further buttress that, we're happy to submit it.

On that point, Your Honor, I would note also that we got certificates from the people we did because they are the folks at these businesses who are, frankly, still alive and able to meet with us and available.

But when you take somebody like the lawyer, he's young enough, he wasn't around when the documents were first obtained, as we pointed out.  And so it was the case that these things originally came into law enforcement possession through other people in some cases.  And that is well documented in the Scottish investigative file.

THE COURT:  Some of which we have certifications for, but not all.

MR. MULROE:  Some of which.

THE COURT:  So I haven't done a comparison to see whether any of these particular challenges that the defense is raising fall into the category of documents that you obtained through Scotland for which there is an original certification. I think not.

MR. MULROE:  Correct.  And just to clarify, it's not limited to the certification.  So for a great many of the documents that originally went into Scottish custody, there are certifications.  There are some that do not have certifications,

and then I should note, there are some that have the certifications, but just the copies of the exhibit that we submitted to chambers do not have those.  We can certainly add those back.  We just removed them from the exhibit to be reviewed.

But I want to emphasize that these certificates, the Scottish certificates that often accompany the documents, are not the only sort of Scottish paperwork that helps establish their authenticity and reliability, because in some cases, I would say in most cases, there is all manner of other documentation that lays out which Scottish personnel obtained these things, whom they obtained it from, when and where.

And so for example, there is a document that I believe is a Libyan Arab Airlines timetable of their flight times.  That one doesn't have a Scottish certificate from the business itself, but the reason for that, when you look at the other paperwork that we've produced in discovery and that we can submit to chambers if it would be helpful, it makes clear that that's just because an officer just went to Libyan Arab Airlines offices and found this, essentially a pamphlet, on the counter for members of the public to take.

So you wouldn't expect to see the certification from the original Scottish Police in that instance.  But of course, we do have our current U.S. certification for that, along with all the others.

THE COURT:  With respect to the Senegalese document that literally has a blank, that does seem to be something that needs to be fixed.

Do you agree?

MR. MULROE:  Yes.  That is one, Your Honor, that we will make every effort to get a --

THE COURT:  Well, I'm telling you now because you say it takes time.  That definitely seems deficient with the open blank.  I think you need a complete certification for that one.

MR. MULROE:  Yes, Your Honor.  We will get that.  We will make efforts immediately to get that, if possible.  And absent that, we will look into other ways of laying the foundation for that document.

THE COURT:  All right.  So the Swiss documents, the government has indicated that it does intend to, I think, introduce evidence at trial, testimony at trial regarding how the Swiss kept the documents?

MR. MULROE:  Oh, I'm sorry.  The Scottish?

THE COURT:  I'm sorry.  The Scottish.

MR. MULROE:  The Swiss I will come back to.

The Scottish recordkeeping practices -- because, Your Honor, a great many of these documents, I think virtually all of them were collected during the original Scottish investigation.  This investigation was a very close partnership between the United States authorities, because it was a U.S. aircraft, and

the Scottish authorities, because of the territorial locus of the crime is Scotland --

THE COURT:  I understand all that.  It's helpful -- if you want a preliminary ruling, it's helpful to have a greater understanding of what you expect to introduce at trial in terms of testimony that would assure me of their recordkeeping practices and storage and all of that.  So you don't have to give it now on the fly, but to the extent you're supplementing anything, it would be a frustrating situation for the witness to testify at trial and it not be adequate.

So if you want a preliminary ruling, I need a little more about what will come out at trial from the Scottish representatives or whoever is going to talk about the ways in which those documents were gathered and stored.

MR. MULROE:  Certainly, Your Honor.

The short answer to that is yes, we fully intend to present such testimony.  We appreciate the Court raising it, because I think it's going to be important for the jury to hear about the diligence and the rigger that they brought to bear on this, as well as Your Honor for making that preliminary ruling.

So if you're looking for a sort of summary of what we anticipate the testimony will be, we can --

THE COURT:  If you want a ruling now, that's kind of what I need.  I can't just accept that you're going to cover all the bases, not knowing the parameters of the testimony.

MR. MULROE:  Understood, Your Honor.  We will put that together and get that to you.

And I do want to make clear that our position is that really the certificates themselves could and should be enough to make the ruling, but we, of course, want to do everything we can to give the Court comfort in the authenticity and reliability of these documents.  So that's no problem at all.

THE COURT:  Understood.  But the defense has argued you took the documents from the Scots and provided it to the businesses.  And to the extent they weren't kept carefully or could have been amended in some way -- I know the burden may shift to them to have to suggest that, but I just think it's prudent for there to be some understanding of what the Scots did to keep those documents secure.

MR. MULROE:  Absolutely.

THE COURT:  All right.  Do you want to move on to the Swiss, you said?

MR. MULROE:  Yes, Your Honor.

So the Swiss documents, they did not have certifications.

THE COURT:  But you're working on that; right?

MR. MULROE:  So we were working for that.  And we represented in the original motion that our understanding was that those certificates were going to be forthcoming from the Swiss authorities.  We learned this morning that we were actually mistaken on that point.

So we are going to seek to get certificates, and barring that, we are going to lay foundation using live witness testimony to get these exhibits in.  But I did want to note that I don't anticipate that is going to be an overnight thing.

So we would ask the Court, to the extent that you're prepared to rule on the other exhibits in the motion, the government would be grateful for that.  And we would withdraw our request as to the Swiss documents --

THE COURT:  Sure, I can do piecemeal rulings.  But you're relying also on the ancient documents exception as well, and all of this is important for that purpose as well.

MR. MULROE:  Yes, and not at all walking away from those arguments.  I think as ancient documents, as business records that are sort of self-evidently business records on their face, under the residual exception, all of those arguments are still in play and, we think, very strong arguments.

But just very narrowly as to the 3505 certificate basis of admission, we are not asking for that at the moment as to the Swiss documents, which I can give you the numbers if you want or send them to chambers.  But I wanted to make that position clear.

THE COURT:  Okay.  It would be helpful to have the numbers, but we don't have to go through that now, but just share with the defense as well when you provide them to chambers.

But in terms of the ancient records grounds for admitting these documents, you are going to have to convince me that they came into the Scottish authorities' hands through reliable means.

MR. MULROE:  Correct; correct.

THE COURT:  And that's a part of the Scottish testimony you will be summarizing?

MR. MULROE:  That will be a part of the Scottish testimony, yes.

THE COURT:  Okay.  All right.  Well, I invite you to supplement your filings for this purpose as well.

I think before we jump into the 404(b)-related foreign documents, it makes sense to hear from the defense on some of these issues, to the extent they want to be heard.

MR. MULROE:  Thank you, Your Honor.

THE COURT:  Unless there's anything else you want to add.  I don't mean to cut you off.

MR. MULROE:  I don't think so.  Just to say we appreciated the Court giving us the opportunity to respond to kind of specific follow-up questions.  Clearly, the Court already appreciates, we want to do everything we can to get these motions decided promptly.  Obviously, Your Honor appreciates that.  So any questions in the future, please don't hesitate.

THE COURT:  All right.  Thank you.

Who from the defense will argue the foreign records? Ms. Rupert?

MS. RUPERT:  Yes, Your Honor.  Thank you.

THE COURT:  So I know you've got a supplemental filing forthcoming, and you probably haven't had much time to review the government's supplemental filing.

MS. RUPERT:  That's correct, Your Honor.

THE COURT:  But their additional authority did seem to support the conclusion that the certifications could be adequate.  But I invite you to provide any contrary authority you may run across.

With respect to A.B., the Air Malta lawyer, what is the defense position with regard to whether the Court can consider information that came through these interviews?

MS. RUPERT:  Well, Your Honor, the lawyer A.B. in his interview, when originally asked about his familiarity with the Air Malta documents, I think his initial response was he's familiar with them now, he's familiar with the documents immediately prior to his tenure at Air Malta, which I think would have been approximately ten years, but not so much with the documents from 1988.  So that was his initial response.

Going back to the Court's specific question, I think that given that the interview itself is not under oath -- let me back up.

I think the type of information gleaned from the interview

can be considered by the Court.  However, given the format that the information was obtained, we would think that another format, an under oath or a signed affidavit that includes the witness's background.

So these interviews, we do acknowledge the fact that the interviews provide much more information about the witness's position and so why they might have familiarity with the records.  Some of the interviews provide information about the record-keeping practices of the companies and businesses that were there, not all of them.  I think that is a little bit more lacking, about when the records were -- when they were made or why they were made or how they were kept and stored and how they were retrieved.

However, like I said, because these interviews were not under oath, while the substance may be considered by the Court in some format, we think the current format is not sufficient.

THE COURT:  And are you making that argument with respect to all of the certifications, even though there's a long string cite of cases in which courts have found these more boilerplate certifications adequate?

MS. RUPERT:  Your Honor, we want to be clear that we're not saying that the government needs live witnesses in every instance, but when they're not using live witnesses, we believe that the certifications must provide enough information so that the witness is clearly -- can be considered a qualified

witness.

THE COURT:  But if the witness says I'm so and so and this was my role at the company, I'm whatever, boilerplate name, this is my job, and he goes on to answer all of the questions under oath, it seems as though, based on the government's supplemental filing, that that's sufficient, even though the witness isn't going through the kinds of detail that you're arguing they should provide.

I understand your position.  I've had many cases where the certifications are much more fulsome.  Even in this case, I think there are some.  But I think you're going to have to show me some competing authority that says across the board I should reject all these certifications as insufficient.

MS. RUPERT:  Your Honor, admittedly, the case law is limited.  What I would point to -- we understand that the bar for these certifications is not tremendously high, but there are cases that support our contention that courts do use or can use information in combination with the certifications in order to determine the admissibility of foreign business records.

To that end, I would want to draw the Court's attention to one of the cases that the government cites.  They cite *Al-Imam*, and that's a district -- that's a D.D.C. case.

THE COURT:  Is this the Judge Cooper case?

MS. RUPERT:  This is related to the *Khatalla* case.  So they're companion cases there.

THE COURT:  But weren't there other issues in play there related to --

MS. RUPERT:  There were other issues.

THE COURT:  Other than just the certification?

MS. RUPERT:  There were other issues.  And in that case, Your Honor, I want to point out that the Court did rule that the business records could come in.  However, in making that ruling, they said that they were considering the certification and the full factual record to come to this conclusion.

And so that full factual record illuminated the process by which the certification was obtained.  And so all of that was considered.

So, Your Honor, we understand, again, we are cognizant of the fact that the case law is limited.  We submit that these certifications are bare bones, and in some instances, you know, they're -- it is even unclear from the certification how the witness's position or job would qualify them to be in a position to make the claims that they are making in terms of the recordkeeping of the business.

THE COURT:  Okay.  And in terms of the case, this was not the *Khatalla* case.  Were you referring to the *Al-Imam* case?

MS. RUPERT:  Yes, I was referring to the *Al-Imam* case.

THE COURT:  But in that case, Judge Cooper did say, as he had explained in *Abu Khatalla*, "A qualified witness is

interpreted broadly.  Thus, for example, a witness is qualified to testify that a record was made at or near the time of the occurrence based on a general familiarity with the business's recordkeeping procedures, even if the witness knows nothing about the creation of the particular record itself."  And "even if the records were created by another entity," he went on to say, "there is no reason to conclude that a similarly permissive principle does not obtain when assessing a person's qualification to attest that a record is a duplicate of the original."

So there is some pretty supportive language for the government's position in this case.

MS. RUPERT:  Your Honor, we are not contending that the witnesses here need to have created the records themselves, need to have -- essentially needed to have been there at that time.  We are submitting, however, that from the face of the certifications, the Court needs to be able to determine that they are familiar with the practices of the business, and I will submit that sometimes in some of these certifications, that is not apparent from the face of the certification themselves.  You maybe can glean from the interviews that were conducted, but they're not necessarily on the face of the certification form.

THE COURT:  As you heard, the government may well supplement what it provides to the Court regarding the interviews that it wants the Court to consider.  I just want to

understand your position.  The Court can or cannot look at any of that context in assessing the certification?  Cannot because it's not sworn testimony?

MS. RUPERT:  Yes, Your Honor, that is our position. Again, I think the content of the interviews may be informative. However, I don't think that the Court can consider them in the current format that it is in.

THE COURT:  All right.  On all of these issues, it goes without saying, to the extent either side has authority to support their positions that they haven't provided already, please do.

MS. RUPERT:  Yes, Your Honor.

THE COURT:  And the check marks on the one certification provided by the office manager with Libyan Airlines, I've looked at it.  The first four -- and I don't have the certifications in front of me, but the first four, three or four phrases are pretty straightforward.  That last one is a little tricky in its wording, and it comes from the rule, not the certifier.  So I don't know, simply because there's not a check mark next to it, that it means that he didn't mean what the language says when he signed it at the bottom.

Can you elaborate on your argument?

MS. RUPERT:  Your Honor, I think the Court --

THE COURT:  You have to be really close to the microphone.

MS. RUPERT:  I think the Court does understand the crux of the argument, that given the fact that the first three bullet points are checked, that is implicitly an indication that the witness agrees with those.  Given that the final point is not check-marked, the opposite is true.  In the other certifications, none of them are check-marked.  Everything is -- and the witness attests to it by signing.

Again, the implication there is that they are signing off on all of the previous bullet points here.  Where we have some indication that the witness has specifically acknowledged three out of the four, we believe that the rational inference is that the witness takes issue with that fourth and final point.

THE COURT:  All right.  Moving on to the records from Scotland, assuming that the government either produces a declaration or summarizes forthcoming testimony that the Scottish will provide regarding recordkeeping and file storage practices, that doesn't seem like something the Court should challenge.

Obviously, if the defense has specific reasons that the Scots' custody over these documents is questionable, the rule certainly contemplates that you can challenge it.  But to date, you haven't.  You've just said I shouldn't trust it.

But they tell me more is coming, and assuming more is coming, I'm telling you you're going to need to have a specific reason for me to challenge that.

MS. RUPERT:  Understood, Your Honor.

THE COURT:  All right.  Have the double hearsay -- and again, I understand if you haven't had a chance to carefully review the government's supplemental filing.  But in your view, based on what you know from the briefing so far, do you think the double hearsay arguments for the specific documents that I asked about in the minute order have been addressed?

MS. RUPERT:  Your Honor, I believe with respect to document 1009, it has been addressed.  With respect to document 1013 and 1024, I do believe that we have supplemental argument regarding those documents.

And I think with respect to both of them in general, I think our argument here is that these two documents also, without regard to whether the Court accepts the government's proffer that it's not submitting those documents for the truth, in addition to that, these documents don't appear to be business records.  One is e-mails between members of the same company.

THE COURT:  So they're not business records even for that company?

MS. RUPERT:  Your Honor, we submit that there's an argument here that an e-mail that is -- just because it's between members of the same company is not necessarily a business record.  That is specifically for the 1013 telex regarding the security measures taken at the airport.

With respect to the 1024, there is an argument that that

document itself, based on the form of that document, demonstrates a lack of trustworthiness.  It appears to be several documents stapled together, maybe not necessarily all.

THE COURT:  So you're going to address this in your supplemental filing?

MS. RUPERT:  Yes, Your Honor.

THE COURT:  Okay.  Your objection to the government admitting documents under the ancient records exception, if the government supplements its filings with more information that convinces the Court that the Scottish documents have been collected and catalogued and stored in a reliable manner and can produce, for example, a list and supporting documents that explain why each document in the hands of Scottish authorities was discovered in a certain place where, if authentic, it would likely be, and then -- and this is a lot of ifs, I know, but would your objection go away at that point?

I know it's hard to say for sure, not knowing what they're going to present, but I'm just wondering if that's the crux of the objection or if there's more to it.

MS. RUPERT:  Your Honor, I think that it would be difficult at this point for me to answer the Court's question without seeing what it is the government intends to produce.  I don't want to foreclose an argument that we may have.  So I don't want to say necessarily an objection based on ancient documents would or would not stand based on --

THE COURT:  Understood.  Thank you, Ms. Rupert.  I may bring you back up after I talk to Mr. Mulroe again for the 404(b) documents.  And I know this is -- I'm not going to rule on this today, but just -- I want to share some of my concerns.

I know that the government has argued that the Stasi served other functions other than the law enforcement function.  But just based on what's before me now, it's hard for me to conclude that these documents had no connection to law enforcement capacities, and therefore, I'm not inclined to admit them under the public records exception.  That's where I tentatively am.

So that leaves the -- and I'm not ruling, but I'm just sharing my initial thoughts.  So if we're looking at these Stasi documents as admissible under the ancient records exception, the defense has raised a number of issues with respect to that, and I will talk to them about some of those.  But with respect to the argument that they've made that you've not shown that the documents were found where they would likely be found if they were authentic, as the rule requires, what can you say in response to that?  That you will present evidence sufficient to support a finding that these are authentic?

MR. MULROE:  Yes, Your Honor.  I think that our proposed approach on that would be very similar to what we've promised in connection with the Scottish recordkeeping procedures.  We have represented in the pleadings that these documents came from the Stasi archives, and we gave what I think

could fairly be called a cursory explanation of what those archives are and how they work.  But we are endeavoring to be able to bring to the Court and ideally bring to the jury a much more fulsome and detailed description of the Stasi archives as sort of an instrument of, I believe, the German government.

And the way that they first came into custody of all the old Stasi documents, the way that they have maintained and catalogued those documents, the way they're able to search those documents, I think all of that, in the government's view, would help to further establish that prong of the ancient documents exception, that in fact these are exactly where you would look to find Stasi documents from the 1980s and frankly nowhere else.

THE COURT:  Are you going to do this pretrial?  If not, you're not going to get a ruling.

MR. MULROE:  Yes, Your Honor.  We would hope to do so pretrial, yes.  I mean, we --

THE COURT:  But you've asked for me to rule on this super early so you don't have to take additional steps.

MR. MULROE:  Yes, Your Honor.  So I appreciate that there are things that we might need to establish that the Court's ruling would depend on.  And I, of course, leave this totally to the Court's discretion, but from the government's perspective, it would be nearly as helpful, maybe just as helpful as a full conclusive ruling if the Court were able to give a ruling that says something along the lines of based on

the government's representations, as a preliminary matter, it appears that the ancient documents rule would apply to these documents, subject to the government presenting evidence that --

THE COURT:  No, I think the ruling you would get is based on what's been presented so far, it doesn't meet the requirements of the rule because the government's neglected to do A, B, C, D, E.

MR. MULROE:  Fair enough.

THE COURT:  I'm not going to preliminarily admit the documents.

MR. MULROE:  In that case, Your Honor, I can say that we are moving as quickly as we can to present more information to the Court.  It does depend on coordination with foreign authorities, which is not always something that happens immediately.  But we will promise to the extent that any delay in the ruling is due to that, we will own that delay.

THE COURT:  Okay.

MR. MULROE:  It is also helpful to just hear during the colloquy --

THE COURT:  That's what I thought would be helpful to both sides, just to kind of hear where I am now.  I haven't settled on any definitive rulings, but I will tell you, the double hearsay problem seems significant as well.  I know there is a circuit split, but the majority position does seem to be that the double hearsay rule applies.  And I'm struggling to see

how you've met requirements for another hearsay exception.

You say the primary sources underlying the visitor's list and hotel report were excepted hearsay as a public record and a business record.

Starting with the hotel record, it doesn't say you've met the requirements for admission of a business record.  And if the Court -- it seems to me the government is going to have to produce a certification from the Metropol Hotel's custodian about the registration cards and how those cards made their way to the Stasi.  And we don't even have a registration card that -- we have a missing registration card.

MR. MULROE:  Correct.  The actual registration card that was the source of the information is missing.  We have a -- one from the same time period that was a part of the same file. I expect that the information or the testimony that we get from the archives will help to explain why it is that there are just some things that they can't find in the archives, whether they were destroyed or just not catalogued properly.

So I don't think the absence of the card in the archives is a reason to infer that it never existed in the first place.  We fully concede that it would be better if we had the card itself.

THE COURT:  Do you have the custodian from the hotel?

MR. MULROE:  Your Honor, I think that -- I don't have it up in front of me, but -- the short answer is no.  What we do have is one of the Stasi officers whose duties made him very

familiar with the kind of interplay between the hotel and the ministry.

THE COURT:  Is that officer going to testify?

MR. MULROE:  We were hoping that the Court would find that his declaration was sufficient on that point.  It may be someone that we are able to get here for live testimony.  It may be someone that, if necessary, we would seek a Rule 15 or potentially video testimony on.

THE COURT:  The government needs to understand that I'm approving these Rule 15 depos, but that doesn't necessarily mean that I'm going to approve every Rule 15 depo being admitted at trial.

MR. MULROE:  Correct.

THE COURT:  So I just am flagging that now.  There's a lot of reliance on getting the depo done and, therefore, you're good for trial.  Not necessarily so.

MR. MULROE:  Yes, and we understand that.  It's a very conclusive showing of unavailability that we are going to need to make showing a witness cannot be secured for trial before they're going to be admissible.

THE COURT:  And I don't know that it's just a witness who doesn't want to travel to the U.S.

MR. MULROE:  That is something, Your Honor, I anticipate we would be happy to do some research and briefing on.

THE COURT:  Anyway, it does seem that you're stretching the business record exception to cover hearsay that's embedded in the ancient records.  So to the extent you have more authority, I invite it from both sides on this issue.  I think this is a tricky evidentiary issue.

Is there anything more you want to say about the hotel records?  I would like to talk about the visa as well.

MR. MULROE:  I think I have comments on the overall set of records.  So it may make sense to discuss the visa, and then I can discuss them together.

THE COURT:  With respect to the visa applications, it doesn't appear that you've offered certifications that support the authenticity of the defendant's visa application, which was supposedly copied into the visa list.

Do you plan to offer supporting certification from a qualified public official?

MR. MULROE:  Your Honor, this, like the hotel, is an instance where the actual underlying primary source record that is particular to the defendant could not be found.  We have submitted another one that was a part of the same collection of applications that formed the basis of the visitors list.

And so I think we could seek a certification as a public record of the one we do have in hand and perhaps even design that certification to say that other visa applications of the same type also met the requirements for the public records

exception.  But at present, we do not have such a certification. We only have the declaration of one of the familiar officers, which candidly I think checks a lot of the same boxes.  It's just not styled as a public records certificate.

THE COURT:  But the Stasi individual doesn't play any role of processing the visa applications or the hotel documents either.

MR. MULROE:  For the -- I think it's the foreign ministry was the component of the East German government that received these -- I think what the declaration establishes is that foreign governments would send visa applications to the East German government by addressing them to the foreign ministry.  And then as a matter of the routine practice of the German -- East German government, the foreign ministry would then share those with the intelligence officers within the Stasi.

And I believe that our declaration we submitted establishes that.  So we don't have someone from the foreign ministry, and frankly, I think it might be hard to find someone just because that government no longer exists.  But we have a person who is familiar with regularly receiving those as a part of his ordinary duties and the reliance that the Stasi placed upon them for what at least they perceive to be very, very important state functions.

THE COURT:  Do you have any cases where a court has

allowed the government to certify like a related document but not the document itself in sort of another analogous missing document instance?

MR. MULROE:  Your Honor, I don't.  I'm not sure it's come up before.  We did not come across any in our research, and we're always happy to take another look.  But I do not have one right now.

THE COURT:  All right.  And then finally, you rely on the residual exception, but that really is for near miss cases.

MR. MULROE:  Well, not entirely, Your Honor, I don't think.  I think that there actually was a circuit split prior to the amendment of the rule, and there was some dispute about what it meant to be a near miss.

And in fact, the dispute that had some circuits sort of in a minority view was that if it was a near miss from one of the specific hearsay exceptions, that meant it was not eligible for the residual clause.

So these courts found that when the authors of the rules spelled out these hearsay exceptions, they really meant that, for example, to be a business record, you had to meet these very rigid criteria, and if you just barely missed it, well, then, you're not a business record, but you also don't get to sort of fudge it by using the residual exception.

So there was a circuit split over whether a near miss is disqualifying or whether a near miss can still be a residual

exception.

I think that they have since amended the Rules of Evidence to clarify that even if it's a near miss, it can still be --

THE COURT:  No, I understand that, but I'm saying I'm not sure this is a near miss.  That's the concern.

MR. MULROE:  I see.  To that point, I would just note that it doesn't have to be a near miss to be a residual exception.

But I think here it is in a very important sense a near miss.  Because as Your Honor has pointed out, we do not have certifications for the original primary source documents.  We in fact do not even have the primary source documents themselves.  But what we do have is a whole lot of information that can give the Court great confidence that these primary source documents did exist and that in substance, even if we don't have a form checking the boxes, in substance, these primary source documents were in fact business records and public records, and they were not nonexcepted hearsay.

So that is why probably the residual argument is our strongest basis for arguing the admission of these records.  Ordinarily, we would lead with the strongest argument.  Here, we put the residual clause near the bottom.  That's not because it's an afterthought, Your Honor.  That's because the residual exception really just comes down to reliability.  And by walking through all these other hearsay rules, the business records, the

ancient documents, the public records, those are all rooted in theories of reliability that, we submit, apply fully to the documents here.

THE COURT:  You led with the public records, which I just -- maybe I don't know enough about the Stasi, but it seems, in looking at these documents, that these were very much investigative in nature.

MR. MULROE:  Well, they were investigative, but they were not investigative for the purpose of prosecuting something. That, I think, is the --

THE COURT:  I don't know that that's what the rule requires.

MR. MULROE:  The rules language, I think, could be read in a number of ways.  But if you look to the purpose of the rule and if you look at the commentary that accompanies the rule, it makes clear that that law enforcement carve-out, the reason they put that in was because they didn't want true police reports coming into trials under the public records exception.

And they say that when the police are -- I think these are almost verbatim the phrases they use in the commentary.  When the police are at the crime scene or when the police are apprehending a suspect, you don't have the same presumption of accuracy and impartiality and neutrality.

THE COURT:  But what about the police investigating a bombing?

MR. MULROE:  And that is the critical point, Your Honor.  The Stasi files -- and perhaps we need to make this context more clear.  The Stasi files that we are submitting were not the files devoted to investigating the bombing.  In particular, the underlying records were not, but even the records we're submitting are not.

So the first one, the hotel report, this was a -- we could bring the whole thing in.  It's a couple hundred pages, I think. But it was about a completely different person.  It was about somebody who the Stasi counter-espionage investigators believed was acting on behalf of Syrian, not even Libyan but Syrian intelligence.  So he was the person they code-named Flunder or Rinde.

THE COURT:  Right.  But weren't they trying to identify suspects, and then the defendant and his co-conspirator's name were thrown in there as other interesting people?

MR. MULROE:  They were not -- the Flunder investigation was not an investigation of the La Belle bombing, and I think that's an important point.  They were investigating this Syrian fellow for just being kind of suspicious and, you know, posing some sort of undefined threat to the state.  So they were, as the Stasi did, comprehensively surveilling him, not because they thought he did any particular crime, not because they thought he was involved in La Belle, just because

they viewed him as a potential enemy of the state.  Which we're not defending that type of investigation clearly, but they followed him around.  They identified who he was associated with.  They tracked his comings and goings and which hotels he was staying at.

And this, I think, is an interesting and important point. In the course of surveilling the Syrian guy, they seemingly by accident identified our defendant as staying in a certain room in that hotel, because they momentarily kind of mixed them up. And so they put our defendant's name into that file and said he's staying in Room 524 in the Metropol.  But in an entire 100-something page file that otherwise is completely unrelated to La Belle, you have this truly incidental record to our defendant.

THE COURT:  So as long as the entity, the law enforcement entity with multiple functions but for purposes of argument here, so long as the law enforcement entity is investigating a different crime, that exception still can apply? The rule just seems to be broader in terms of the exception.

MR. MULROE:  So the rule -- I don't want to commit us to a position on that, because frankly, Your Honor, I haven't researched it.  But the point is this:  If and when, as I expect we will, we are ultimately relying on the residual exception to get things in, it is the same reliability arguments of the public records exception we would say apply fully to these

documents, even if sort of as a -- I don't want to overstate it, but as a hypertechnical matter, perhaps they arguably were exercising a law enforcement function.  But if they were, it does not raise any of the reliability concerns that predicated the carve-out of the public records rule.

THE COURT:  And if you were able to provide me with enough to meet the ancient records exception, are you going to argue in the alternative that it's not being admitted for the truth of the matter, the Stasis had reason to believe that the defendant was at this location on this date?

MR. MULROE:  That is one I'd have to think about, Your Honor.  I wonder if you could say a little more because --

THE COURT:  I'm just -- I'm trying to pull out arguments that I think may be forthcoming if I don't rule in your favor.  So I'm just --

MR. MULROE:  I reserve the right to walk this back, I think, but we want these things in --

THE COURT:  I know you do.

MR. MULROE:  -- because they show that he was there.

THE COURT:  I get it.

MR. MULROE:  And so just off the top of my head, I can't think of what we would offer it for other than to show that he was there.

But, Your Honor, it all comes down to reliability, and the same reason that public records are reliable, the same reason

that business records are reliable, the same reason that ancient documents are reliable, it's really -- whether or not it's a near miss, it at least is sort of at the intersection of all of those specific rules.

And the last point I think I want to make about it is that generally we exclude hearsay because we don't want out-of-court statements that may be mistaken or out-of-court statements that may be lies. And we want to be able to test them. But these documents, just by their nature, it's clear that they're not a misstatement, and it's clear that they're not a lie, because they have his name, his traveling companion, his birth date, his nationality, and his passport number down to the Nth decimal that match exactly to corresponding travel records that he used when he traveled elsewhere.

So this just couldn't have been information that ended up in these reports by accident. By the same token, it just couldn't have been the case that the Stasi were trying to frame him.

THE COURT: But is the Court supposed to look at the admission of these documents in full, or each stands on its own? I think each stands on its own, each decision point. I don't think that I get to look at all of this close, call it near miss, call it bigger miss, and put them all together and then say they all come in because they all have common threads. Correct me if I'm wrong, but I think I have to assess each piece

of evidence on its own.

MR. MULROE:  In terms of exhibit by exhibit or exception by exception?

THE COURT:  I'm just admitting exhibit by exhibit. I've got to look at each one independently.

MR. MULROE:  Well, I think whether or not you can look at them in conjunction or if you must look at them separately, I think our position would be that it doesn't matter too much. You compare these two exhibits to each other, and they say essentially the same thing.

But the point I'm making is that these exhibits accord with other evidence in the case in a way that confirms their accuracy and reliability.  And I think that if the bedrock inquiry of the residual exception is to try to figure out whether the particular exhibit is reliable or not, then I think it's perfectly logical and acceptable to ask yourself does it kind of fit with everything else.

I think certainly, if it did not fit with everything else, they would be asking you to use that as a point in favor of excluding it.  And our argument is that this fits down to the 10th decimal with everything else in a way that confirms that it wasn't the product of chance or fabrication.

THE COURT:  Okay.  To be clear, I've not ruled on this.  I do have concerns.  I think the large ones I've shared. I do invite supplemental briefing from both sides to address the

particular issues I've raised, and since it's the government's motion, I would suggest you start the supplemental briefing, and then I will give the defense time to respond.

MR. MULROE:  That sounds fine to the government, Your Honor.  I do wonder -- that makes good sense as to the 404(b), the La Belle-related things.

I think with respect to the other category of --

THE COURT:  You mean just the general foreign records?  I'm waiting on some discrete information from you.  I don't know that I need additional briefing on that set.  But the defense is likely to have the burden to come forth with something to rebut what the government provides.  If it provides the Court what it says is coming, I think under the rule, the burden is going to shift to you for me to question the admissibility of these documents.

MS. MINTER:  Yes, Your Honor.

THE COURT:  So to be clear, I'm talking about the 404(b) documents, supplemental briefing on those documents.

And how long, Mr. Mulroe, do you need to supplement that briefing?

MR. MULROE:  On the 404(b)?

THE COURT:  Yeah.  You've asked for an early ruling on this.  I'm not pushing for this yesterday, but to the extent the government wants early rulings, you need to get your briefs, supplemental brief in.

MR. MULROE:  Court's indulgence for one moment.

THE COURT:  I will just say, all of this makes me question how realistic it is to have an April trial.

(Government counsel conferred.)

MR. MULROE:  We would ask for two weeks, Your Honor.

THE COURT:  Two weeks.  All right.  So the government will supplement its motion to admit the 404(b)-related documents on or before November 26.  The defense shall respond by December 10.  That's two weeks for each of you.  And then any reply by the 17th.

MR. MULROE:  That should be fine, Your Honor.

And I do just want to preview, that two weeks will be plenty of time for us to submit further legal argument and description of the documents and those types of submissions, but as it relates to more information about the Stasi archives practices, I don't think we're going to be able to get information from the Germans that quickly.

THE COURT:  Well, I kind of need that, I think. Explain to me why I don't.  Think about this.  We can circle back to this at the end of the hearing, but I don't want to have multiple more rounds of this.  It's inefficient.  But I think I've shared with you enough of my concerns.

I'm not -- clearly not ruling at this point that these documents don't come in.  I think the government has more work to do, and I would prefer to address them once the government's

done whatever work it can rather than piecemeal.

So think about that. We can circle back at the end of the hearing.

MR. MULROE: And let me just offer this thought. Apologies, Your Honor. But I think -- well, we will think on that.

THE COURT: Okay.

MR. MULROE: Thank you, Your Honor.

THE COURT: All right. Thank you, Mr. Mulroe.

While it's on my mind, the sealing issues, I know that there's been some confusion about the Rule 15 depositions, because at the last hearing I asked why are these all coming in under seal when it seems like portions could be on the public record, and I asked you all to go back and look at those documents and propose redacted versions that could be on the docket. That's on me. I expect to do that this week. But I think that confused you about what I meant prospectively.

Rule 15 motions, all motions should be filed on the docket. To the extent the motion needs to be filed under seal, in full or in part, you should file a motion to seal with the sealed material.

And to the extent you know that the other side doesn't object to what you're proposing, by all means, put that in the motion to seal. If you don't, the other side needs to realize that I'm going to be interested in acting on that motion pretty

quickly.  So I would ask that you respond to that motion to seal within -- what's reasonable?  24?  48 hours?  72?  How quickly can you all respond to these motions to seal?

In general, I would hope that the party who is proposing the sealed filing is only proposing redacting or sealing seal-worthy materials.  So I don't think that these are going to be fights between each side, but I don't want to jump the gun and grant a motion to seal, unseal the motion, and then have the other party objecting.

So just understand, if you don't file something within 24 hours or so, I may well act on that motion.  If there's an objection that the parties oversealed it or undersealed it, we will address it at the time.  But if it's an undersealing issue, we've got a problem once it's on the public docket.

Do you all want to give me some feedback on how quickly I should act on those motions to seal that I'm confident that you've had a chance to at least read it and tell me "I'm objecting, give me more time to explain why but don't rule on this"?  Can we say within 24 hours, if we don't have a filing saying "I need more time to object," I can act on it?

MS. KOENIG:  Your Honor, I see Ms. Minter coming up. I would suggest 72 hours, unless Ms. Minter comes up with a different number.

MS. MINTER:  I would agree with that, Your Honor --

THE COURT:  72 hours, okay.

MS. MINTER: -- just because different people are handling different parts of the case.

THE COURT: That's fine. So I will act -- 72 hours after it's filed, I will act on the motion to seal. That will be my goal. Things come up for me as well, but that will be my goal.

I do want to emphasize, your motions to seal should be motions to seal what's seal-worthy only. So I don't expect this to be a problem. But once I grant a motion to seal, I will unseal the motion to seal. You all understand that? So if there is a need to keep the motion to seal under seal, I need to know that clearly, because in general, in the normal course, there's a motion to seal materials, the Court grants the motion to seal. Simultaneously, the parties file the redacted version if it's not sealed in full on the public docket at the time the motion to seal is filed. The Court grants the motion, puts the sealed attachment on the docket under seal, and then unseals the motion so the public knows there is something under seal.

Does that make sense? Are we all on the same page?

I don't need e-mails for Rule 15 depositions saying this is what we propose sealing and not. Just handle it like a normal motion, and my apologies if I confused you all with that at the last hearing.

MS. MINTER: Understood, Your Honor. That's actually the practice in our district, is to file the motion to seal

publicly from the outset.

THE COURT:  Yes.

MS. MINTER:  I just wanted to clarify one point.  The Court is saying, however, if the parties confer in advance and -- say, for example, the government files a motion to seal and we do not oppose it, if the government includes that in their motion to seal, is that sufficient for the Court's purposes?

THE COURT:  That's sufficient, and I will just act on the motion.  And I will tell you all, I'm not always reading the filing as it comes in in realtime unless there's an objection.  What could happen is several weeks down the road when I'm reading it and I think the parties have oversealed, I might raise the issue then.

But unfortunately, in our district, Ms. Minter, when motions to seal are filed, for some reason they come in under seal because there's not a way to file the motion on the public record, which is really infuriating, because the Court then has to act to unseal the motion, and sometimes, that creates problems because you want only the motion to unseal be unsealed, not the exhibit.  So this is just an issue we have to deal with here that maybe our clerk's office could talk to yours about how ECF works differently for your system than ours.  But in my experience, the motions to seal come in under seal, and I have to unseal them.

MS. MINTER:  Yes.

THE COURT:  So if you file a motion to seal and it's unopposed, then I'm going to grant the motion to seal, and it's going to go on the docket, and you won't hear from me again unless I think one side has oversealed.

Does that make sense?

MS. MINTER:  It does, Your Honor.

If I could make one note about the Court's prior briefing schedule.  I would just like to note, Your Honor, we'll obviously take a look at whatever the government files at the end of November, but as the Court noted, the government has asked for this early ruling.  We submitted 31 pages of briefing in response.

THE COURT:  And you don't have to respond, but I want to give you the opportunity if there's a need to respond.

MS. MINTER:  We certainly will want to, Your Honor. The problem is, the government is now coming back and saying well, there's additional information about reliability that we could submit.  We would like to have that --

THE COURT:  At a certain point, the government may have to wait until the pretrial conference to get a ruling on all this.

MS. MINTER:  Understood, Your Honor.

THE COURT:  I do think with all of the MLATs and all of that, it makes sense for the bulk of foreign records for me

to try to resolve that upfront, and I think I'm in a position to do that with -- you've raised some specific issues I'm making them address, and if I'm still uncertain, I will reserve on that as well.  But I get that the defense is busy trying to prepare for trial, and this is a huge distraction.

MS. MINTER:  I think that's a fair description, Your Honor.  And we just want to be able to respond to whatever the situation is going to be, not what it might be once they get more information.  So I just note --

THE COURT:  I'm encouraging the government to go all out right now on these 404(b) documents if they want them in, because I -- there's a lot that needs to come in for me to admit them.  So I don't want the piecemeal coming in.

MS. MINTER:  Yes, Your Honor.

THE COURT:  All right.  The government has a motion for live witness testimony at trial.  Tell me, because I'm confused, is there a reason why this has to be under seal?  I don't see it.

MR. KENERSON:  For the most part, no, Your Honor.  The government had proposed some redactions, I think on the mistaken belief that that's what the Court had wanted.

THE COURT:  And it's fine with minimal redactions, but I just want -- so it came in with maybe the motion to seal, so that's why it's sealed, because I haven't granted that?

MR. KENERSON:  Correct.  There was a motion to seal,

and then we had submitted proposed redactions, which my recollection is that they were relatively benign.

THE COURT:  So I will, if I haven't already, grant that motion to seal.  So there's very specific minor information that will remain under seal, but the motion to seal is unsealed because I don't think that information is in the motion to seal. If so, you all just be careful that you're not putting information in the motion to seal that's seal-worthy.

Okay.  In any event, I'm going to discuss this -- yes, Mr. Kenerson.

MR. KENERSON:  Just on that point, one suggestion I was going to make for the Court's consideration, because sometimes information that is seal-worthy is the justification for the sealing, not always but sometimes, the government would certainly be more than happy to file a half sheet any single time we file something under seal so the public knows.  If the Court were willing to --

THE COURT:  That's a good -- I think the goal is for the public to know something's been filed under seal.  So if you could -- I don't know how you separate those out, though.

MR. KENERSON:  It would be similar to kind of what we file in, I think, the CIPA context, which is just notice of filing, we have filed the following thing.  It's a one-page --

THE COURT:  That's fair, because sometimes the basis for sealing does require the party to reveal information that

needs to stay under seal.  So I'm fine with both sides doing that as needed.

MR. KENERSON:  Thank you, Your Honor.

THE COURT:  All right.  So with respect to the live testimony of the translator who has translated statements from Arabic to English and the motion is for that witness to appear at trial remotely by live video, I'm going to give my reasons in a moment, but I am going to deny the motion to approve live video testimony.  I will defer at this point on the government's request for a Rule 15 deposition.

The shoe is on the other foot now, Ms. Minter.  Does the defense intend to object to these translations?  Has the defense just not had time to even review the translations?

MS. KOENIG:  Your Honor, this is my issue.

MS. MINTER:  Yes, I would defer to Ms. Koenig, Your Honor.

MS. KOENIG:  So, Your Honor, I am in the process of reviewing whether we anticipate we will have any objections to the translations.  So I do not yet have an answer, but we are working on that.

THE COURT:  All right.  Because this seems like an issue the parties should be able to work out.  If there are no objections, then -- I can't force a stipulation, but it seems reasonable to have a stipulation.  If not, the other option, of course, is to get a different translator or to get this

translator who presumably as a part of the contract anticipated there might be a need to testify at trial, that he or she should be willing to appear, if necessary.

So I'm going to defer on the Rule 15 deposition. I'm not saying that if the defense has objections to the testimony, that the Court would not permit a Rule 15 deposition. That does not mean that the Court again is necessarily saying it would be admissible at trial. We can go down that route, but this is a lot of time and expense on both sides that may be unnecessary. But let me give you the reasons that I'm not inclined to allow the live video testimony in this instance.

The confrontation clause of the Sixth Amendment provides that in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him. In general, the clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact. *Coy v. Iowa*, 487 U.S. 112, 116.

Thus, while the Supreme Court has never insisted on an actual face-to-face encounter at trial in every instance in which testimony is admitted against the defendant, *Maryland v. Craig*, 497 U.S. 836, 847, it has instructed that a defendant's right to confront accusatory witnesses may be satisfied absent a physical face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important policy, public policy, and only where the reliability of the

testimony is otherwise assured.  That's *Craig* at 850.

Here, the government has not offered a sufficiently important public policy to warrant allowing C.H.'s testimony at trial to proceed via live video.  The government asserts the broad proposition that the prosecution of a mass terror attack that killed 190 American citizens furthers an important public policy objective.  Motion at 5.

But the mere fact of a terrorism prosecution, no matter the scale of the alleged attack, cannot alone constitute an important public policy adequate to deny the defendant physical face-to-face confrontation.  If so, the government's asserted public policy interest would apply to every witness in this case.

Nor has the government identified an important public policy interest specific to C.H. himself.  The government argues that the Court should use remote video testimony only in circumstances like those involving C.H. in which, quote, conducting a Rule 15 deposition would pose a significant burden on the parties and the Court relative to the expected length or topics of that testimony.  Motion at 12.

But litigation convenience is not the type of public policy that is sufficiently important to overcome the confrontation clause's preference for face-to-face confrontation at trial.  Compare *United States v. Yates*, 438 F.3d 1307, 1316.

And while case-specific public policy interests regarding a

particularly critical witness may under some circumstances overcome that preference, compare *United States v. Trabelsi*, 2023 WL 4344526 at 16 through 19, *United States v. Abu Ali*, 528 at F.3d 210, 240, 241, the government itself admits that C.H.'s testimony may ultimately be circumscribed or even unnecessary.  Indeed, the government has not explained why another expert in English-Arabic translation could not provide testimony regarding the translations that the government seeks to introduce in this case.

While the Court appreciates that the government has presumably been working with C.H. to prepare for trial, the added expense of securing a different witness is not a legitimate public interest warranting circumvention of face-to-face confrontation.

Finally, the Court rejects the government's suggestion that it should more readily approve live video testimony where the relative scope and import of the expected testimony is minimal. A defendant's confrontation rights do not diminish in the face of subsidiary testimony, nor does the government's burden to identify a public policy decrease.  And the government again has not identified such a policy here.

So for these reasons, the Court will deny the government's motion to allow C.H.'s testimony to be taken live at trial via remote video, and the Court will defer ruling on the government's alternative request for a Rule 15 deposition and

again genuinely hopes that the parties can work this out or narrow the need for testimony in terms of translations.

All right.  Does it make sense at this point to talk about the trial date, or does it make sense to go into the sealed hearing and then resume with discussion on the trial date?  Let me hear from the government first.

MR. KENERSON:  I think -- we defer to the Court and the defense on that question.  Just logistically, it might be easier to not have to go to sealed and come back, but we defer.

THE COURT:  Let me hear from the defense.  I know the government did sit down, I think it was going to sit down for a proffer.  Did that happen?  Did that aid the defense, or does the defense still have the same concerns about being prepared in April?

MS. MINTER:  It did happen, Your Honor.  We very much appreciate that.  But it was -- it's not a substitute for our ability to review the information.  It's certainly helpful to understand the contours of the government's case and where they're coming from and how they intend to prove their case. But we, of course, cannot accept that evidence at face value. We have to take that information and investigate further.

The government has continued over time to provide ongoing discovery, and we understand, to the Court's point about the MLATs and the interaction with other organizations and other countries, that this has not been an easy process for them

either.  We're certainly not finger-pointing.  But the point is and remains that we have to be able to do what we need to do with this voluminous amount of material to suitably and effectively represent Mr. Al-Marimi at trial.

So I would say if anything, Your Honor, the workload has intensified, both in terms of additional information coming in but also additional pleadings.

THE COURT:  Coming in from CIPA rulings or what?  What do you mean?  Additional discovery?

MS. MINTER:  Additional discovery, Your Honor, certainly not of the scope that it has been throughout the case, but new things continue to come in.  And we have to assess those things in turn, but I can tell the Court that the government made a production on the 30th of October that I am working through as we speak because of other obligations and other things, not least of which is the discovery conference that the Court referenced.

And so we are working, I won't say around the clock, Your Honor, but sometimes, it gets close to that.  But at the end of the day, there's a limit to how much we can do, how much we can outsource.  We've worked as hard as we possibly can to divide it among the individuals on the trial team.  Sometimes, that backfires, for example when an individual who knows the subject matter isn't able to make it to the courthouse.  We have brought in help from everywhere that we possibly can.  But, Your Honor,

we have to continue to do the work.

THE COURT:  Okay.  Initially, you had asked for a continuance until July.  Is that a date you could meet?

MS. MINTER:  Your Honor, I think so.  And again --

THE COURT:  I will say, I can't -- this can't keep slipping.  I will say that the clerk's office and the jury office here both think, contrary to what I suggested last hearing, that the summer, though not ideal for travel reasons, in picking a jury is preferable to starting in September and running the risk that this goes into the holidays next year, which creates potentially very big problems.  And this fall, we had the government shutdown.  Let's hope we're not dealing with that in the future, but all of these things make, from their perspective, the summer less problematic than the fall, as I had suggested.  So to the extent I'm considering delaying the trial, it would be as you said, to start in July.

MS. MINTER:  I think, of course, the Court could also split the difference.  I think the parties continue to believe that this would be in the range of a 12-week trial.  So certainly, I think an August start date would allow the case to be completed prior to the holidays.

Your Honor, we do think that July is a reasonable date.  If I've learned anything in this case, it's that predicting the future on a scope this large is challenging.  At this point, that seems very feasible, but then we learn about additional

Rule 15s or things along those lines.

THE COURT:  From where I sit now, it's unfortunate that -- we had delays in this trial for a year through no one's fault, but it's apparent to me now that things could have happened during that period that didn't happen that are jamming the ability to move this case to trial.

MS. MINTER:  I think on some level, that's true, Your Honor.  I think that there could have been some degree.  I will tell the Court that not having proximate access to Mr. Al-Marimi did inhibit our ability to bring a motion to suppress any earlier.  It truly was not something that we could have accomplished.  I think at the time I was hopeful that we could.  But looking back at the work we have done with him, I think we are realizing that that couldn't have come to pass while he was gone.

I will let the government speak to their challenges.  But I do know they had logistical difficulties with relation to some of the witnesses who will be the subject of these Rule 15s.  So I don't know that the government could have moved any faster on those things as well.

But certainly, I think, Your Honor, the good news is that everything is moving at this point.  But it can't be moving all at once.  And the advantage, I think -- perhaps I should say that in air quotes.  But the slight benefit that we have, Your Honor, is that I do think with the exception of some smaller

productions that have continued to come in over time, that at this point, the defense has what I hope is the overwhelming majority of the discovery in the case.  And I think that also positions us differently, because had we moved forward on some of these things, I think there could have been a real risk that we would have had to go back and revisit issues in a way that I don't think we will have to now, assuming that we have everything that we expect to have.

So on some level, Your Honor, I think things could have moved differently at the beginning, but I don't know that it would have made it more efficient on the back end.  But I would say that everything we articulated in our motion to continue and at the last hearing stands, but that if this somewhat shaky ground holds with respect to what we expect is coming, I think that a summer trial date remains feasible for the defense.

THE COURT:  Is there anything that we will discuss in the sealed hearing from your perspective that might inform the Court's decision on the trial date, i.e. any motions that you anticipate filing?

MS. MINTER:  With respect to the CIPA issues, Your Honor?  At this point, I don't think so, Your Honor.  The parties have been in discussion about ways to make that process more streamlined.  So we're optimistic about that.  I suppose -- only to the extent that additional Rule 15s that might want to be discussed under seal, the timing for those, obviously, puts a

burden on our preparation.

THE COURT:  Well, that's a part of why I was suggesting talking about this at the conclusion of the hearing after I hear more about that, because that is a huge time sink for everyone, all the attorneys.  The Court as well has to carve out time.  I've got a three-week espionage case starting in January.  So you all are not going to have access to me for chunks of time in January.

I do think I'm going to have to reserve on this until after I hear more about that.  But can we talk about, before we conclude -- and we can come back on line for the public to hear the portion of the hearing that addresses the trial date after I've had the sealed hearing, but can we talk about what's realistic in terms of an argument on the defendant's motion to suppress the statement and the 404(b) argument?  Like, what were you all -- when would you envision doing that?

MS. MINTER:  Your Honor --

THE COURT:  I don't think I can do a deposition and a suppression hearing in one week and hear legal arguments based on that evidentiary hearing.

MS. MINTER:  I'm sorry.  Did the Court say the Court cannot?

THE COURT:  Cannot.  Do you think I can?  Were you expecting that I would be able to?  I'm trying to be realistic about what that week's going to look like, and it's hard -- you

all know much more about the facts than I do.  As I look at the briefs and the defendant's evolving theory, it's very hard for me to anticipate what that week will look like.

MS. MINTER:  Understood, Your Honor.  And as to specifics, that witness and that issue are Ms. Koenig.  So I would defer to her for argument.

I do think it turns heavily on the government's view of how long it will take to elicit testimony.  And we did discuss this previously.  I don't know that they have a precise answer, Your Honor.  I think the parties are optimistic that we could get to arguments, but I take the Court's point.

THE COURT:  Okay.  Hypothetically, let's say we don't, and I certainly will be very happy if we do, but let's say we don't get to argument.  Then are we talking about doing argument the week of December 22, or are we talking about doing it in January?

If in January, I have a judicial conference meeting the first week.  Then I have a week here where I have a pretrial conference in the three-week espionage case that then begins the 19th.

So we need to be talking about when this might happen, if it doesn't happen on the 16th of -- or the 19th of December.

MS. MINTER:  Your Honor, I will let Ms. Koenig weigh in with respect to the motion to suppress, and I can answer with respect to the others, Your Honor.

THE COURT:  Okay.

MS. KOENIG:  If it doesn't happen, if we are not able to get to it the week of December 15, I would suggest if we can find a window of time between the Court's judicial conference and the beginning of the espionage case in January.

THE COURT:  Okay.  I think that means that we should hold January 12 for that.

MS. KOENIG:  Yes, Your Honor.

THE COURT:  And if we don't need it, then we can vacate that or use it for something else.  But a hearing on January 12 at 10:00 a.m., does that work for the parties?

MS. KOENIG:  Yes, Your Honor.

THE COURT:  All right.  Is there anything else we should cover before we --

MS. KOENIG:  Your Honor, the Court had asked me, and I was still transitioning from my earlier case today when I first got on, about --

THE COURT:  Oh, yeah, the briefing, redacted version of a statement.  Is there any reason why that couldn't be taken up at the January -- we couldn't have briefing such that I could address that during the same hearing?

MS. KOENIG:  No, I think that's fine.  The Court is referring to footnote 5 that we dropped on page 17 of the reply, which is ECF Number 175, and what I was going to propose in terms of a briefing schedule on that is if the defense could

file their position on what evidentiary rules we anticipate may be at play by December 1 and then give the government two weeks and give us one week to respond.

THE COURT:  That's fine.  Are you being deliberately vague about what evidentiary rules may be at play?

MS. KOENIG:  I'm not trying to be vague, Your Honor. The ones that come to mind, at least without sitting down to brief it, are 403, 404, and hearsay, because it's rife with, I think, all of those.

THE COURT:  Okay.  Yes.  Does that work for the government?

MR. KENERSON:  That schedule is fine for the government, Your Honor.

THE COURT:  Okay.  So the defense will file any additional motion related to the motion to suppress statements relying on other Rules of Evidence on or before December 1, and the government will file a opposition by the 15th, and then a reply by the defense by December 22.

Is that what you're proposing, Ms. Koenig?

MS. KOENIG:  Yes, Your Honor.

THE COURT:  That works.  All right.  Is there anything else we should talk before we go into a sealed proceeding to handle the Rule 15 and CIPA issues?

MS. MINTER:  I think I know the answer to this, Your Honor, but just to clarify, the argument on the 404(b) and the

foreign documents would also be on the 12th?

THE COURT:  I don't know.  Does the -- I can't even remember the briefing schedule that I set for the supplemental. That's fully briefed by then?

MS. MINTER:  I think it would be, Your Honor.  I think the challenge would be if the government doesn't have any additional information about the bases that they're arguing by then.

THE COURT:  All right.  Well, Mr. Mulroe?  To the extent the government is able to answer the questions that we've discussed here, that would be helpful.

MR. MULROE:  Yes.

THE COURT:  But the government can put off a ruling on the 404(b), but for planning for both the government and the defense, that doesn't seem wise.

MR. MULROE:  Yes, Your Honor, certainly.  I think just to separate them out, on the general foreign records, we had a set of discrete things that we were going to provide you some additional information on, the biggest of which is Scottish recordkeeping.  I don't know that we discussed a deadline for that, but we would expect to file that in fairly short order.

On the 404(b), it is sounding like one of the very important parts of that is going to be information that we need to get from the Stasi archives.  And so I would be reluctant to set a deadline of like two weeks or three weeks from today, just

because I don't think that is realistic.  I think that --

THE COURT:  On the 404(b) documents, but there's no reason I couldn't hear argument on just the admissibility of the other bombing.

MR. MULROE:  Correct, I think that's right.  They are intertwined to a large degree, I think.  I think if the documents were to be excluded, we would sort of lose some of our arguments for 404(b) generally, but I do think that the Court could address the theory of relevance separate from the documents.

So on the documents, I would just ask that we be given a little bit of time to confer with our counterparts.

THE COURT:  Confer with your counterparts.  Confer with defense counsel.  For now, let's say that the Court would like to address the motion to suppress at that hearing, argument on that, the larger 404(b) issue, to the extent the Court can. The parties should be prepared, in other words, to argue those motions.

Whether there's a need to defer ruling on that to give the government a little more time to get this foreign information that they expect could take some time, I think I would be open to that, but I think it would be helpful for the parties to be prepared to argue those motions.

As for the general foreign documents, the non-404(b) foreign documents, I think I will -- I'm wondering whether we

won't have time next -- well, when are you going to supplement that filing?

MR. MULROE:  Your Honor, on that sets of documents, I think that we were going to supplement it with some of the information.  I also think that the defense was going to submit something as well.  It sounded to me like some of what they were planning to submit would fairly be characterized as new arguments, for example the notion that intracorporate e-mails are not business records.

Given that we have filed a pleading on this this morning, what makes sense from our perspective would be for them to file what they're going to file, and then we would file something that provides the additional information that Your Honor requested and also gives us an opportunity to respond to anything new that they've raised.  And we would not need very much time at all on that, but --

THE COURT:  All right.  So to the extent it's teed up, that, too, on January 12th.  This may be an all-day hearing.  All right?

To the extent the Court can make any rulings before then, for example if next week's deposition doesn't take -- that may be overpromising, but I could, I think, if there is time, perhaps rule on some sets of these documents next week, but I'm not committing to that.  So let's hold open the possibility that -- what time are we starting the depositions?  9:00?

MR. MULROE:  9:00 eastern time.

THE COURT:  At noon on the 21st, that we might have a public hearing, if I'm in a position to rule orally on some of the foreign records.

MR. MULROE:  That's fine by the government.  I think some of us may still be overseas, but perfectly acceptable.

THE COURT:  If the defense needs more time?  You do?  Okay.  Never mind.  Never mind.  We'll talk next week about whether it makes sense for me to schedule a hearing to provide an oral ruling on certain foreign documents before year end.  Okay?

MR. MULROE:  Yes, Your Honor.  And just one final request, Your Honor, before we move to the sealed portion.  Ms. Keil and I have travel that we need to get to.  So if the Court will allow, may we be excused when that transition happens?

THE COURT:  Of course.  Thank you.

All right.  Ms. Minter, I don't know that I set a date for you to respond to the government's filing this morning.  Not Ms. Minter.  This is not your issue, is it?  This is Ms. Rupert.

MS. RUPERT:  We have not set a date, Your Honor.

THE COURT:  Okay.  Let's set a date there.  How much time do you need to respond to that?

MS. RUPERT:  I would ask for two weeks, Your Honor.  I'm also overseas next week for the depositions.  So that would

give plenty of time.

THE COURT:  So on or before November 26, you will file your response to the government's supplement?

MS. RUPERT:  Yes, Your Honor.

THE COURT:  Okay.  I realize I should have done this before Mr. Munroe left, but to the extent either of you can respond to this, the additional information from the Germans, did he -- he didn't give a date certain?

MR. KENERSON:  No, Your Honor.  I believe that's what he was referring to by saying let us confer with our counterparts.

THE COURT:  So let's discuss that during the depositions next week, or you all file something on the record. I don't want to leave that issue open without an understanding of when we can expect more information.

MR. KENERSON:  Certainly, Your Honor.  And while I'm up here for issues Mr. Mulroe raised, I think he had just requested that Your Honor permit us to respond to whatever the defense files on the 3505.  So if they file in two weeks, can we have one week after that?

THE COURT:  Yes, you may.

MR. KENERSON:  Thank you.

THE COURT:  All right.  So the defense will file something on November 26, and the government will file any reply to that by December 3.

Okay.  Are we ready to go into a sealed proceeding?

COURT REPORTER:  May we take a break?

THE COURT:  Yes, we can absolutely take a break.  The court reporter needs a break.  We all need a break.  We will take a brief recess.

(Recess taken from 4:25 p.m. to 4:36 p.m.)

COURTROOM DEPUTY:  We are back on the record in Criminal Case 22-392, United States of America versus Abu Agila Mohammed Mas'ud Kheir Al-Marimi.

This is a sealed portion of the hearing.

(The following occurred under seal.)





































































(End of sealed proceedings.)

THE COURT:  We are now back on the public record.  The Court has addressed issues related to the Classified Information Procedures Act issues and the Rule 15 deposition issues.

The Court now wants to resume a discussion of the trial date, and I will hear from Mr. Kenerson.

As I understand it, Mr. Kenerson, there is additional forensic findings forthcoming from the government to the defense. There's also the potential for more Rule 15 depositions.

What else, from your perspective, could be forthcoming? Obviously, motions in limine and jury instructions and voir dire and all of those issues.

MR. KENERSON: Yes.

THE COURT: By the way, on voir dire, I'm holding the ground in terms of there will be a questionnaire on length of time but not one on specific questions. So the parties will be able to consult with one another and propose questions together or separately for the Court to consider for the general voir dire and also follow-up with individuals at the -- in the witness box, but I'm not going to do the voir dire except for the length of time of the trial.

So, Mr. Kenerson, what else have I not stated in terms of more work that's coming from the government's perspective? Obviously, I'm waiting for additional briefing on the issues we discussed earlier today.

MR. KENERSON: Yes, and I think as we noted, there's a deadline for defense dispositive motions coming up in December. It sounds like they will be filing dispositive motions. There will be potentially litigation over expert notice that the government has recently provided.

As the Court alluded, the government has recently notified the defense of a new forensic finding.  Once we receive that report, we will provide it to them.

There will -- and there is still one, I think as we said at the last hearing, potential forensic finding outstanding.  The defense is aware of that issue, and once we have anything to provide to them on that issue, we will.

THE COURT:  All right.  In addition, I understand there's the potential for additional CIPA litigation, both potential for productions by the government as well as motions by the defense potentially.

Mr. Kenerson, the Court is inclined to vacate the April trial date in light of the forthcoming briefing on the issues we discussed today, the dispositive motions that will be forthcoming by the defense, the additional forensic findings that are forthcoming and the ones that were recently provided by the government to the defense that is going to prompt briefs -- briefing relating to the expert notice, and of course, potential for more Rule 15 depositions.  In light of all this, the Court is inclined to vacate the April trial date.

The Court does note that the defense's conflict that arose was legitimate.  The defense counsel who was one of the lead counsel did have a valid conflict that necessitated his recusal and two new attorneys coming into this case.

The Court appreciates the government has tried hard to

facilitate their ability to get up to speed, but the fact remains there is a great deal of work that remains for all sides, government included, to do before trial, and the holidays are on us.

So the Court is going to vacate the April trial date.  The Court's inclined to set a trial to begin July 7, or whatever the date is after the 4th, which I think is -- the 6th is the Monday after July 4th, but I would propose starting trial July 7.

MR. KENERSON:  So understanding that the Court has ruled on the issue of a continuance, there, I think, is a significant potential problem for the government in having a trial starting in July, and that is because of some of the issues we've been raising with the Court about the majority of the witnesses coming from outside the United States and being outside the government's subpoena power.

It is, I think, the month of late July and August in particular for witnesses from the vast majority of European countries, we just do not have any -- if we could compel them to come, it would be one thing, but we cannot compel them to come.

So I think it's going to pose significant challenges to the government to put this case forth in a trial that spans through late July and into August.

So our request would be -- I understand the Court had talked about talking to the jury office and that the jury office had opined after the last hearing that July may be better than

September in this case, if we could at least pick the jury in August and hit the ground running as soon as possible after Labor Day with testimony, that would allow the government to ensure it can present the witnesses the Court needs, both to fill trial days and also to put on its case.

This was -- as I think the Court notes, the fact that we wound up in a continuance was not through -- it was a legitimate conflict, as the Court found, but certainly nothing of the government's making.

THE COURT:  Well, Mr. Kenerson, I think while this case was on hold, I think the government can and should have done more over the course of that year.  Some of the briefing I'm dealing with now could have been briefed much earlier.  Some of the CIPA stuff we could be farther along with.  There were things that the government could have, and I think should have, done during that hiatus in the case.

MR. KENERSON:  Certainly, all parties could always have done more, there's no question about that, at any particular point in time.  But for many of the reasons that I think Ms. Minter identified, we talked about what could and could not be filed at certain times, and I think a lot of the issues that we had hoped to be able to deal with during that time were going to be challenging for the defense because of the access to their client.

And we did spend that time --

THE COURT:  The foreign records and the CIPA stuff?

MR. KENERSON:  Understood on foreign records.  I would have to go back and look at the actual dates that things were filed.  My understanding is while not throughout the entire process of that time, we were in fact continuing to work on getting CIPA pleadings ready, which takes a significant amount of time.  We did file, I think, during the period one of the CIPA -- the third CIPA, I think, was filed in December of last year, which is when the defendant was unavailable.

And we worked on getting discovery out to the defense in a way that they could use it for the vast majority of that time.  The government was moving the case forward and putting the defense in a position to be able to hit the ground running when we got back online and when the defendant came around.

And when he got here, what we proposed was a trial schedule that got us to April involving moving for Rule 15 depositions, I think, within a month or two of when we first got here.  We, frankly, would have been happy to do it sooner, but at the defense request, we proposed a later schedule.

THE COURT:  And I know this is a mammoth case, and I know particularly in the CIPA arena that the government has worked exceedingly hard.  There's a lot of documents.  I get all that.  And the Court didn't rule as quickly on the last CIPA motion as it could have.

So I'm not pointing fingers, but what I am saying is I'm

not sure, simply because there are a lot of European witnesses who typically take off parts or all of certain months, that I'm going to bump the trial to begin in the fall and run the risk of losing a jury around the holidays and dealing with any other number of things that can happen at the end of the year with funding and the like.

The government is talking about needing, what, eight weeks to present its case?

MR. KENERSON:  We hope to be able to pair that down further.  We actually have had conversations since the Court's last -- the last hearing with the Court about ways we can pare that down further.  We very much hope to be able to do so, but we certainly don't want to overpromise at this point about what we can do.  But we do think we can pare it down and streamline as much as possible.

But I don't think that the government should be hamstrung in putting on the case it can with the witnesses who are willing to travel to the United States because of a continuance that was necessitated by first a defense issue and where the government has gone to the lengths it has gone since then to try to put the defense in the best position to succeed, including the reverse proffer Ms. Minter mentioned, including being willing to answer questions from them at all times, including briefing issues for the Court on very quick turn-arounds to get the Court the information it needs to make rulings.

The government is -- did everything it could to try to hold the April trial date.  And we understand the Court has ruled at this point on the April trial date, but I don't think that that should hamstrung the government's ability to actually present a case with the witnesses it has to put forth to prove its case.

THE COURT:  But I guess if we start picking a jury in July, we're talking about the government starting its case realistically late July, early August.  You're going to have some September dates anyway under that schedule.

MR. KENERSON:  We have very few witnesses who are from the United States in this case.  The vast majority of witnesses are coming from overseas.  And I know the Court has only seen the ones who have said that they are not willing to travel, but many have.  I think the vast majority of witnesses we are going to present in this case will be coming from overseas, and that is why we are so concerned about setting a date that includes late July and August.

THE COURT:  All right.  But at this point, just simply saying witnesses tend to travel in Europe in July and August, that's the case for the United States as well.  I'm not prepared to say now that you can't get your witnesses here.  Some of them for certain dates, and of course, we would have to try to accommodate those dates.  But as you stand here, you haven't even tried.

MR. KENERSON:  Certainly.  And candidly, after the

last hearing, when the Court indicated it did not think July was going to work --

THE COURT:  I know.  But I've been strongly convinced that pushing it later is not a good idea.  My inclination was with yours, but people who have handled long trials in this court think the contrary.

MR. KENERSON:  We can certainly speak from our experience of traveling to speak to these witnesses up until this point, that it has been nearly impossible for us to operate during the month of August with the European countries' schedules.

Now, if we make individual -- reach out to each of these witnesses, is it possible?  Certainly.  Until we make those inquiries, we don't know.  But those inquiries themselves will take time.

THE COURT:  Well, what you may be faced with, Mr. Kenerson, if I start the trial in September, would be we're picking the jury in August, and you have four weeks to try your case.  This may be the trade-off that you're dealing with if we go this route, that we are moving the case so that we're not running the risk of getting into Thanksgiving and Christmas holidays.

MR. KENERSON:  The government is all for streamlining this case.  To be clear, part of what is driving our estimates is being unsure that the defense is willing to stipulate to

anything, and so far, it sounds like not.

I would be happy to talk to the defense about stipulations that would streamline our case.  If we had some of those agreements, I think we could get it down to four weeks quite easily.  But we don't, and we've had no indication that they are interested in talking about that.

THE COURT:  Some of these custodians, these are quick witnesses.  You put them on the stand, and you get the documents in, even if they don't stipulate.  So that's maybe three or four days of, you know, mind-numbing testimony.  But it's not going to extend the length of the trial any dramatic amount, I don't think.

MR. KENERSON:  It may not.

THE COURT:  Or you need to lay out that case for me on how the failure to stipulate means that the case needs to be a certain amount of time.

MR. KENERSON:  Certainly, certainly.  And we also just don't know, nor would you expect to know at this point what the defense is going to be.  So whether we call certain witnesses or present certain evidence will depend on what openings say, on what cross-examination looks like.

So some witnesses that we may be planning to call right now anticipating the defense goes one way, we would not call if they go another way.

So I do think we are very committed to streamlining this

case as much as possible, but we do need to hold options open, but we are committed to streamlining this case as much as we possibly can.

THE COURT:  All right.  Let me hear from Ms. Minter.

MS. MINTER:  Your Honor, I'm not sure I have any correct answers because the Court's point is well-taken about scheduling issues in the fall.  I wonder if perhaps the Court might consider splitting the difference and perhaps starting in August.  I think --

THE COURT:  But the government is telling me they can't get anyone here in August, which I'm not prepared to accept now without them having tried.

MS. MINTER:  I suggest that, Your Honor, for a couple of reasons.  One, I do think perhaps at that point some time would be occupied with voir dire for selecting a jury, obviously.  And then perhaps the government could be creative about putting forth the witnesses that they could get in the remaining time frame in August.

I will note, as I have across the board, that Mr. Al-Marimi remains interested in the earliest available trial date that will allow his counsel to zealously represent him.  So I don't want to argue for a later date, but I will tell the Court that we want to be able to do our job and do it effectively.  And the past weeks have been incredibly challenging for his trial team, to try and review the material, try and meet the deadlines that

were existing deadlines prior to the issue with counsel's conflict. And we appreciate the flexibility of the government and the Court in adjusting those somewhat, but it has been a very frenetic pace.

And so to the extent that a little bit of margin on the back end means that as these issues crop up, like the new forensic testing that we've just learned about or some discovery that is new that has been provided in the past -- over a couple of productions over the past couple of weeks, that we're not in a position where we then have to come to the Court and say well, we're not prepared to go forward.

For example, circling back to the 404(b) motion, we're not in a position where we're setting argument and then one party says well, we need time for more evidence and then we're moving that argument. And I think the government would agree that in the initial round of scheduling back on the original original trial date, we had this issue with an accordion effect where something would get moved and then something else would be --

THE COURT: Whatever trial date I set, I'm going to front-load all these motions so tight, we are going to be operating as though we're going to trial in April, because inevitably things blow up here and issues that are unexpected come up. So I will certainly keep the trains running as though this case is starting in April, and if we have plenty of time in the summer for everyone to be relaxed and really well prepared

for trial, that will be great, but I'm not going to slow down the pace of the motions practice.

MS. MINTER:  And at this point, Your Honor, I think that is the hope of both parties.  Because I think what we have realized is that when deadlines slip, they ultimately butt into other deadlines, and it just makes for this frenetic pace.  So we aspire to a calmer window immediately before trial, as the Court alluded to.

I wonder if perhaps that small amount of margin on the back end would ease somewhat the government's scheduling challenges but would also allow the parties to truly wring out all of the issues well in advance.

THE COURT:  All right.  Well, here's what I'm going to do, because I don't want to keep setting trial dates and everyone, witnesses, victims, everyone is anticipating a trial date and then it slips, and that's -- that is not good for anyone, and especially for attorneys, too, who need to plan.

So I am going to vacate the trial date.  I am going to ask the government to get in touch with its witnesses and inquire about witness availability between the dates of July 7, which is what the Court proposed, on into some date in August, and I think that will inform my decision.

To the extent you have other witness issues on your side, I would like to know that as well.  And if the parties want to file things ex parte for this purpose because all your witnesses

aren't disclosed, that's helpful, but I don't -- the next date I set will stick, barring the courthouse shutting down.  Okay?

I'm going to give you all until -- how much time, Mr. Kenerson, do you think you need?  Can you file something within the week, by the 18th or 19th?

MR. KENERSON:  I doubt it.  The reason is that for most of these witnesses, we can't contact them directly.  We have to reach out to our foreign counterparts and ask them to do the contacting.

THE COURT:  All right.  Well, I need to set a trial date soon.  So what's the most expedited response you could get?

MR. KENERSON:  I think what I would request, if the Court would allow it, is if we can propose a date by the end of this week, if we can propose a date once we talk to our law enforcement partners to figure out what a reasonable response time would be from the foreign countries.

THE COURT:  But you know what a reasonable response is on a pretty basic inquiry, like can you check with this witness. You know how quickly they turn that around, and you don't have to necessarily have every witness a response from, but what I need is a critical mass who are going to be available.

MR. KENERSON:  I understand.  And my concern there, though, is that, one, each country is different and, two, I think we would like a chance to impress upon those countries the urgency here, which we certainly will, but that will inform how

quickly we think we can get a response from the countries on these witnesses' availability.

Many of them cannot in their own systems move as quickly as we would like, and we would like to have --

THE COURT:  Just realize -- you're asking for two days to be able to tell me how quickly?  Just realize, I may, after you file something in two days, say get what you can get by a certain date.

MR. KENERSON:  I understand.

THE COURT:  Okay.  I don't think that this is heavy lifts for those countries.  This is a priority case for the government, and simply making a phone call to a witness on their availability in the summer seems like a pretty discrete ask.

All right?

MR. KENERSON:  Understood, Your Honor.

THE COURT:  So you will let me know by when?  Friday?

MR. KENERSON:  Friday.

THE COURT:  So on or before November 14, the government is going to file -- submit a filing that will indicate when it expects to be able to give the Court -- and again, it can do so in an ex parte filing.  The government will alert the Court when it anticipates being able to let the Court know about not every single witness, but the bulk of the government's witnesses.

Because under any scenario, it seems that it's likely that

some portion of the government's case could go into September; right?

MR. KENERSON:  I'm actually -- I mean, if we actually start on July 7, I'm not sure that's guaranteed.

But just one question of clarification, the Court had said to ask about availability between July 7 and some point in August.  I just did not hear the end date.

THE COURT:  The end of August.

MR. KENERSON:  The end of August.  Thank you.

THE COURT:  Actually, that doesn't make sense.  The end of August is when I would anticipate the trial starting, but that would mean the testimony could go into September.  So I guess the question should be their availability between -- and it's not even July 7.  It would be -- hold up.  I'm in the wrong year.  Say between July 15 through September 30.  Okay?

And the same for the defense.  I offer you the same option. It sounds like what the defense is asking for here is a continuance until some time in August.

MS. MINTER:  I think that's correct, Your Honor.  I don't know that we have quite the limitations geographically. We have some, but I don't know we have as many as the government does.

THE COURT:  All right.  I think I've -- correct me if I'm wrong, but I think I've excluded time under the Speedy Trial Act until April, the trial date.  Is that right?

MR. KENERSON:  Yes, Your Honor.

MS. MINTER:  Yes, Your Honor.

THE COURT:  Once we set a new trial date, at the next hearing, let's address whether there's any agreement on excluding time until that trial date.

MS. MINTER:  Yes, Your Honor.

MR. KENERSON:  Yes, Your Honor.

THE COURT:  Anything else we need to address?

MR. KENERSON:  Not from the government, Your Honor.

THE COURT:  Ms. Minter?

MS. MINTER:  Nothing for the defense.

THE COURT:  Did I set the status hearing we talked about?  Yes, I did.

All right.  Thank you, all.

(Proceedings adjourned at 5:54 p.m.)

                    CERTIFICATE OF OFFICIAL COURT REPORTER


        I, Sara A. Wick, certify that the foregoing is a

correct transcript from the record of proceedings in the

above-entitled matter.




/s/ Sara A. Wick                         November 15, 2025

SIGNATURE OF COURT REPORTER              DATE