**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 22-cr-392 (DLF)** |
| | : | |
| **ABU AGILA MOHAMMAD** | : | |
| **MAS'UD KHEIR AL-MARIMI,** | : | |
| | : | |
| **Defendant.** | : | |

**OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE* REGARDING PORTIONS OF
MR. AL-MARIMI'S ALLEGED CONFESSION PURSUANT TO FEDERAL RULES OF
EVIDENCE 402, 403, 404, 602, AND 802**

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, respectfully submits its opposition to the defendant's motion *in limine*

requesting exclusion of portions of the defendant's statement under the Federal Rules of Evidence,

ECF 231. The defendant's statement, taken as a whole, is relevant, non-hearsay, and is not being

introduced for an improper propensity purpose.  Especially because the defendant has reserved the

right to "challenge the lack of reliability of his alleged confession at trial," ECF 175 at 17, the

entirety of the statement is separately admissible to rebut the defendant's claim that is unreliable.

It should be admitted in its entirety.

## I.    LEGAL STANDARDS

The defendant contends that portions of his statement must be excluded on four different

grounds (1) relevance, (2) propensity, (3) hearsay, and (4) speculation.  As each of those grounds

is governed by different legal principles, the government will address them in turn.

### A.  Relevance

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than

it would be without the evidence; and (b) the fact is of consequence in determining the action."

1

Fed. R. Evid. 401. "The bar for relevance is low," *United States v. Green*, 149 F. 4th 733, 755 (D.C. Cir. 2025), and "[t]he fact to which the evidence is directed need not be in dispute." Fed. R. Evid. 401, Advisory Committee Notes. Once relevance is established, the relevant evidence is admissible unless barred by the U.S. Constitution, a federal statute, or some other rule. *See* Fed. R. Evid. 402.

### B. 404(b)

Federal Rule of Evidence 404(b)(1) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Courts have often described Rule 404(b)(1) as forbidding the use of "propensity" evidence. *See, e.g.*, *Old Chief v. United States*, 519 U.S. 172, 181-82 (1997).

Rule 404(b)(2), however, makes clear that there is no prohibition on the use of "other crime[s], wrong[s], or act[s]" for purposes *other* than showing the person's propensity to commit similar acts. The rule lists nine examples of such permissible purposes: "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

As a whole, then, "Rule 404(b) is a rule of inclusion rather than exclusion." *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000). As the *en banc* D.C. Circuit observed, "although the first sentence of Rule 404(b) is framed restrictively, the rule itself is quite permissive, prohibiting the admission of other crimes evidence in but one circumstance—for the purpose of proving that a person's actions conformed to his character." *United States v. Crowder*, 141 F.3d 1202, 1206 (D.C. Cir. 1998) (*en banc*) (quoting *United States v. Jenkins*, 928 F.2d 1175, 1180 (D.C. Cir. 1991) (internal quotation marks omitted)). Indeed, just before the rule was enacted, its phrasing was modified to "properly place[] greater emphasis on admissibility." Fed. R. Evid. 404(b), Advisory Committee Note to 1974 Enactment.

When other-acts evidence is offered for a permissible purpose, the court need not make any preliminary finding that the government has proven the other act by a preponderance of the evidence. *See Huddleston v. United States*, 485 U.S. 681, 689 (1988). Instead, the standard is whether a jury could reasonably find that the defendant committed the other act. *See id.* (citing Fed. R. Evid. 104(b)). That question is decided based on "all the evidence in the case" and without weighing credibility. *Id.*

### C. Hearsay

To qualify as hearsay, an out-of-court utterance must satisfy two conditions: (1) it must be a "statement," which is defined as a person's "oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion," and (2) it must be offered by a party to prove the truth of the matter asserted in the statement. See Fed. R. Evid. 801(a) & (c).

"Statement," for purposes of the hearsay rule, has a specific definition that is tied to the speaker's assertive intent. "Nothing is an assertion unless it is *intended* to be one." *United States v. Long*, 905 F.2d 1572, 1579 (D.C. Cir. 1990), quoting Fed. R. Evid. 801 advisory committee note (emphasis original to opinion but absent from note). The party opposing introduction of an out-of-court utterance bears the burden of proving that the utterance is in fact a statement as defined in the rules. See *Long*, 905 F.2d at 1579. "Questions, commands, greetings, or other 'nonassertive' communication where any 'conveyed messages … [are] merely incidental and not intentional" are not hearsay. *United States v. Moore*, 2021 WL 1966570 (D.D.C. 2021) (Boasberg, J.) at *5, quoting *Long*, 905 F.2d at 1580.

Even if an out-of-court utterance qualifies as a statement, that statement is not hearsay unless the proponent of the statement offers it for the truth of the matter asserted in the statement. Fed. R. Evid. 801(c)(2). Statements are non-hearsay, for example, if they "go to the defendant's intent, motive, or state of mind, help to explain his future conduct, or serve to refute any possibility

3

of mistake or misunderstanding." *Moore*, 2021 WL 1966570 at *5 (cleaned up), *quoting United States v. Safavian*, 435 F. Supp. 2d 36, 45-46 (D.D.C. 2006) (Friedman, J.).   Rule 801 further defines as non-hearsay five categories of statements if they are offered against a party.   Two are potentially relevant for purposes of this motion: statements made by a party, and statements made by a party's co-conspirator during and in furtherance of the conspiracy.   *See* Fed. R. Evid. 801(d)(2)(A) & (E).[1]

For statements that meet the hearsay definition, there are a number of exceptions, including for the declarant's then-existing state of mind (Fed. R. Evid. 803(3)) and statements against interest (Fed. R. Evid. 804(b)(3)).

### D.  Speculation

"Admissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule."   Fed. R. Evid. 801, Notes of Advisory Committee.   Admissions of party opponents have thus generally been admitted without "the restrictive influences of the opinion rule and the rule requiring first-hand knowledge.   *See id*; *see also Aliotta v. National R.R. Passenger Corp.*, 315 F.3d 756, 761 (7th Cir. 2003).   "Because trustworthiness is not the touchstone for admissibility of party admissions, they are not subject to the personal-knowledge requirement of FRE 602."   *Jordan v. Binns*, 712 F.3d 1123, 1128 (7th Cir. 2013).

Fed. R. Evid. 602 dictates that "*A witness may testify* to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter" (emphasis added).   The government offering the defendant's statement into evidence pursuant to

---

[1] The defendant's assertion, ECF 231 at 5, that his statement is hearsay, is thus incorrect. It is defined as non-hearsay when offered by the government against him.

Fed. R. Evid. 801(d)(2)(A) does not render him a witness subject to Rule 602. As will be argued below, Rule 602 is completely inapplicable in this context.

## II.      ARGUMENT

The jury is entitled to the benefit of considering the defendant's statement in its entirety, especially here where the defendant has promised to vigorously challenge the reliability of that statement at trial. The entirety of the statement is relevant, in other words, to the jury's consideration of the defendant's promised claim that the statement is not reliable. The defendant's statements recounting his commission in other crimes is admissible to show his motive, knowledge, intent, and identity, and the defendant's bare-bones motion has not remotely met his burden of showing that the utterances of others, as recounted in his statement, qualify as hearsay: most contain neither assertive statements nor are offered for their truth – they are offered to provide context for the defendant's statements and actions or to show his state of mind. Even if some statements of others recounted within the defendant's motion do contain assertions offered for their truth, they are admissible as co-conspirator statements under Fed. R. Evid 801(d)(2)(E), as statements of intent under Rule 803(3), or as statements against interest under Rule 804(b)(3). The mere argument that portions of the defendant's statement are hearsay is not sufficient to make it so; as demonstrated, the defendant is unable to make *legal* arguments supporting his position.

Separately, as the government has previously argued, the defense treats the defendant's admission as divisible, almost a series of mini-admissions, when it is one contiguous piece of evidence that rises and falls on its own merits as a whole. The defendant's admissions about La Belle, Pan Am Flight 103, and the attempted assassination of a U.S. Secretary of State were part of a single statement in which he recounted his overall *curriculum vitae* as an intelligence

operative. To conceal this fact by excising or redacting portions of the statement would mislead the jury and prejudice the government. As argued in the government's response to the motion to suppress, ECF 163, the length of the statement, the variety of episodes addressed in it, the inclusion of relatively banal personal and professional details, and the inclusion of negative responses to some questions, are all critical context for evaluating the reliability of the Pan Am Flight 103 admission. Even if there were not extrinsic evidence corroborating La Belle, therefore, it would be necessary to put the entire statement before the jury.

### A. The defendant's statement is relevant in its entirety.

The question at the heart of this case is whether the defendant was telling the truth about his involvement in the bombing of Pan Am 103 when he gave his statement to the Libyan police officer. Regardless of what strategy the defense adopts, the government will have the burden of persuading each juror beyond a reasonable doubt that the confession was accurate, not a false story that was extracted from him under duress, made up by him for his own purposes, or fabricated by some faction of the post-Qaddafi Libyan government. *See* Criminal Jury Instructions for the District of Columbia, 2.305 (Statements of the Defendant – Substantive Evidence) ("You may consider whether [the defendant] was forced, threatened, or pressured . . . You may consider all of the conversations between him/her and the police . . . You may consider where and when the statement was given; the duration of the questioning . . . You may consider the age, education, experience, intelligence, and the physical and mental condition of the defendant").[2] The evidence

---

[2] At the appropriate time, the government reserves the right to suggest appropriate modifications of Instruction 2.305. The inclusion in the jury instruction of the fact that the jury can consider the defendant's "age, education, experience, intelligence, and the physical and mental condition" counsels in favor of admission of the entirety of the defendant's statement as well. As argued in the government's opposition to the defendant's motion to suppress, the sheer breadth of the defendant's experience with the Libyan government, as well as the fact that he unilaterally decided to abort a lethal operation in the presence of a superior, militates against a finding that the defendant would succumb to coercion.

the jury will rely on to discharge its obligation under this instruction will be essentially (1) the testimony of "Jamal," and (2) the content of the statement itself. For that reason, everything about the statement is important: its length, its structure, its tone of voice, the details it includes, and the details it omits. No alterations can be made to the statement without fundamentally changing the character of the document and thereby depriving the government of the full factual context it needs to prove the case and the jury of the full context it needs to evaluate the statement.

It is especially important that the jury receive the statement because the defendant has reserved the right to "challenge the lack of reliability of his alleged confession at trial." ECF 175 at 17. Evidentiary rulings which pertain to relevancy "must turn upon the evidence as developed in the particular trial," *United States v. Akers*, 702 F.2d 1145, 1148 (D.C. Cir. 1983).. Here, the entirety of the defendant's statement, including those he has highlighted in pink, are relevant to rebut any doubts about the statement's reliability. The defendant has argued that his statement was coerced because he was allegedly given a single-page paper containing an order to confess to two terrorist attacks, and the next day he was asked leading questions and directed to sign a statement he was not afforded the chance to read. He has also since suggested that the statement was concocted in Libya approximately three years later, after an English-language documentary aired on American public television, *see* ECF 175 at 13-14, or that it was possibly "prepared independently from Mr. Al-Marimi and only later associated with him." ECF 174 at 12. The contents of the defendant's statement on pp. 15-16 are relevant to combat the defendant's insinuation that his statement was coerced, concocted, and/or contrived—either by any of the far-fetched scenarios he has put forth to date, or by any others he may posit in the future.

Take first the defendant's recitation of his family situation as of the date of his statement, beginning on page 15. The defendant freely provides details of the location and construction of

his home, as well as the make, model, and year of his car and the names, years of birth, and occupations of his children. The jury can rightly consider this passage as it considers, for example, the credibility of the defendant's claim that he was fearful at the time of the interview because those who detained him threatened his family. *See* ECF 159 at 6-7.[3] Or if the defendant does not go with that version at trial and instead presents a theory that his statement was "prepared independently from Mr. Al-Marimi and only later associated with him," ECF 174 at 12, the fact that those who allegedly concocted the statement got details such as his children's names correct would make it less likely that the statement was in fact concocted.

The defendant has attempted to argue that extrinsic corroboration of the defendant's statement is irrelevant because "whether it was an authentic confession, a coerced regurgitation, or prepared independently from Mr. Al-Marimi and only later associated with him, one would expect the information in it to be accurate." ECF 174 at 12. Even assuming *arguendo* that the defendant's argument here is genuine (if he is open to stipulating, for example, that it is accurate that he "participated in . . . the Lockerbie airliner bombing," ECF 232-2 at 4, the government would



[3] Even if the defendant's version of events as told in his Motion to Suppress Statements is not admitted at trial, the defendant has provided notice of an expert in "false confessions to assist the jury in understanding the facts and the law as applied to statements of an accused." The government reserves the right to move to preclude or limit this proposed expert's testimony, but should the Court permit it, the relatively mundane details provided by the defendant would go to rebut testimony suggesting that the defendant was coerced or had falsely confessed.

be interested in such a stipulation), the argument by its own terms leaves open three possibilities: an authentic confession, a coerced regurgitation, or a confession prepared independently of the defendant and later associated with him. Where there are multiple interpretations available of the same evidence, that is a classic jury question. The jury should be provided with all of the information it needs to make that determination. *See* Criminal Jury Instructions for the District of Columbia, 2.305 (Statements of the Defendant – Substantive Evidence).

The defendant's statement regarding actions he undertook during the revolution that overthrew the Qaddafi regime, ECF 232-2 at 16, are relevant for similar but distinct reasons. The defendant was asked whether he carried out any acts against the revolution after it started, and he answered in the negative, but he noted that he undertook certain monitoring "under instructions form the various Directorates of the Organisation or other security bodies." ECF 232-2 at 16. This exchange demonstrates that the defendant was still a high-ranking member of the ESO as of the revolution and shows that he was receiving orders from a senior officer of that organization up to and through the revolution. It also undermines the narrative from the defendant's motion to suppress statements that his will was overborne. As the government argued in its opposition to that motion, if the defendant were coerced into a false confession, why would the interviewer have permitted him to deny committing crimes with Libya, especially when those were precisely the types of crimes with which he was later charged? To combat the defendant's suggestion that his statement is false and/or coerced, the jury will be entitled to consider the entirety of that statement, including the questions asked and not asked by the interviewer, and including the freeness with which the defendant provided familial information.

### B.  The defendant's statement is admissible under Fed. R. Evid. 404(b) and 403

Defendant challenges his statement recounting his participation in three operations other than the attack on Pan Am Flight 103: the La Belle Discotheque Attack, an aborted assassination

9

attempt of the U.S. Secretary of State at a Pakistani state funeral, and an operation in Egypt targeting the Egyptian President, as well as training individuals from Ghana on the use and handling of explosives. Evidence of all three categories should be admitted as relevant to motive, knowledge, intent, and identity.[4] Any single permissible purpose is sufficient to make evidence admissible under Rule 404(b). *See United States v. Miller*, 895 F.2d 1431, 1436 (D.C. Cir. 1990). Rule 404(b) "is quite permissive, prohibiting the admission of other crimes evidence in but one circumstance—for the purpose of proving that a person's actions conformed to his character." *United States v. Crowder*, 141 F.3d 1202, 1206 (D.C. Cir. 1998) (*en banc*).

The defendant admitted to participation in an aborted attempt to assassinate the U.S. Secretary of State at the state funeral of former Pakistani President Zia-al-Huq. *See* ECF 232-2 at 10-14. According to contemporaneous news reporting, the funeral took place on August 21, 1988, and the then-sitting U.S. Secretary of State, George P. Shultz, attended the funeral and laid a wreath on his grave. *E.g.*, Fineman, Mark, *Million Mourn at Funeral for Pakistan's Zia*, LOS ANGELES TIMES, August 21, 1988, *available at*: https://www.latimes.com/archives/la-xpm-1988-08-21-mn-1149-story.html (last visited December 12, 2025).

In his recounting of that aborted assassination attempt, the defendant relays how he and his contemporaries were "in a state of mobilization against America and the West, there was a strong feeling in favour of carrying out any act against the Americans." ECF 232-2 at 10. He detailed his construction of bombs of various types, *id.* at 10, how he defeated scanning defenses that had been set up, *id.* at 11 and how he unilaterally decided to abort the mission when he learned that the would-be suicide bomber was unaware of his role. *Id*.

---

[4] The admissibility of the La Belle attack under Rule 404(b) is the subject of a pending government motion *in limine*, ECF 147. The government adopts its arguments made in that filing, as well as its reply in support thereof, ECF 182, and incorporates them herein.

The defendant also objects to admission of his trip to Addis Ababa in 1986, where he was asked to take an explosive vest and target the Egyptian President (in another operation that was called off), as well as the fact that he trained 15 Ghanaians on the use and handling of explosives. *Id.* at 24-25.[5]

### 1. Motive

Motive is "something… that leads one to act." *Black's Law Dictionary* (2024). Here, the government alleges that the defendant was led to act by orders from his ESO superiors as part of Libyan leader Muammar Qaddafi's quest for vengeance against the United States. This case therefore involves multiple layers of motive: the defendant was motivated to act by the orders of his superiors within the ESO, and those superiors were themselves motivated to act by their government's hostility to the United States. This background is crucial to the jury's understanding of how and why the defendant helped execute the bombing of a civilian aircraft.

The defendant's personal motive is inextricably tied to his status as an ESO operative, and his involvement in the assassination attempt of the U.S. Secretary of State and the Egyptian president. This use of other-acts evidence is routine in conspiracy cases,[6] where courts regularly affirm the use of Rule 404(b) evidence to "explain the background, formation, and development of the illegal relationship." *United States v. Escobar-de Jesus*, 187 F.3d 148, 169 (1st Cir. 1999)

---

[5] It is unclear that the training of Ghanaians qualifies as 404(b) evidence at all. There was no insinuation from the statement that the defendant was providing criminal training. The government assumes *arguendo* for purposes of this response that the training would qualify as other crimes act, but the Court should require the defendant to put forth some evidence or argument on that front.

[6] Although the defendant in this case is not charged with conspiracy, similar to conspiracy cases, the defendant is alleged to have committed the offense in concert with others in pursuit of a shared objective. *See* ECF 7 at ¶ 10 (Indictment, alleging that defendant conspired with other ESO associates to commit terrorist acts against the United States). The statute of limitations had run on conspiracy at the time the indictment was returned in this case.

(citing *United States v. Prevatte*, 16 F.3d 767, 775–76 (7th Cir. 1994); *United States v. Jones*, 982 F.2d 380, 382-83 (9th Cir. 1993); *United States v. Passarella*, 788 F.2d 377, 383-84 (6th Cir. 1986); *United States v. Magnano*, 543 F.2d 431, 435 (2d Cir. 1976)). Likewise, here the La Belle evidence serves to "demonstrate a continuing relationship between" the defendant and his ESO co-conspirators. *United States v. Vega*, 285 F.3d 256, 261 (3d Cir. 2002) (quoting *United States v. Scarfo*, 850 F.2d 1015, 1019 (3d Cir.1988)). That relationship is relevant to the defendant's motive, as well as to other permitted purposes like opportunity.

Also relevant is the bigger-picture motive of the Libyan government. "Hostility is a paradigmatic motive for committing a crime," *United States v. Russell*, 971 F.2d 1098, 1107 (4th Cir. 1992), and the defendant specifically acknowledges these hostilities as part of his recitation of his participation in the aborted attempt on Secretary Shultz's life.  Specifically, the defendant acknowledges that at the time of the funeral—August 1988, just four months prior to the bombing of Pan Am Flight 103—he and others were "in a state of mobilization against America and the West" and that there was a "strong feeling in favour of carrying out any act against the American." It is rare to see as clear a statement of motive as the defendant's.[7]

  2. Knowledge

To create an improvised explosive device requires uncommon technical skill as well as access to specialized materials. To carry its burden at trial, the government must persuade the jury that the defendant had the requisite skills and materials — that is, the knowledge — to perpetrate the charged offense.

---

[7] To the extent the planned attack on Secretary Shultz is relevant to the motives of persons other than the defendant, such as senior Libyan officials, it is still valid as Rule 404(b) evidence. *See United States v. Green*, 617 F.3d 233, 250 (3d Cir. 2010) (rejecting defendant's argument that "motive" is limited to defendant's motive and affirming admission of evidence about defendant's prior conduct as relevant to the motive of a witness).

Because of the specialized nature of the craft, prior episodes of bombmaking by a defendant charged with bombmaking are relevant for the non-propensity purpose of establishing that the defendant possessed the requisite "knowledge and skill." *United States v. Trenkler*, 61 F.3d 45, 48 (1st Cir. 1995) (skill of bombmaking); *cf. also United States v. Barrett*, 539 F.2d 244, 248 (1st Cir. 1976) (skill of burglar-alarm tampering); *United States v. Garcia*, 880 F.2d 1277, 1278 (11th Cir. 1989) (skill of forging documents).

Accordingly, the defendant's prior participation as a bomb technician for the operations in Pakistan and Addis Ababa, as well as the fact that he was chosen by the ESO to train foreign operatives in the use of explosives, should be admitted for the purpose of proving that he had the knowledge and skill to play the same role in the Pan Am Flight 103 bombing.

### 3. Intent

At trial, the government will argue that the defendant knew and intended that his bomb would be used to destroy a U.S. aircraft and kill civilians, rather than for some innocent purpose. *See* 18 U.S.C. § 32(a) (statute charged in Counts One and Two, requiring that defendant acted "willfully"); *Bryan v. United States*, 524 U.S. 184, 191 (1998) ("As a general matter, when used in the criminal context, a 'willful' act is one undertaken with a bad purpose." (cleaned up)). His prior involvement in the operations in Pakistan and Addis Ababa is probative of that guilty state of mind.

"The intent with which a person commits an act on a given occasion can many times be best proven by testimony or evidence of his acts over a period of time prior thereto, particularly when the activity involves a continuous course of dealing." *United States v. Harrison*, 679 F.2d 942, 948 (D.C. Cir. 1982). Here, the defendant's ongoing role as a bombmaker for the ESO was a "continuous course of dealing" from which his knowledge and intentions can be inferred based on the results of earlier events. As the government has previously argued, after the La Belle attack,

the defendant would have well understood that his bombs were being used to commit terror attacks directed at civilians. The Pakistani operation establishes that as of August 1988, the defendant knew that his bombs were still being used to target United States as part of his and his organization's "mobilization against America and the West" and that "*there was a strong feeling in favour of carrying out any act against the Americans*. ECF 232-2 at 10 (emphasis added). The operation in Addis Ababa underscored that the defendant's bombs would be used in a similar fashion. When the defendant later built the bomb that destroyed Pan Am Flight 103, he did so with a bad purpose, and he was under no illusions about the violent use to which it would be put.

   4.  Identity

In cases where the identity of the perpetrator is at issue, courts have allowed the government to present evidence that the defendant committed similar crimes during a similar timeframe, on the theory that a distinctive pattern of conduct is probative of identity. *See, e.g.*, *United States v. Gomez*, 763 F.3d 845, 854 (7th Cir. 2014); *United States v. Shumway*, 112 F.3d 1413, 1420 (10th Cir. 1997); *United States v. Lamb*, 831 F. App'x 938, 940-42 (11th Cir. 2020) (unpub.); *United States v. Scott*, 631 F. App'x 137, 138 (4th Cir. 2016) (unpub.). Such use of prior acts is known as a "modus operandi" theory, but as one Court of Appeals has noted, "modus operandi is not the exclusive theory for admitting other acts to prove identity." *United States v. Gomez*, 763 F.3d 845, 861 (7th Cir. 2014).

The defendant's involvement in the Pakistani and Addis Ababa operations, as well as his training of the Ghanaians is proof of his identity as a bombmaker and explosives expert for the Libyan government, which is itself highly probative of his participation in the Pan Am Flight 103 bombing. His specialized role within an organizational structure is part of the modus operandi of the offense. So too are other features the bombings have in common, like the intended targets (Americans), and finding ways to creatively conceal the bombs.

5. Corroboration

Given that the defendant intends to attack the reliability of the defendant's statement, the government should be permitted to introduce evidence that the defendant's statement is corroborated. In addition to corroboration of his statements regarding Pan Am Flight 103 and La Belle, which is covered elsewhere, the government should be permitted to demonstrate that the defendant's statement is corroborated by other statements taken by the Libyan officer. For example, when the defendant described his participation in the aborted attempt to assassinate the U.S. Secretary of State, he named some of the other participants. One of those participants corroborated the defendant's account of that aborted assassination attempt. *See also* ECF 163 (with citations to the corroborating portions). As the government has demonstrated, *see* ECF 147 at 7-10; ECF 182 at 2-5, corroboration is a non-propensity purpose. Extrinsic evidence that the defendant's statement was accurate is a powerful rejoinder to his argument that the confession was coerced and that he was directed to admit to things he had "nothing to do with." *See* ECF 159 at 6.

6. Rule 403 does not bar the defendant's admission to other crimes.

Once a permissible purpose is shown, Rule 404(b) evidence still must be evaluated under Rule 403, which permits the court to exclude evidence if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. That is not the case here.

On the one side of the balance, as discussed above, the fact of the defendant's role in the Pakistan and Addis Ababa operations, as well as his role in training Ghanaians, are highly probative of his motive for the charged offense, his knowledge and skill to create a bomb, his intent in making that bomb, and his identity.

15

On the other side, there is no danger of unfair prejudice if the evidence is admitted. As the D.C. Circuit has observed when affirming the admission of a defendant's prior gun possession in a gun-possession case: "'[U]nfair prejudice' as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party.  Virtually all evidence is prejudicial or it isn't material. The prejudice must be 'unfair.'" *United States v. Cassell*, 292 F.3d 788, 796 (D.C. Cir. 2002) (quoting *Dollar v. Long Mfg., N.C., Inc.*, 561 F.2d 613, 618 (5th Cir. 1977)).

Here, there would be no unfair prejudice because there is little chance the jury would use these other incidents as improper propensity evidence. The law regards propensity evidence as dangerous because of "the risk that a jury will convict for crimes other than those charged—or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment." *Old Chief*, 519 U.S. at 181 (quoting *United States v. Moccia*, 681 F.2d 61, 63 (1st Cir. 1982) (Breyer, J.)).  That risk is not present here. The primary evidence for the defendant's involvement in the other uncharged acts is the very same statement in which he admitted to his involvement in the charged Pan Am Flight 103 bombing. These mutually corroborating admissions are likely to stand or fall together in the jury's eyes. In the unlikely event the jury were to credit one part of the defendant's statement and discredit another, they would be more likely to believe he participated in the Pan Am Flight 103 bombing, since the extrinsic evidence for that offense will constitute the overwhelming majority of the government's trial presentation. Consequently, there is no appreciable risk that a jury might find reasonable doubt as to the Pan Am Flight 103 bombing but nonetheless return a guilty verdict based on their belief that the defendant committed the other acts in his statement.

Nor would the presentation of this evidence confuse the issues, mislead the jury, cause undue delay, waste time, or lead to cumulativeness. The government should therefore be permitted to present the entirety of the defendant's statement bombing during its case-in-chief.

### C. The defendant has not demonstrated that any portion of his statement is hearsay.

The defendant has not met his burden of establishing that the statements he challenges as "hearsay" within his admission are in fact hearsay, *i.e.*, he has not made any specific argument, much less demonstrated that any utterance he reported upon is both an assertion and offered for the truth of the matter asserted.[8]  He makes only a blanket argument that the utterances he has highlighted in blue or gray are "statements" that "necessarily depend on the truth of the matter asserted." ECF 231 at 5.  Other than cursory citations regarding "effect on the listener" arguments in an out-of-circuit case and a ruling on a motion for summary judgment in a civil case, the defendant makes no attempt whatsoever to develop an argument for why the challenged statements are hearsay, leaving both the Court and government to guess at his arguments.  Because it is the defendant's burden to establish that the challenged utterances are hearsay at all, *see United States v. Long*, 905 F.2d 1572, 1579, the Court should require an additional showing from the defense before entertaining any argument about the hearsay nature of portions of the defendant's statement. Perhaps the defendant declines to offer legal analysis because any such analysis will show that the challenged portions of the defendant's statement are not hearsay at all.[9]  The challenged statements are (1) not "statements" as defined by Rule 801(a), and (2) not offered by the government for their

---

[8] "The party opposing the introduction of relevant evidence bears the burden of persuading the Court that the evidence constitutes hearsay as defined in [Federal Rule of Evidence] 801." *United States v. Fuller*, 761 F. Supp. 3d 125, 131 (D.D.C. 2025) (Jackson, J.).  Only once the defense (in the context of this motion) has met that burden does the burden shift to the government to identify an exception. *Id.* at 131-32.

[9] Should the defendant, in his reply brief, submit a legal analysis for the first time, the government requests the right to seek a sur-reply. *See United States v. Apodaca*, 241 F. Supp. 3d 1, 5 (D.D.C. 2017) ("Issues may not be raised for the first time in a reply brief").

truth.   In any event, even if they were statements offered for their truth, they would all be admissible as non-hearsay co-conspirator statements under Fed. R. Evid. 801(d)(2)(E) or under a hearsay exception.

      1.  La Belle Discotheque

The very first utterance that the defendant challenges as "hearsay" is an order or direction. The defendant recounts that Said Rashid "asked [the defendant] to travel to East Germany and meet the Security Officer at the Libyan Embassy, a man named Ali Ibrahim Kashlaf."   In the defendant's recounting, after he got to East Germany, Kashlaf informed him that he "was required to prepare an 'explosive package' to be used against an American target." ECF 232-2 at 5. These directions to carry out an attack are classic non-hearsay.  They contain no assertive statements of any separately existing fact.[10]   These statements are imperatives with their own operative effects, being communicated by a superior (Rashid or Kashlaf) to the employee (the defendant) with the responsibility for carrying out the directive.  This type of instruction "is, by its nature, neither true nor false and thus cannot be offered for its truth." *United States v. Shepherd*, 739 F.2d 510, 514 (10th Cir. 1984) (citing *United States v. Keane*, 522 F.2d 534, 558 (7th Cir. 1975)); cf. also *United States v. Davis*, 596 F.3d 852, 856 (D.C. Cir. 2010) (citing *Shephard* in support of holding that

---

[10] It is unclear from the defendant's statement whether he is relating his own belief that Ali Keshlaf is the security officer at the Libyan Embassy or whether Rashid told him that fact. Even assuming *arguendo* that Rashid relayed that fact to the defendant, that utterance was (1) not intended as an assertion, as the fact of Ibrahim's position was intended for the defendant's use as part of the directive, rather than as a standalone fact; and (2) is not offered for its truth in any event. It does not matter to the government whether Kashlaf did in fact hold the position of Security Officer at the Libyan Embassy in East Berlin.  What matters is that the defendant was instructed to meet with a person that *the defendant believed was* the Security Officer at the Embassy in East Berlin.  Similarly, it does not matter to the government whether Kashlaf has in fact "handed the matter of interest to the person who would carry out the task."  What matters is that Kashlaf informed the defendant of that, and the defendant acted accordingly.  The relevance, in other words, is that fact that the words were said, not that they are true.

money orders are "legally operative documents with a meaning independent of the truth of the words they display").

The defendant's cursory citations do not help his argument that the challenged utterances would be inadmissible to show their effect on the listener.  He cites, at 5, to *United States v. Graham*, 47 F. 4th 561, 567 (7th Cir. 2022), for the proposition that a "statement is offered to show an effect on the listener only if the listener heard and reacted to the statement, and if the 'actual use' of the statement at trial was to demonstrate the listener's response."  Here, it is clear from the defendant's statement that he heard Rashid's imperative and acted upon it to travel to East Germany.  Ironically, the defendant also seeks to exclude the evidence of that action on "hearsay" grounds: the defendant told his interviewer that he "knew since Said Rashid had informed [him] that [he] was to go to East Germany on a work assignment."  In other words, the defendant confirmed that he heard Rashid's instructions, traveled to Germany on them, and *knew*, as a result of those instructions, that he was traveling to East Germany for work.  Kashlaf's directive to the defendant – that he was required to prepare an explosive target to be used against an American target – is offered to show specifically that the defendant was put on notice by others in the Libyan government that his bombs would be used against American targets.  The relevance of Kashlaf's words is the fact that they were said, not for the truth of any assertions in that statement.[11]  This, too, is a classic non-hearsay purpose, as statements are non-hearsay if they go to the defendant's motive, intent, state of mind, or help to explain his future conduct.  *See*, *e.g.*, *United States v.*

---

[11] This argument applies with equal force to the defendant's objection about the television reports.  For one, the fact that the defendant watched news about the La Belle Discotheque attack is a fact he has first-hand knowledge of (as he himself watched the reports), so there is not even plausible hearsay in that statement.  Kashlaf nodding his head in response to those reports is non-assertive, but even if it is, the defendant's interpretation of that nod goes to show his knowledge. The defendant's interpretation, of course, is not even plausibly hearsay either, even though it is highlighted in gray on the defendant's exhibit.

*Moore*, 2021 WL 1966570 at \*5 (D.D.C. 2021) (Boasberg, J.) (quoting *United States v. Safavian*, 435 F. Supp. 2d 36, 45-46 (D.D.C. 2006) (Friedman, J.).

The final statement that the defendant challenges on hearsay grounds as part of his recitation of his participation in the La Belle Discotheque Attack is as follows:

Q. What was the result of the explosion in the club?

A. What I recall is that four American officers were killed and a number were wounded.

ECF 232-2 at 5.

The defendant does not even posit what the "statement" is that he seeks to preclude here, and the Court should not entertain the argument without the defense so identifying. That aside, however, the defendant's recollection of the number of officers killed is incorrect (two were killed, along with a Turkish woman). Whatever the statement is, it cannot be offered for its truth, as those numbers are incorrect. Nor would it matter if the numbers were in fact correct. This statement is relevant to the defendant's knowledge—including, among other things, his knowledge that his handiwork at the direction of his superiors in the ESO killed and wounded U.S. service members. The Court should not exclude any of the defendant's statements regarding La Belle on hearsay grounds.

Even if the Court were to find that any of the statements made by members of the Libyan government about La Belle were in fact offered for their truth, they would nonetheless be admissible under Fed. R. Evid. 801(d)(2)(E)[12] as statements of a co-conspirator and statements

---

[12] To admit statements under Fed. R. Evid. 801(d)(2)(E), the Court must find by a preponderance that the conspiracy existed and that the defendant and declarant were members of that conspiracy. *E.g.*, *United States v. Gewin*, 471 F.3d 197, 201 (D.C. Cir. 2006). The Court can consider the statements themselves in this analysis, but there must be some evidence independent of the statements. Here, the existence of conspiracies to bomb Pan Am Flight 103 and the La Belle Discotheque, along with the defendant's and declarants' membership in those conspiracies, are more than adequately established by the defendant's statement. The independent evidence

against their penal interest under Fed. R. Evid. 804(b)(3), but the Court should not need to reach those exceptions/exclusions to resolve this motion.[13]  Any statements about what was to happen in the future (*e.g.*, Said Rashid telling the defendant to travel to Germany or Ali Kashlaf telling him he would be required to prepare an explosive package to be used against an American target) would also qualify as statements of the declarant's state of mind, including intent and plan, at the time they were made.  *See* Fed. R. Evid. 803(3).

    2.  Pan Am Flight 103

The defendant's arguments about hearsay within his recitation of the commission of the bombing of Pan Am Flight 103 fare no better than those he made with respect to the La Belle attack.  The defendant's hearsay complaints include a literal order ("he ordered me to take one of these cases and travel with it to Malta," ECF 232-2 at 6); directions for how to carry out the attack ("I was asked to get up the following morning at seven o'clock in order to set the timer of the explosion inside the suitcase in such a way that the explosion would occur  exactly eleven hours later," *id.* at 7); his own state of mind ("I did know that Americans would be targeted with this explosive device," *id.* at 7-8); the employment of his co-conspirator ("Abdulbasit Al-Magrahi worked in the External Security Organisation and was responsible for the security of planes . . ."

---

includes, but is not limited to, the fact that both attacks happened, as well as the evidence underpinning both the government's motion to admit foreign records, ECF 147, and to admit evidence of the La Belle attack, ECF 148.

[13] To admit statements under Fed. R. Evid. 804(b)(3), the declarant must be unavailable for trial.  Some of the declarants at issue here are deceased.  For those who are not, the government expects to be able to demonstrate their unavailability if needed.  Additionally, given that this is a criminal case, the statement must be "supported by corroborating circumstances that clearly indicate its trustworthiness."  Fed. R. Evid. 804(b)(3)(B).  For the same reasons the defendant's statement is corroborated, his co-conspirators' statements evincing culpability in either attack contains the requisite corroborating circumstances.

*id.* at 8[14]); and expressions of gratitude ("he thanked us for the success of the operation," *id.* at 9).
The defendant makes no specific arguments about how any of these statements were intended as
assertions or offered for their truth.  He cannot do so credibly.

Take the defendant's initial exchange with Abdullah Senussi, recounted at ECF 232-2 at 6.
Senussi, one of the defendant's superiors in the ESO, ordered him to travel to Malta with the
"booby-trapped" suitcase.  The defendant does not object to his recitation of the fact that he was
summoned to Senussi's office in the winter of 1988, but he objects to the identity of the summoner.
The defendant presumably was informed of the summons directly by the summoner (which would
make the summons a command and thus non-hearsay), but even if he were not, it does not matter
whether he was indeed summoned by that person.  All that matters is that the defendant believes
he was.  Similarly, it does not matter whether Senussi had in fact personally previously requested
rigged suitcases be prepared by the Technical Operations Section.  What matters is that the
defendant was being directed to retrieve what he believed to be one such suitcase (and the evidence
will establish that that is in fact what the defendant did).[15]  Senussi's order to travel to Malta is just
that—an order, which is classic non-hearsay as described above.

---

[14] Curiously, the defendant objects to this response as hearsay, without any elaboration, but
he does not object to a later answer about having previously known Megrahi from "the
Organisation" and having met Fhimah for the first time during the operation in Malta.  ECF 232-
2 at 9.

[15] In addition to not being offered for its truth, Senussi's statement about having requested
the rigged suitcases is not an assertion.  Senussi's intent in making the statement was plainly to
orient the defendant to the specific type of suitcase he should retrieve.  Any message conveyed
during the course of that utterance is incidental, and thus the statement is not an "assertion" for
purposes of the Rule 801(a) analysis. *See United States v. Long*, 905 F.2d 1572, 1580 (D.C. Cir.
1990) (although a caller's questions – asking whether the defendant had any drugs available for
purchase – implied that the defendant sold drugs, making that assertion was not the caller's intent,
and thus the questions were not a "statement").

The defendant also objects, without any developed argument, to his statement that Senussi told him that Megrahi and Fhimah would meet him in Malta. *See* ECF 232-2 at 6 (highlighting that statement in blue; *see also generally* ECF 231 (making no specific argument with respect to that statement or any others). Like many other statements discussed herein, there is nothing assertive about that statement. They defendant had not yet met Megrahi and Fhimah in Malta at the time it was made, so there was no truth value to it at all. It is offered for its effect on the defendant and the fact that it was said by the defendant's superior who was ordering him to travel to Malta. The defendant then went to Malta and met with Megrahi and Fhimah. That he was directed to do so by Senussi was part of the plan. The statement was a directive, and thus classic non-hearsay as discussed above. It was, at most, a part of Senussi's then-existing state of mind and the plan he was communicating to the defendant and thus would be admissible (even if the government were offering an assertion for its truth) under Rule 803(3).

Just as straightforward is the defendant's recitation of being asked to get up at 7 a.m. the following morning to set the timer and being given $500 to purchase clothes for the suitcase. ECF 232 at 6-7. This, like so many other challenged utterances, is a directive for the defendant to carry out some future action, not a recitation of what he or anyone else had done in the past. It does not carry assertive intent, nor is there any "truth" for which it could be offered. The defendant's nonsensical solution is for the jury hear that the defendant "carried out what had been asked," but be forbidden from knowing what had in fact been asked. *Id.* at 7. As discussed above, directions are classic non-hearsay, and even if they had some "truth" value, statements offered to place the defendant's admissions in context are not hearsay. *See United States v. Bostick* 791 F.3d 127, 147 (D.C. Cir. 2015); *United States v. Safavian*, 435 F. Supp. 2d 36, 44 (D.D.C. 2006) (Friedman, J.). They would nevertheless be admissible, even if assertions offered for their truth, under Fed. R.

Evid. 803(3).  In any event, it is hard to envision what the defendant's co-conspirator's instructions to him could be asserting, as they were directing him to undertake actions in the future and not reciting actions he or anyone else had taken in the past.

The also objects to his statement of his own knowledge as hearsay ("I did know that Americans would be targeted with this explosive device").  There is not even an utterance associated with the defendant's statement of his own mindset, let alone anything that the defendant can plausibly contend is a statement offered for the truth of the matter asserted therein.  Even assuming there was such a statement, however, statements offered to show the defendant's state of mind are classic non-hearsay (or at most admissible under Fed. R. Evid. 803(3)).[16]  *See, e.g.,* *United States v. Baird*, 29 F.3d 647, 654 (D.C. Cir. 1994) ("Thus Baird offered O'Dell's statements of his conversation with Baird only to show Baird's state of mind, not for the truth of the matter asserted. Accordingly, the testimony was not hearsay"); *Moore*, 2021 WL 1966570 at *5 (statements are non-hearsay if they go, among other things, to the defendant's state of mind); *Safavian*, 435 F. Supp. at 44 ("Looking at the content and context of other e-mails and what events preceded or immediately followed them, the Court finds that a number of the e-mails are admissible under Rule 803(3) to show Mr. Safavian's state of mind at the time he received them or at some later time").

---

[16] The defendant's proposed version of the statement would also have the effect of presenting a misleading version of the hi state of mind to the jury.  He was asked whether he had "prior knowledge of the target that was to be blown up?"  The defense's proposed redacted answer to that question is as follows: No, I didn't know the exact target, but I did know that Americans would be targeted with this explosive device."  (ECF 232-2 at 7-8, blue highlighting original to that exhibit).  The defendant's proposed redaction makes it seem like the defendant expressed *no knowledge at all* about the intended target, when he in fact stated that he knew that Americans would be targeted.

The defendant's objection to his own reaction to various news reports and things he learned post-bombing fares no better. He objects to his own statement that he learned after the explosion that the plane went from "Malta to Frankfurt to America" and that there were about 260 passengers on board, as well as the crew. ECF 232-2 at 8. The defendant does not specify what "statement" he is objecting to, but regardless the truth of any such statements is immaterial. It does not matter whether some unnamed person was accurately reporting that the plane went from Malta to Frankfurt to America. What matters is that the defendant heard that information and connected it in his own mind to the bomb he had built and handed to Fhimah in Malta. So too with the 260 passengers. What matters is the defendant's state of mind as revealed by the fact that he connected that information to the attack he was a part of, and connecting his conduct with that attack. These "statements" go to the defendant's state of mind and thus are not hearsay.

The defendant also objects to a number of after-attack statements by senior Qaddafi-regime officials. He objects to Senussi thanking him and Megrahi for the operation. That utterance is relevant for the fact that it was said; to the extent it contains assertive statements (it does not) the government does not care whether Senussi in fact believed the operation to have been successful. The defendant objects to Senussi informing him that he should travel to Benghazi the next day. That is a directive or order, which as discussed above is not hearsay. He also objects to his own recitation of Qaddafi praising him and thanking him for a "great patriotic act against the Americans." Much like Senussi's statement above, there is no assertive value in an expression of gratitude, and to the extent there is, it does not matter whether the act was in fact great or carried out with precision. What matters is that the defendant heard Qaddafi say it. So too the tasking of Senussi to look after them. The defendant's government manifested an intent to take care of him

25

and he believed he was being taken care of by that government, as a result of his involvement in this attack. Whether he actually was being taken care of is irrelevant.

The defendant's objection to his recitation Senussi banning him from traveling abroad is equally unconvincing as his other objections. For one, he objects to Senussi "permanently withdraw[ing his] passport." There is no utterance there, let alone a statement. Senussi's verbal ban is a directive or order and thus non-hearsay. The defendant's understanding of why Senussi withdrew the passport – to avoid the risk of the defendant falling into the hands of a foreign power – is relevant to the defendant's state of mind after the attack – *i.e.*, he believed that what he did was a crime that may land him in the hands of a foreign power. The government does not care whether a foreign power may in fact apprehend him, only that Senussi informed him of that belief. Senussi's utterances are neither statements nor offered for their truth.

Finally, just as with the La Belle statements, should the Court find any assertions for the truth of the matter made by Senussi, Megrahi, or Fhimah, such statements would be admissible as co-conspirator statements if they were made during and in furtherance of the conspiracy. Fed. R. Evid. 801(d)(2)(E). Similarly, the statements, including those that arguably occurred after the end of the conspiracy, would be admissible as statements against penal interest under Fed. R. Evid. 804(b)(3). The defendant has not met his burden of demonstrating that any of the challenged statements are hearsay, and even if he has, the government has identified exceptions and exclusions to the hearsay rule.

### 3.  Pakistani President's Funeral

In addition to the Lockerbie and La Belle attacks, the defendant admitted to participation in an attempt to assassinate the sitting U.S. Secretary of State at the funeral of Pakistani President "Zia-ul-Haq." ECF 232-2 at 10-15. The defendant's hearsay objections to this portion of his statement are similar to—and similarly unfounded as—his objections to hearsay during his

26

recitation of the La Belle and Lockerbie attacks.  His very first objection is to two "instructions," (his word), that he and a co-conspirator take a booby-trapped overcoat, make preparations, and go to a base to accompany the delegation heading to Pakistan, and that the fourth person with them would wear the overcoat.  ECF 232-2 at 10-11.  Instructions are standard non-hearsay as discussed above, and the relevance is the fact that the defendant heard them.  Shibani's instructions to the would-be suicide bomber recounted by the defendant are, again, instructions and non-hearsay.  *See* ECF 232-2 at 11. They also place the defendant's next statement – "*It was at this point* that I realized that this person was not aware he was going to carry out a suicide mission" (emphasis added) – into stark context.  Context for the defendant's statements, as noted above, is also classic non-hearsay.  The same is true for the next challenged statement: The defendant's ESO superior "discovered that the Pakistani security forces were installing a scanner at the entrance to the hotel. He informed us of this, and as a result, I and the fourth person 'wearing the overcoat' left before the installation was completed."[17]  The ESO superior relaying information to the defendant shows that information's effect on him, and in fact the defendant's next statement demonstrates how he used that information.  That is a classic effect-on-the-listener/context use of the statement, neither of which are hearsay.  So too are the defendant's statement that he found out that the operation would be against the American minister in the morning of the operation and that the would-be suicide bomber was instructed to get close to the American minister.  ECF 232-2 at 13-14.

The defendant also challenges on hearsay grounds his statement that his ESO superior "would inform the person wearing the booby-trapped overcoat of the location of the American Minister so that he could get closer to him, and [the defendant's] role was to trigger the bomb in

---

[17] The defendant proposes leaving "I and the fourth person 'wearing the overcoat . . ." in the statement but redacting the preceding portion of the sentence.  This again would present a misleading impression to the jury.

the overcoat when he got close." ECF 232-2 at 11. There is no utterance associated with that objection, let alone a statement offered for its truth. It is a recitation of the defendant's state of mind and his understanding of how the operation would unfold. It is not hearsay. There is similarly no utterance associated with the defendant's statement that "we didn't tell [the would-be suicide bomber] anything" about the fact that the overcoat contained a bomb. *See* ECF 232-2 at 13. That response from the defendant self-evidently manifests the *lack* of a statement. He was explaining the fact that a statement was not made. There is by definition no statement, and no truth for which any statement could be offered. The fact of the lack of statement is what is relevant.

The defendant thus has not met his burden to show that any of the challenged statements are hearsay and his objection on those grounds should be overruled. Even if the Court finds some assertions offered for their truth within the defendant's recitation of the operation in Pakistan, those made by co-conspirators during and in the course of the conspiracy are admissible under Fed. R. Evid. 801(d)(2)(E), those made against the declarant's penal interest are admissible under Rule 804(b)(3), and those expressing a then-existing state of mind, including plan, are admissible under Rule 803(3).[18]

### D. Federal Rule of Evidence 602 does not bar admission

The defendant has cited no authority in support of his proposition that the proscription of witness testimony in the absence of personal knowledge, as described in Fed. R. Evid. 602, applies to the admission of a defendant's statement as non-hearsay by a party-opponent. There is good

---

[18] The defendant's other hearsay objections follow similar grounds and should be summarily rejected. He complains of a senior ESO official asking "the Head of the Organisation to ask us to take an explosive vest with us" and that he received instructions that the mission had been aborted. ECF 232-2 at 14-15. He also objects to an instruction to record a different ESO official's calls with the American Foreign Minister. Instructions are not hearsay, plans are admissible under Fed. R. Evid. 803(3), and statements against interest are admissible under Rule 804(b)(3).

reason for that lack of citation – the advisory notes to the Federal Rules of Evidence, as well as nearly every court to address the issue (including every Circuit), has concluded that the strictures of Rule 602 do not apply to admissions offered into evidence by a party's opponent under Rule 801(d)(2).  The Advisory Committee Notes to Rule 801 specifically states that personal knowledge is not required for admission under that provision:

> Admissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule.  . . . No guarantee of trustworthiness is required in the case of an admission. The freedom which admissions have enjoyed from technical demands of searching for an assurance of trustworthiness in some against-interest circumstance, and from the restrictive influences of the opinion rule and the rule requiring firsthand knowledge, when taken with the apparently prevalent satisfaction with the results, calls for generous treatment of this avenue to admissibility.

The Seventh Circuit, citing the Advisory Committee Note, has specifically held that admissions of a party opponent are not subject to the strictures of Rule 602.  "Because trustworthiness is not the touchstone for admissibility of party admissions, they are not subject to the personal-knowledge requirement of FRE 602."  *Jordan v. Binns*, 712 F.3d 1123, 1128 (7th Cir. 2013).

In the analogous context of the admission of co-conspirator statements under Fed. R. Evid. 801(d)(2)(E), the Circuit courts to have addressed issue have uniformly held that personal knowledge is not a requirement for admission of the statement of a co-conspirator, with many citing to the Advisory Note quoted in the preceding paragraph. *United States v. Torres*, 124 F. 4th 84, 100 (2d Cir. 2024); *United States v. Lindemann*, 85 F.3d 1232, 1237-38 (7th Cir. 1996) (citing Advisory Committee Note to Fed. R. Evid. 801); *United States v. Saccoccia*, 58 F.3d 754, 782 (1st Cir. 1995); *United States v. Goins*, 11 F.3d 441, 443-44 (4th Cir. 1993) (citing Advisory Committee Note); *United States v. Ammar* (citing Advisory Committee Note), 714 F.2d 238, 254 (3d Cir. 1983).  Accordingly, none of the defendant's statement should be excluded under Fed. R. Evid. 602.

29

## III.    CONCLUSION

For the reasons above, the Court should admit the defendant's statement in its entirety.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:    */s/ Erik M. Kenerson*
ERIK M. KENERSON (OH Bar No. 82960)
CONOR MULROE (NY Bar No. 5289640)
BRITTANY KEIL (D.C. Bar No. 500054)
Assistant United States Attorneys
JEROME J. TERESINSKI (PA Bar No. 66235)
Special Assistant United States Attorney
National Security Section
United States Attorney's Office
601 D Street NW
Washington, D.C. 20530
(202) 252-7201
Erik.Kenerson@usdoj.gov

KATHLEEN CAMPBELL (MD Bar No. 9812170031)
JENNIFER BURKE (MD Bar No. 9706250061)
Trial Attorneys
Counter Terrorism Section
National Security Division
950 Pennsylvania Avenue NW
Washington, D.C. 20530