BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,            .
                                     .   Case Number 22-cr-392
          Plaintiff,                 .
                                     .
      vs.                            .
                                     .
ABU AGILA MOHAMMAD MAS'UD            .   Washington, D.C.
KHEIR AL-MARIMI,                     .   January 12, 2026
                                     .   10:14 a.m.
          Defendant.                 .
- - - - - - - - - - - - - - - - -


PUBLIC TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE DABNEY L. FRIEDRICH
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the United States:       ERIK KENERSON, AUSA
                             CONOR MULROE, AUSA
                             JOCELYN BALLANTINE, AUSA
                             United States Attorney's Office
                             601 D Street Northwest
                             Washington, D.C. 20579

                             JENNIFER BURKE, ESQ.
                             KATHLEEN CAMPBELL, ESQ.
                             United States Department of Justice
                             National Security Division
                             950 Pennsylvania Avenue Northwest
                             Washington, D.C. 20530


                    -- continued --

APPEARANCES (CONTINUED):

For the Defendant:          WHITNEY MINTER, AFPD
                            BROOKE RUPERT, AFPD
                            Federal Public Defender's Office
                            1650 King Street
                            Suite 500
                            Alexandria, Virginia 22314

                            LAURA KOENIG, AFPD
                            Federal Public Defender's Office
                            701 East Broad Street
                            Suite 3600
                            Richmond, Virginia 23219


Official Court Reporter:    SARA A. WICK, RPR, CRR
                            333 Constitution Avenue Northwest
                            Room 4704-B
                            Washington, D.C. 20001
                            202-354-3284


Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

(Call to order of the court.)

COURTROOM DEPUTY:  We are on the record in Criminal Case 22-392, United States of America versus Abu Agila Mohammad Mas'ud Kheir Al-Marimi.

For the record, the interpreters were sworn in before the hearing.

Starting with the government, please approach the podium and state your appearance for the record.

MR. MULROE:  Good morning, Your Honor.  Conor Mulroe for the United States.  And also at counsel table are Erik Kenerson, Kathleen Campbell, Jennifer Burke, and Jocelyn Ballantine.

THE COURT:  All right.  Good morning to all of you.

MS. RUPERT:  Good morning, Your Honor.  Brooke Rupert, and with me are Whitney Minter and Laura Koenig, on behalf of Mr. Al-Marimi.

THE COURT:  Good morning, Ms. Rupert, and to all of you.  Good morning, Mr. Al-Marimi.

Before we get started, I want to confirm that the victims' remote access line is open and that the victims can hear both me and the attorneys.  I understand the attorneys have requested lapel microphones because the victims had a hard time hearing you last time.

Is that something that you all are wearing or you need?

MR. MULROE:  Your Honor, thank you.  We are awaiting confirmation from the victim Webex line that that's open and coming through loud and clear for the victims.

I would say on the lapel mics, if they're available, I think it certainly wouldn't hurt for us to use them.  I don't have one on right now, but we would gladly take them if the court has them.

THE COURT:  Well, I leave it up to you.  But if and until we have lapel mics on you, let's make sure everyone is speaking into the microphone, because I can imagine that's very frustrating to not be in the courtroom and not hear clearly.  So sometimes I forget to remind you.  I'm going to count on you all to speak into the microphones.  If any of you would like a lapel microphone, we have a limited number, I think.

COURTROOM DEPUTY:  We have one.

THE COURT:  We only have one right now.

MR. MULROE:  All right.  Well, we will pass this back and forth, I think.  But in the meantime, we have heard from the victim line that it's on and they can hear us.  So I believe we are ready to proceed from that standpoint.

THE COURT:  Thank you, Mr. Mulroe.

We've got a lot to cover.  Today, I intend to issue a very long oral ruling on some, but not all, of the issues related to the foreign records.  The government is seeking to admit foreign records from seven different countries.  I will issue rulings on

most categories of documents, though I will reserve on certain documents and arguments.

After I rule on the foreign records issues, I will discuss some scheduling issues, including the pending motion to suppress.  The victim access line will not be open for that evidentiary hearing that is currently scheduled for the week of, I believe, February 9, some time during that week, but we need to talk about the logistics for that.

I trust that the government is making arrangements to have viewing sites manned in the other U.S. courthouses and in the U.K., given that this is an evidentiary hearing.

Can someone from the government speak to that issue?

MR. MULROE:  Your Honor, we would certainly be happy to provide information about that.  I think for today's purposes, right now, our preparations for this morning's hearing focused on the motions that are under argument.  And so we staffed it accordingly.  Mr. Teresinski, the victim point person, is not with us.  We would ask, if the Court has a desire for information about that, that Mr. Teresinski be able to submit something in writing.

THE COURT:  Okay.  I just don't know right now that we have another hearing before that next public hearing, which is a suppression hearing, which consistent with my order from December 2024 evidentiary hearings won't be open to the public line.

So you all need to think about that, confer with one another, and file something on the docket just alerting victims as to how they can be present if they want to view that hearing.

MR. MULROE:  Yes, Your Honor.

THE COURT:  And the government has a forthcoming redacted response brief to the suppression hearing issues that the defense has briefed?

I know the defense has a redacted version of that motion -- not motion, but the defense's position with regard to that hearing is in redacted form on the public docket, and the government has filed a sealed version and will be filing a redacted version today; correct?

MS. KOENIG:  Your Honor, I think the government has filed their version.  We have a reply that is due on that issue on Tuesday, January 20, for the Court.

THE COURT:  But I don't know that I've, unless it came in this morning, seen a redacted version on the public docket. Wasn't that filed under seal?

I think you all requested until the 14th.  I gave you until tomorrow morning, I think.

MR. MULROE:  Your Honor, I believe that's correct, that the redacted public version of that document is still forthcoming, and we will file it.  I believe tomorrow was the deadline.  We wanted to get the unredacted version to Your Honor a little early.

THE COURT:  Understood.  I would like to issue a brief either oral and/or brief written ruling alerting the public as to how the Court is going to proceed with regard to that hearing so that there's sufficient notice about that.

So we can talk later.  You all can think about it, whether it makes sense to set a brief hearing on Thursday for me to rule on that, or does the defense expect replying to the latest version that the government has filed?

MS. KOENIG:  Your Honor, unfortunately, I'm not able to lay out what our reply will look like, but we do anticipate filing a reply.

THE COURT:  How quickly can you do that?

MS. KOENIG:  By Tuesday, Your Honor.

THE COURT:  By Tuesday, okay.  So again, I think I would like to rule on that by Thursday.  So inevitably, we're going to take a break at some point during this hearing.  It's going to be just too long to go straight through.

MS. KOENIG:  Oh, I'm sorry.  Not tomorrow, Tuesday. It's due on January 20, Your Honor, so next Tuesday.

THE COURT:  Oh, so I did give you -- a while back, I gave you until next Tuesday?

MS. KOENIG:  Yes.

THE COURT:  Then strike that.  That's not feasible.

Still, I would like to rule shortly thereafter.  So we should talk about whether it makes sense to set a very brief

hearing.  I will be in a three-week trial.  So I don't have a lot of time.  But I think it's important as soon as possible for me to rule on that so there's notice to the public.

MS. KOENIG:  Understood.

THE COURT:  All right.  And a few more reminders on the sealing motions.  I appreciate the changes you all have made.  I'm still going to ask for some additional changes. Please file your sealed filings with some heading that's reflected in the docket, because we now have nearly 300 filings, and the vast majority say "sealed filing," "sealed filing," "sealed filing."  I think there's a way for you to put something in the heading that gives some notice as to what's on the docket.  I know in other cases, sealed filings come across, and the docket says more than just "sealed filing."  But maybe the new system is triggering.

You all look confounded.  So do you disagree with me, that there's not a way to put something in the heading other than "sealed filing"?

For example, when I get a presentence report, it comes like "sealed presentence report," but maybe I'm remembering under the old system, which changed in the -- very recently.

MR. MULROE:  Your Honor, I think that to the extent ECF gives us an opportunity to describe it, we generally have been providing some description.

Now, the one caveat to that, I would add, is that, you

know, the main filing, like ECF 150, say, is the motion to submit a sealed filing.

THE COURT: And there's no way to say "a motion to submit a sealed filing on" --

MR. MULROE: I think there may not be.

THE COURT: -- "deposition," "foreign deposition"?

MR. MULROE: Now, the document that we're actually trying to file under seal then becomes an attachment to the sealing motion, and we were at first providing descriptions of those documents, but then it became apparent that once the sealing motion becomes unsealed, the titles of the attachments are then visible on the docket.

THE COURT: So can the document that's attached be given a title?

MR. MULROE: I think we've done that, but then that title became public when the Court grants the sealing motion.

THE COURT: Oh, okay, but --

MR. MULROE: So we've been a little careful since then to make it descriptive enough but not very identifying.

THE COURT: I will check with the Clerk's Office to see if there's anything more. It's just impossible to find anything on this docket for me or for anyone else.

MR. MULROE: And I think the distinction might be with some other document activity that's more descriptive, if a party is just straight up filing something under seal without cover of

a motion to seal, it might be that then they can add a description, like presentence report or motion for whatever relief.

THE COURT:  I will dig into this a little bit more and may give you some future guidance on this.  But it is frustrating to try to track briefs on the docket right now.

MR. MULROE:  Yes, Your Honor.

THE COURT:  If there's a way to be more precise, we will share that.

Also, ideally, at the same time the motion to seal with the sealed motion in it is filed, it would be helpful to have the redacted version filed on the docket.  I appreciate you're consulting and trying to reach some agreement beforehand.  I'm going to ask that you try to do that within 24 hours, and if you can't, whoever is filing the motion, file the redacted version, and if the other side is going to object, I have to deal with it.  But I think it's important as close to realtime as possible to have redacted versions on the docket.  Again, it's just "sealed filing," "sealed filing," "sealed filing," with no context for the public.

All right.

MS. KOENIG:  Your Honor, I do have a question about that.  There have been times since we've been discussing the sealed filings that I think a party intends to have the whole motion filed under seal and does not intend to file something

unredacted.

Do you want us just simply to note that in the sealing motion itself, that we are seeking --

THE COURT: That would be helpful. But sometimes, I disagree with you.

MS. KOENIG: That's fair.

THE COURT: And I think you all have treated filings with respect to depositions as locked down under seal. And I'm previewing a little bit on how I may come out on some of these issues that are before the Court, but issues relating to depositions, some of them are akin to motions in limine to admit or exclude certain testimony at trial, and that would be on the public record.

So granted, these legal issues are coming up earlier than they otherwise would come up, but nonetheless, they would come up before a jury is selected. And arguably, when they come up this much in advance of trial, arguably, it's less prejudicial because it's not press immediately before a jury selection.

So I'm just warning you all that I think a lot of these issues that have to deal with what testimony will be admissible or not at trial can and should be unsealed, including the fact that a deposition has been taken at some point. I understand there may be security reasons. I understand there may be reasons to keep the fact that a deposition is occurring at a certain time and place under seal. But the legal issues related

to those depositions are going to need to be on the public docket.

MS. KOENIG:  Understood, Your Honor.  We will at least signal what our intent is, and obviously, if the Court directs us otherwise --

THE COURT:  That's helpful.  And I think you all have adjusted to this, but the understanding you should have when you file a motion to seal is an expectation that the Court will unseal the motion.  So if ever there's a motion to seal that needs to remain under seal because it's -- the entire motion as well as the underlying document is seal worthy, you need to make that clear in the motion to seal as well.

MS. KOENIG:  Yes, Your Honor.

THE COURT:  All right.  Any other questions about sealing matters?

MR. MULROE:  No, Your Honor.

THE COURT:  All right.  With respect to the foreign records, there's been extensive briefing, some at the Court's request admittedly, but because of the extensive briefing, the Court does not intend to hear additional argument today on these motions, but instead, as I said, I intend to issue a partial ruling on the foreign records admissibility.

I will say, we've done our level best to review the briefing and to address all the arguments, consider all the arguments raised by the parties.  But I am going to put the onus

back on the parties after I've ruled to review my ruling, and to the extent you don't think that I have addressed the arguments and objections with respect to each category of documents and with respect to each individual document, I am going to ask you to let me know.  There's a lot to keep track of here, and this is a rare case in which a Court issues preliminary rulings nine months before a trial is scheduled to begin.  I've agreed to do it here so that the government can identify the appropriate witnesses who must appear at trial and so that the defense may plan accordingly.

I am willing to go through the same process for the defense to the extent the defense has foreign records that it would like to have preliminary rulings on so that it does not have to have witnesses travel here for trial.  I offer the same to the defense side.

Please understand that the rulings today are preliminary and are no substitute for the final rulings the Court will make at either of the pretrial conferences or for some documents during trial itself.  403 issues, for example, are not the kinds of issues the Court will necessarily address pretrial.

But I will give the parties an opportunity to identify arguments that you feel that the Court did not address today. There are simply again too many issues that have been raised to date for the Court to be confident that it has addressed each argument.

And I will make the same point when we go into the sealed hearing with respect to the deposition, the same issue.  There were some that were flagged ahead of the deposition in writing, which I think I will be clear about I'm addressing.  There were others that were raised orally during the deposition, some of which have not been briefed.  So I address some of those but not all.

So I'm really -- I'm not trying to punt, but I am pushing it back to you all to raise issues that you think have not been sufficiently addressed, or you risk forfeiting them.  It's just there are too many issues for us to be confident we've hit them all.

So to that end, we can talk about this more later, but I do think it would be helpful following my ruling for the government to take the lead in creating -- I'm sure it has something like this already -- an Excel spreadsheet or something that lists the documents that list the grounds on which the government sought their admission that maybe perhaps has a separate column that identifies the defense objections to each document and then the final column which summarizes in very broad terms what the Court's ruling was.

But again, we can talk about that.  I'm not going to expect you to do that immediately, but perhaps, I don't know, within four weeks or so so that we can put some of these issues to bed and be confident that the Court hasn't missed anything.

So for purposes of the foreign records briefing, the Court has reviewed the following briefs:  148, the government's motion to admit foreign records; 173, the defendant's response to the motion; 183, the government's reply in support of the motion; 204, the government's supplemental brief in support of motion; 229, the defendant's supplemental brief in opposition to the motion; 242, the government's second supplemental brief in support of motion; and 255, defendant's supplemental brief in opposition to the motion.

Do the parties agree that this list is complete?

MR. MULROE:  Including all the attachments thereto, yes, Your Honor.

THE COURT:  Of course, yes.

MS. RUPERT:  Yes, Your Honor.

THE COURT:  All right.  So in this set of motions, the government has moved to introduce foreign documents, as I said, from seven countries as business records, public records, ancient documents, or under the residual exception.

I'm first going to identify the documents and issues I will not be addressing at this hearing, and then I will turn to authentication issues and the parties' arguments about certifications under Section 3505 of Title 18.  Then I will address the relevant hearsay exceptions.

As for those issues which the Court will not address today, they include the Swiss documents for which the government has

yet to offer certifications, as well as the Senegalese documents for which the certification offered is incomplete.

The Court also won't address the defendant's 403 arguments now because the probative value and prejudicial effect of the foreign records will depend on the admission of other evidence. The defense can renew their 403 objections to the foreign records evidence closer to trial in sufficient time for the Court to address these issues and, to the extent practicable, at the pretrial conference.

Again, I recognize some can be reserved for trial, but I think for many of these, the Court should be able to resolve them once it has a more complete view of the case.

The Court will also reserve on the government's argument that the Maltese IRO cards and Czech visa applications should be admitted as public records. According to the government's motion, Docket 148 at 16, the government intends to call live witnesses from Malta and the Czech Republic to testify to these records and as such has not obtained Section 3505 or Rule 902(3) certifications for these exhibits.

To the extent I state anything that the parties disagree with, like that last statement, let me know in realtime, and we will discuss it, but that's my understanding of where things stand with respect to the Maltese IRO cards and Czech visa applications.

Turning to the authentication of foreign records under

Title 18 United States Code Section 3505, this statutory provision governs the authentication of foreign records of regularly conducted business activities in a criminal proceeding.  Under Section 3505, the moving party must produce the foreign certification attesting that such record was made at or near the time of the occurrence of the matters set forth by or from information transmitted by a person with knowledge of those matters; that such record was kept in the course of a regularly conducted business activity; that the business activity made such a record as a regular practice; and if such a record is not the original, such record is a duplicate of the original.

Section 3505(c)(2) defines "foreign certification" as a written declaration made and signed in a foreign country by the custodian of a foreign record of regularly conducted activity or another qualified person that, if falsely made, would subject the maker to criminal penalty under the laws of that country.

Even with such a certification, foreign records may be excluded if the source of the information or the method or circumstances of preparation indicate a lack of trustworthiness.

Here, the government has offered, with minor variations, the same foreign certification signed by various custodians under penalty of perjury.  The Court notes that the defense has not argued in its briefs, nor does the Court discern any basis for finding that the custodians would not face the requisite

criminal penalty in their countries if these certifications were falsely made.

The government's proffered certifications track the requirements enumerated in Section 3505.  As just one example, Exhibit 706C reads as follows:  "I, F.A., attest on the penalty of criminal punishment for false statement or attestation that I was employed by/associated with Universal Import and Export, Limited, in the position of sales director and by reasons of my position am authorized and qualified to make this attestation. Each of the records attached hereto is a record in the custody of the above-named business that, A, was made at or near the time of the occurrence of the matters set forth by or from information transmitted by a person with knowledge of those matters; B, was kept in the course of regularly conducted business activity; C, was made by the business as a regular practice; and D, if not an original record, is a duplicate of the original, 18 June, 2024, Valletta, Malta," with a signature.

The defendant raises several arguments as to why the government's proffered certifications do not meet the statutory requirements and also why the Court should find the records not trustworthy.

First, the defense argues that every certification offered by the government fails to satisfy Section 3505 because the government has not shown its witnesses are custodians or other qualified persons capable of certifying these records.  The core

of this argument is that the certifications are too rote because they merely recite the Section 3505 statutory criteria and do not provide some appreciable degree of factual information addressed to the admissibility requirements.  Docket 229 at 4.

As I've already stated, Section 3505 lists four requirements that must be attested to for foreign certifications.  Nothing in the text of Section 3505 suggests that a custodian's certification must offer additional details. The case law on this issue is admittedly sparse.

Rule 803(6), which governs the admission of records of regularly conducted business activities, in the foreign record criminal context is similar to Section 3505.  This rule provides a hearsay exception for records if, A, the record was made at or near the time by or from information transmitted by someone with knowledge; B, the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; C, making the record was a regular practice of that activity; D, all these conditions are shown by the testimony of the custodian or another qualified witness or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification.

Given the dearth of case law on Section 3505, the Court looks to decisions on sufficiency of certifications under Rule 803(6)'s closely worded criteria.

One of the only relevant Circuit Court cases identified by

the parties is *United States v. Ayelotan*, 917 F.3d 394 at 402, Fifth Circuit, 2019, which held that certificates from a records custodian that track the language of Rule 803(6) nearly word for word render the record self-authenticating.

In that case, the district court admitted e-mail transmittal data related to the defendants' fraud ring and relied on records custodian statements from Google and Yahoo! to treat those business records as self-authenticating.  The Fifth Circuit relied on its earlier decision in *Wilson v. Zapata Off-Shore Company* to conclude that such certifications from the records custodians were sufficient to authenticate the records from Google and Yahoo!.

Likewise, in *United States v. Heatherly*, 985 F.3d 254, 270, Third Circuit, 2021, Judge Bibas rejected a defendant's argument that a certification for business records, there IP records from an Internet provider, admitted under Rule 803(6) and 902(11) were insufficiently detailed.  Judge Bibas explained that the rules do not require the custodian to explain in detail who compiled the records, how, or how she knows they are accurate. 985 F.3d at 270.

A few district courts have held boilerplate certifications insufficient under Rule 803(6), but the cases relied upon most by the defense involved certifications that suffered from other substantive defects.

In *United States v. Ekiyor*, 90 F.Supp.3d 735, 741, E.D.

Michigan, 2015, the district court rejected a rote certificate to establish an airline baggage log as a business record.  But the analysis in that case appears to turn on the contents of the log.  That is, despite the attestation that the document was a record made in the regular course of business, the baggage log was in fact prepared for the government to use against the defendant at a criminal trial.

In *United States v. Pancholi*, 2023 WL 5706197 at *3, Eastern District of Michigan, 2023, the district court also rejected a rote custodian certification under Rule 803(6), but the Court did so because it found that contrary to the proffered certification, the e-mails in that case did not qualify as business records.

And in *United States v. Browne*, 606 F.Supp.3d 106, 110, District of New Jersey, 2022, the district court rejected a certification because the contents of the records, like those in Ekiyor, suggested that the boilerplate certificate improperly said that the record was maintained in the ordinary course of business.  The district court then admitted the same document with an amended certificate that explained that the content of the record was collected and maintained in the ordinary course of business.

The defense also cites from *Wye Oak Tech, Inc., v. Republic of Iraq,* 2018 WL 5983385, D.D.C., 2018, a case in which Judge Lamberth reasoned that bare-bones declarations offered to

authenticate documents under Rule 803(6) lacked sufficient detail for admission at trial, but he said that he would consider the declarations at the summary judgment stage.

The defense has also identified a few cases involving Section 3505 certifications in which the government supplemented boilerplate certifications, but none addresses whether the boilerplate certifications would have been sufficient under Section 3505.

The defense's discussion of *U.S. v. Khatalla*, 278 F.Supp.3d 1, D.D.C. 2017, does not convince me that the boilerplate certification offered in that case was inadequate. As I see it, the government's decision in that case to offer additional testimony about the qualification of a telephone company employee who signed a Section 3505 certification does not establish that the certification, which generally resembles those at issue here, was insufficient.

The defense opposed the proffered certification, which was complicated by what appears to be classified surveillance issues.  But nothing in Judge Cooper's opinion suggests that the government's decision to offer live testimony stemmed from a holding that the certification was legally deficient.

Finally, the defense has pointed to Mueller and Kirkpatrick's *Federal Evidence* treatise.  In that treatise, the authors state that certifications must provide detail on the custodian's qualifications and requisite knowledge.  But that

portion of the treatise does not appear to be supported by binding or persuasive case law.

So based on the plain language of 3505 and the relevant cases, I agree with the government that the proffered certifications, which mirror the requirements enumerated in Section 3505, are sufficient. And in the absence of contrary binding case law or strong persuasive case law, the Court will not graft an extra-detail requirement onto the four statutory requirements for certifications under Section 3505.

It appears to the Court that in enacting Section 3505, Congress struck a balance between detail, which can always be helpful, and the efficient introduction of foreign records of regularly conducted business activities.

The defense's arguments about the benefits of detailed certifications are better found in Section 3505(a)(1)'s language providing that even with the foreign certification attesting to all four requirements, the Court shall exclude foreign business records as hearsay if the source of the information or the method or circumstances of preparation indicate lack of trustworthiness.

But in the Court's view, arguments under the lack of trustworthiness component of Section 3505 turn on the circumstances surrounding each proffered document rather than invalidating every certification offered by the government simply because the defense says it's boilerplate.

In sum, the Court finds that the government's certifications satisfy the four foreign-certification requirements under Section 3505.  Much like the Fifth Circuit's decision on the analogous requirements under Rule 803(6), the Court finds that certifications that track the language of Section 3505 are legally sufficient.  *Ayelotan*, 917 F.3d at 402.

Accordingly, the Court will consider issues as to the trustworthiness of certain records under Section 3505's specific authorization to do so, rather than create an extra-textual certification requirement, before ruling on whether the proffered records qualify as records of regularly conducted activities admissible under Section 3505.

The next issue raised by the defense is that the recorded interviews of custodians who signed the certifications suggest a lack of trustworthiness because some custodians wavered on identifying certain documents as records from their respective businesses.

The Court agrees with the defense that these interviews, which were not conducted under penalty of perjury, cannot supplement the certifications for purposes of Section 3505.  The Court also agrees that it can consider the interviews insofar as they might suggest that the source of the information or the method or circumstances of preparation indicate a lack of trustworthiness under Section 3505(a)(1).

But the Court disagrees that the interviews themselves, as

described in excerpted transcripts, indicate a lack of trustworthiness.

I won't address each of the defense's arguments as to each of the deposed custodians, but in my view, the defense has confused cautious language from the deponents for a reason to doubt their certifications.

For example, the defense complains that F.B. expressed uncertainty about some of the documents presented to him.  But as the government's response makes clear, Docket 242 at 14, F.B. refused to identify several documents that he did not recognize and ultimately certified one document about which he initially expressed uncertainty.

In the Court's view, F.B.'s uncertainty and especially his decision not to attest to certain documents suggests trustworthiness, not a lack thereof.  F.B. was presented with documents from decades ago, and it was reasonable for him to sift through the documents, weeding out those about which he was not certain and ultimately deciding to certify some of them.

In sum, the defense has not convinced me that the video interviews of the Maltese custodians renders their certifications untrustworthy.

Apart from the videos, the defense also argues that one custodian, A.B., a lawyer serving as Air Malta's company secretary for documents 802 through 809 and 811, did not furnish a sufficiently confident certification because he scratched

out "is a" duplicate and replaced it with "appears to be" a duplicate.

I agree with the government that the "appears to be" modification to the standard certification form can be attributed to A.B.'s lawyerly meticulousness rather than because either he or the documents he certified lack trustworthiness. A.B. was not in actual possession of the relevant Air Malta documents. So he reasonably hedged his language to encompass the possibility that the documents presented to him were tampered with in the interim.

And for reasons I will discuss in a moment, I see no evidence to suggest that the interim record holder, the Scottish authorities, tampered with the records.

So I will credit A.B.'s certification for documents 802 through 809 and 811, despite the "appears to be" modification.

The defense further argues that the certifying witness for documents 814 through 820, D.V., an office manager with Libyan Airlines, offered an incomplete certification because he put check marks next to three of the listed requirements, but he failed to put a check mark next to "if not an original record, is a duplicate of the original."

The government attributes the lack of a fourth check mark, which the attestation form did not invite, to an assumption that D.V. believed the document was not a duplicate.

I agree that D.V.'s slight modification to the standard

certification form does not indicate a lack of trustworthiness by the custodian or the Libyan Airlines records.  And thus, I will not exclude these documents merely because the custodian added an extraneous check mark to his certification form.

The defense raises two issues related to the Scottish authorities' interim storage of most of the proffered records.

First, the defense argues that these documents are not trustworthy because the government did not acquire them directly from the relevant businesses or the government entities that produced them.

Second, the defense argues that some of the records from Scotland are particularly unreliable because the government has not included a certification from the time of the Scottish investigation.

I'm not inclined to rule that the foreign records are untrustworthy merely because they were held by Scottish authorities.  As the government has noted, the records have Crown Production cover pages, and almost all include additional evidence tags, suggesting careful cataloging and recordkeeping by the Scots.  And the declaration of Paul Grainger, filed at Docket 242, explains the means by which the Scots organized and managed these documents.  The government also represents that it will elicit additional live testimony relating to this issue at trial.

And the defense has not identified any reason to doubt the

Scottish authorities' interim recordkeeping, other than asserting that it adds a link in the chain of custody for these documents.  But an extra link is not fatal if the relevant keeper can be trusted.

The defense's supplemental filing after the Grainger declaration does not identify any issues with the methods described therein, stating only that it, quote, intends to explore several issues raised in the declaration during its cross-examination.  Docket 255 at 4.

Until the Court hears testimony from the anticipated Scottish witness, the Court declines to exclude the foreign records merely because they were held by the Scots after collection from the relevant businesses and authorities.

The Court notes that the Maltese records contained in the 700 and 800 series lack the Crown Production cover pages and evidence tags.  The government represents that the versions submitted to the defense included those pages, which the Court finds important to establishing that the Maltese documents were dutifully collected, catalogued, and stored by the Scots. Docket 180 at 5.

The Court thus provisionally admits these documents on the understanding that the government will file the full exhibits with the coverage page and evidence tag when such exhibits are due before trial.

The Court likewise rejects the defense's second argument

regarding the missing Scottish certifications for certain documents, specifically 818, 903 through 908, 1004 through 1007, 1011 through 1013, 1018, 1031, 1101, 1103 through 1107, 1403, 1513 through 1515, 1519 through 1520, 1525 through 1526, 1529 through 1530, 1531, 1533 through 1534, 1539, 1541, 1549 through 1551, 1558 through 1559, and 1573 through 1576.

For each of these documents, the government has offered recent certifications from custodians associated with the relevant business or government from which the Scottish authorities obtained the documents decades ago.  The government argues that the absence of an original Scottish certification matters only if the current custodian incorrectly attested that the record belongs to his business, not realizing that it was actually a fabrication or had been tampered with by the Scottish authorities.

To that end, the government says that authenticity is a low bar because it need not conclusively prove authenticity so long as a reasonable juror could find that the evidence is what its proponents claim.

The government cites *United States v. Al-Imam*, 382 F.Supp.3d 51, 57, D.D.C., 2019, a case in which Judge Cooper applied his earlier decision in *Khatalla* to reject the defense's argument that a Section 3505 certificate was insufficient because the certifying witness did not have the firsthand knowledge about the duplicate telephone records' collection and

interim storage.

As Judge Cooper explained, the qualifying witness requirement is interpreted broadly.  It encompasses witnesses who know nothing about the creation of a particular record, and it allows witnesses to offer testimony even if the records were created by another entity.

Based on this capacious reading, there appears to be no reason to graft on an additional requirement that a qualified witness know about every chain of a document's acquisition and storage.

I reject the defense's argument that the lack of a similar certification from the time of the Scottish investigation renders the identified documents unreliable.  To be sure, the government's inclusion of two certifications, one from the Scottish investigation and one recent, is better than one.  But the defense has identified no case in which a recent certification alone has failed to satisfy the 3505 certification requirement merely because the document was collected by an intermediate authority that did not obtain a contemporaneous certificate.

And again, on the record before me, I do not find any reason to doubt the authenticity of the records merely because they were held by the Scottish authorities.  Nor does the fact that the documents listed on page 11 of the defense's response do not include certifications from the time of the Scottish

investigation render them inherently untrustworthy.

Next, the custodians attest that, quote, the records attached hereto is a record in the custody of the above-named business.  See e.g., 706C, 1101C.  But as we know, these proffered records were most recently in the custody of the Scottish authorities, not the old businesses, many of which are defunct.  Indeed, the custodians identified the records by their Scottish Crown Production numbers.

The defense identified this issue as affecting whether the witnesses were knowledgeable.  Docket 173 at 10.

The Court has not seen a compelling response to this issue from the government.  So I want to talk about the is/was distinction, which arguably detracts from the custodians' trustworthiness because they falsely attested that the documents are in the custody of the respective businesses rather than clarifying that the documents were in the custody of their respective businesses.

Mr. Mulroe, you haven't -- this particular issue was flagged by the defense but not for the same reason the Court is raising it, and I'm wondering what the government's response is to this is/was distinction.

Is this just a typo?  Every single certification says "is." And to what extent should this discrepancy undermine the trustworthiness of the certifications?

MR. MULROE:  Yes, Your Honor.  The angle that you've

identified on that candidly is not one that we picked up on either but appreciate your Court's flagging that issue.

I think for us to give a sort of complete and conclusive response to that, if that's what the Court needs, we may seek additional briefing.

But our initial reaction to it is that that is not something that should carry any weight in terms of casting doubt on the validity of the certifications.  As Your Honor has already discussed a bit in the reading, a part of the nature of these certifications is that they are boilerplate.  And as we've briefed, that was Congress's intent.

And it's also the case, as we flagged in the briefing, that when the United States enters into treaties bilaterally with foreign countries for the purpose of exchanging evidence, the certification is made an attachment to the treaty such that it is a legally binding and mandated form that the parties are required to use.

THE COURT:  So this is just a form that's routinely recreated --

MR. MULROE:  Yes, Your Honor.

THE COURT:  -- through this process?

MR. MULROE:  Yes, Your Honor.

THE COURT:  So you, the government, don't edit these forms?  It's a rare case, I guess, when it's a past tense like this and documents have been in the custody of another.  Perhaps

it's the first time.  I don't know.

But as you stand here, that's the explanation, is this is just a standard form, a standard certification that's a part of the treaty process?

MR. MULROE:  That's correct.  This is a standard form, and yes, it is -- Your Honor is exactly right, that normally they would be coming directly from the originating businesses. So that "is" would be accurate there.  I think that's all that explains the is/was distinction.  That is not something that we expect the witnesses wouldn't flag necessarily and say hey, you need to fix this.  So we don't think that detracts from the reliability.

THE COURT:  It would be helpful -- and I'm looking at a page or two.  I've had ample briefing on this.  I am interested in this process that you describe, that there's a standard certificate.

Are you confident in that?  Based on that, I'm inclined to rule that it doesn't undermine the entire trustworthiness of the document.  It's unfortunate that even your lawyer types didn't pick up on this.

MR. MULROE:  And I think that goes to the subtlety of the distinction.  It's just not something that jumped out to these folks or even, frankly, to us, even when they read these things very carefully.  It's one small word.

So I can represent standing here that this is a standard

form that is usually just kind of taken off the shelf.  It's what we call a "go by," and you get it and use it.  I'm going to be candid, there wouldn't be anything stopping us from changing it to "was."

THE COURT:  No, I understand.  But as an officer of the court, you're representing this is the standard process?  These certifications are even generated by the receiving country?

MR. MULROE:  They are provided by the United States to the receiving country, but done so --

THE COURT:  In kind of a pro forma process?

MR. MULROE:  Exactly, standard boilerplate.

I'm going to turn to my colleagues --

THE COURT:  Are you all even the lawyers who do this, or is this a separate part of the DOJ that spins these requests out to foreign countries?

MR. MULROE:  So in the ordinary case, it is generally done by another component of the Department of Justice.  The case team attorneys are involved in putting that request together, but it's not sort of a core response.

This is different, as Your Honor knows, because we ourselves did go to these countries, and we brought the forms with us and presented them to the witnesses.  But that's not how it usually goes.

If I could just -- Court's indulgence one moment just to

make sure I have all that right.

THE COURT:  Okay.  All right.  But again, your attorneys go with the standard form that's done in every other case and puts these certifications in front of the witness?

MR. MULROE:  Correct.

THE COURT:  All right.  Does the defense want to be heard on this?

I'm not inclined to -- you all have briefed these issues at great length.  I'm not inclined to ask you to do more here.

I have to say, I reject the argument that this suggests that the witnesses weren't knowledgeable, but this is kind of a separate argument, but I do think the explanation satisfies me that it doesn't so undermine the trustworthiness of those who attested that I would preclude them from relying on the certifications.

But I want to give you a chance to say anything you would like to say orally, and if you want a chance to file a page or to on this, I will grant you that.

MS. RUPERT:  Your Honor, I don't think that we necessarily need additional briefing on this unless whatever the government submits --

THE COURT:  I'm not even sure, based on what Mr. Mulroe said, I'm going to require it.  If you all have reason to question what he told me, we can certainly have some supplemental briefing on this discrete issue.

MS. RUPERT:  No, Your Honor, there's no reason to question what he's said here in court.

THE COURT:  All right.

MS. RUPERT:  Your Honor, I would like to point out, and I think the Court has essentially flagged this, the fact that many of the witnesses did make corrections to portions of the certifications indicating --

THE COURT:  I'm surprised no one caught this one.

MS. RUPERT:  Right.

THE COURT:  But neither side really did.  You all flagged this and made another argument, but -- you did catch the tense.

MS. RUPERT:  That's the only point I would like to make, is that when witnesses did find --

THE COURT:  The meticulous lawyer didn't do it, but he did other things, yes.

MS. RUPERT:  That's all, Your Honor.

THE COURT:  All right.  I do -- I conclude, based on Mr. Mulroe's proffer here, that given the way in which these certifications are prepared, this was an oversight.  Again, it's surprising to me that given how detail oriented some of these certifiers are, that no one caught this.  But I do tend to view this discrepancy as a minor issue that in and of itself does not undermine the trustworthiness of all the attestations.

So I'm not going to exclude the records on this basis.

Having determined that the Section 3505 certifications are satisfactory, the government seeks to admit the bulk of the associated exhibits as a record of regularly conducted business activity.  For some of the nonbusiness documents, the Court moves to admit under Rule 803(8), which governs -- I'm sorry, the government moves to admit under Rule 803(8), which governs the admission of public records.

The Court will first address whether the foreign records obtained from the businesses qualify as records of regularly conducted activities admissible under Section 3505.

Section 3505(c)(1) defines foreign record of a regularly conducted activity as a memorandum, report, record, or data compilation in any form of acts, events, conditions, opinions, or diagnoses maintained in a foreign country.  That language does not specify that the record must be of a business activity, but the Section 3505(a)(1) requires an attestation that the business activity made such a record as a regular practice.  As such, the parties appear to agree that Section 3505 governs only the admission of business records.

In turn, Section 3505(c)(3) defines "business" broadly to include business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.  The Court will address the business documents on a country-by-country basis before addressing any document-specific issues.

First, the records from Malta.  These records include delivery notes, invoices, and delivery books from clothing stores and suppliers in Malta.  The government intends to connect those items of clothing to the defendant or his conspirators through fragments collected from the wreckage.  The other Maltese documents are from airlines and hotels.  They include flight manifests, passenger lists, aircraft reports, and timetables from KM Malta Airlines, Air Malta, Libyan Airlines and Libyan Arab Airlines and hotel logs, registration cards, and departure lists from Holiday Inn and Hilton.

Subject to specific exclusions the Court will discuss next, the Court does find that these records are quintessential business records of regularly conducted activity.  For clothing sellers and suppliers, records of sales and deliveries are typical forms of records that such a business must keep. Likewise, the airline records are typical of those kept by airlines, which must keep track of passengers and flights. Moreover, the hotel records are typical of those kept by hotels, which typically track the check-ins, registrations, and departures of their guests.

The Court does find issues with one of the proffered Maltese business records.  The government offers document 803 as a table of flights at the Luqa airport in Malta.  The plain-text list includes no indicia of who prepared the list, whether it was an airline or the airplane authorities.  That's unclear.

The government has offered A.B., who served as company secretary of Air Malta, to certify this document, even though it includes flight information for other airlines.

Based on the record before me, I can't say that this table of flights was produced or kept in the ordinary course of business. It may well be the practice of Air Malta to keep such records, but it's just not clear to me, given all the different flights that are reflected on the document, that this was something that was produced or kept in the ordinary course of business, because there's not enough information about its creation by or distribution to Air Malta.

So I'm not saying this document is excluded. I'm saying based on what I know so far, I need more explanation here. It's not clear to me from the face of the document that it's a business record.

Turning to the second category, records from the Czech Republic. The government offers records related to the defendant's alleged co-conspirator's travel from Malta to Prague, which in the former Czechoslovakia at the time. These records include account reminders from the Intercontinental Hotel, a bill for seven dates of accommodation from the same hotel, an invoice for another stay from the same hotel, and finally, a letter from the Libyan Embassy in Prague to the same hotel confirming that the Libyan government will pay the invoice for Mr. Mohamed's stay.

40

The documents created by the Intercontinental Hotel appear to be classic records of regularly conducted business activity by a hotel. Invoices and bills are typical records produced by a hotel. All of these documents appear on official paper from the hotel bearing its logo or insignia and are initialed by an employee of the hotel.

For all these reasons, the Court concludes that the records from the Intercontinental Hotel, documents 903 through 907, are provisionally admissible under the business records exception.

The Court has concerns about document 908, the letter from the Libyan Embassy in Prague to the Intercontinental Hotel, and whether it can be admitted as a business record.

As the defense argues, this letter lacks any marks of intake or processing by the hotel. And the government has yet to advance a convincing theory that hotels regularly retain such letters in the course of regularly conducted business. Such retention may well have been the case in the 1980s before the rise of modern travel booking, but again, if this is going to be admitted, the government needs to offer some evidence that this letter is typical before I will even provisionally admit it.

The third category are records from Germany. These records center on the Frankfurt Airport. The records include tracking sheets for the baggage and interlining, the process of connecting bags and passengers between airlines, from the Frankfurt Airport. Other records include passenger manifests

for Pan Am 103 from Pan Am, Telexes regarding the interline baggage screening process, Pan Am operations bulletins, a computer system report from the airport, load plans for Pan Am 103, security alerts, and a schematic of the Frankfurt luggage system.

The Court finds that the documents kept by the Frankfurt Airport Authority were regularly kept in the course of running an airport.  As an initial matter, the Court will treat the Frankfurt Airport management as a business under Section 3505(c)(3), which defines "business" broadly to include business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

The proffered documents related to the operation of the Frankfurt Airport all seem to be ordinary features of running an interline baggage system, keeping track of planes and baggage, and maintaining security at an international airport.  The defense has not advanced any arguments to the contrary.

Accordingly, I will provisionally admit documents 1004 through 1007, 1012, 1017 through 1020, and 1028.  The Court will also admit document 1031, an aircraft security check by Alert Management Systems because such paperwork appears to have been created and maintained as a matter of course.

As discussed during the November hearing, document 1009 is admissible as a business record and not barred by Rule 805 double hearsay, so long as the government excludes the

accompanying police report.

The Court also finds that the Pan Am records were regularly kept in the course of operating an airline.  As with the Maltese airline records, it appears that these records concerning passengers, baggage, missing ticket/refund slips, security procedures, staff, and luggage loading plans are typical of airline business.

Accordingly, the Court finds that documents 1008, 1011, 1014 through 1016, 1022, and 1026 are admissible as business records.

The defense has raised specific objections to documents 1013 and 1024.  Those documents are internal correspondence related to Pan Am's security operations at the Frankfurt Airport contained in Telexes.

The government argues that the messages in these Telexes are offered not for the truth of the matter asserted but for their effect on security personnel at the Frankfurt Airport, who would have conformed their procedures to the guidance contained in the message.

But absent testimony from a luggage handler who states that he took the action he or she took as a result of reviewing the Telexes, I agree with the defense that the messages are offered for the truth of the matter asserted.  The messages from Pan Am to the airport staff are relevant only insofar as they dictated a security policy that would be followed at the Frankfurt

Airport.  So the Telexes, absent testimony by a luggage handler, must be offered for the truth of the matter asserted therein and are therefore barred by Rule 805, absent another exception for the nested hearsay.

And even if the Telexes did not contain nested hearsay, I am not inclined to admit document 1024 because it lacks indicia of trustworthiness and authenticity.  Specifically, that document contains several Telexes pasted together in a haphazard fashion.  It is unclear who curated and arranged this collection of Telexes and whether certain messages may have been selectively included or excluded.  Further, some of the messages appear totally irrelevant.  For example, one relates to a Christmas party.

So at this point, I am not inclined to preliminarily admit documents 1013 or 1024.

The fourth category consists of records from the United Kingdom.  These records are from Pan Am and include loading sheets, weight and balance sheets, and load plans for Pan Am 103.

As with other airline records, the Court finds that these documents were regularly kept in the course of operating an airline.  Accordingly, the Court finds that documents 1101 through 1107 qualify as business records under Section 3505.

Fifth are records from Switzerland.  As noted at the outset, the Court will not provisionally rule on the Swiss

documents for which the government has not furnished certifications.  Therefore, the Court will not address documents 1513, 1519, 1525, 1526, 1529, 1533, 1534, 1537, 1539, 1541, or 1546.

The first set of documents for which the government has furnished certifications are records kept by suppliers for Mebo, a company that built timers, which the government alleges includes the invoices for components of the MST-13 timer used in the explosive device.  The documents include a circuit board and a plan for the timer from Thuring AG, invoices, and delivery records.

The Court finds that these documents are typical of those kept by companies engaged in the design, manufacture, and sale of electronic parts.  Therefore, documents 1514, 1515, 1520, 1530, 1531, and 1579 are admissible as business records.

The second set of Swiss documents are records allegedly obtained from Mebo that shows its business relations with a Libyan firm.  The government has not produced certifications for these documents.  So the Court will not address their admissibility as business records at this time.

The third set of Swiss documents are travel records.  The Court will address those documents when it turns to the public records exception.

The sixth category are records from Japan.  The government offers records from Toshiba, the Japanese company that it claims

to have manufactured the radio in which the bomb was secreted. The records are a printed list of Toshiba radio cassette recorders and the types of circuit boards used within, a list of the company's codes for each country to which it exports its products, and a negative of a sales report sheet showing the quantity and yen amount of various radio models broken down by country of receipt.

While the Court at this point has no reason to doubt that the certification tracks the English equivalent provided, the government is going to need to get a translation of the Japanese certification.

The Court finds the proffered documents are admissible as records of Toshiba's regularly conducted business of manufacturing and selling radios.  First, the circuit board list is typical of a firm that must manage the parts that beyond -- parts in its various products.  Second, the sales report and the accompanying country list to help decode it is typical of any firm that makes international sales.

The defense objects to the circuit board use list, document 1301, Docket 173 at 11, Docket 229 at 13, on the ground that it is not immediately apparent from the record itself whether it was prepared in the ordinary course of business or was prepared upon request to assist in the investigation or prosecution of the Pan Am 103 bombing.

The government contends that the list was created for

Toshiba's business use.  In support, the government has identified the summary of the custodian's statement certifying that list to the Scottish authorities in 1999.  Docket 242 at 21.

In that statement, the custodian explains that the document was kept by Toshiba to show which products contain a particular part, two different types of circuit boards.  It was supplied by the production department.  The Court agrees that this statement generally refutes the defense's vague argument that the list could have been made at the request of investigators.

Moreover, the Court agrees with the government that even if the list were generated by Toshiba at the request of investigators, such records may still be business records so long as the underlying data was stored on Toshiba's computer systems and retrieved without alteration.  The defense has offered no reason to believe that the data reflected was not kept in the ordinary course of business.

The Court agrees that this list is unlike the data addressed in *Ekiyor*, the Eastern District of Michigan decision I've mentioned, because that district court barred baggage data that contained conclusions about the defendant's data rather than a replication of the raw data kept by a computer system.

As such, the Toshiba list, if produced by the company for the investigation, is much like telephone logs which are often pulled from massive data sets and printed into legible forms for

admission under the analogous Rule 803(6) business records exception.

In sum, the Court will provisionally admit all three Japanese records under Section 3505.

The government argues that a small subset of other records is admissible under the public records exception in Rule 803(8). The public records exception covers a record or statement of a public office if it sets out, among other categories of information, the office's activities or a matter observed while under a legal duty to report but not including in a criminal case a matter observed by law enforcement personnel and the opponent does not show that the source of the information or other circumstances indicate a lack of trustworthiness.

Under Rule 902(3), a public record is self-authenticating and may be admitted without a witness if it appears to be signed or attested by a person who is authorized by a foreign country's law to do so. The proffered document must be executed by the proper official in his official capacity, or the genuineness of the document must be attested to by a proper official in his official capacity, and there must be some indication that the official vouching for the document is who he purports to be.

The government moves to admit three sets of records under the public records exception. For reasons already mentioned, the Court will reserve ruling on two of those sets because the government has failed to produce supporting certifications as

required for authentication under Rule 902(3).  And therefore, the Court will not address here the Senegalese jail documents, the Maltese IRO cards, or the Czech visa documents.

Those exclusions leave the Court with one set of records to address:  The travel records from Switzerland.  These documents are Swiss visa applications and letters submitted in support of visa applications for a Libyan national.

The Court finds that the records do not satisfy the requirements for admission as public records.  As an initial matter, the proffered certifications contain a significant defect.  As the defense's initial opposition argues, the certifications from 2024 and 2025 state that the certifying official, quote, caused the production of the records in their official capacities.  Docket 173 at 12.

But we know that can't be right because the records have been in Scottish custody since the 1990s.  This discrepancy, the Court views, is more significant than the is/was issue with the Section 3505 certifications, as it is implied that the certifying custodian was actually responsible for the production of the records when that was not the case.

The government does not offer a compelling argument that the certifications are nonetheless trustworthy and therefore self-authenticate the travel records under Rule 902(3).  Instead, the government raises that the -- argues that the rule allows for the Court to order the document to be treated as

presumptively authentic without final certification for good cause or allow authenticity to be evidenced by an attested summary with or without certification.

Although the Court is perhaps open to those arguments, the government has not advanced good cause or a summary to satisfy Rule 902 despite the faulty certificates. And even if the government had satisfied the authentication requirements, I'm skeptical that the visa applications and especially the letters in support qualify as public records under 803(8). The rule requires that the public records set out the office's activities or a matter observed while under a legal duty to report but not including in a criminal case a matter observed by law enforcement personnel.

It is not clear to the Court that the visa applications set out the office's activities. Nor is it clear that the information in these applications was entered by an official with a legal duty to report. The applications include handwritten text with the applicant's name, year of birth, marital status, nationality, passport information, occupation, reason for the journey, and duration of the trip. One column of the application is stamped ink with the initials of the le charge d'affaires for the Swiss Embassy in Tripoli. While that last portion was made while the official was under a legal duty, it is not clear to the Court whether the official filled in the other information about the applicant.

Because the applicant could have filled in personal information such as his name and passport number without being overseen by a public official, I doubt those portions of the application qualify as, quote, a matter observed while under a legal duty to report, end quote.

I see the government's case on this point advanced elsewhere in its motion as inapposite. In *Ngamfon v. U.S. Department of Homeland Security*, 349 F.Supp.3d 975, 980, note 1, C.D. California, 2018, the district court ruled that visa records were admissible under 803(6) because the application was overseen by a consular official. The Court has no such information about the Swiss visa application process here.

The letters in support of the visa applications suffer from even worse defects as none of the information was supervised or filled in by public officials. Instead, the letters include a form and typed letters from companies, presumably mailed to the visa office without oversight and then stamped into an application file. Those letters are thus not foreign records within the scope of 803(8).

Therefore, the Court will not admit the Swiss visa records, documents 1549, 1550, 1551, 1558, 1559, 1573, 1574, 1575, 1576, and 1577 under the public records exception.

The government has moved, in the alternative, to admit the foreign records under the ancient document exception.

Rule 803(16) makes admissible hearsay contained in a

document that was prepared before January 1, 1998, and whose authenticity is established.  In turn, Rule 901(b)(8) provides examples of the evidence through which the authenticity of an ancient document can be established, including evidence that the ancient document, A, is in a condition that creates no suspicion about its authenticity; B, was in a place where, if authentic, it would likely be; and, C, is at least 20 years when offered.

As stated by the advisory committee, the rationale for Rule 901(b)(8) is the unlikeliness of a still viable fraud in the lapse of time.

The defense argues that the ancient documents is inapplicable because the government has not shown that the documents were in a place where, if authentic, they would likely be, as Rule 901(b)(8) requires.

The Court is inclined to agree with the government that most, if not all, of the proffered business documents could be admitted under the ancient document exception.  As an initial matter, I believe that all of the proffered documents predate January 1, 1998.

As discussed in the Section 3505 context, the government has offered the Court many reasons to find that the documents' authenticity is established.  First, the documents are all in good condition and bear no signs of tampering.  Second, the documents were stored by Scottish officials after their trial and were initially collected from businesses where the documents

likely would have been.

And as I have already stated, the defense has not advanced any reason for the Court to doubt the Scottish recordkeeping practices. While the defense says it will cross-examine the government's witness as to several issues with the Scottish recordkeeping, nothing before me suggests that anything untoward has happened with these foreign records. My confidence in the records is heightened by the government's inclusion of the Crown Production cover pages and evidence tags for almost all documents and its representation that it has such documents for the Maltese documents that lack those indicia of reliability. Moreover, the documents' authenticity is heightened by the government's certifications, however bare-bones they might be, because custodians have attested under penalty of perjury that the records came from their respective businesses.

My willingness to admit under the ancient documents exception as an alternative may reach those documents I excluded because I found they did not qualify as business records. For example, the ancient document exception may justify admitting the Libyan letter to the Intercontinental Hotel, document 908. But the ancient document route does not necessarily provide a path around the nested hearsay issues that afflict the Telexes in documents 1013 and 1024. The Court would need to hear briefing on that issue before admitting -- see briefing on that issue before admitting those documents as ancient records,

especially given the authenticity concerns I have raised with respect to document 1024.

Likewise, the Court may be open to admitting the Swiss travel records, which I just held inadmissible under the public records exception, under the ancient documents exception. Although the visa applications and letters in support of those applications may not necessarily be public records, they could be ancient documents. And the government may be able to overcome the defect I've identified in the foreign official custodian's certifications to show that the document was where it would likely be if authentic.

The government should tell the Court, however, more about the Scots's means of retrieving those documents from the Swiss, ideally with an affidavit or amended certification.

The defense has advanced other purpose-based arguments against the ancient documents exception. In a footnote in its response brief, the defense, referencing the 404(b) foreign records that the Court will address at a later date, noted that all these records were collected close in time and immediately following the event in question during a criminal investigation of the incident. According to the defense, this timing undermines the rationale behind the ancient documents rule, which reasons that old documents are more likely to be divorced from the instant controversy. Docket 173 at 14, note 7.

In a supplemental filing, the defense cites the McCormick

evidence treatise for the proposition that the age requirement generally assured that the assertion was made before the beginning of the present controversy, alleviating reliability concerns.  But the defense then again swaps the term "made" for "collected" to argue that these records are less reliable because they were collected after the bombing.

The Court rejects the defense's purpose-based theory. Accepting the antedates-controversy purpose behind the ancient documents rule militates in favor of admitting the proffered documents under the ancient documents rule because all were created before the crash.

Accordingly, there was no reason for any of the documents, ranging from clothing sale invoices to schematics of the Frankfurt Airport luggage system, to have been created to warp the facts in this trial.

Moreover, the defense's reframing of the purpose to turn on the time of collection would render the ancient documents exception meaningless.  Most ancient documents are collected after controversy arises because that is when parties go in search of evidence.

In the classic common law ancient documents cases that turn on ancient deeds, the whole point is that one of the parties unearthed a very old deed to defeat another's claim to their land.  See e.g., *Fulkerson v. Holmes*, 117 U.S. 389, 396, 1886.

But on the defense's view, all of those cases are wrong

because the ancient deed was merely collected after the controversy arose.  That approach can't be right.

But today, the Court will not issue a definitive ruling on whether the ancient documents exception supports the admissibility of the documents the government seeks to admit.  Instead, the government shall, one, correct the defects I've identified in the business and public records I declined to admit to the extent it can and, two, argue more persuasively as to why those rejected documents or any other documents the government seeks to admit for a secondary basis satisfy the ancient document requirements.

As another basis for admissibility, the government argues that in the alternative the foreign records should be admitted under the residual exception.  Rule 807 allows for the admission of a hearsay statement that is not otherwise admissible under Rule 803 or Rule 804 so long as three conditions are satisfied.

First, the statement must be supported by sufficient guarantees of trustworthiness after considering the totality of the circumstances under which it was made and evidence, if any, corroborating the statement.

Second, the statement must be more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Third, the proponent must give the adverse party reasonable notice of the intent to offer the statement so that the party

has a fair opportunity to meet it.

The defense cites case law from this circuit providing that the residual exception should be applied only in the most exceptional circumstances. *United States v. Slatten*, 865 F.3d 767, 807, D.C. Circuit 2017.

Again, while the Court agrees that some of the foreign records in this case could potentially satisfy the residual exception because this is indeed the rare case in which the government must obtain decades-old records and new certifications from dozens of countries, and the government has, or at least come very close, to satisfying the requirements for each of its proffered records.

As to the first prong of Rule 807, the vast majority of proffered documents are supported by sufficient guarantees of trustworthiness. With some exceptions, the documents are supported by certifications, records from the Scots, an affidavit about the rigors of Scottish recordkeeping system, the prevalence of the Crown Production covers and evidence tags, and, for many documents, the inclusion of an original certification.

But as to the second prong of Rule 807, the Court cannot determine at this time whether any of the exhibits is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts because the government has not advanced arguments about

what other evidence it could obtain if the Court were to exclude any of its proffered records.

So if the government wishes to advance its residual exception arguments, it will need to make a document-by-document argument that satisfies both prongs of Rule 807, particularly the second prong.

All right.  Before I move on to the deposition and housekeeping matters, let me repeat, to the extent either party thinks the Court has overlooked an important argument, I ask you to bring it to my attention at the time the spreadsheet is filed or earlier or consider the argument forfeited.  I just can't do any better than -- we can't do any better than we have tried to do addressing all the numerous arguments.  There's simply too many, many of which have evolved over the course of the briefing, for the Court to be confident all have been addressed.

How much time do the parties -- would the parties like?  I know you've got a lot to do.  I think while these issues are fresh, it would be good for you to work on the spreadsheet, but I'm going to ask you to propose a date no later than, say, February 2 or February 9.  I think we need to put some of this to bed to the extent we can.

I will ask you, Mr. Mulroe, because the heavy lifting is going to be on the government on this project.

MR. MULROE:  Your Honor, I completely agree it's appropriate and useful to get this tied up while it's still

fresh.  Let me just confer with the team for one moment.

Let me ask this -- well, let me confer.

(Government counsel conferred.)

MR. MULROE:  I think February 9 would be feasible from the government's perspective.

THE COURT:  Okay.  And by that time, not only your part of the job, but you've got to give the defense adequate time to look at it and make sure their arguments have been captured.  Okay?  I want a combined effort.

MR. MULROE:  The spreadsheet is a joint product between the parties?

THE COURT:  Yes.

MR. MULROE:  To the extent there's any disagreement, we will flag that.

THE COURT:  Does that work for the defense, February 9?

MS. RUPERT:  Yes, Your Honor.

THE COURT:  Just don't dump it on them February 8.

MR. MULROE:  Of course.  Thank you, Your Honor.

THE COURT:  All right.  Before we turn to the other issues, we need to address Speedy Trial Act.  I think it's -- I can't remember the exact date.  I think it was until trial.  I don't know that I've gone beyond trial.  That does not have to happen today, but I don't want to neglect moving forward.  At some point, we can -- I will ask you all to help me remember to

flag it at the hearing in February.  I just haven't studied the pretrial order to know what future dates we have between now and the trial date, and I want to make sure we address that.  I think it's tolled until April 20.  So I'm just flagging it now.

Are there any pretrial scheduling issues that we can address on the public record?  You all need to flag any housekeeping matters that you want to talk about.

MR. MULROE:  No, Your Honor.

THE COURT:  What about for the defense?

MS. MINTER:  Court's indulgence, please.

(Defense counsel conferred.)

MS. RUPERT:  No, Your Honor, not at this time.

THE COURT:  All right.  Before moving on to other matters that will need to be conducted under seal, I will note that on the government's motion, Docket 275, the Court is going to unseal the fact that there has been a Rule 15 deposition of Allen Feraday, who the government is offering as an expert in explosive forensics, but the contents of that deposition, some of which involves testimony the defendant argues will be highly prejudicial if admitted, will remain under seal unless and until the time the Court finally rules on the admissibility of that deposition at trial.

And I agree with the parties that Rule 15 depositions and related motions can remain sealed unless and until they're admitted at trial.  Docket 129 at 17, Docket 130 at 14, and

Docket 131 at 128.  Because as the Supreme Court has clarified in the civil context in *Seattle Times Company v. Rhinehart*, 467 U.S. 20, 33, 1984, pretrial depositions are not public components of a trial, so too here where if the Court ultimately rules that Mr. Feraday's Rule 15 deposition is not admissible at trial, the testimony will not be a part of the record, and related motions activity is rendered noncritical to the case.

In the forthcoming sealed portion of this hearing, the Court will address legal arguments surrounding the defense's motion to exclude Mr. Feraday's testimony, which is filed on the public docket at ECF 170.  The Court will address several issues under seal, including arguments by the defense that parts of Mr. Feraday's deposition contain hearsay that would be inadmissible under Rule 703 and would violate the confrontation clause if admitted at trial.

The Court again will unseal the related motions and transcripts of this portion of this forthcoming sealed hearing if and when parts of the deposition are ruled admissible for trial or if they can otherwise be unsealed because they no longer present a risk of substantially prejudicing the defendant.

So those are issues the Court will be addressing in the future, but at this point, this concludes the portion of the public hearing.  So the Court will ask those in the courtroom who are not tied in to the prosecution and defense team to

please leave the courtroom, and the victims' line will be turned off at this point.

Thank you, all.

(The following occurred under seal.)































































































































































(End of sealed proceedings.)

THE COURT:  All right.  Thank you, everyone.

(Proceedings adjourned at 2:20 p.m.)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Sara A. Wick, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Sara A. Wick                    January 14, 2026

SIGNATURE OF COURT REPORTER        DATE