**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 22-cr-392 (DLF)** |
| | : | |
| **ABU AGILA MOHAMMAD MAS'UD KHEIR AL-MARIMI,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S NOTICE OF ADDITIONAL EVIDENCE FOR MOTION TO SUPPRESS HEARING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this proffer of additional facts related to the hearing on the defendant's Motion to Suppress Statements. This submission provides (1) additional facts about the crash of Libyan Arab Airways Flight 1103; (2) information regarding the timing of the departure of the Libyan Minister of the Interior; and (3) supplemental authority on the general issue of voluntariness.

**A. Crash of Civilian Airliner Near Tripoli**

The Libyan Police Officer testified that he viewed a report about a crash of a Libyan civilian airliner that included statements from two military pilots and a female air traffic controller that indicated that a Libyan Air Force jet had crashed into the civilian aircraft. *See* Libyan Police Officer Depo. Tr. (Day 1 p.m.) at 13. The Officer watched that report on television, which aired during the first days of the interviews he conducted. *Id.* at 17. As a result of that program and the detainees' denial of participation in causing the crash, the Officer decided that the plane crash was not important and informed the Minister of the Interior that he did not intend to keep interviewing the detainees about the crash. *Id.* at 17-18

The government provides the below information to substantiate and supplement the proffer it made regarding the crash at argument on the defendant's motion to suppress statements. In short, interviews with the pilots and an air traffic controller that aired as part of a documentary posted to Al Jazeera's website in 2013 (the "Al Jazeera Documentary") corroborate the substance of what the Libyan Police Officer testified to seeing on television regarding the crash, and the other circumstances support an inference that interviews with those individuals were likely available within Libya prior to having been posted on Al Jazeera's website.[1] The government's proffer is as follows:

- Libyan Arab Airways Flight 1103 crashed near Tripoli International Airport on or about December 22, 1992. According to the Al Jazeera documentary, although the Qaddafi regime conducted an investigation and determined that the cause of the crash was a mid-air collision between the civilian aircraft and a Libyan military jet, the regime did not release the report publicly. Instead, Qaddafi publicly blamed a mechanical failure and stated that Western sanctions were denying Libya access to vital aircraft parts.
- In December 2011, Reuters reported that victim-families traveled to the a mass gravesite, around the 19th anniversary of the tragedy, and that those families

[1] The government agrees that the English-language version of the documentary was posted to Al-Jazeera's website in August 2013 and that the Arabic-language version was posted in June 2013. The government has not been able to locate the date on which the Arabic version was broadcast on television, which may have been earlier; in 2012, it was common for networks to air a program prior to making that program available on the internet. The English version of the documentary is available at https://www.aljazeera.com/video/al-jazeera-world/2013/8/7/flight-1103 (last visited March 4, 2026).

demanded that the new Libyan government re-investigate the crash.[2] According to Reuters, the occasion was "the first time the families of the flight victims were allowed to gather at the site in such numbers and conduct a wreath-laying ceremony."

- In an Arabic-language article posted on January 1, 2012, it was reported that the Middle East News Agency learned that a group called the Association of Martyrs of Flight (LN-1103) had submitted a request to the Libyan government to reopen the investigation into the crash.[3]
- No later than July 2012, public reporting indicated that there would be a forthcoming documentary about the crash that would air on Al Jazeera.[4]
- In a meeting with Jamal after the Court lifted its ruling preventing the government from speaking to him about his testimony, Jamal stated information about the incident circulated within Libya on social media, including information that the pilots had stated that it was caused by a mid-air collision. Jamal also reported that watched the program he described in his testimony on a Libyan television station.
- An Arabic-speaking linguist employed by the FBI has noted that many Libyan media outlets do not have substantial online footprints.
- December 22, 2012, marked the 20th anniversary of the tragedy.

---

[2] *See* https://www.reuters.com/article/world/families-demand-libyan-probe-into-1992-crash-idUSTRE7BR0JW/ (last visited March 4, 2026)

[3] Copies of the original Arabic version of the article, as well as a machine translation thereof, are attached hereto as Exhibit A.

[4] *See* https://www.express.co.uk/news/uk/334466/Tests-could-reveal-Gaddafi-bomb-plot (last visited March 4, 2026)

- In late 2012 and early 2013, English language news outlets began quoting one of the pilots of the Libyan military aircraft, Majid Tayari, as stating that there was no mid-air collision. *See*, *e.g.*, ECF 355-1.
- The Arabic version of the Al-Jazeera documentary was posted to its website in June 2013. In that documentary, both Tiary and the other pilot, Ahmed Abu Sneina, state on camera that the crash was in fact a mid-air collision – consistent with how the Libyan Police Officer described. Some excerpts from their interviews are below, along with time stamps from the English-language Al-Jazeera Documentary.[5]
    - Tiary: Our altitude was 2,000 ft. We were flying at 700 kilometers per hour. I didn't see a plane in front of us. Suddenly, I felt a tremor and heard a loud noise (37:07).
    - Tiary: Our fighter hit the hit the rear part of the civil plane (37:33).
    - Abu Sneina: The front nose of the fighter was damaged (38:11).
    - Tiary: I felt something hit my arm. I didn't think about the control tower. I looked back. I saw fire under our jet (38:24).
    - Abu Sneina: The warning alarm went off (38:40).
    - Tiary: When I saw the fire and felt the vibration, I decided to eject the seats (38:44).
    - Tiary: Had I seen the civil plane, I could have avoided the accident. There'd have been no collision. Our jet had excellent maneuverability (39:26).

[5] Attached hereto as Exhibit B are screenshots of portions of these interviews. The subtitles are original to the documentary.

- The documentary also contains footage of a female air-traffic controller, Miriam Al Machaa, who provided a description that she ordered the civilian aircraft to circle until cleared to land due to military aircraft in the area and her eyewitness description that, as she saw the plane go down, it was not on fire (18:45, 31:50).

The defense notes that Al Jazeera states that people close to the pilots convinced them to speak to Al Jazeera, and that Al Jazeera "returned to film with them to reveal to the media for the first time the details of the crash of their military plane in conjunction with the civilian plane." ECF 355 at ¶ 1.d. The government has not located an earlier broadcast featuring video interviews of the pilots, but the government submits, as it did at argument, that it would be consistent with the Officer's testimony for the pilots' versions of events to have traveled throughout Libya and/or Libyan media before being aired by a multinational media conglomerate like Al Jazeera. That is especially likely given the time it would have taken Al Jazeera to complete production of the professionally edited, 46-minute long feature documentary. Moreover, it is not surprising that, more than 13 years later, the parties are unable to find a record of similar interviews being aired on local Libyan television prior to the release of the Al Jazeera Documentary. There are multiple Libyan media companies without a significant online presence easily searchable from Western computers, and one would expect there to be even less of an online footprint for programs aired on Libyan media companies operating in or around 2012, a time period which both parties agreed after the hearing was especially chaotic in Libya.[6]

[6] As an example, searching the archives for the Libyan News Agency—the successor to the Libyan state-run news agency under Qaddafi—for articles that contain the term "Tripoli" from March 1, 2012, through December 31, 2012, returns no results, despite the fact that one would expect the agency to have written articles referencing Tripoli in that time period. A copy of a screenshot of that search is attached hereto as Exhibit C.

If, as Al-Jazeera claims, those close to the pilots did in fact convince them to come forward, they must have known the pilots' version of events from somewhere. It is reasonable to infer that the pilots' and air traffic controller's versions of events had been available on Libyan social media and/or television, but that the televised versions either were never available on the Internet, owing to the chaos in Libya in 2012, or they have since been removed therefrom or are difficult to locate through Western search engines.[7] It is worth noting that December 2012 would mark the 20th anniversary of the tragedy, so it would be a reasonable inference, especially in light of renewed interest in the crash following the fall of the Qaddafi regime, that the topic would receive media attention within Libya in the period leading up to the anniversary.

Regardless, as laid out above, the substance of the pilots' and air traffic controller's statements as documented by Al Jazeera closely corroborates the Officer's testimony that what the pilots said caused him to not continue to pursue that line of questioning. Moreover, the Officer would have no reason to offer information about Flight 1103 if it were not true, and the government would have had no reason to inquire about that flight had the Officer not offered it. The Officer's actions in discontinuing that line of inquiry further demonstrate that he was not out to set up the detainees he interviewed to confess to something they did not do: when faced with evidence that they did not commit a crime on behalf of the Qaddafi regime, the Libyan Police Officer did not continue that line of questioning, but instead reported to his superior that they were not at fault for

[7] Indeed, Al-Jazeera's statement that the pilots' interviews with it represent the pilots "reveal[ing] to the media for the first time the details of the crash of their military plane in conjunction with the civilian plane" is contradicted by the existence of the BBC article proffered by the defense at the hearing, which appears to predate the documentary. If the pilot gave at least one interview predating the documentary being posted, it is a reasonable inference that there were others, especially in light of the factors laid out above.

the crash. *See* Libyan Police Officer Depo. Tr. (Day 1 p.m. at 17-18). His actions are consistent with him having taken a voluntary statement from the defendant.

**B. Departure of Libyan Cabinet Minister**

The government generally agrees with the timeline laid out by the defense, per public reporting, regarding the Minister who tasked the Libyan Police Officer with conducting the interviews at issue and when he was appointed to and left that office, *see* ECF 355 at ¶ 2.b-2.g. The timeframe as laid out corroborates the Libyan Police Officer's testimony. In short, the Minister was appointed in November 2011, and he served in the role through approximately late November 2012, before being nominated as the Libyan Ambassador to Bahrain in late 2012. In addition to the articles provided by the defense, the government is submitting, as Exhibit D, an article, machine-translated from its original Arabic, indicating that the Minister "handed over his ministerial duties" on or about November 25, 2012.

Regardless of when the Minister actually began his role as Ambassador, the timeline above (which is not generally in dispute) corroborates the Officer's testimony. The testimony was that the Minister was "transferred" to the Libyan Embassy in Bahrain within "months" of the statement being taken. *See* Libyan Police Officer Depo. Tr. (Day 1 p.m.) at 84-85. The agreed-upon public reporting indicates that the Minister left his post approximately two months after September 2012, and that he was nominated as Ambassador to Bahrain approximately three months after September 2012. That time frame is consistent with the Officer's testimony, as he noted in his redirect examination. *See* Libyan Police Officer Depo. Tr. Vol. VI at 5-6.

**C. Case Citations**

The government provides the below case citations in response to the Court's invitation to provide any additional to those listed in the briefing.

- *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 177, 215 (2d. Cir. 2008) (incommunicado detention of 14 days, during which no threats or promises were made, and there was no evidence of mistreatment, cannot be said to have induced the defendant's statements).
- *United States v. Kiendra*, 663 F.2d 349, 351 (1st Cir. 1981) ("[S]olitary confinement [for thirty days]... cannot be presumed to have weakened [a suspect's] will to such an extent that he was incompetent to exercise his rights").
- *United States v. Suchit*, 480 F. Supp. 2d 39, 55-56 (D.D.C. 2007) (statements from defendant's brief that he was abused by Trinidadian police prior to giving statement to FBI were not supported by the record, and voluntariness was supported by testimony of FBI agent that he witnessed no signs of abuse, fear, or anxiety on the defendant).
- *United States v. Marzook*, 435 F. Supp. 2d 708, 764-774 (N.D. Ill. 2006) (Finding voluntary multiple statements given while in custody to Israeli authorities over a 2.5-month period by a U.S. national, arrested at Israeli-Palestinian border, during which he was interrogated multiple times, was subject to a "bird drill," that involved placing the detainee with inmates co-opted by the Israeli services, who simulated terrorist centers in prisons.[8] The statements found voluntary included one written during the "bird drill," and another that involved the defendant signing a statement written in a language he did not know).

[8] The specifics of the "Bird Operation" were redacted from the published opinion due to the Classified Information Procedures Act. *See* 435 F. Supp. 2d at 721. The court suppressed two earlier statements because the government had not provided sufficient evidence regarding the circumstances of those particular statements.

## CONCLUSION

After considering the above evidence and proffers, in addition to that evidence and argument presented at the hearing and in the briefing on this matter, the defendant's motion should be denied.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By: ***/s/ Erik M. Kenerson***
ERIK M. KENERSON (OH Bar No. 82960)
CONOR MULROE (NY Bar No. 5289640)
BRITTANY KEIL (D.C. Bar No. 500054)
Assistant United States Attorneys
JEROME J. TERESINSKI (PA Bar No. 66235)
Special Assistant United States Attorney
601 D Street NW, Washington, D.C. 20530
(202) 252-7201 // Erik.Kenerson@usdoj.gov

KATHLEEN CAMPBELL (MD Bar No. 9812170031)
JENNIFER BURKE (MD Bar No. 9706250061)
Trial Attorneys, Counter Terrorism Section
National Security Division
950 Pennsylvania Avenue NW, Washington, D.C. 20530