**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 22-cr-392 (DLF)** |
| | : | |
| **ABU AGILA MOHAMMAD** | : | |
| **MAS'UD KHEIR AL-MARIMI,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS ON DUE PROCESS GROUNDS**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this response in opposition to the defendant's motion to dismiss on Due Process Grounds (ECF 251 and 253-2, as supplemented by ECF 351 and 352-2). The defendant's motion does not meet any of the heavy burdens he must carry to prevail on his claims: The motion does not establish actual prejudice from any pre-indictment delay in bringing charges; it does not establish that any delay was reckless or for tactical reasons; it does not establish that the actions of Libyan, Senegalese, or German law enforcement are attributable to the United States government for purposes of the defendant's Due Process rights; and in any event it does not establish bad faith on the part of those foreign law enforcement agents.

The defendant's motion is without merit and should be denied.

\*     \*     \*

1

Table of Contents

BACKGROUND.................................................................................................2

ARGUMENT ....................................................................................................5

    A.      There is No Fifth Amendment Due Process Violation ......................................5

        1.    Legal Standard .................................................................................5

        2.    The defendant has not established actual prejudice..........................................6

        3.    There was no tactical delay.............................................................11

    B.      There was no bad-faith failure to preserve potentially exculpatory evidence. .14

        1.    The joint venture doctrine is not the proper legal standard. .............................15

        2.    There is no joint venture between the United States and Libya. ......................17

        3.    The defendant has not demonstrated bad faith in the alleged loss of the recording. ...............................................................................................24

        4.    The defendant has not demonstrated bad faith in the alleged loss of any other evidence. ...............................................................................................29

    Conclusion ...................................................................................................32

**BACKGROUND**

This case arises from the bombing of Pan American World Airways ("Pan Am") Flight 103 on December 21, 1988. On November 29, 2022, a federal grand jury in the District of Columbia returned a three-count indictment charging the Defendant with destruction of an aircraft resulting in death, in violation of 18 U.S.C. §§ 32(a)(2), 34, and 2; destruction of an aircraft resulting in death, in violation of 18 U.S.C. §§ 32(a)(1), 34, and 2; and destruction of a vehicle used in foreign commerce by means of an explosive, resulting in death, in violation of 18 U.S.C. § 844(i).[1]

---

[1] On December 21, 2020, the government unsealed a criminal complaint charging the Defendant with these crimes. An arrest warrant was issued, and the United States lodged an Interpol Red Notice to obtain lawful custody of him. A federal grand jury later returned an Indictment for these charges on November 29, 2022.

During the 32 years between the crime and the issuance of the complaint charging the defendant of the defendant in this case, the government undertook a massive, worldwide investigation to bring the perpetrators to justice. *See* ECF 26. There was a complicated investigation that involved numerous countries, hundreds of witnesses, thousands of pieces of evidence – all amongst the background of delicate international diplomatic relations. See ECFs 26, 45, 125-1, 163. Some of the key dates to consider for this motion include the following:

- **2012** – Defendant confessed to the Libyan Witness

- **2013-2015** – Routine information-sharing and discussions occurred between U.S., Libyan, and Scottish governments

- **2015** – U.S. authorities learned of the existence of the defendant's confession

- **2017** – U.S. authorities received a copy of confession

- **2018** – ██████████████████████████████████

- **March 2020** – After two years of negotiations, prosecutors and agents interviewed Libyan Witness in Tunisia

- **March 2020**-2022 – International pandemic

- **December 2020** – U.S. charges filed against defendant, who was still in Libyan custody, and the charges were unsealed

- **Throughout 2021-2022** – ████████████████████████████ ██████

- **November 2022** – Indictment returned against defendant

- **December 2022** – Defendant transferred to U.S. custody

The United States made one official request for assistance from Libya prior to the date the defendant's statement was taken. ████████████████████████████

In 2017, the United States received a copy of the defendant's statement, which had first been provided by Libya to Scotland.

██████████████████████████████████████████, and it was permitted to participate in an interview the Libyan Police Officer (the "Officer") in 2020.  Within nine months of that interview, the government brought charges against the defendant.  Within three months of those charges, it formally sought custody of the defendant from Libya.  The defendant was lawfully transferred from Libya to the United States approximately 18 months later.

The defendant has now moved to dismiss the indictment against him, arguing that pre-charging delay, as well as the Officer's actions with respect to the attempted recording of his statement, violated his Due Process rights.  For the reasons that follow, that motion should be denied.

**ARGUMENT**

**A.  There is No Fifth Amendment Due Process Violation[3]**

1.  Legal Standard

"Statutes of limitations, which provide predictable, legislatively enacted limits on prosecutorial delay, provide the primary guarantee, against bringing overly stale criminal charges." *United States v. Marion*, 404 U.S. 307, 322 (1971).  "[T]he Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment."  *United States v. Lovasco*, 431 U.S. 783, 790 (1977).  Courts may only dismiss an indictment based on pre-indictment delay when that delay "violates those fundamental conceptions of justice which lie at the base of our civil and political institutions." *See id.* (internal quotations omitted).

---

[3] There is no Sixth Amendment violation implicated here.  As the Supreme Court held in *United States v. Marion*, 404 U.S. 307, 321 (1971), until there is an arrest, Speedy Trial rights are not implicated. The defense has limited itself to pre-indictment argument and the indictment occurred prior to the defendant's arrest in this case.

Indictments brought within the statute of limitations are presumptively reasonable, regardless of the length of delay.  *See id.* at 789.  Therefore, the Due Process Clause "has a limited role to play in protecting against oppressive delay." *Id.* at 788.  To establish that dismissal is warranted due to alleged pre-indictment delay, the defendant must show "(1) that the government delayed bringing the indictment in order to gain a tactical advantage; and (2) that the delay caused him actual and substantial prejudice."  *United States v. Mills*, 925 F.2d 455, 464 (D.C. Cir. 1991).[4]

The defendant has not met his heavy burden to demonstrate that the indictment should be dismissed on Due Process grounds, and his motion should be denied.

>2.   The defendant has not established actual prejudice.

The defendant was charged by complaint in this case on December 14, 2020, and by indictment on November 29, 2022.[5]  The defense alleges prejudice in four categories: death of witnesses, loss of important physical evidence, loss of documentary evidence, and the defendant's own mental and physical deterioration.  To establish a due process violation for pre-indictment delay, "a defendant must establish that the delay resulted in 'actual prejudice to the conduct of the defense.'" *United States v. Brodie*, 326 F. Supp. 2d 83, 87 (D.D.C. 2004) (quoting *Marion*, 404 U.S. at 325).  Additionally, the prejudice must be substantial.  *See, e.g., Marion*, 404 U.S. at 324; *Mills*, 925 F.2d at 464

Actual prejudice must be "definite and not speculative. Courts apply the actual prejudice test stringently." *United States v. Manning*, 56 F.3d 1188, 1194 (9th Cir. 1995) (quoting *United*

---

[4] The panel decision in *Mills* was subsequently reviewed by the court *en banc*. See 964 F.2d 1186 (D.C. Cir) (*en banc*), cert. denied, 506 U.S. 977 (1992). The *en banc* decision left intact the Due Process rulings of the panel that originally considered the case. *Id.* at 1189 n.3.

[5] The defendant's argument that the government "symbolically" charged the defendant on the 32nd anniversary of the bombing, ECF 251 at 14, confuses the charging date with the unsealing date.  Regardless of timing, as noted below, the government began diligently pursuing custody of the defendant nearly immediately after the filing of those charges.

*States v. Butz*, 982 F.2d 1378, 1380 (9th Cir. 1993)).  "A mere loss of potential witnesses is insufficient absent a showing that their testimony would have actually aided the defense." *United States v. Crouch,* 84 F.3d 1497, 1515 (5th Cir. 1996) (internal citation omitted) (collecting cases). Speculative prejudice does not suffice. *United States v. Parks*, 68 F.3d 860, 868 (5th Cir. 1995); *see also United States v. McGough*, 510 F.2d 598, 604 (5th Cir. 1975) ("death of some six potential defense witnesses," some of whom the defendant claimed "would have testified as to firsthand knowledge of several of the transactions," with no further information as to how their testimony would have assisted the defense, was insufficient).

A recent instructive case in this jurisdiction addresses many of the same issues that the defendant raises here, and the Court ultimately refused to find a due process violation.  In *United States v. Evans*, 2022 WL 16758553 (D.D.C. 2022), the defendant was indicted ten years after the offense.  In that case, the defendant claimed that he was actually prejudiced due to physical evidence that was no longer available to him, an "exculpatory witness" whose memory faded, and other "exculpatory witnesses" who died or were no longer available. *Id* at *8.  The court found that the defendant had access to photos, reports, and witness testimony about the evidence and therefore had the opportunity to challenge the evidence.  *Id*.  The Court further stated the defendant did not further explain "how the other physical evidence identified in his reply actually prejudiced his defense beyond mere—impermissible—speculation." *Id.* (citing *United States v. Burnett*, 827 F.3d 1108, 1116 (D.C. Cir. 2016) ("Not only ha[s] the defendant [] failed to prove bad faith, [he] also ha[s] advanced no credible argument that the [lost] evidence was potentially exculpatory, which is a separate requirement to succeed on this kind of due process claim.") (internal quotation marks and citation omitted).

The defendant's arguments with respect to the witnesses here fare no better. The defendant in *Evans* argued that he was prejudiced because a witness who gave a different physical description than that of the defendant could no longer recall that information. As the D.C. Circuit has made clear, "[m]emories inevitably dim with the passage of time" and thus faded memories, standing alone, are not sufficient to show prejudice. *United States v. Bridgeman*, 523 F.2d 1099, 1112, (D.C. Cir. 1975). The *Evans* defendant's argument that another potential witness might have helped his defense but had since died was easily refuted by the fact that there was no guarantee that witness would have testified on his behalf, especially as he may have faced potential charges of his own. *Evans*, 2022 WL 16758553 at *8. Regardless, "[t]he death of a witness, however, is not an occasion to dismiss [indictments] on the basis of speculation about what the lost evidence might have suggested." *Id.* (citing *In Re Sealed Case*, 494 F.3d 139, 151 (D.C. Cir. 2007))[6]; *see also United States v. Jones*, 524 F.2d 834, 844 (D.C. Cir. 1975) ("[P]rejudice is not satisfied by… the slender hope that a witness, now unavailable, might have been able to come forth with testimony favorable to the defense." (internal quotation marks and citation omitted).

The cases cited by the defendant, in which a court found a due process violation based on witness unavailability, are not on point. The cases he cites involved situations where the defendant was unable to produce *any* witness in his defense, which is plainly not the case here. *See* ECF 253 at 18; *United States v. Santiago*, 987 F. Supp. 2d 465, 485 (S.D.N.Y. 2013) (one of the other two alleged shooters (besides the defendant) was unavailable to testify and the other shooter had invoked their right not testify); *United States v. Sabath*, 990 F. Supp. 1007, 1012 (N.D. Il. 1998) ("sole witness" no longer had an independent recollection of the key events of the

---

[6] *In re Sealed Case* discussed the dismissal of civil complaints involving the complainants' constitutional rights. The *Evans* court placed the word "indictment" in the brackets.

night); *United States v. Barket*, 530 F.2d 189, 196 (8th Cir. 1976) (all potentially exculpatory witnesses were "dead or unable to recall circumstances that existed more than five years ago").

Looking at the specific facts in this case, there is no evidence that the defendant is prejudiced by the unavailability of the witnesses that he points to.  Megrahi is an alleged co-conspirator, who in fact faced charges of his own and would still face those charges if he were alive.[7]   There is no basis to believe that he would have testified on defendant's behalf, nor withstood cross-examination. The defense seems to acknowledge this, claiming that in any event Megrahi would have served as a "valuable resource."  ECF 253 at 16. Missing out on a potential "valuable resource," one who may not have assisted at all, is not sufficient – not to mention that one of the other named co-conspirators, Fhimah, is still alive, as are Megrahi's lawyers.  Both Anthony Gauci and Ulrich Lumpert were witnesses who testified for the Crown in 2000; there is no evidence on the record that their testimony would have been exculpatory for the defendant.  If anything, the loss of these witnesses hurts the government more than the defendant. Regarding Lumpert specifically, the defendant states the defense investigation "surely would have involved an attempt to interview" him. *Id*. at 17. This is facially insufficient to support a Due Process violation. Finally, regarding the individuals with possible knowledge of the defendant's conditions of confinement, *id*., the defendant's entire theory on what these witnesses might have said is pure speculation, and the defense has since stated that some of the individuals they previously believed were deceased may still be alive in any event.  ECF 352-2 at 11-12.

The defendant then argues that the relevant locations in the case, such as the changes and renovation of airports, as well as the closing of Mary's House have prejudiced him. ECF 253-2. at

---

[7] The indictment charging Megrahi in connection with the attack on Pan Am Flight 103 was dismissed only upon his death.  *See United States v. Megrahi, et. al.*, No. 91-cr-645 (ECF 18 & Minute Entry dated December 8, 2015).

19.  The defendant's lone statement – that if these locations still existed, they "could have" provided material investigation – is woefully deficient of the due process standard. *Id*.  Here, as in *Evans*, the defendant has been provided with numerous videos, photos and witness statements of people who worked in most of these locations.  He will have every opportunity to challenge the government's evidence.

The defendant seems to realize he has no actual prejudice claim regarding the documentary evidence, other than the destroyed documents have "value." *Id*.[8] There is no statement as to what documents precisely are missing, what they said, or what they would have used them for.  This is insufficient to establish actual substantial prejudice.  *See United States v. Manning*, 56 F3d 1188 (9th Cir. 1995) (defendant's assertion that he lost access to his credit card records which could have explained his location at the time of the killing is too speculative).

Finally, the defendant argues that his own mental and physical deterioration hampers his defense. ECF 253 at 20. This vague assertion does not advance any due process allegation. *See id*. at 1194 (where defendant also claimed his own memory fading was an indication of actual prejudice, the court held that generalized assertions of the loss of memory, witnesses, or evidence are insufficient).  The defendant has not met his burden to establish actual prejudice, and his motion should be denied on that ground alone.

---

[8] Even if there were some merit to the defendant's claim substantively, and there is not, the documents he complains of were very likely destroyed in 1989-90, during the Peaceful Revolution that resulted in the reunification of Germany.  This alleged destruction was thus within approximately two years of the attack (and prior even to the filing of charges against Megrahi and Fhimah in 1991), by a government unrelated to the charges at issue.  That type of destruction cannot support a Due Process claim for the reasons stated *infra*.

3. <u>There was no tactical delay.</u>

In addition to his failure to establish prejudice, the defendant's claim fails for the separate reason that he has not established that the government delayed for any tactical advantage. The defendant has proffered no facts, nor has he offered any analysis or argument, that would support a claim of tactical delay. As it is the defendant's burden to demonstrate any such delay, the Court should treat that issue as conceded. The defendant's arguments about recklessness contain only marginally more substance and easily fail on the merits.

The defendant points to several pieces of inculpatory information that the government possessed about him prior to its receipt of the defendant's statement, arguing that because the government suspected the defendant's involvement for decades and received inculpatory information about him from a witness in the mid-2010s, it should have somehow brought charges sooner. *See* ECF 253-2 at 20-21. That the defendant would implicitly argue that the government should have brought charges prior to establishing probable cause is stunning. Regardless, the defendant's argument on that front is foreclosed by Supreme Court precedent:

> It requires no extended argument to establish that prosecutors do not deviate from fundamental conceptions of justice when they defer seeking indictments until they have probable cause to believe an accused is guilty; indeed it is unprofessional conduct for a prosecutor to recommend an indictment on less than probable cause. It should be equally obvious that prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt. To impose such a duty would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself.
>
> *        *        *
>
> Rather than deviating from elementary standards of fair play and decency, a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of orderly expedition to that of mere speed. This the Due Process Clause does not require. We therefore hold that to prosecute a

11

> defendant following investigative delay does not deprive him of due process, even
> if his defense might have been somewhat prejudiced by the lapse of time.

*United States v. Lovasco*, 431 U.S. 783, 790-91, 95 (1977) (cleaned up).  There can be no Due Process violation where the government seeks charges expeditiously after it satisfies itself that it can prove the case beyond a reasonable doubt.

The defendant's argument about recklessness boils down to the period of delay between the government's receipt of a copy of the defendant's statement in 2017, and the grand jury's return of the indictment in 2022 (where the case was charged by complaint in 2020 and the government made diligent attempts to secure custody of the defendant from Libya beginning three months after that complaint was signed).  *See* ECF 249 at 21.

An examination of the record, including the discovery materials to which the defendant cites, establishes that there was no unjustifiable, let alone reckless, delay between 2017 and 2022. Even assuming *arguendo* that once the government received a copy of the defendant's statement, it had bare probable cause to seek charges, to do so at that point it would have been required to seek charges without knowing whether it would be able to admit the statement at trial.  Anticipating that the defendant would be likely to file a motion to suppress that statement, the government sought to assure itself that it could be likely to both succeed in authenticating that statement and in prevailing on any such motion prior to seeking charges. ██████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████ in March 2020, Police Scotland (with FBI agents present), conducted an interview of the Officer who took the defendant's statement.  *See, e.g.*, Officer Deposition. (hereinafter "Depo.") Vol. II. at 83.[9]  The

---

[9] The government will refer to transcripts from the first day of the deposition volume number.  We note that it appears that the p.m. transcript of Day 1 is inadvertently labeled "Volume

Officer was informed of this meeting just days beforehand. *Id.* This interview in March 2020 was the first time that U.S. or Scottish authorities had interviewed anyone with firsthand knowledge of the circumstances of the defendant's statement. It thus represented the first time that the government obtained evidence from someone with firsthand knowledge that would support the admission of the statement and that could be relied upon in litigating the expected motion to suppress that statement.

From there, only nine months elapsed until the complaint was signed and later unsealed in December 2020. At that point, the defendant was on notice that he was charged, and he could have engaged counsel to begin seeking witnesses and evidence if he so chose. In March 2021, ███ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████ Ultimately, after over 18 months ██████████████████████████ ███████████████████████████████████ the United States lawfully gained custody of the defendant. The Prime Minister of Libya later publicly acknowledged that his government lawfully transferred custody of the defendant. *See, e.g.*, Musa, Rami, "Libyan PM Admits Rule in Extraditing Lockerbie Suspect to U.S.," THE GLOBE AND MAIL, *available at* https://www.theglobeandmail.com/world/article-libya-pm-admits-role-in-extraditing-lockerbie-suspect-to-us/ (last visited March 10, 2026).

The defendant concedes that he was "convicted in Libya for offenses relating to alleged activities during the Qaddafi regime and sentenced to 10 years' imprisonment." ECF 253-2 at 6. He represents that he was released from Libyan prison in "mid-2022." *Id.* at 8. The defendant has

---

I," when it should be Volume II. The government accordingly refers to that transcript as "Volume II" throughout.

made no representation or argument to the effect that, even assuming charges had been in place prior to his release in mid-2022, Libya would have agreed to transfer custody of him to the United States prior to the expiration of that sentence

"There is an indisputably high burden on a defendant who argues that delay rises to the level of a due process violation; while acknowledging a defendant's right to dismissal on an indictment for certain types of pre-indictment delay, the Supreme Court has yet to see a case in which it ruled for the defendant on that ground." *United States v. Santiago*, 987 F. Supp. 2d 465, 489 (S.D.N.Y. 2013). Here, where the government acted quickly to charge the defendant once it spoke to the Libyan Police Officer, and diligently to seek custody of the defendant thereafter, the defendant has not remotely met that burden.

**B. There was no bad faith failure to preserve potentially exculpatory evidence.**

The defendant has not met his burden to support his claims that the United States is responsible for the alleged bad-faith destruction of evidence by Libyan, Senegalese, or German authorities. The United States is not generally responsible for the actions of foreign governments, and none of the exceptions to that general rule apply here, for the reasons stated below. Even if the actions of foreign governments were imputed to the United States, the defendant has not demonstrated any bad faith by the Libyan, Senegalese, or German officials, as he must for his claim to succeed under *Arizona v. Youngblood*, 488 U.S. 51 (1988). The Officer had no reason to know the value of any recording in the United States legal system until well after it would have been lost or destroyed (and he nonetheless took steps to try to locate the video at that point). Senegalese evidence was destroyed routinely well before its value to this case became apparent. Finally, much of the German evidence the defendant complains of was not destroyed at all (and he has made no request to inspect the evidence that is still available). Because the defendant cannot carry his burden to demonstrate bad faith, his motion must be denied.

1.    <u>The joint venture doctrine is not the proper legal standard.</u>

The joint venture doctrine, on which the defendant relies to support his claim that the

alleged loss or destruction of evidence by a foreign government implicates his due-process rights

under the U.S. Constitution, is used by courts to determine whether the exclusionary rule provides

for the suppression of evidence gathered abroad.  The doctrine most often arises in the context of

custodial interrogations carried out by foreign law-enforcement agents, and it ensures "that U.S.

law enforcement cannot circumvent their obligations under *Miranda* just by outsourcing custodial

interrogation to foreign agents while still actively participating in the questioning conducted by

foreign authorities, or by having the foreign officials act as their agents or virtual agents."[10]  *United*

*States v. Straker*, 800 F.3d 570, 615 (D.C. Cir. 2015).  *See also United States v. Alexander*, 817

F.3d 1178, 1182 (9th Cir. 2016) (noting that the doctrine applies in the context of the exclusionary

rule, but specifically declining to extend the doctrine to Constitutional Speedy Trial analysis);

*United States v. Abu-Ali*, 528 F.3d 210, 227-28 (4th Cir. 2008) (noting that the joint venture

doctrine can result in suppression of statements taken abroad in the absence of *Miranda* warnings

if U.S. law enforcement agents actively participate in questioning conducted by foreign

authorities); *United States v. Heller*, 625 F.2d 594, 599 (5th Cir. 1980) (suppression can result if

foreign authorities "were acting as agents for their American counterparts"). The defendant has

---

[10]   The joint venture doctrine typically applies in the Fifth Amendment context, but some Circuits have applied it in the Fourth Amendment context. *See United States v. Peterson*, 812 F.2d 486, 490 (9th Cir. 1987); *United States v. Valdivia*, 680 F.3d 33, 52 (1st Cir. 2012).  The Second Circuit has specifically declined to apply the doctrine in the Fourth Amendment context. *See, e.g.*, *United States v. Getto*, 729 F.3d 221, 235 (2d Cir. 2013).  The government is not aware of any Circuit court applying the doctrine in the analysis of alleged bad-faith destruction of evidence.

cited no case standing for the proposition that, even if a joint venture existed, that doctrine applies to a claim of bad-faith destruction of evidence.[11]

The government is not aware of any case in which the D.C. Circuit has extended the joint-venture doctrine beyond the *Miranda* context. The Second Circuit has propounded a different test, which it has applied in the Fourth Amendment context, for whether cooperation with foreign officials may implicate Constitutional restrictions.  Under this test, "constitutional requirements may attach in two situations: (1) where the conduct of foreign law enforcement officials rendered them agents, or virtual agents, of United States law enforcement officials; or (2) where the cooperation between the United States and foreign law enforcement agencies is designed to evade constitutional requirements applicable to American officials."  *United States v. Getto*, 729 F.3d 221, 230 (2d Cir. 2013), *citing United States v. Lee*, 723 F.3d 134, 140 (2d Cir. 2013).  In specifically declining to adopt the joint venture doctrine in the context of the Fourth Amendment, the Second Circuit noted:

> As we have explained above, the purpose of the Fourth Amendment's exclusionary rule is to inculcate a respect for the Constitution in the police of our own nation. This purpose of deterrence is not served in instances where American law enforcement officers, not intentionally seeking to evade our Constitution, participate in a so-called joint venture but do not direct or otherwise control the investigation. We, therefore, decide again not to adopt the joint venture doctrine and, instead, reaffirm the longstanding principles of "virtual agency" and intentional constitutional evasion described in this opinion as the applicable analytic rubric to determine whether cooperation with foreign law enforcement officials may implicate constitutional restrictions.

---

[11] The government is aware of only one case to date that involved a motion to dismiss under *Arizona v. Youngblood*, 488 U.S. 51 (1988), on which the defendant relies here, and a claim of joint venture.  In *United States v. Archibold-Manner*, Judge Lamberth assumed, without deciding, that a joint venture existed between U.S. and Colombian officials at the time of an alleged destruction of cocaine, but nonetheless declined to dismiss the case, finding no bad faith.  577 F. Supp. 2d 288, 289 (D.D.C. 2008).  Judge Lamberth conducted no analysis of whether the joint venture in fact applied, relying instead on his finding that the government had not acted in bad faith and that there was no evidence that the cocaine allegedly destroyed would have been exculpatory. *Id.*

*Getto*, 729 F.3d at 233 (cleaned up).

The Second Circuit's logic applies with even greater force in the context of the defendant's claim involving the loss or destruction of evidence under *Arizona v. Youngblood*, 488 U.S. 51 (1988), which requires a showing of bad faith to succeed. As explained in greater detail *infra*, the analysis of whether the police acted in good faith depends in large part, if not entirely, on whether the police knew of the potential exculpatory value of the evidence at the time of its loss or destruction. *See, e.g.*, *Youngblood*, 488 U.S. at 56, n.*. A requirement that would impose this level of knowledge on foreign officials—who, in the absence of being "virtual agents" would lack the knowledge of the entirety of the case and American legal procedure to make that judgment—would serve no purpose in ensuring that U.S. law enforcement follows Constitutional requirements, unless the defense demonstrates that the relationship with foreign law enforcement was *designed* to evade Constitutional requirements. *See Getto*, 729 F.3d at 230 (emphasis added). The defense has not even alleged as much, much less made the requisite showing. As such, the defendant's motion should be denied.

> 2. <u>There is no joint venture between the United States and Libya.</u>

Even if the joint venture doctrine applied here, the defendant has failed to establish that there was a joint venture between the U.S. and Libya (via Scotland)[12] at the time of the alleged destruction of the recording. The defense has proffered nothing that would establish coordination and direction by the U.S. authorities of the Libyan authorities, at the time of the defendant's statement or at any point since. *Straker* is instructive. There, the D.C. Circuit considered and

---

[12] The defense baldly states, without further explanation or argument, that "the United States and Scotland are cooperating such that the actions of Scottish authorities are equally constrained by the U.S. Constitution." ECF 249 at 28. The government disagrees, but the Court need not decide that issue, as the inquiry raised by the defendant's motion is whether the United States was in a joint venture with *Libya*, not with Scotland.

17

rejected an argument that cooperation between U.S. and Trinidadian authorities, which included (1) an exchange of information between those authorities; (2) Trinidadian police aiding the FBI in securing an interview of a cooperating witness; (3) joint trips to crime scenes and FBI forensic assistance to the Trinidadian authorities; and (4) a joint interview conducted by the two agencies, rose to the level of a joint venture. *Straker*, 800 F.3d at 615-16.  In finding no joint venture, the D.C. Circuit relied on the lack of coordination and direction of the Trinidadian investigation by the FBI and the fact that what assistance the FBI did provide was limited in time and scope and served its own investigative efforts. *Id.* at 616.

Similarly, the Fourth Circuit's decision in *Abu-Ali* demonstrates how high a bar the defendant must clear to demonstrate that a joint venture exists.  There, the Saudi authorities "allowed United States law enforcement officers to propose questions to be asked of the defendant," and the Saudi authorities actually asked six of the questions posed by the FBI, though they declined to ask the majority of the questions posed. *Abu-Ali*, 528 F.3d at 228.  FBI and Secret Service agents were permitted to observe Abu-Ali's interrogation live through a one-way mirror, and a Saudi official consulted with the U.S. agents who observed the interview at its conclusion. *Id.*  The Fourth Circuit noted that "coordination and direction" of an investigation or interrogation would constitute a joint venture, but mere presence would not. *Id.*

The level of coordination and direction between U.S. and Libyan authorities is dramatically lower than the coordination at issue in *Straker* and *Abu-Ali*, where no joint ventures were found. The U.S. government did not request that the statement be taken, was not present at its taking, suggested no questions that should be asked, and only become aware of the existence of the statement more than three years after it was taken.  It then only became aware of an attempt to record that statement in the spring of 2024, approximately 12 years after the attempt to record

itself.  If this were truly a joint venture involving "coordination and direction," *Straker*, 800 F.3d at 616, of the Libyan authorities by their U.S. counterparts, why would Libya hold onto the statement for three years after it was taken? Why would the attempted recording only come to light in 2024?

The straightforward answer is that there was no joint venture.[13]  That simple fact is illustrated by the timeline upon which the defendant relies.  *See generally* ECF 352-3.  █████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[13] Indeed, the defense has implicitly conceded as much.  In the context of the defendant's motion to suppress statements—where the doctrine would require *Miranda* warnings prior to a custodial statement if the U.S. were in a joint venture with Libya (which it was and is not), the defendant has not alleged that there was a joint venture, nor has he moved to suppress his statements for any alleged failure to provide *Miranda* warnings.  At the hearing on that motion, the defense specifically agreed at argument that *Miranda* does not apply.  Feb. 12, 2026, Hr'g Tr. (p.m.) at 6, lines 8-11.



The defendant's supplement references multiple meetings between the U.S., Scottish, and Libyan authorities occurring between 2013 and 2018.[14] What the supplement describes is routine information sharing between foreign governments, precisely the type of coordination that the D.C. Circuit specifically decided did not establish a joint venture. *See Straker*, 800 F.3d at 616 ("[I]solated incidents of routine cooperation between the Trinidadian police and the FBI do not amount to the type of closely coordinated investigative effort that would trigger the joint venture doctrine").[15] What the defendant has not proffered—and what he cannot proffer because it did not happen—is any substantial participation of U.S. law enforcement in evidence gathering within Libya, such as witness interviews, between 2011 and 2022, when the U.S. took custody of the

---

[15] The defendant provides not a scintilla of support for his allegation that

defendant. To cite a few examples, there was no U.S. participation in the taking of the defendant's statement or input on how to document or preserve it. Agents were not invited to have access to Libyan investigative files.



The Officer testified that he was instructed to interview the defendant and other ESO operatives to obtain information about the 1992 crash of Libyan Arab Airways Flight 1103, as well as to determine whether they took any action against the revolution that ousted Qaddafi. *See* Depo. Tr. Vol. I at 43. There is no evidence that Libyan officials initiated their investigation into the crash of Libyan Arab Airways Flight 1103 at the behest of U.S. authorities,

There was no U.S. participation in the Officer's interview, and the U.S. government was not even made aware of its existence until some three years after it was taken. The defendant has proffered no facts on which the Court could find a joint venture between the United States and Libya under the standards announced in *Straker*, *Abu-Ali*, or any other case of which the government is aware.[17]

---

[17] The few cases that have found a joint venture have involved incredibly detailed participation by U.S. authorities. For example, in *United States v. Emery*, the DEA agents alerted their Mexican counterparts of possible activity, coordinated surveillance at an airport, supplied a pilot for the operation, and gave the signal that instigated arrest. 591 F.2d 1266, 1268 (9th Cir. 1978). In *United States v. Peterson*, the DEA was "involved daily in translating and decoding intercepted transmissions, as well as advising the Philippine authorities of their relevance." 812 F.2d 486, 490 (9th Cir. 1987). Here by stark contrast, what the defendant proffers constitutes a

Lacking facts to proffer, the defendant resorts to conjecture. *See* ECF 249 at 29. The defense notes that the Libyan Officer was instructed to interview the defendant, but it omits the reason (which was a plane crash within Libya and then-recent actions taken within Libya). The defense argues that the statement the officer produced was "*exactly* what the United States wanted: wholly inculpatory, crystal clear, and seemingly conclusive as to *multiple* ongoing investigations that had stumped the international community for decades." *Id.* (emphasis in original). The upshot of the defendant's argument seems to be that the Libyan government, seeking to curry favor with the United States, produced the defendant's statement out of whole cloth to put an end to multiple ongoing investigations that had stumped the international community for decades. *See* ECF 253-2 at 29.[18] This unsupported analysis is belied by the record. If the Libyan government was intent on providing the United States with a ready-made response to its request, one would have expected that response to include information regarding, ███████████████████████████

███████████████████████████████████ One would not expect the response to have included an aborted assassination attempt about which the United States had not requested information, nor would one expect it to include information about training Ghanaians and operations in Saudi Arabia or Addis Ababa. What Libya provided, however, was

---

joint venture is the government's passive receipt of a statement over three years after it was taken, and its subsequent interviews of the officer who took that statement. That does not a joint venture make. *See, e.g., United States v. Frank*, 599 F.3d 1221, 1229 (11th Cir. 2010) (no joint venture where "American officials did not know of Frank's presence in Cambodia until after he was arrested and did not participate in Frank's detention or interrogation").

[18] The defense does not even offer conjecture as to why the Libyan government then held onto that statement for three years. Additionally, in arguing that the statements produced by the Officer freed "stumped" Western authorities, the defendant does not address the fact that many of the topics covered in the statements taken by the Police Officer had already resulted in trials and verdicts: Scotland held a trial related to Pan Am Flight 103; Germany held a trial related to the bombing of the La Belle Discotheque; and ██████████████████████ ██

in fact the statements contained within Government's Exhibits 500 and 500t that included information about the attempted assassination in Pakistan, about Saudi Arabia and Addis Ababa, and about the Libyan revolution and other operations that have nothing to do with the United States or Scotland. The statements provided did not contain a word about ███████████████████ ███. The only logical conclusion from this record is that the United States was not directing Libyan law enforcement, as required to establish a joint venture under *Straker*, 800 F.3d at 616; *Abu-Ali*, 528 F.3d at 229.

Even if the 2011 MLAT request and subsequent coordination meetings had indeed caused the Libyan government to ask the Officer to interview the defendant about a Libyan plane crash and the 2011 revolution, that would not establish a joint venture for multiple reasons. Foreign officials' execution of a U.S. MLAT request generally does not establish that the U.S. officials directed the foreign officials such that U.S. constitutional provisions attach to the actions of the foreign officials. *See United States v. Getto*, 729 F.3d 221, 232 (2d Cir. 2013) ("[D]efendant's argument that the [Israeli authorities] would not have investigated defendant but for the MLAT request, even if true, does not bear upon whether American law enforcement directed the subsequent investigation in Israel").

No subsequent requests of the Libyan government, nor interviews of the Officer, establish that a joint venture existed at any point, let alone between 2012 and the present. ██████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████

██████████ These standard requests do not establish a joint venture. *See id.* Nor does any subsequent contact between U.S. Authorities and the Officer. The defense claims, "after the provision of the written statement to the United States, the relationship deepened, to the point

where the interrogator began working directly with U.S. prosecutors and law enforcement." ECF 249 at 29. That grossly overstates the government's contact with the witness, which is consistent with the level of contact the government would have with an important fact witness. The government first met with Officer in 2020, some eight years after he took the statement (and thus after any loss or destruction is likely to have occurred), and that meeting was pursuant to a Scottish, rather than an American request. Following that meeting, the United States did not meet in person with the Officer until spring 2023, after the defendant was in U.S. custody. The government later met with him once more in 2023, four times in 2024 (one of which was to retrieve the phone he voluntarily provided to the FBI), and once in 2025. *See generally* Feb. 11, 2026, Hr'g. Tr. (a.m.) at 148-197 & Officer Depo., Vol. IV., at 12 (noting date of meeting with defense team). This frequency of meetings is consistent with conducting trial preparations for a significant fact witness, which does not create a joint venture.

3. <u>The defendant has not demonstrated bad faith in the alleged loss of the recording.</u>

Even if the actions of Libyan law enforcement are attributable to the government – and for the reasons stated above, they are not – the defendant has not come close to meeting his burden to establish bad faith in any loss of video evidence. "To make out a claim that the destruction of evidence violated the Due Process Clause, 'the *defendant* bears the burden of proving that the government failed *in bad faith* to preserve *material* and *potentially exculpatory* evidence.'" *United States v. Burnett*, 727 F.3d 1108, 1116 (D.C. Cir 2016) (quoting *United States v. McKie*, 951 F.2d 399, 403 (D.C. Cir. 1991)) (emphasis in original). "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Arizona v. Youngblood*, 488 U.S. 51, 56, n.*.

The potentially exculpatory nature of any video recording would not be readily apparent to the Officer, who is unfamiliar with the U.S. legal system or its requirements.[19] His understanding of Libyan law – the legal system in which he operates – was that the video would not be accepted as evidence. The Officer testified that he did not seek to stop the interview when the phone ran out of battery because a charger was not available. "At that time," he explained, he was not interested in the recording "[b]ecause it cannot be used as evidence in a trial [in Libya]." Depo. Tr. Vol. II at 55. The defense has not contested the Officer's testimony that an unauthorized recording would be unavailable in Libya. Following his attempts to record the interview of the defendant, the Officer placed the phone in the safe at his home. Depo. Tr. Vol. II at 56. He did so within months of recording the interview, which would likely be late 2012 or early 2013. A dozen or so years later, he volunteered to the FBI that he had attempted to record the interview, and he later provided the FBI with the phone and a consent to search it. *See* Feb. 11, 2026, Hr'g Tr. (a.m.) at 166, 173, 177-78.

The timeline surrounding the SD inserted in the phone is admittedly less clear. It is clear that the SD card was at some point removed from the phone, as when the FBI received it there was no SD card in it. *See id.* at 181. ████████████████████████████████████

████████████████████████████████████

---

[19] The government does not agree that the video would have exculpatory value. Indeed, the government fully expects that the video would corroborate the Officer's testimony, and any loss thereof is more detrimental to the government than the defendant. Nonetheless, for purposes of this argument, the government assumes *arguendo* that any loss of the recording is properly analyzed under *Youngblood*.

[20] The Officer testified that "as far as [he] remembered," he kept it in the phone, Depo. Tr. Vol. II at 56, and that he "[didn't] recall if [he] had taken it out to put it away on its own or not." Depo Tr. Vol. V at 10. He continued to clarify that he "may have" taken the SD card out of the phone because he was scared about losing the phone. *Id.* This lack of memory about such a specific detail nearly 14 years later is not surprising.

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████  *see also*

Feb. 11, 2026, Hr'g Tr. at 182 (SSA Tunstall testifying that the Officer looked for SD cards and was not able to find any).

When the FBI conducted a forensic search of the phone, it found no evidence that any files, including those that may have been on removable media, were deleted.  Feb. 11, 2026, Hr'g Tr. at 181.  It also found no evidence of any file that would appear to be an interview file.  *Id.* at 181-82.

Nothing in this timeline remotely establishes bad faith.  The Officer's decisions must be viewed through two lenses: one regarding Libyan law and legal procedure, and the other regarding the conditions as they existed in Libya from 2012-14.  Turning first to Libyan legal procedure, the Officer's uncontradicted testimony is that (1) any recording he made would not be admissible in Libyan courts, and (2) as a result, he was more concerned with the written product.  For example:

Q. Did you realize your phone had run out of batteries?
A. Yes. The phone stopped working.
Q. Did you go try to get a charger and charge it up?
A. No.
Q. Why not?
A. A charger was not available. And at that time, I wasn't really that interested in the recording.
Q. Why weren't you interested in the recording?
A. Because it cannot be used as evidence in a trial.

Depo Tr. Vol. II at 55.

The defendant – who bears the burden to establish bad faith – has not proffered that the Officer had any awareness of the potential value of a video recording to the U.S. legal system prior to the spring of 2024.  Despite averring in his motions papers that the fact that a recording was

26

made at all "suggests that the interrogator, *before the interrogation began*, considered the preservation of the non-verbal and non-transcribable aspects of the interrogation to be important," ECF 253-2 at 24-25 (emphasis added), the defendant did not attempt to develop any testimony in that regard on cross-examination of the Officer.  *See generally* Depo Tr. (Vol. III, IV, and V).  The Officer's uncontradicted testimony establishes that his decision to record was a spontaneous one and that he treated the written product as the official record.  *See*, *e.g.*, Depo. Tr. Vol. II at 53 (the decision to record was spontaneous and the video would not be accepted as evidence in a Libyan court).  Given Libyan legal procedure, and the Officer's ignorance of American procedure at the time, the defendant has failed to demonstrate bad faith.

Moreover, there is no evidence that, if the Officer had given any copy of the video to his superiors (as the defense implies he should have done, *see* ECF 253-2 at 25), that the video would still exist.  As the Officer testified, he did not know if he could trust those around the Minister, given the political environment in Libyan from 2012-14 to safeguard the written statement.  *See* Depo Day 1 Vol. II at 77.  That logic would apply to even greater force with a video of a former Qaddafi regime official admitting to terrorist attacks, especially one taken in violation of Libyan procedure that would be inadmissible in court.  Given the video's inadmissibility in Libyan court, there is no guarantee it would still exist if the Officer had given it to the Libyan prosecutor along with the written interview.[21]

---

[21] The defense calls the existence of the written interview "the most damning indication of bad faith."  ECF 253-2 at 27.  This is curious.  Far from being "controlled and manipulable," *id.*, it represents evidence that the government must present through a witness, just like any other written recitation that courts routinely accept as evidence.  The defense has produced not a scintilla of evidence that the statement was manipulated, nor that its contents fail to accurately record the defendant's words.  He has similarly failed to produce any evidence to substantiate his bald claim that the original version of the statement could undermine the Police Officer's version of events. *See* ECF 253-2 at 30.

Lest there be any doubt, had the Officer not told the government about his attempt to record the defendant's interview, the government would likely have had no reason to look for any such recording. The Officer's affirmative volunteering of that information, without any prompting, and his later agreement to provide the phone and to consent to a search of that phone are strong evidence that he did not act in bad faith. *See United States v. Taylor*, 312 F. Supp. 3d 170, 177-78 (D.D.C. 2018) (bad faith cannot be inferred from the government's failure to document potentially exculpatory evidence where the only reason the parties knew of the potentially exculpatory value was from other evidence that the police did preserve).[22]

---

[22] The outlier facts of *United States v. Zaragoza-Moreira*, 780 F.3d 971 (9th Cir. 2015), on which the defendant relies, are not analogous. There, an agent, interviewing a suspect who had just crossed the border with drugs, learned in the course of that interview that the defendant was claiming she had done so under duress. The defendant specific statements regarding actions she took while in line that she said corroborated her claim of duress. *Id.* at 975-76. The agent did not review or preserve any surveillance video from the border crossing. The agent later wrote a probable cause statement that referenced the defendant's admissions, but not the facts that could lead to a duress defense. *Id.* at 976. After the arrest, but before the video was routinely overwritten, defense counsel requested that the U.S. Attorney's Office preserve all video evidence relating to the arrest. *Id.* Only after the court granted a motion to compel did the USAO request a copy of the video from U.S. Customs and Border Protection, at which point the footage had already been routinely overwritten. *Id.* at 976-77. The agent's testimony at the hearing established that she understood that the defendant's statements could support a defense of duress, that she had a duty to collect both inculpatory and exculpatory evidence, and that she knew that the border crossing at issue was under constant surveillance. *Id.* at 980. By contrast, there is no indication that the Officer had any reason to believe that the defendant would claim coercion in a U.S. court over a dozen years after his statement, or that he knew what the value of that video would be under U.S. law prior to 2024. There was no preservation request, and once the officer alerted U.S. law enforcement to the fact that he tried to record the statement, both he and U.S. law enforcement acted as swiftly as possible to determine whether a video existed and, if so, to preserve it. A closer analogue is *United States v. Kennedy*, 720 Fed. Appx. 104, 108-09 (3d Cir. 2017) (unpub). There, officers inadvertently lost dash cam footage, attempted to recover it, and were unsuccessful. The Third Circuit noted that even if the officers failed to follow procedure and did not try hard enough to recover the footage, "such errors are not equivalent to an action taken to gain a tactical advantage over the defendant," and held that the defendant's due process rights were not violated. *Id.* at 109.

4.  <u>The defendant has not demonstrated bad faith in the alleged loss of any other evidence.</u>

The defendant's other claims of evidence destruction merit only brief treatment.  The defendant claims that the alleged loss of evidence regarding explosives originating in Senegal and Germany "bear mention."  ECF 253-2 at 30.[23]  The defendant has not alleged, let alone substantiated, that the United States was in a joint venture with either Germany or Senegal.  As such, even under the defendant's rubric, the actions of neither government can support dismissal of the indictment on due process grounds.  Even if he had, the incidents to which he cites neither establish, nor contribute to, a finding of bad-faith destruction of evidence.

With respect to Senegal,



---

[23] It is unclear from the defendant's papers why he believes these incidents "bear mention." He does not, for example, ask the Court to dismiss the indictment because of the alleged loss of German and Senegalese evidence.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████ *See,*

*e.g., United States v. Burnett*, 827 F.3d 1108, 1116 (D.C. Cir. 2016) (no bad faith destruction of evidence where state authorities destroyed drugs that were at issue in a federal prosecution after dismissal of state charges).

The defendant claims that the German authorities destroyed materials seized in connection with the "Autumn Leaves" raid, which occurred in October 1988 in West Germany. That raid, which resulted in the seizure of at least one improvised explosive device triggered by a barometric switch and housed within Toshiba Bombeat radio-cassette recorder[25], resulted in the arrest of multiple Palestinians affiliated with a terror cell. Many of those arrested were later tried in Germany. The United States has provided extensive discovery materials to the defendant about that raid. ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████
███████████████████████

[25] This model was of a different variety than the RT-SF16 later found to have housed the bomb that brought down Pan Am Flight 103.



Those items are still maintained as evidence, *see* Sensitive-USAO-00112306 at 20-23, and the defense has made no request to examine them.  The defendant cannot establish bad faith where he has not even attempted to examine the items that are in fact available to him.

31

**CONCLUSION**

For the above reasons, the defendant's motion should be denied.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:    */s/ Erik M. Kenerson*

ERIK M. KENERSON (OH Bar No. 82960)
BRITTANY KEIL (D.C. Bar No. 500054)
CONOR MULROE (NY Bar No. 5289640)
Assistant United States Attorneys
JEROME J. TERESINSKI (PA Bar No. 66235)
Special Assistant United States Attorney
601 D Street NW, Washington, D.C. 20530
(202) 252-7201 // Erik.Kenerson@usdoj.gov

KATHLEEN CAMPBELL (MD Bar No. 9812170031)
JENNIFER BURKE (MD Bar No. 9706250061)
Trial Attorneys, Counter Terrorism Section
National Security Division
950 Pennsylvania Avenue NW, Washington, D.C. 20530