**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 22-cr-392 (DLF)** |
| | : | |
| **ABU AGILA MOHAMMAD** | : | |
| **MAS'UD KHEIR AL-MARIMI,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SUPPLEMENT IN SUPPORT OF**
**MOTIONS *IN LIMINE* TO PERMIT RULE 404(b) EVIDENCE AND**
**FOR RULINGS ON HEARSAY EXCEPTIONS**

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, respectfully submits this supplemental brief in support of its motions *in*

*limine* regarding the bombing of the La Belle Discotheque [ECF 147].

Attached to this pleading, the government is submitting a declaration from a former

employee of the official German government archives from which the records at issue came. *See*

Ex. 1 (the "Archives Declaration"). The Archives Declaration further supports the reliability of the

government's proffered exhibits and addresses questions and concerns raised by the Court during

the status conference on November 12, 2025. This pleading also offers additional legal argument

in support of the exhibits' admissibility. Finally, this filing provides an additional proposed exhibit

that the government obtained after the original motion *in limine* was filed.

\*        \*        \*

**TABLE OF CONTENTS**

**FACTS**................................................................................................................................**3**

      A.    The Hotel Report, from the "Rinde" file. ............................................................... 4

      B.    The Visitors List, from the "Box" file.................................................................. 5

      C.    The Newly Obtained Flight Record. ...................................................................... 7

**ARGUMENT**.....................................................................................................................**7**

      A.    The Exhibits are Admissible as Ancient Documents. ............................................ 7

          1.    The Visitors List.................................................................................... 8

          2.    The Hotel Report................................................................................... 10

          3.    The Flight Record. ............................................................................... 12

      B.    The Exhibits are Admissible as Public Records .................................................... 12

      C.    The Exhibits are Admissible under the Residual Exception................................. 14

          1.    Background principles. ......................................................................... 14

          2.    The proposed exhibits are reliable. ...................................................... 17

               a.    The documents were made close in time to the relevant facts. ..................... 18

              b.    The documents are highly specific................................................................. 19

               c.    The documents are corroborated. .................................................................. 19

              d.    The documents are consistent with each other. ........................................... 21

               e.    The documents establish a binary proposition. ............................................ 22

               f.    The documents' authors had no reason to lie. .............................................. 22

               g.    The documents' authors had no ability to fabricate the relevant information. ................................................................................... 23

              h.    There is no basis to infer unreliability. ......................................................... 23

           3.    There is no substitute for the exhibits. ............................................... 24

           4.    This is an exceptional case.................................................................... 25

**CONCLUSION** ....................................................................................................... **27**

**FACTS**

The government has previously argued that the authenticity of the proposed Stasi exhibits is established because the documents came from a place where, if authentic, they would likely be: namely, the German government's official archive of Stasi records. *See* ECF 182 at 11-12. Those arguments are now fully substantiated by the Archives Declaration, which was executed by an employee who began working at the Archives in the year of their founding and remained there for approximately 32 years, most of that time in a supervisory role. *See* Archives Decl. at ¶¶ 3-4.[1]

Among other points relevant to this motion, the Archives Declaration establishes that each of the proposed exhibits is an authentic document from the German government's official archive of the Stasi files. *See id.* ¶¶ 15, 18-20. That conclusion is doubly supported: first by the distinctive appearance of the documents, and also by the "BSTU" stamp that appears on each page. *See id.* ¶ 15.[2] The documents' provenance from the Archives assures that they are authentic Stasi documents because of the Archives' strict procedures designed to safeguard the integrity of the documents. *See id.* ¶ 12. Indeed, the declarant considers it virtually impossible that a document from the archives would be a fabrication. *See id.* ¶ 22. This level of rigor is necessary for the archives to serve their purposes, which include supplying evidence for use in German criminal cases, *id.* ¶ 13, including prosecutions of former Stasi employees whose activities are documented in the files, *id.* ¶ 9.

---

[1] The author of the Archives Declaration is not willing to travel to the United States to testify at trial. However, the government has identified a similarly qualified employee of the archives who is willing to appear and whom we anticipate calling as a trial witness to testify to the same facts.

[2] The government also proffers that it received the documents from the German governments pursuant to a Mutual Legal Assistance request, accompanied by cover letters from the Archives.

The Archives Declaration also establishes important facts about the operations of the Stasi themselves. Rather than an ordinary police force, the Stasi were an intelligence agency that collected information about East German citizens and foreigners for intelligence purposes. *Id.* ¶ 6. Consistent with that function, the Stasi considered it important that the information in their extensive files be correct, since intelligence is only valuable if it can be relied upon as accurate. *Id.* ¶ 7. In gathering this intelligence, the Stasi routinely obtained information and documents from other parts of the East German government and from businesses. *Id.* ¶ 8.

The Archives Declaration also provides information about the specific documents the government is offering. In particular:

### A. The Hotel Report, from the "Rinde" file.

The government has previously submitted its proposed Exhibit 608, a document we refer to as the "Hotel Report," which establishes that the defendant and his traveling companion Abdulhakim Shadi were guests at the Metropol hotel in East Berlin from April 4-5, 1986. *See generally* ECF 147 at 22-23.

As the Archives Declaration explains, the Hotel Report was ***not*** generated as part of an investigation of the defendant or of the La Belle bombing. Instead, it was part of a file called "Rinde" – an "*Operative Personen Kontrolle*," or "OPK" file, documenting the Stasi's surveillance of a suspected Syrian intelligence operative. Archives Decl. at ¶ 15. Although investigative in nature, this OPK did not have any criminal justice purpose; its goals were entirely oriented to intelligence-gathering and the prevention of acts that would discredit the East German government. *Id.*; *see also* Ex. 605-t6 (linguist's translation of page from "Rinde" file describing objectives). Consistent with that purpose, the OPK ultimately resulted not in any criminal charges but in a travel ban that prevented the target from reentering the country. Archives Decl. ¶ 15; *see also* Ex.

605-t7 ("[A]n exploitation of extremist forces in the GDR was eliminated. A travel ban was initiated for 'Rinde.'").

Within the 243-page file on the Syrian operative, there is a passing reference to the defendant's and Shadi's residence in the Hotel Metropol from April 5-6, 1986. The file does not otherwise document any surveillance of the defendant and Shadi; this piece of information appears to have been recorded incidentally in the course of investigating the suspected Syrian operative. The Archives Declaration deems it reasonable to conclude that this information came "directly from the hotel's registration cards," Archives Decl. ¶ 17, which cards were filled out by hotel guests and kept in the routine course of the hotel's business, *id.* ¶ 16. Notably, the Archives Declaration's conclusion about the source of the information, based on the declarant's extensive experience reviewing the archived records of the Stasi, is the same as that of the Hotel Report's author, who "no longer ha[d] a memory" of writing the report but was "confident that th[e] information would have come from the hotel's registration cards and/or copies of the guest's passports." Ex. 608-c.

## B. The Visitors List, from the "Box" file.

The government has also previously submitted its proposed Exhibit 603, a document we call the "Visitors List," which establishes that visas were sought to allow the defendant and Shadi to enter East Germany in April of 1986. *See generally* ECF at 20-22.

The Visitors List came from a different Stasi file, codenamed "Box." Unlike "Rinde," "Box" did relate to the bombing of La Belle and Libya's suspected involvement in the attack. But "Box" is like "Rinde" in that it was compiled for intelligence purposes and intended for internal use, rather than to support a possible criminal prosecution. As the Archives Declaration notes, the Stasi were not the ordinary criminal law enforcement agency of East Germany; there was a separate police force for that. Ex. 1 at ¶ 6. Moreover, the La Belle attack took place outside the

territory of East Germany, so even the normal East German police would not ordinarily investigate it as a criminal offense. *See id.* ¶ 21.

The contents of the "Box" file make further clear that it was not compiled for anything like a law-enforcement purpose. On page 52, according to machine translation, the file observes that "[i]t is beyond doubt that members of the Libyan People's Bureau prepared terrorist attacks in West Berlin" and that similar activities "cannot be ruled out in the future," which "continues to pose a risk of political discrediting the GDR." Page 53 states that the Stasi were to "mobilize all operational resources to clarifying the actual background of the attack" and develop "measures to curb the activities of those involved in planning terrorist attacks." In other words, the Stasi's goal in investigating La Belle was not to punish the perpetrators but to prevent them from carrying out future attacks in West Berlin, for the self-interested purpose of preventing political embarrassment.

Like with the Hotel Report, the source of the information in the Visitor's List is known. The Archives Declaration explains that the list was compiled by summarizing the details of visa requests, an example of which (previously submitted as Ex. 604) was shown to contain the name, passport number, and other identifying information for the person whose entry to the country was being sought. *See* Archives Decl. ¶ 18-19. This conclusion echoes that of two Stasi officers who worked in the relevant department. *See* Ex. 603-c ¶¶ 4-5 ("Based on my experience, I know that this [the Visitors List] was compiled from visa requests like [the Abulgasem visa request]… I am confident that each of the other entries on the list was similarly based on the original visa requests from the government of Libya (or photocopies of those requests). The Ministry of State Security took great care to accurately record information in documents like these."); Ex. 603-c2 603-c ¶¶ 4-5 (same).

### C. The Newly Obtained Flight Record.

The German authorities recently identified and provided an additional document establishing the defendant's presence in East Germany in April of 1986. The document, which the government will submit to the Court and counsel via email, and which is referred to herein as the "Flight Record," appears to be a passenger list for flights on April 23, 1986 including the route "SXFTIP," that is, from Berlin Schönefeld Airport (code SXF), the main airport of East Germany, to Tripoli (code TIP). The passenger list contains the names "ABOAGILA/MR" and "ABDULHAKIM/MR." *See* Ex. 611. This document corroborates the defendant's statement that, after traveling to Berlin with Abdulhakim Shadi, he "remained in Germany for approximately two weeks" after the bombing. (The flight to Tripoli on April 23 was approximately eighteen days after the bombing on April 5).

ARGUMENT

### A. The Exhibits are Admissible as Ancient Documents.

Federal Rule of Evidence 901(8) provides that an ancient document can be proven authentic by "evidence that it: (A) is in a condition that creates no suspicion about its authenticity; (B) was in a place where, if authentic, it would likely be; and (C) is at least 20 years old when offered." All those criteria are met for each of the three proposed exhibits, especially in light of the Archive Declaration and the anticipated trial testimony that will mirror it. The documents are more than 20 years old, and they came from exactly the place where one would expect to find old Stasi documents. Moreover, nothing about the documents supports any suspicion about their authenticity; indeed, given the safeguards in place at the archives, the documents' authenticity is assured. *See* Ex. 1 ¶ 22 ("I have never heard of a fabricated document being placed into the Archives, and I do not see how this could possibly happen given the security measures that are in place.").

7

The defense has argued that the exhibits are not admissible under the ancient documents rule because they include multiple layers of hearsay. *See* ECF 174 at 23-24. This argument should be rejected because the statements in the ancient documents are each based on non-hearsay or, in the alternative, statements that are exempt from the rule against hearsay. In particular:

1. The Visitors List

As discussed above, the Visitors List is a compilation of information from visa requests sent by Libya to East Germany, one of which is available as Ex. 604. That example shows that the visa requests were standard pre-printed forms where blanks would be filled in with the applicant's name and other information:

*Portion of Ex. 604*

The People's Office of the Socialist People's Libyan Arab Jamahiriya in the German Democratic Republic expresses its respect to the Consular Section of the Ministry of Foreign Affairs of the German Democratic Republic and transmits the passport of Mr. [Handwritten] MUSBAH OMAR ABULGASEM
Born in.................... TRIPOLI .......... on ........ 1957 ......
Passport no.: 180940 ....................
Issued in ... TRIPOLI .........................
On........ 9/3/85 ..............................
The People's Office requests a multiple [entry] visa and stay(s) from: ...... 4/11/86 ...............
until ...... 5/10/86 ...............

*Portion of Ex. 604-t*
*(linguist translation)*

The visa requests that underlay the Visitors List are not hearsay. To begin, they are not assertions of a fact. According to a translation by a qualified linguist, the German text on the document conveys the "utmost respect" of the Libyan government to the Consular Section of the Ministry of Foreign Affairs of the German Democratic Republic and states, "The People's Office requests a multiple [entry] visa and stay(s)" with a certain start and end date. Out-of-court statements that are "more in the nature of… a request" are "to a large degree,… not even capable

of being true or false," and are therefore "not hearsay." *United States v. Rivera*, 780 F.3d 1084, 1092 (11th Cir. 2015) (quoting *United States v. Cruz*, 805 F.2d 1464, 1478 (11th Cir. 1986)). *See also, e.g.*, *United States v. Safavian*, 435 F. Supp. 2d 36, 44 (D.D.C. 2006) (emails "seeking assistance and favors" were not hearsay); *United States v. Long*, 905 F.2d 1572, 1580 (D.C. Cir. 1990) (call to drug suspect's telephone asking if he "still had any stuff" and requesting "a fifty" were "nonassertive" and therefore not hearsay).

Even if the visa applications were considered to be asserting some fact, they would still be definitionally non-hearsay because they were made by the defendant's coconspirator(s) in the Libyan government during and in furtherance of a conspiracy. *See* Fed. R. Evid. 801(d)(2)(E). As the defendant's statement establishes, he was sent to Berlin on an operational mission for the Libyan government. The visa request by his government was necessary to gain him access to East Berlin and was therefore essential to the success of that mission. "[C]o-conspirator statements may be admissible under Rule 801(d)(2)(E) even if the defendant is not formally charged with any conspiracy in the indictment and even if the conspiracy that forms the basis for admitting the co-conspirator statements is not the same conspiracy or the same crime for which the defendant has been indicted." *Safavian*, 435 F. Supp. 2d at 47 (citing *United States v. Ellis*, 156 F.3d 493, 497 (3d Cir. 1998)).

And even if the visa requests were definitionally hearsay, they would be admissible as records of the regularly conducted activities of the East German Foreign Ministry. *See* Fed. R. Evid. 803(6). The Stasi officer's declarations confirm what would otherwise be natural to assume: that "the Foreign Ministry routinely received and retained" visa requests like these "as part of its official duties." Ex. 603-C ¶ 3; Ex. 603-2 ¶ 3. This attestation satisfies Rule 803(6)(B) and (C). The remaining requirement is "the record was made at or near the time by — or from information

transmitted by — someone with knowledge" of the "act, event, condition, opinion, or diagnosis" being documented. Fed. R. Evid. 803(6)(A). Here, the "act [or] event" in question is the visa request itself; it is therefore inherently true that the person creating the document had knowledge of what was being requested and that the document was made close in time with the making of the request. Indeed, applying Rule 803(6)(A) to the visa requests helps demonstrate that they are not hearsay, because the only fact they establish is their own existence. *See* Fed. R. Evid. 801, advisory committee notes ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay.").

Accordingly, the Visitors List involves no inadmissible second-layer hearsay. The first layer is satisfied by the Ancient Documents Rule, and the second layer is admissible as either non-hearsay or a record of regularly conducted activity. It should be admitted as an ancient document.

2. The Hotel Report.

As discussed above, the Hotel Report was based on the hotel's records; specifically, the registration cards that each guest must complete when checking in. *See* Archives Decl. ¶¶ 16-17; Ex. 608-C ¶ 7. Given that the cards are completed by the guests themselves, the defendant's card is his own statement and therefore non-hearsay pursuant to Rule 801(d)(2)(A). Likewise, Shadi's card was Shadi's statement, and therefore admissible as a co-conspirator statement under Rule 801(d)(2)(E).

The registration cards would also qualify as business records under Rule 803(6). At the November 12 hearing, the Court asked if the government had a custodian from the hotel. *See* 11/12/25 Tr. 46. In the months that followed, pursuant to a Mutual Legal Assistance request, the German authorities conducted a search for a qualified witness. A former Deputy Director of the hotel was identified but was later learned to be deceased, and no substitute has been found or appears likely to be found.

10

Regardless, both the Archives Declaration and the declaration from the Stasi author of the Hotel Report, Ex. 608-c, sufficiently establish the necessary foundation under Rule 803(6) to qualify the Metropol's registration cards as business records. "[T]here is no reason why a proper foundation for application of Rule 803(6) cannot be laid, in part or in whole, by the testimony of a government agent or other person outside the organization whose records are sought to be admitted." *United States v. Hathaway*, 798 F.2d 902, 906 (6th Cir. 1986); *see also Zayre Corp. v. S.M. & R. Co., Inc.*, 882 F.2d 1145, 1150 (7th Cir. 1989) (explaining that Rule 803(6)'s phrase "'other qualified witness' is interpreted broadly" and "need not be an employee of the entity" (quoting 4 Weinstein's Evidence ¶ 803(6)[02] (1988))).

Here, both declarants are qualified to provide the necessary foundation. The Stasi officer worked for years writing reports like the Hotel Report, incorporating information from sources that the Stasi deemed reliable. *See* Ex. 608-c ¶ 2. As part of that work he "routinely received" information from the Department responsible for hotels, and became familiar with the hotels' recordkeeping practices. *Id.* ¶ 4. The Archives declarant worked with archival Stasi records for more than 30 years and developed familiarity with the Stasi's "common[]" practice of obtaining records from hotels and other businesses as part of their mass surveillance apparatus. Archives Decl. ¶ 8. Through this deep familiarity with the documentary record, as well as from personal experience filling out registration cards herself, the declarant knows that registration cards were "a routine part of how hotels in the GDR did business" and were completed by guests (who had knowledge of their own identities) at the time of each stay. *Id.* ¶ 16. These facts satisfy the requirements of Rule 803(6).

Accordingly, the Hotel Report involves no inadmissible second-layer hearsay. It should be admitted as an ancient document.

11

### 3.　The Flight Record.

The Flight Record is a primary-source document that does not contain information gleaned from a separate document. It is admissible as an ancient document without any need to analyze additional layers of potential hearsay.

### B.　The Exhibits are Admissible as Public Records

In its original motion, the government argued for the admission of the Hotel Report and Visitors List as public records pursuant to Fed. R. Evid. 803(8). *See* ECF 147 at 25-26. At the November 12 hearing, the Court expressed skepticism about the applicability of the public records exception given the documents' apparent connection to a law enforcement function, and in particular that they seemed to result from "the police investigating a bombing." 11/12/25 Tr. 43, 52. The government understands this concern to be grounded in Fed. R. Evid. 803(8)(A)(ii), which makes the exception unavailable "in a criminal case" for record of "matter[s] observed by law-enforcement personnel" – what we will call the "law-enforcement carveout."

The law-enforcement carveout "is not quite as broad as its wording suggests." *United States v. Fryberg*, 854 F.3d 1126, 1132 (9th Cir. 2017). The purpose of the carveout is "to exclude observations made by officials at the scene of the crime or apprehension, because observations made in an adversarial setting are less reliable than observations made by public officials in other situations." *United States v. Hernandez-Rojas*, 617 F.2d 533, 535 (9th Cir. 1980). *See also United States v. Enterline*, 894 F.2d 287, 290 (8th Cir. 1990) ("It is clear that the exclusion concerns matters observed by the police at the scene of the crime. Such observations are potentially unreliable since they are made in an adversary setting, and are often subjective evaluations of whether a crime was committed."). Consistent with that purpose, courts have ruled the law-enforcement carveout inapplicable to "largely ministerial task[s]" that involve "objective" observations, as opposed to the type of "'subjective observation[ ], summar[y], opinion[,] [or]

12

conclusion[ ] of law enforcement personnel' that Congress intended to exclude from the scope of the public records exception." *Fryberg*, 854 F.3d at 1133 (quoting *United States v. Orellana-Blanco*, 294 F.3d 1143, 1150 (9th Cir. 2002)).

The cases are replete with examples of such "objective" and/or "ministerial" facts that can be admitted as hearsay under Rule 803(8) despite being recorded by law enforcement. *See, e.g.*, *United States v. Dowdell*, 595 F.3d 50, 72 (1st Cir. 2010) (police booking sheet); *Enterline*, 894 F.2d at 290-91 (list of VINs for cars reported stolen); *Fryberg*, 854 F.3d at 1133 (return of service); *United States v. Union Nacional de Trabajadores*, 576 F.2d 388, 391 (1st Cir. 1978) (return of service); *United States v. Hernandez-Rojas*, 617 F.2d 533, 535 (9th Cir. 1980) (warrant of deportation); *United States v. Quezada*, 754 F.2d 1190, 1194 (5th Cir. 1985) (warrant of deportation); *United States v. Orozco*, 590 F.2d 789, 793 (9th Cir. 1979) (record of license plates crossing border); *United States v. Grady*, 544 F.2d 598, 604 (2d Cir. 1976) (report of serial numbers of firearms); *United States v. Phoeun Lang*, 672 F.3d 17, 25 (1st Cir. 2012) (record of naturalization interview); *United States v. Reyes*, 09-cr-10021, 2009 WL 3273896, at *4 (S.D. Fla. Oct. 9, 2009), *aff'd*, 406 Fed. Appx. 405 (11th Cir. 2010) (Coast Guard report of rescue after capsize of vessel under investigation).

Under that well established definition of the law-enforcement carveout, there is no barrier to the admission of the Stasi documents as public records. The facts at issue here – visa requests and hotel residence – are "quintessentially ministerial and non-adversarial" and were recorded by "rote recitation. *United States v. Zarauskas*, 814 F.3d 509, 520 (1st Cir. 2016). Recording these facts is like recording license plate numbers crossing a border: the officers do nothing more than "mechanically register" an "unambiguous factual matter," so the resulting documents are

13

admissible. *United States v. Puente*, 826 F.2d 1415, 1418 (5th Cir. 1987) (quoting *Quezada*, 754 F.2d at 1194).

Fortifying that conclusion, the Stasi were not exercising a law enforcement function when they created the documents at issue. As the Archives Declaration explains, the Stasi "were not primarily a law enforcement agency; instead, they acted as an intelligence agency that collected information about GDR citizens and foreigners for intelligence purposes." Archives Decl. ¶ 6. Gathering accurate intelligence was expressly the purpose of both the "Rinde" file (source of the Hotel Report) and the "Box" file (source of the Visitors List); as discussed above, the objective of both operations was to *prevent* future acts against the GDR rather than to *punish* anyone for acts already committed. The reasoning behind the law-enforcement carveout, consequently, is totally inapplicable here.

Accordingly, and for all the reasons argued in the government's prior pleadings, ECF 147 at 25-26; ECF 182 at 13-14, the exhibits are admissible as public records.

## C. The Exhibits are Admissible under the Residual Exception.

Separate and apart from all the arguments above, the documents are admissible under the residual exception.

### 1. Background principles.

"If they are worth their salt, evidentiary rules are to aid the search for truth." *Dallas Cnty. v. Com. Union Assur. Co.*, 286 F.2d 388, 395 (5th Cir. 1961). That principle is the foundation of the Federal Rules of Evidence, the express purpose of which is "ascertaining the truth and securing a just determination" in the cases where they apply. Fed. R. Evid. 102. To that end, the Rules "should be construed so as to administer every proceeding fairly, eliminate unjustifiable expense and delay, and promote the development of evidence law." *Id.* As courts and commentators have observed, this statement of purpose "establishes flexibility as the theme of the Federal Rules of

Evidence," along with a preference for "general, normative goals above subservience to specific, technical rules." *S.E.C. v. Singer*, 786 F. Supp. 1158, 1166 (S.D.N.Y. 1992) (quoting Jack B. Weinstein & Margaret A. Berger, 1 *Weinstein's Evidence* § 102[01] at 102–6 (1991)); *see also United States v. Carneglia*, 256 F.R.D. 384, 396 (E.D.N.Y. 2009) (same).

These principles bear especially strongly on the law of hearsay. The various enumerated hearsay exceptions are specific and technical, creating a danger in unforeseen cases that (to borrow Weinstein's phasing) a "subservience to specific, technical rules" might supersede the "general, normative goal" of determining the truth.  Indeed, the Rules' authors fully recognized that the hearsay exceptions, "while they reflect the most typical and well recognized exceptions to the hearsay rule, may not encompass every situation in which the reliability and appropriateness of a particular piece of hearsay evidence make clear that it should be heard and considered by the trier of fact." Fed. R. Evid. 803, Advisory Committee Notes.

Accordingly, the Rules include a residual exception, intended "'[t]o provide sufficient flexibility to permit the courts to deal with new and unanticipated situations' and '[t]o facilitate the basic purpose of the Federal Rules of Evidence: truth ascertainment and fair adjudication of controversies.'" *United States v. Arrington*, 634 F. Supp. 3d 57, 66 (W.D.N.Y. 2022) (quoting 5 Weinstein's Federal Evidence § 807.02 [1] (2022)). Or, as some courts have put it, to free the law of hearsay from the "straightjacket" that would otherwise constrain it. *United States v. Clarke*, 2 F.3d 81, 84 (4th Cir. 1993) (quoting *In re Japanese Elec. Prod. Antitrust Litig.*, 723 F.2d 238, 302 (1983)).

In the event the Court found no other basis for admission of the Stasi records, this would be a paradigmatic case for the application of the residual exception. As previously discussed, that exception requires that:

> (1) the statement is supported by sufficient guarantees of trustworthiness--after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and
>
> (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Fed. R. Evid. 807. As the D.C. Circuit has put it, these requirements limit the residual exception to evidence that is "very important and very reliable." *United States v. Washington*, 106 F.3d 983, 1001 (D.C. Cir. 1997). It applies "only in exceptional cases." *United States v. Kim*, 595 F.2d 755, 765 (D.C. Cir. 1979).

The rule's commentary instructs that "a court assessing guarantees of trustworthiness may consider whether the statement is a 'near-miss' of one of the Rule 803 or 804 exceptions."[3] Fed. R. Evid. 807, Committee Notes to 2019 Amendments. For all the reasons argued above, if any of the government's exhibits here were to fall short of admissibility under the enumerated exceptions, it would be a very near miss. In such a case the court "should—in addition to evaluating all relevant guarantees of trustworthiness—take into account the reasons that the hearsay misses the admissibility requirements of the standard exception." *Id.* If the shortcoming were a technical one not bearing heavily on the benchmark question of reliability, then admission under the residual exception would be the necessary way to serve justice and further the jury's search for truth.

District courts enjoy "broad discretion… in assessing the probity and trustworthiness of documents" for purposes of the residual exception. *S.E.C. v. First City Fin. Corp., Ltd.*, 890 F.2d 1215, 1225 (D.C. Cir. 1989) (citing *United States v. Reese*, 561 F.2d 894, 903 n.18 (D.C. Cir.

---

[3] This clarification was necessary because some courts had previously taken the position that "near-miss" statements were ineligible for the residual exception. *See generally, e.g.*, *United States v. Deeb*, 13 F.3d 1532, 1536 (11th Cir. 1994) (discussing and rejecting the so-called "'near-miss argument,' which maintains that a hearsay statement that is close to, but that does not fit precisely into, a recognized hearsay exception is not admissible under [the residual exception]").

1977)). The D.C. Circuit accordingly should not "overturn a trial court's admissibility ruling under the residual hearsay exception absent a definite and firm conviction that the court made a clear error of judgment in the conclusion it reached based upon a weighing of the relevant factors." *United States v. Slatten*, 865 F.3d 767, 805 (D.C. Cir. 2017) (quoting *United States v. North*, 910 F.2d 843, 909 (D.C. Cir. 1990)).

Here, all factors strongly support the exercise of the Court's discretion to admit the exhibits, which are very reliable and very probative of important issues in this exceptional case.

2.  The proposed exhibits are reliable.

As a general matter, the law treats hearsay cautiously because of "four classes of risk peculiar to this kind of evidence: those of (1) insincerity, (2) faulty perception, (3) faulty memory and (4) faulty narration." *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 232 (2d Cir. 1999) (citing *Headley v. Tilghman*, 53 F.3d 472, 477 (2d Cir. 1995); Edmund M. Morgan, *Hearsay Dangers and Application of the Hearsay Concept*, 62 Harv. L. Rev. 177, 185 (1948)). Each of the enumerated hearsay exceptions guards against some, but usually not all, of these dangers; for example, statements of present-sense impression, excepted by Rule 803(1), present no danger of faulty memory but some risk of insincerity and faulty narration. *See generally id.* at 233. "It follows that a hearsay statement need not be free from all four categories of risk to be admitted under" the residual exception, *id.,* although as we will establish below, *none* of the four risks are present here.

When evaluating the reliability of hearsay, "[t]here is no procedural canon against the exercise of common sense." *Dallas Cnty.*, 286 F.2d at 397. Applying that maxim, the Fifth Circuit affirmed the admission of a 58-year-old newspaper article about a fire to prove that the fire had taken place. *Id.* The court explained: "Taking a common sense view of this case, it is inconceivable to us that a newspaper reporter in a small town would report there was a fire in the dome of the new courthouse— if there had been no fire." *Id.* With no apparent motive for the newspaper to

falsify, and every incentive for accuracy, "the article published in the [newspaper] on the day of the fire is more reliable, more trustworthy, more competent evidence than the testimony of a witness called to the stand fifty-eight years later." *Id.*

The same common-sense reasoning applies here. It is inconceivable that the Stasi's internal files would report that a visa request for the defendant and Shadi had been received, or that the defendant and Shadi were staying at the Hotel Metropol in April of 1986, if those things were not true. Like in *Dallas County*, none of the "usual dangers inherent in hearsay evidence, such as lack of memory, faulty narration, intent to influence the court proceedings, and plain lack of truthfulness" are present. *Id.* Quite the opposite: many factors are present here that courts have identified as supporting the reliability of statements under the residual exception. In particular:

        a.   <u>The documents were made close in time to the relevant facts.</u>

A significant factor in assessing reliability is "the amount of time that elapsed between the event and the statements." *United States v. Carneglia*, 256 F.R.D. 384, 392 (E.D.N.Y. 2009). Recency is important because it "establishes that [the declarant's] recollection of… events was fresh when" the statement was made. *In re Drake*, 786 F. Supp. 229, 235 (E.D.N.Y. 1992). Moreover, when a "statement is proximate in time to the event [it describes], less opportunity for fabrication exists." *Ticey v. Peters*, 8 F.3d 498, 503 (7th Cir. 1993).

Here, the statements in the Stasi documents were written close in time to the events they describe. The Visitors List is dated April 16, 1986, a date within the window of time requested by the defendant's visa request. The Hotel Report is dated April 15, 1986, approximately ten days after the hotel stay it documents. Moreover, the precision of the reported information—including 6-digit passport numbers for both the defendant and Shadi—raises a strong inference that the authors of these documents were copying the relevant information directly from the underlying

primary source documents, making the reports especially reliable and providing yet another appliable hearsay exception. *See* Fed. R. Evid 803(1) (exception for Present Sense Impression).

        b.   <u>The documents are highly specific.</u>

Specificity is another factor relevant to the reliability of an out-of-court statement. *See Drake*, 786 F. Supp. at 234 (admitting statements under residual exception based on "relevant indices of reliability include[ing]… that the statements… are very specific"); *United States v. Donaldson*, 58 M.J. 477, 488 (C.A.A.F. 2003) (applying residual exception to statements that "contain[ed] the degree of specificity normally associated with reliable statements"); *United States v. Burgess*, 99 F.4th 1175, 1184 (10th Cir. 2024) (applying residual exception to child victim's statement describing abuse "in fairly specific detail" (citing *United States v. Tome*, 61 F.3d 1446, 1453 (10th Cir. 1995); *United States v. Farley*, 992 F.2d 1122, 1126 (10th Cir. 1993))).

Here, the statements are highly specific. The Visitors List does not just say "The Libyan People's Bureau requested visas for Masud and Shadi"; rather, it provides precise details such as passport numbers, places of birth, and the name of the person that Masud and Shadi would be visiting. Likewise, the Hotel Report does not just say "Masud and Shadi stayed at a hotel in East Berlin"; rather, it provides the name of the hotel, the dates of the stay, the guests' identifying details, and even the room number. This specificity is a mark of the documents' reliability.

        c.   <u>The documents are corroborated.</u>

Even better, the specific details in the documents are consistent with separate extrinsic evidence, corroborating their accuracy. Rule 807(a) expressly requires the Court to consider the "evidence, if any, corroborating the statement" when evaluating whether it is "supported by sufficient guarantees of trustworthiness." *See also United States v. Slatten*, 865 F.3d 767, 808 (D.C. Cir. 2017) (analyzing "evidence 'corroborating the veracity of the statement[s]' ruled admissible under residual exception (quoting *Rivers v. United States*, 777 F.3d 1306, 1315 (11th Cir. 2015));

*Burgess*, 99 F.4th at 1183 n.5 (recognizing that current version of rule "specifically require[s] the court to consider corroborating evidence," overruling Tenth Circuit's prior rule that corroboration did not bear on trustworthiness under the residual exception).

These documents enjoy an extraordinary degree of corroboration.

First, the documents harmonize perfectly with the defendant's statement. The defendant stated that he was sent to the Libyan Embassy in East Germany in April of 1986, and the documents show that the Libyan People's Bureau (i.e., the embassy) requested a visa for him starting on April 3, 1986. The defendant stated that he traveled with an ESO colleague named Abdulhakim Shadi, and the documents show both that Shadi's visa was requested along with the defendant's. The defendant stated that he and Shadi were brought to the "hotel," and the documents show that he and Shadi stayed together at a hotel in East Berlin. The defendant stated that he had to "remain[] in Germany for approximately two weeks" because flights to Tripoli were unavailable, and the documents how that he and Shadi were on a flight from Berlin to Tripoli on April 23, about two and a half weeks after the bombing. Everything lines up.

The documents are also corroborated by independent documentary evidence from Malta. The government at trial will offer Maltese immigration records; specifically, "IRO cards" that are completed by travelers entering and leaving the country.[4] These include multiple IRO cards with the defendant's name and signature, one of which has his fingerprint on it. They show his passport number as 835004. That is the same passport number that appears in the Hotel Report (where it was sourced from the Metropol Hotel's registration cards) and on the Visitors List (where it was sourced from the visa application). The odds of the Stasi correctly guessing the defendant's six-

---

[4] At the recent suppression hearing, the government's witness provided an overview of these IRO cards and their role in the case, and discussed specific examples. *See* 2/11/2026 AM trans. at 85-94.

digit passport number are literally one in a million, and there is no apparent explanation for how they could have obtained it other than by copying it from his visa request and registration card.

### d. The documents are consistent with each other.

Along with being consistent with independent extrinsic evidence, the documents are consistent with each other in establishing that the defendant and Shadi went to East Berlin in April of 1986. This is a further point in favor of their reliability, because "[t]he risk of mistake or dishonesty is reduced given the multiple [statements] by different sources." *Hicks v. Charles Pfizer & Co. Inc.*, 466 F. Supp. 2d 799, 809 (E.D. Tex. 2005). *See also id.* (admitting mutually consistent newspaper articles under the residual exception).

Even if one considers the Stasi as an institution to have been the unitary author of the documents, consistency is factor supporting reliability. *See, e.g.*, *Slatten*, 865 F.3d at 808 (explaining, when admitting statements under residual exception, that "[c]onsistency supports the reliability of [the declarant's] multiple statements and, consequently, his veracity"); *United States v. Harrison*, 296 F.3d 994, 1005 (10th Cir. 2002) (emphasizing "the consistency of the declarant's statements" as " a factor that we find particularly persuasive" in the residual exception analysis);[5] *cf. also United States v. Bumpass*, 60 F.3d 1099, 1102 (4th Cir. 1995) (identifying "whether the declarant repeated the statement and did so consistently" as a reliability factor when applying hearsay exception for statements against interest); *Idaho v. Wright*, 497 U.S. 805, 821 (1990) (naming "consistent repetition" as a factor supporting reliability of child witness's out-of-court statements under former Confrontation Clause jurisprudence).

---

[5] The government respectfully submits that these authorities answer the question raised by the Court at the status hearing, whether the Court can consider "common threads" among the offered exhibits or is required to "look at each one independently." 11/12/25 tr. at 56-57.

e.    <u>The documents establish a binary proposition.</u>

The question addressed by the Stasi documents is a binary: either the defendant and Shadi went to Berlin in April 1986 or they did not. This issue is unlike "more difficult, qualitative issues that would involve complicated issues of perception and description." *Hicks v. Charles Pfizer & Co. Inc.*, 466 F. Supp. 2d 799, 809 (E.D. Tex. 2005). Courts have recognized that out-of-court statements establishing binary propositions are inherently more reliable: "[t]he dangers of hearsay, as well as the value of cross-examination, are minimized when the fact sought to be proved is binary; 'even if the author's perception, memory, or narration ... [is] less than perfect,' a binary event is still likely to be reported accurately." *Id.* (quoting *Jacobson v. Deutsche Bank, A.G.*, 206 F. Supp. 2d 590, 596 (S.D.N.Y. 2002), *aff'd*, 59 Fed. Appx. 430 (2d Cir. 2003)). The relevance of the Berlin visit does not "rise[] and fall[] on the details," such as exactly what time they checked into the hotel or how they were dressed upon arrival. *Jacobson*, 206 F. Supp. 2d at 596. This situation is therefore unlike, for example, a defamation suit where "every word, their placement, order, and translations from [one language to another], are highly relevant"; instead, the documents address a yes-or-no question on which a mistake would be "inconceivable." *Id.* (quoting *Dallas County*, 286 F.2d at 397).

f.    <u>The documents' authors had no reason to lie.</u>

To find a statement reliable, "a court must find that the declarant of the prior statement 'was particularly likely to be telling the truth when the statement was made.'" *Slatten*, 865 F.3d at 807 (quoting *United States v. Washington*, 106 F.3d 983, 1002 (D.C. Cir. 1997)). A critical part of that analysis involves considering what motives the declarants might have had to be truthful or untruthful. *See, e.g.*, *United States v. Simmons*, 773 F.2d 1455, 1459 (4th Cir. 1985) (affirming admission of ATF forms under residual exception because "there is simply no reason for the manufacturers of these weapons to falsify the entries on the routine ATF forms").

Here, the exhibits' Stasi authors were particularly likely to be telling the truth when they generated the documents at issue. The statements at issue were part of the Stasi's internal files, and as a general matter, "[t]he Stasi considered it important that the information in these documents be accurate so that they could rely on the documents." Archives Decl. ¶ 7. That is clearly true of the exhibits here, given the purposes for which they were created. The objective of the "Rinde" file – protecting the GDR from hostile action by a suspected Syrian intelligence operative – would be ill served by planting falsehoods in the file. Likewise the objective of the "Box" file, which was to prevent future acts of terrorism from being launched from East Germany to the political detriment of the GDR government. In both cases, the declarants were especially likely to be telling the truth.

g.   The documents' authors had no ability to fabricate the relevant information.

Along with having no motive to fabricate the relevant facts in the documents, the authors had no ability to do so. So far as the voluminous files indicate, both Masud and Shadi were unknowns to the Stasi other than the isolated facts of their visa applications and presence at the Hotel Metropol. There is no apparent explanation for where the Stasi could have learned these men's names – much less the defendant's passport number that matches his Maltese immigration records from two years later -- if the defendant and Shadi had not actually visited Berlin. *Cf. Earnest v. Dorsey*, 87 F.3d 1123, 1134 (10th Cir. 1996) (finding accomplice confession reliable in part because it "describe[d] the crime at a level of detail which would be difficult to render in a fabricated admission".

h.   There is no basis to infer unreliability.

Finally, the defense has provided no persuasive reason to doubt the reliability of the documents. They have argued that the government's exhibits fall short of technical compliance with several of the enumerated hearsay exceptions, but they have not explained why such shortfalls are a reason to doubt the records' trustworthiness, given that the purposes of the nearly missed

23

exceptions still apply. *See* Fed. R. Evid. 807, advisory committee note ("If the court employs a 'near-miss' analysis it should—in addition to evaluating all relevant guarantees of trustworthiness—take into account the reasons that the hearsay misses the admissibility requirements of the standard exception."). And they have noted the often-sinister motives and techniques of the Stasi – a point with which the government fully agrees as a general matter – but they have not explained why the "expressly political aims and the incentives of the investigators" would supply a motive to falsify this specific information under these specific circumstances. ECF 174 at 28. When documents are meant for external dissemination, there might be propaganda value in deception, but not when the files were created for internal use only, as these ones were.

*　　*　　*

For all the above reasons, the first requirement of the residual exception – that the documents be "supported by sufficient guarantees of trustworthiness" – is more than satisfied.

3. <u>There is no substitute for the exhibits.</u>

The residual clause further requires that the exhibits be "more probative on the point for which [they are] offered than any other evidence that the proponent can obtain through reasonable efforts." These records are. The points being established are that the defendant traveled to East Berlin with Abdulhakim Shadi at the beginning of April of 1986 and that he stayed there until later in the month. These events happened approximately 40 years ago, and at the time there was nothing remarkable about them that would have attracted notice or caused anyone to remember them decades later. Unsurprisingly, therefore, there are no percipient witnesses who can testify to having seen the defendant enter or leave the country or having encountered him at the Metropol Hotel.[6]

---

[6] The government is aware of one individual who knows about the defendant's trip to Berlin: an accomplice who was convicted in Germany of the La Belle bombing and has since given

4.    This is an exceptional case.

The residual exception was "intended to be a narrow exception to the hearsay rule, applying only in exceptional cases." *Kim*, 595 F.2d at 765. This is exactly such a case.

For one thing, the charged offense was an extraordinarily serious crime, making it especially important that relevant evidence not be withheld from the jury because of technicalities. *Cf. United States v. Cree*, 778 F.2d 474, 478 (8th Cir. 1985) ("While evidence should be admitted under [the residual exception] in only those cases presenting exceptional circumstances, it is hard to imagine many cases more compelling than this case.").

Establishing the defendant's presence in Berlin in 1986 is, likewise, a critically important point for the government's case. Because the defense has claimed that the defendant's statement is a fabrication, it is crucial that the government corroborate its accuracy on every possible detail. Other than the Stasi records, there is no documentary evidence corroborating the defendant's account of how he helped perpetrate the La Belle attack. The defense would be free to argue (and, even absent that, jurors would be free to speculate) that this portion of the statement was invented by the defendant's captors in an effort to frame him.

The case also involves extraordinary factors bearing on the government's ability to obtain and present corroborative evidence. The defendant and his co-conspirators perpetrated a conspiracy that was international in scope, leaving a trail of evidence spanning numerous foreign countries. The Libyan government under Qaddafi was also largely successful in maintaining the secrecy of its terrorist activities for decades, meaning that U.S. investigators could not begin piecing together facts like the details of the defendant's travel to Berlin until many years after the fact. Those effects of time and geography combine in an especially challenging way here, because

---

interviews to U.S. investigators about the defendant's role in the attack. This person resides in a foreign country and is not presently considered to be a viable trial witness.

25

the government that created the documents in question no longer exists, having dissolved in disgrace more than 35 years ago. None of the Stasi employees still alive today remember the mundane events recorded in the documents, and even if they did, the U.S. government could not compel them to testify about their involvement in what is rightly regarded as a dark chapter of their country's history.

In sum, the residual exception is grounded in the understanding that unusual situations can arise where the enumerated hearsay exceptions are insufficient to promote the goal of truth-seeking and accomplish justice. This is exactly the type of case it was designed for.

## CONCLUSION

For the reasons above and those already argued, the Court should grant the government's

motion *in limine* and admit the proposed exhibits.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:    ***/s/ Conor Mulroe***
       CONOR MULROE (NY Bar No. 5289640)
       ERIK M. KENERSON (OH Bar No. 82960)
       BRITTANY KEIL (D.C. Bar No. 500054)
       Assistant United States Attorneys
       JEROME J. TERESINSKI (PA Bar No. 66235)
       Special Assistant United States Attorney
       601 D Street NW, Washington, D.C. 20530
       (202) 740-4595 // Conor.Mulroe@usdoj.gov

       KATHLEEN CAMPBELL (MD Bar No. 9812170031)
       JENNIFER BURKE (MD Bar No. 9706250061)
       Trial Attorneys, Counter Terrorism Section
       National Security Division
       950 Pennsylvania Avenue NW, Washington, D.C. 20530