# FEDERAL PUBLIC DEFENDER
## EASTERN DISTRICT OF VIRGINIA
**1650 KING STREET, SUITE 500**
**ALEXANDRIA, VIRGINIA 22314**
**(703) 600-0800**
**FAX: (703) 600-0880**

| | | |
|---|---|---|
| **Geremy C. Kamens** | | **Whitney Minter, Brooke Rupert, Laura Koenig** |
| **Federal Public Defender** | **(703) 600-0800** | **Assistant Federal Public Defenders** |

May 22, 2026

<u>Via *Email*</u>

Erik Kenerson, Esq.
Brittany Keil, Esq.
Conor Mulroe, Esq.
Kathleen Campbell
Assistant United States Attorneys
U.S. Department of Justice
United States Attorney's Office
555 4th St NW, Suite 11-449
Washington, D.C. 20530

Re:  <u>*United States v. Abu Agila Al-Marimi*</u> - 1:22-cr-392-DLF

Dear Counsel:

We write pursuant to Federal Rule of Criminal Procedure 16(b)(1)(C) to provide the following disclosures on behalf of our client, Abu Agila Al-Marimi. Pursuant to Federal Rule of Criminal Procedure 16(b)(1)(C) and the Court's May 20, 2026, Minute Order, we provide the following disclosures regarding the expert testimony that we expect Mr. Al-Marimi may present at trial in support of his case-in-chief.

This letter supplements the defense's prior expert notice regarding Dr. Cutler, dated November 25, 2025. The November 25, 2025, notice and its attachments set forth Dr. Cutler's credentials, publications, and prior testimony history in addition to providing general disclosures and the underlying science supporting Dr. Cutler's anticipated testimony and opinions. All references herein are included in the November 25, 2025, notice and its attachments. This supplemental notice reiterates the scope of Dr. Cutler's anticipated testimony as previously disclosed and provides additional and more specific opinions formed about facts that the factfinder may determine exist in this case. To the extent any opinion stated herein is inconsistent with or expands upon the prior notice, this supplemental notice controls. The defense continues to reserve the right to further supplement this disclosure as circumstances warrant.

As previously noticed, Dr. Cutler is expected to testify regarding matters within his expertise as a social psychologist with specialized knowledge about interrogations and false confessions.

Specifically, Dr. Cutler may offer opinions about the following factors known to increase the risk of false confession:

1. **Situational risk factor of isolation:** Dr. Cutler may testify that should the factfinder determine that Mr. Al-Marimi was isolated for the purpose of interrogation, such a setting can increase the risk of false confession. With respect to interrogation settings, interrogations are typically conducted in an interview or interrogation room, deliberately designed to maximize privacy (Inbau et al., 2013). Inbau et al. (2013) provide detailed specifications for interview and interrogation rooms designed to maximize a sense of privacy for the suspect, the idea being that a suspect is more likely to confess to a transgression in private than in public.

   The conditions that create privacy, however, can also create a sense of physical and social isolation, and isolation can have negative effects. Humans are social beings. Our identities are often determined by our relationships with other people. In ambiguous or new situations, we look to the behavior of others for cues as to what is going on and how to behave. In stressful situations, we look to others for social support and belonging (Kassin et al., 2010). Indeed, research shows that chronic social isolation leads to poorer health and premature mortality and represents a significant public health concern (Holt-Lunstad, Smith, Baker, Harris & Stephenson, 2015). The interrogation is a stressful situation (Kassin et al., 2010). Isolation increases stress and may contribute to perceptions of loss of control and autonomy (Kassin & Gudjonsson, 2004). The isolated nature of the interrogation setting and lack of outside support increases anxiety and decreases self-confidence, which in turn diminishes the ability to resist an investigator's demands among innocent and guilty suspects alike (Ofshe & Leo, 1997). The inability to seek and obtain support from friends, family members or a legal advocate can heighten distress and enhance the motivation to end the interrogation (i.e., by confessing).

2. **Situational risk factor of excessive length of interrogation:** Dr. Cutler may testify that should the factfinder determine that the length of time Mr. Al-Marimi was interrogated was excessive, such a factor can increase the risk of false confession.

   In Drizin and Leo's (2004) analysis of 125 cases of proven false confessions, the durations of the interrogations were much longer than the average interrogation lengths from the survey (Kassin et al., 2007) and observational (Leo, 1996) studies. In the false confession cases, 16% of interrogations lasted less than 6 hours, 34% 6-12 hours, 39% 12-24 hours, 7%, 24-48 hours, and 4% 48 hours or more. By contrast, survey research of investigators has found that interrogations typically do not exceed an hour and a half (Kassin et al. 2007). Trainers maintain that a properly conducted interrogation should last no more than three to four hours (Buckley, 2017; Inbau et al., 2013) or less (Wicklander-Zulawski, 2020), and highly discourage exceeding six hours (Blair, 2005). In cases of particularly long interrogations, Inbau et al. suggest inquiring about what justifies the excessive length (pp. 347-248): "can the excessive length of interrogation be explained by the suspect's behavior? For example, did the suspect offer a series of different versions of events, before offering the first incriminating statement? A suspect who has maintained their innocence and made no incriminating statements for 8 or 10 hours has not offered any behavior to

account for this lengthy period of interrogation." Long interrogations deplete self-regulation abilities and the ability to resist influence by the interrogator and lead to cognitive distortions (Davis & Leo, 2012; Leo & Davis, 2010).

3. **Situational risk factor of using accusatory tactics:** Dr. Cutler may testify that should the factfinder determine that the interrogator used accusatory tactics, such a factor can increase the risk of false confession.

Accusatory interrogation is often trained as a guilt-presumptive technique (Inbau et al., 2013). When the investigator decides to move from an interview to an interrogation, the investigator assumes for the purpose of interrogation that the suspect is guilty and behaves accordingly. The stated goal of the interrogation is to learn the truth (Inbau et al., 2013), but because interrogation is only used on people believed to be suspicious, once the investigator decides to interrogate, the objective is to secure a confession and inculpatory information. Naturally, the strength of the investigator's belief in the suspect's guilt can be expected to affect the interrogator's determination and resolve to obtain a confession (e.g., Kassin, Goldstein, & Savitsky, 2003; Liden, Minna, & Juslin, 2018). Thus, an investigator who believes that the suspect might be guilty may press ahead and interrogate the suspect as if they are guilty, but back off if met with signs of innocence (Carr, 2015; Inbau et al., 2013; Wicklander-Zulawski, 2020). In contrast, an investigator who strongly believes in a suspect's guilt may ignore or misinterpret signs of innocence and persist in using more rigorous strategies to obtain a confession (Kassin et al., 2003). Ironically, innocent people sometimes behave in such a way as to appear more suspicious and invoke more rigorous interrogation strategies by the interrogator (Kassin, 2005).

4. **Situational risk factor of using a rapport-building in the context of interrogation:** Dr. Cutler may testify that rapport building in the context of interrogation is inherently deceptive and can render suspects more vulnerable to manipulation.

In Dr. Cutler's research on the development of the Interview and Interrogation Instrument ("IAII") (Kaplan et al., 2019), he and his colleagues drew on interrogation scholarship and interrogation training manuals and derived a list of 194 interrogation tactics. Included in their list were 98 tactics that spanned the domains identified by Kelly et al. (2013), 65 suspect behaviors, 18 environmental factors, and 13 suspect characteristics. Dr. Cutler and his colleagues then conducted a series of studies designed to (1) reduce items, (2) assess inter-rater reliability among graduate students trained in the use of the Instrument, and (3) test validity of the Instrument against expert evaluations of a set of interrogations. The reliability and validity tests supported the Instrument's psychometric properties.

Through these Instrument development studies Dr. Cutler and his colleagues derived a set of 36 interrogation tactics divided into five domains, that closely mapped onto the categories of Kelly et al. (2013), including the Rapport-Building Domain. The Rapport-Building Domain consists of 5 tactics through which the interrogator attempts to establish a social connection with the suspect. The tactics are (1) engaging in small talk; (2) minimizing the investigator's law enforcement role; (3) expressing sympathy toward the

suspect and their situation; (4) offering concessions, such as food or a beverage, and (5) offering material incentives in exchange for a confession.

Trainers of interrogation (and many forms of interviewing) recommend that the interrogator take efforts to establish rapport with the suspect in the service of making the suspect comfortable disclosing personal information with interrogator (e.g., Inbau et al., 2013). Psychological research on persuasion demonstrates that persuasion is more effective when the source of persuasion expresses empathy, commonality, and liking for the target of persuasion (Cialdini, 2001). Thus, engaging in small talk, sympathizing with the defendant, and finding common ground enhance persuasion. Offering another person a concession, such as a stick of gum, enhances compliance (Burger et al., 2006). Thus, some forms of rapport-building have the ironic effects of, on the one hand, making an interrogation seem less oppressive or coercive, but on the other hand, enhancing the interrogator's persuasive influence over the suspect. Research has also demonstrated that rapport-based tactics enhance the suspect's susceptibility to misleading information (e.g., Saurland et al., 2018; Vallano & Schreiber Compo, 2015; Wright, Nash, & Wade, 2015). Some commentators (Crough et al., 2021) have argued that the establishment of rapport during the adversarial context of a suspect interview is inherently deceptive and is independent of—and often in opposition to—the suspect's best interests. Perhaps the most notable example of a problematic tactic falls under the tactic of minimizing the interrogator's role. Investigators have been observed at times portraying themselves as suspects' lifelines and portraying their roles in the interrogations as ones meant to facilitate helping suspects (Kaplan & Cutler, 2022). Premising interrogations on seeking to help suspects is discouraged in interrogation training manuals and literature (Carr, 2015; Inbau et al., 2013; Wicklander-Zulawski, 2020).

The assessment of coercion in interrogations using the IAII or similar method requires an accurate record of the interrogation. The best record of what occurred is a video recording of the full interrogation (Kassin et al., 2010). In the absence of a recording, the factfinder may rely on the memories of the interrogator(s) and suspect. Human memory has been the subject of psychological study for more than 100 years. It is well-accepted that memory is fallible and subject to distortion, even under the best of circumstances. In contested confession cases, the suspect's memory for the interrogation is likely impaired by the stress experienced by the suspect. An interrogator who uses coercive tactics may choose not to report the use of those tactics.

Reliance on officer notes of interviews (Gregory et al., 2011; Lamb et al., 2000; Warren & Woodall, 1999) does not serve as an adequate substitute for a video recording of an interrogation. Research on officers' notes shows substantial gaps in completeness of notes taken from witness interviews. Research on the accuracy of investigator notes of their interviews showed that the notes were often significantly incomplete, misrepresented the structure of the interviews, and misclassified responses given to directed questions as having been given in response to open-ended questions.

5. **Relevant psychological principles:** Dr. Cutler may testify that should the factfinder determine that the psychological principles of social influence and self-regulation existed

in the context of Mr. Al-Marimi's alleged confession, such psychological principles can increase the risk of false confession.

Social influence is a classic subfield of study within social psychology. Social psychologists have historically conducted research on such topics as conformity, persuasion, compliance, and obedience to authority, all of which may play a role in the interrogation room. For example, obedience refers to behavior that complies with direction from authority. Common sense tells us that obedience is appropriate in many cases. Children should obey their parents and teachers. Employees should obey their managers. Members of the armed forces should obey their higher-ranking officers. And citizens should obey law enforcement. Common sense also tells us that obedience has limits. Many laypeople think that they would not or should not obey commands that are contrary to their moral codes. Contrary to common sense, however, social psychological research informs us that certain situational pressures may overwhelm our moral codes (Blass, 2009; Burger, 2009). According to Blass (2009), people have a propensity to obey authority to the point of acting in ways that are contrary to their own moral principles or in ways that are directly in opposition to their own self-interests. When people accept the legitimacy of an authority figure guiding their behavior, they experience certain changes that ultimately lead to their obedience. They accept the authority's definition of the reality of the situation and see things through the eyes of the person in charge.

Resisting pressures to confess requires self-regulation, or the ability to regulate one's own thoughts, behaviors, and emotions. Examples of self-regulation include holding back one's temper when provoked, making oneself appear cheerful when sad, and declining dessert when dieting. Self-regulation can be thought of as willpower, a muscle, or an energy source (Baumeister, Vohs & Tice, 2007). Self-regulation is limited. Fear, fatigue, hunger, pain, anxiety, and cognitive effort deplete self-regulation (Davis & Leo, 2013), whereas rest and glucose restore self-regulation (Baumeister, Vohs, & Tice 2007; Blagrove, 1996). Thus, the mental state that the suspect brings to the interrogation from the outset influences their ability to self-regulate their thoughts, emotions, and behaviors, and to resist confessing. A suspect who is tired, hungry, and/or physically uncomfortable begins the interrogation with a depleted source of self-regulation. The act of arguing one's innocence requires cognitive effort and further depletes self-regulation. Once self-regulation becomes sufficiently depleted, the suspect no longer has the willpower to resist and gives in to the temptation to confess. The concept of regulatory decline is not purely an abstract psychological construct but is measurable on a physiological level. Confrontational and coercive interrogations may affect suspects' heart rates, blood pressure, and neural activity (Guyll, Yang, Madon, Smalarz, & Lannin, 2019).

High levels of prolonged stress may interfere with memory and reasoning abilities (Arnsten, 2009), placing suspects in a more suggestible, vulnerable, and easily manipulated state (Davis & Leo, 2012; 2013). Leo and Davis (2010) discuss the phenomenon of a stress-induced confession: a confession "in which the suspect has become so distressed (tired, fearful, anxious, or distressed by the aversiveness of the interrogation) that they become willing to do or say anything—including give a false confession—to escape the

5

interrogation." When known false confessors are asked why they falsely confessed, they commonly respond that they just wanted to end the interrogation (Leo, 2008).

Factors such as self-regulatory depletion and stress can interfere with cognitive functioning and lead to temporal discounting. Temporal discounting refers to the well-established finding that immediate—or proximal—factors have a stronger influence on behavior than delayed—or distal—factors (Madon et al., 2012). In the interrogation context, temporal discounting may lead suspects to give greater weight to ending the interrogation by confessing than to the more distal consequences of the confession (Kassin et al., 2010), a finding supported by laboratory research (Madon et al., 2012; Yang, Madon, & Guyll, 2015). Perceived uncertainty of the distal consequences may also increase the extent of temporal discounting (Yang, Madon & Guyll, 2015). Thus, to the extent that an innocent suspect believes that their innocence will eventually be established, perhaps because of the belief that the truth will prevail, they might be more willing to falsely confess to end the proximal distress of interrogation. In Madon et al.'s (2012) words, "Because innocent suspects tend to believe that their innocence will protect them (Kassin, 2005), they may be more inclined than guilty suspects to perceive future punishment as an improbable event."

Further, Dr. Cutler may offer opinions about contamination errors in investigations. Dr. Cutler may testify that should the factfinder determine that the interrogator intentionally or inadvertently leaked crime details to Mr. Al-Marimi, such leaked information can contaminate the confession.

In the course of the interrogation, interrogators may intentionally or inadvertently leak crime details to the suspect. Guided by the belief that the disclosure of crime details will further persuade the suspect to confess, the investigator might intentionally convey crime details during evidence tactics or as a way of proving their claimed omniscience. Alternatively, the investigator might inadvertently disclose details as part of an interrogation tactic and without consciously noticing the disclosure or remember the disclosure after the interrogation (Garrett, 2010, 2015; Trainum, 2006). Regardless of whether the detail leakage is intentional or inadvertent, the leaked information contaminates the confession (Appleby, Hasel, & Kassin, 2013; Garrett, 2010, 2015; Leo, 2008).

A significant problem caused by confession contamination is that it makes false confessions appear compelling to others. In a study of the first two-hundred and fifty (250) post-conviction DNA exonerations of innocent prisoners in the American criminal justice system, Garrett (2010) demonstrated that contamination was present in 95% of the false confession cases in his data set (38 of 40 cases). In other words, police interrogators in most of these cases fed the suspect unique non-public facts that "only the true perpetrator would know," but the prosecutor erroneously alleged that the suspect volunteered these facts and that the suspect thereby corroborated the reliability of their own confession. Because the jury in each case believed the prosecutor rather than the defense, each of the confessors was convicted, and in each of these cases, the defendant's innocence (and the falsity of the confession) was only proven many years later by DNA evidence. In a follow-up study of DNA exonerations involving false confessions, Garrett (2015) found that another 21 of 23 (91%) were contaminated. In most of the cases analyzed in Garrett's (2010, 2015) studies, the police denied providing critical details to the suspect and claimed that the suspect independently volunteered the details. In most of the false confession DNA exoneration cases, the

6

officers testified under oath that they did not provide the confession details to the suspect (Garrett, 2015). In these cases, the officers were likely testifying truthfully but based on inaccurate and/or incomplete memories for the interrogations.

The inadvertent conveying of information during interrogation is illustrated in an article written by former Washington, DC detective James Trainum (2006). Trainum was an experienced police officer when he interrogated a woman suspected of murder. Trainum and his team secured a confession: "The suspect said she had beaten the man to death and dumped his body by a river. She said she made purchases with the man's credit card and tried to withdraw cash using his ATM card. Surveillance video from the ATM showed a woman who resembled the suspect, and an expert said the signature on the credit card receipts was consistent with the suspect's handwriting. Even the suspect's attorney later told me she believed her client was guilty, based on the confession." Trainum and his team later discovered that the suspect could not have committed the murder because she had an ironclad alibi. The suspect was in a homeless shelter where she lived when the murder occurred, and the shelter's record indicated that she was in the shelter at the time of the murder. Years later, Trainum reviewed the taped interrogation and discovered that they revealed the crime details during the interrogation. They conveyed the details without realizing it, and the suspect adopted them. In contemporary practice, investigators may determine at the outset and document the information that they will withhold from the suspect (referred to as "holdback") in order to avoid contaminating the suspect's statement.

Appleby, Hasel and Kassin (2011) analyzed 20 false confessions from the Innocence Project's cases and from Dr. Kassin's case files. In each of these cases, the confessions were taken during police interrogation, but factual innocence had been established through DNA, dismissal of all charges, acquittal, or an overturned conviction. The confessions were similar in structure, explaining the who, what, when, and why the crimes were committed. More specifically, 100% of the confessions cited the time and location of the crimes, contained visual details, and made references to the victim and the victim's behavior. Other people were discussed in 95% of the confessions. There were details about the victims' appearances in 75% and the victims' mental states in 45% of the confessions. In 80% of the confessions, there were references to what the victim said. The confessions also contained to varying degrees references to the suspects' mental states, including reflections (85%), motives (80%), themes (60%), remorse (40%) and apologies (25%). The authors concluded that, "Although false confessions are drawn from innocent suspects lacking guilty knowledge Study 1 showed that most are not simple admissions but rather rich and textured narratives that contain a broad range of details about how the crime was committed as well as an explanatory motive" (p. 14).

In a second study reported in their article, Appleby et al. sought to determine what qualities of false confessions were most influential to those evaluating them. They created different versions of false confessions modeled after those examined in their first study. The different versions varied the level of detail, the suspect's motive, and whether the suspect apologized. In the detailed confession condition, the confession included a step-by-step account of how the murder occurred, what the victim was wearing, what she said, and what the accomplices said. There was also a no confession condition. Each of 141 university students read a brief case summary and one version of the confession (or no confession) and rendered verdicts. As in previous research, participants who read any confession were more likely to convict than participants who read the case without

a confession. Participants rendered more guilty verdicts when the confession contained details than when it contained few details, and they rendered more guilty verdicts when the confession contained a motive than when there was no motive mentioned.

Additionally, Dr. Cutler may testify that should the factfinder determine that a confession was made, psychological research shows that confession evidence leads to confirmation bias when interpreting other case evidence. For example, knowing that a suspect confessed increases the likelihood that an eyewitness will falsely identify the innocent suspect (Hasel & Kassin, 2009). Confession evidence has also been shown to contaminate analyses of deception in polygraph charts (Elaad et al., 1994) and latent fingerprint comparisons (Dror & Charlton, 2006).

Dr. Cutler's opinions are based upon his education, experience, knowledge, and training as a social psychologist and are rendered to a reasonable degree of scientific certainty. If additional relevant information becomes available after the submission of this supplement, Dr. Cutler will incorporate such information as necessary. Dr. Cutler also may incorporate additional information in response to any expert report or opinions proffered on behalf of any other party to this case.

Sincerely,

Laura Koenig
Whitney Minter
Brooke Rupert
Assistant Federal Public Defenders

Brian L. Cutler, Ph.D.