**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:22-cr-392 (DLF)** |
| | ) | |
| **ABU AGILA MOHAMMAD** | ) | |
| **MAS'UD KHEIR AL-MARIMI,** | ) | |
| **Defendant.** | ) | |

**MR. AL-MARIMI'S RESPONSE TO**
**THE COURT'S JUNE 15, 2026, MINUTE ORDER**

Pursuant to the Court's June 15, 2026, Minute Order, Mr. Al-Marimi clarifies his position regarding the application of the coconspirator hearsay exemption to his alleged statement and offers supporting authorities. Mr. Al-Marimi also provides his position regarding what the government must establish for each out-of-court statement at issue pursuant to Federal Rule of Evidence 801(d)(2)(E).

Mr. Al-Marimi does not respond in this filing to the government's alternative argument under Rule 801(d)(2)(B), which the government submitted in an unordered and unprompted supplemental brief several days after the deadline to state its position on the hearsay issues in the alleged confession. *See* ECF No. 496 (filed on June 20, 2026). If the Court accepts the government's filing and orders a response, Mr. Al-Marimi proposes the close of business on Wednesday, June 24, 2026, for his response.

## I. Legal Standard

The coconspirator hearsay exemption is premised on the dubious belief that each member of a conspiracy is an agent of other conspirators when speaking or

acting in furtherance of the conspiracy. Wright & Miller, 30B Fed. Prac. & Proc. Evid. § 6777 (2026 ed.) ("Wright & Miller"). The Advisory Committee's notes to Rule 801 describe the agency theory as "at best a fiction"; accordingly, courts and commentators understand the rule to place firm limits on the admission of coconspirator statements, and not to extend "an invitation to let such statements flow unchecked through the courthouse doors." *Id.*; *see, e.g.*, *United States v. Lang*, 589 F.2d 92, 100 (2d Cir. 1978) (noting rule is "protective of defendants" and motivated by concerns about the "admission of less reliable evidence").

In *Bourjaily v. United States*, 483 U.S. 171 (1987), the Supreme Court described the showing needed to claim the coconspirator hearsay exemption:

> Before admitting a co-conspirator's statement over an objection that it does not qualify under Rule 801(d)(2)(E), a court must be satisfied that the statement actually falls within the definition of the Rule. There must be evidence that there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made "during the course and in furtherance of the conspiracy."

*Id.* at 175 (quoting Fed. R. Evid. 801(d)(2)(E)). Each factor—the existence of the conspiracy, the participation of both the party opponent (the principal) and the declarant (the agent/coconspirator) in the conspiracy, and that the statement was made both during and in furtherance of the conspiracy—represents a preliminary question under Rule 104(a) that the proponent must establish by a preponderance of the evidence. *Id.* at 176 (citing Fed. R. Evid. 104(a)); *United States v. Gewin*, 471 F.3d 197, 201 (D.C. Cir. 2006). A court may conditionally admit statements under the coconspirator exemption subject to the presentation of later evidence establishing the required factors. *Gewin*, 471 F.3d at 201.

The rule limits the proponent's ability to bootstrap the required showing to the alleged coconspirator statements at issue. A statement offered under Rule 801(d)(2)(E) "must be considered but does not by itself establish . . . the existence of the conspiracy or participation in it . . . ." Fed. R. Evid. 801(d)(2). In *Bourjaily*, the Supreme Court explained that alleged coconspirator statements "*could* themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy." 483 U.S. at 180 (emphasis added). This is so because, under Rule 104(a), courts are not bound by the Rules of Evidence when ruling on preliminary questions. *Id.* at 178–79. However, out-of-court statements are presumed unreliable, and that presumption must be rebutted by other evidence that, "in cumulation" with the statements, proves existence and participation by a preponderance. *See id.* at 179–80; *Gewin*, 471 F.3d at 201 (stating "our circuit has held that the finding must rest on some independent evidence of the conspiracy") (citing *United States v. Gatling,* 96 F.3d 1511, 1520–21 (D.C. Cir. 1996)).

So, the necessary findings under Rule 801(d)(2)(E) can be based in part on the challenged statements themselves, but there must also be independent evidence of certain factors. Wright & Miller § 6781. And the probative value of the challenged statements on each prong depends on the circumstances. The party opposing admission may "point out the shortcomings in such evidence before the trial court finds the preliminary facts[,]" and "trial courts must be permitted to evaluate these statements for their evidentiary worth as revealed by the particular circumstances of the case." *Bourjaily*, 483 U.S. at 180.

While a criminal conspiracy need not be charged to support the admission of alleged coconspirator statements, the D.C. Circuit has looked to the law of criminal conspiracy to inform the necessary showings. *See, e.g.*, *United States v. Carson*, 455 F.3d 336, 366 (D.C. Cir. 2006) (incorporating standards for knowing participation in a conspiracy); *United States v. Beckham*, 968 F.2d 47, 51 (D.C. Cir. 1992) (rejecting statements under coconspirator exemption when the evidence did not support that the alleged coconspirators "had the specific intent to further [a] common unlawful objective" and were "committing the independent crime of conspiracy") (quoting *United States v. Tarantino*, 846 F.2d 1384, 1392 (D.C. Cir. 1988)).

**A. The joint venture**

The essence of a conspiracy is "an agreement to commit an unlawful act." *Iannelli v. United States*, 420 U.S. 770, 777 (1975). For purposes of the coconspirator hearsay exemption, however, the purpose of the agreement may be lawful or unlawful.[1] *Gewin*, 471 F.3d at 201. Still, "some specificity of objective is required to activate the agency fiction that motivates the rule." Wright & Miller § 6778.

"A conspiracy may involve only two or three individuals" or "may grow quite large" depending on its nature. *United States v. Gigante*, 166 F.3d 75, 82–83 (2d Cir. 1999). For large conspiracies, courts have sometimes applied special rules and required more focused showings under Rule 801(d)(2)(E). In *Gigante*, the Second Circuit addressed "a sprawling criminal enterprise involving both the Genovese and

[1] Extending the exemption to statements made in furtherance of lawful joint ventures arguably is inconsistent with the historical usage of the exemption. *See* Ben Trachtenberg, *Coconspirators, "Coventurers," and the Exception Swallowing the Hearsay Rule*, 61 Hastings L.J. 581 (2010).

Colombo crime families and enveloping an entire industry." *Id.* It held that the lower court's admission of coconspirator statements based on "a general overriding conspiracy" among all the Mafia groups was error, as that logic "would allow the admission of any statement by any member of the Mafia regarding any criminal behavior of any other member of the Mafia." *Id.* Instead, courts "in each instance must find the existence of a specific criminal conspiracy beyond the general existence" of the larger enterprise—a "specific criminal goal in addition to a general conspiracy to be members" of the enterprise. *Id.* "It is the unity of interests stemming from a specific shared criminal task that justifies Rule 801(d)(2)(E) in the first place—organized crime membership alone does not suffice." *Id.*

### B. Party and declarant participation

The proponent must show that the opposing party and the declarant both "agree[d] to enter and 'knowingly participated in the conspiracy with the intent to commit the offense'" or otherwise accomplish the joint venture's objective. *Carson*, 455 F.3d at 366 (quoting *Gatling*, 96 F.3d at 1518); *see also United States v. Childress*, 58 F.3d 693, 707–08 (D.C. Cir. 1995) (explaining that conspiracy requires specific and purposeful intent or "conscious desire" to achieve a "result"; *Carson* acknowledged these requirements in the hearsay context).

Some courts have held identification of the declarant by name is not required, but these cases involved strong showings that the unnamed declarant was a willing participant in the conspiracy. *See, e.g.*, *United States v. Wenxia Man*, 891 F.3d 1253, 1272 (11th Cir. 2018) (finding owner of anonymous email address was a participant

based on defendant's inculpatory emails to that address). Mr. Al-Marimi has not located D.C. Circuit authority on the question, but he submits that the less that is known about the declarant, the more difficult it will be to establish his or her knowing participation in the alleged conspiracy and intent to achieve its objectives.

**C. During and in furtherance of**

The duration of a conspiracy is defined by the underlying agreement. Statements made after the accomplishment or failure of the agreement's objectives generally are not made "during" its existence. *United States v. Turner*, 548 F.3d 1094, 1097–98 (D.C. Cir. 2008). An "express original agreement" to conceal or pursue some other ongoing objective may extend the duration of the conspiracy. *Krulewitch v. United States*, 336 U.S. 391, 404 (1949); *see United States v. Hong Vo*, 978 F. Supp. 2d 49, 53–54 (D.D.C. 2013). Some agreements may implicitly extend to the concealment of related activities when that is part of the "essence" of the conspiracy, but the Supreme Court has "rejected the theory 'that in every conspiracy there is implicit an agreement . . . for the conspirators to collaborate to conceal the conspiracy.'" *Turner*, 548 F.3d at 1097 (quoting *Lutwak v. United States*, 344 U.S. 604, 616 (1953)). Thus, courts may not infer an agreement to conceal solely from conspirators' concealing acts. *Id.* at 1098; *Grunewald v. United States*, 353 U.S. 391, 402 (1957).

"Statements are made in furtherance of a conspiracy if they 'can reasonably be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the

conspiracy.'" *United States v. Miller*, 738 F.3d 361, 374 (D.C. Cir. 2013) (quoting *United States v. Tarantino*, 846 F.2d 1384 (D.C. Cir. 1988)). For example, statements "that keep a coconspirator updated on the status of the business, motivate a coconspirator's continued participation, or provide background information on key conspiracy members." *Id.* (quoting *United States v. Carson*, 455 F.3d 336, 367 (D.C. Cir. 2006)). Casual comments and mere narratives of past successes and failures are not made in furtherance of a conspiracy. *Id.* "The declarant's intent is the relevant inquiry." *United States v. Edmond*, 52 F.3d 1080, 1111 (D.C. Cir. 1995).

These requirements naturally overlap. In *Miller*, the D.C. Circuit held the admission of statements under the coconspirator exemption was error because the statements were made months after the conspiracy ended and, thus, were not in furtherance of it. 738 F.3d at 385–86. It rejected the government's argument that the coconspirator declarants were trying to update the testifying witness or recruit him to the defunct conspiracy, as no evidence supported those contentions. *Id.*

**D. Independent evidence**

Independent evidence has taken many forms, and there is no set list of what may and may not suffice. The commentary to Rule 801 urges consideration of "the circumstances surrounding the statement, such as the identity of the speaker, the context in which the statement was made, or evidence corroborating the contents of the statement . . . ." Fed. R. Evid. 801, Advisory Committee Note to 1997 Amendment. The Sixth Circuit has described "appropriate and sufficient independent evidence" as "not merely a scintilla, but rather enough to rebut the presumed unreliability of

hearsay. Admissibility of the hearsay, therefore, hinges on whether some sufficiently corroborating evidence exists which overcomes the suspected unreliability of out-of-court statements" and establishes what the rule requires. *United States v. Clark*, 18 F.3d 1337, 1342 (6th Cir. 1994) (citing *United States v. Silverman*, 861 F.2d 571, 579 (9th Cir. 1988)).

Courts have relied on independent evidence in the form of testimony, recordings, documentary evidence, and physical evidence that supported the required factors in different ways. *See, e.g.*, *Bourjaily*, 483 U.S. at 180–81 (evidence showed defendant visited a location, brought money, and picked up drugs, as predicted by the challenged coconspirator statements); *Gatling*, 96 F.3d 1511, 1520–22 (testimony and financial transactions); *United States v. Piper*, 298 F.3d 47, 52 (1st Cir. 2002) (admitting statements based on "a cornucopia of extrinsic evidence" that included corroborative testimony from coconspirators and surveilling detectives); *United States v. Mosquera-Murillo*, 153 F. Supp. 3d 130 (D.D.C. 2015), *aff'd,* 902 F.3d 285 (D.C. Cir. 2018) (describing proffered independent evidence as "substantial" when it consisted of "testimony from cooperating co-conspirators, [] audio recordings of intercepted calls between the defendants themselves, and [] evidence of seized narcotics on an unidentified vessel allegedly used to transport narcotics").

The evidentiary force of the independent evidence necessarily turns on the circumstances of the case, the statements, and the alleged conspiracy. For example, in *Gatling*, the D.C. Circuit affirmed the admission of coconspirator statements based primarily on "substantial" testimony from multiple witnesses—including a

coconspirator who pled and several victims—about the alleged conspiracy and those involved. 96 F.3d at 1521. The court also discussed a series of financial transactions involving one of the alleged conspirators, although it acknowledged that evidence was "weak" (and presumably carried less evidentiary weight). *Id.* Only after discussing these forms of independent evidence did the court consider the contents of the challenged statements, which were consistent with the other evidence and so solidified a "clearly sufficient" basis for admission. *Id.*

Conversely, in *Beckham*, the D.C. Circuit held statements were not admissible under the coconspirator exemption when the only independent evidence consisted of observations that the alleged coconspirators sat near each other and appeared to be acquainted. 968 F.2d at 51 ("mere physical proximity and friendship"). This was so even though one of them sold drugs to an undercover officer and said the officer could "get another from [her] buddy" before the other person stood up and retrieved more drugs. *Id.* at 49. The court considered the statement's content alongside the observations but still concluded there was "scant basis for inferring that [the two] were joint venturers in a criminal enterprise or had any sort of prior agreement—the essence of a conspiracy." *Id.* at 51. Thus, even conduct potentially consistent with a joint venture will not suffice as independent evidence when it "at most" supports something less. *Id.* (reasoning the evidence tended to show that one of the pair spontaneously turned to the other "as an alternative source of supply").

## II. Argument

The table below identifies the facts the government must prove by a preponderance to qualify for the coconspirator exemption for each challenged out-of-court statement. To illustrate the underlying logic, consider one of the statements discussed during the June 1, 2026, hearing: "I was informed of this [summoning to Senusi's office] by the Head of the Section, Muftah Abdulkarim." Here, Mr. Al-Marimi allegedly stated that he was told about a meeting he should attend by Abdulkarim.[2] The declarant of the out-of-court statement at issue is Abdulkarim. To take advantage of the coconspirator exemption for Abdulkarim's alleged statement, the government must show that there was a conspiracy in which both Mr. Al-Marimi and Abdulkarim knowingly participated, and that Abdulkarim's statement about the future meeting with Senusi was made during and in furtherance of the agreement's purpose. At the hearing, the Court asked the government what independent evidence supported the assertion that Abdulkarim was a coconspirator, and the government deflected instead of identifying any. June 1, 2026, Tr. at 96–97. Thus, on the present record, that factor is supported only by the out-of-court statement itself and the statement cannot be admitted under Rule 801(d)(2)(E).

Mr. Al-Marimi maintains that Jamal is not a credible witness, rendering Mr. Al-Marimi's alleged confession unreliable, and thus, Mr. Al-Marimi's alleged confession should be afforded no evidentiary worth in the Court's analysis of each preliminary question. Even beyond the evidence Mr. Al-Marimi has presented that

[2] The government has argued, consistent with the statement, that the information originated from Senusi before passing through Abdulkarim. June 1, 2026, Tr. at 96–97.

the statement was coerced, the circumstances surrounding its acquisition by the United States, the issues relating to Jamal, and the government's failure to obtain (or timely request) original copies undermine its purported utility. That remains true even for those statements in the alleged confession that would otherwise be admissible under the hearsay rules, like Mr. Al-Marimi's own alleged statements.

The government "contends that the relevant conspiracy was a conspiracy to commit terrorist acts against the United States of America and its citizens, and that the conspiracy continued following both the La Belle and Pan Am Flight 103 attacks." ECF 491, at 7 n.4. Of course, the objectives and scope of any conspiracy are not up to the government; they are determined by the underlying agreement and the available evidence of it. In any event, the government's attempt to paint with a broader brush creates a *Gigante* problem, and the Court should require independent evidence focused on the "more specific" criminal goals the government alleges were part of the amorphous anti-U.S. conspiracy. 166 F.3d at 83. The government appears unable to meet that burden, particularly with respect to some of the alleged coconspirators' involvement. *Cf. id.* (holding statements should have been excluded "because there was no evidence that Gigante ever joined in a conspiracy with those figures to murder Vastola" and the fact that he might have conspired with the declarants "to commit other crimes on other occasions is irrelevant").

**La Belle**

| | Statement | Government's burden |
|---|---|---|
| 1 | [Saʿīd Rāshid] asked me to travel to East Germany and meet the Security Officer at the Libyan Embassy, a man named ʿAlī Ibrāhīm Kashlāf | i. Existence of La Belle conspiracy<br>ii. Participation of Rashid (declarant)<br>iii. Participation of Mr. Al-Marimi (party)<br>iv. During conspiracy – that Mr. Al-Marimi joined the conspiracy beforehand.[3] Subsequent statements indicate he did not; he did not learn about an explosive package until days later. |
| 2 | [Kashlāf] told me that I was required to prepare an "explosive package" to be used against an American target. | i. Existence of La Belle conspiracy<br>ii. Participation of Kashlaf (declarant)<br>iii. Participation of Mr. Al-Marimi (party)<br>iv. During conspiracy – that Mr. Al-Marimi joined the conspiracy beforehand |
| 3 | and I knew since Saʿīd Rāshid had informed me that I was to go to East Germany on a work assignment | The government asserts the exemption as to Rashid informing Mr. Al-Marimi that he was to go to East Germany. ECF 496, at 3.<br>i. Existence of La Belle conspiracy<br>ii. Participation of Rashid (declarant)<br>iii. Participation of Mr. Al-Marimi (party)<br>iv. During conspiracy – that Mr. Al-Marimi joined the conspiracy beforehand (what was his understanding of "work assignment") |
| 4 | On the evening of the same day a short while after sunset, [Kashlāf] informed me he had | i. Existence of La Belle conspiracy<br>ii. Participation of Kashlaf (declarant)<br>iii. Participation of Mr. Al-Marimi (party) |

[3] Several circuits have held that statements "can be admitted under Rule 801(d)(2)(E) even if the party against whom the evidence is offered did not join the conspiracy until after the statements were made." Wright & Miller, § 6779 (citing, *e.g.*, *United States v. Tremusini*, 688 F.3d 547, 555 (8th Cir. 2012)). The D.C. Circuit does not appear to have considered the question. The rule in other circuits seems to "significantly predate" the modern Rule 801(d)(2)(E). *Id.*; *see United States v. U.S. Gypsum Co.*, 333 U.S. 364, 541 (1948) (holding "the declarations and acts of the various members, even though made or done prior to the adherence of some to the conspiracy become admissible against all as declarations or acts of co-conspirators in aid of the conspiracy"). This approach is inconsistent with both the rule's text ("the party's coconspirator" and "during") and the underlying agency rationale.

| | | |
|---|---|---|
| | handed the matter of interest to the person who would carry out the task | iv. Concededly during and in furtherance if conspiracy established |
| 5 | German broadcasters started broadcasting news of it on television, and ʿAlī Kashlāf nodded his head, and I understood that this was the target for which the explosive charge had been prepared [xxx]. He didn't explicitly say this because ʿAbdulḥakīm was with us. The explosion was in a night-club frequented by individuals and officers of the American army | i. Existence of La Belle conspiracy<br>ii. Participation of Kashlaf (declarant)<br>iii. Participation of Mr. Al-Marimi (party)<br>iv. In furtherance – Kashlaf's intent in nodding<br>v. Concededly during if conspiracy established |
| 6 | Q. What was the result of the explosion in the club?<br><br>A. What I recall is that four American officers were killed and a number were wounded. | The government has not asserted Rule 801(d)(2)(E). ECF 496, at 4. |

**<u>Pan Am 103</u>**

| | Statement | Government's burden |
|---|---|---|
| 7 | I was informed of this [summoning to Sanūsī's office] by the Head of the Section, Muftāḥ ʿAbdulkarīm | i. Existence of Pan Am 103 conspiracy<br>ii. Participation of Abdulkarim and Senusi (declarants)<br>iii. Participation of Mr. Al-Marimi (party)<br>iv. During – that Mr. Al-Marimi joined the conspiracy beforehand |
| 8 | that [Sanūsī] personally had previously requested be prepared by the Technical Operations Section | i. Existence of Pan Am 103 conspiracy<br>ii. Participation of Senusi (declarant)<br>iii. Participation of Mr. Al-Marimi (party)<br>iv. During – that Mr. Al-Marimi joined the conspiracy beforehand |

| | | |
|---|---|---|
| 9 | and [Sanūsī] ordered me to take one of these cases and travel with it to Malta. | i. Existence of Pan Am 103 conspiracy<br>ii. Participation of Senusi (declarant)<br>iii. Participation of Mr. Al-Marimi (party)<br>iv. During – that Mr. Al-Marimi joined the conspiracy beforehand |
| 10 | And, according to what ʿAbdullah Al-Sanūsī told me, ʿAbdulbāṣit Al-Magraḥī and Al-ʾAmīn Fḥīma [xxx] would meet me in Malta | i. Existence of Pan Am 103 conspiracy<br>ii. Participation of Senusi (declarant)<br>iii. Participation of Mr. Al-Marimi (party)<br>iv. During – that Mr. Al-Marimi joined the conspiracy beforehand |
| 11 | where I was asked to get up the following morning at seven o'clock in order to set the timer of the explosion inside the suitcase in such a way that the explosion would occur exactly eleven hours later. He handed me the sum of 500 American dollars to buy some clothes to put in the suitcase instead of my own clothes, which I did | i. Existence of Pan Am 103 conspiracy<br>ii. Participation of Senusi (declarant)<br>iii. Participation of Mr. Al-Marimi (party)<br>iv. Concededly during and in furtherance if conspiracy established |
| 12 | and one day after that I heard that there was an American airliner that had exploded | The government has not asserted Rule 801(d)(2)(E). ECF 496, at 7. |
| 13 | but I did know that Americans would be targeted with this explosive device. | i. Existence of Pan Am 103 conspiracy<br>ii. Participation of unidentified declarant, if any[4]<br>iii. Participation of Mr. Al-Marimi (party) |

[4] Mr. Al-Marimi clarifies that this statement and the meaning of the translated word "knew" is at best ambiguous. The context indicates that Mr. Al-Marimi learned this information from an unspecified source, almost certainly hearsay and potentially layers of hearsay, implicating lack of personal knowledge. While the Court has indicated that it is not inclined to apply Federal Rule of Evidence 602 to party-opponent statements under Rule 801(d)(2), *see* June 1, 2026, Tr. at 89–90, when an essential element of the government's case against Mr. Al-Marimi hinges on his alleged knowledge that Americans would be targeted with an explosive device he allegedly made, the question of the statement's presumed unreliability grows more significant.

| | | |
|---|---|---|
| | | iv. During – that Mr. Al-Marimi joined the conspiracy beforehand |
| 14 | Q. What was the destination of the plane that was blown up?<br><br>A. I got to know of that after the explosion -- that the plane was from Malta to Frankfurt to America. | The government has not asserted Rule 801(d)(2)(E). ECF 496, at 7. |
| 15 | and that was never mentioned on the news afterwards. There were about 260 passengers on board as well as the crew. | The government has not asserted Rule 801(d)(2)(E). ECF 496, at 8. |
| 16 | Q. Where did each of ʿAbdulbāṣit Al-Magraḥī and Al-ʾAmīn Fḥīma work?<br><br>A. ʿAbdulbāṣit Al-Magraḥī worked in the External Security Organisation and was responsible for the security of planes and Al-ʾAmīn Fḥīma, what I knew was that he worked for the Libyan Airlines Company. | The government argues the statements are coconspirator statements if the Court finds that the information came from Megrahi, Fhimah, or "someone else in the ESO[.]" ECF 496, at 9.<br>i. Existence of conspiracy<br>ii. Participation of unidentified declarants<br>iii. Participation of Mr. Al-Marimi (party)<br>iv. During – that Mr. Al-Marimi joined the conspiracy beforehand<br>v. In furtherance – that the information about Megrahi and Fhimah's jobs somehow furthered conspiracy's objectives |
| 17 | and [Sanūsī] thanked us for the success of the operation. | i. Existence of Pan Am 103 conspiracy<br>ii. Participation of Senusi (declarant)<br>iii. Participation of Mr. Al-Marimi (party)<br>iv. During and in furtherance – that conspiracy continued after the accomplishment of the bombing, and that gratitude furthered some continuing objective |
| 18 | [Al-Magraḥī] contacted my office at work, he asked them to inform me | i. Existence of Pan Am 103 conspiracy<br>ii. Participation of Megrahi (declarant)<br>iii. Participation of Mr. Al-Marimi (party) |

| | | |
|---|---|---|
| | to prepare to travel to Benghazi the following day. | iv. During and in furtherance – that conspiracy continued after the accomplishment of the bombing, and that this information furthered some continuing objective |
| 19 | and after greeting us, [Qaddafi] praised and thanked us for performing a great patriotic act against the Americans and said that the operation had been carried out with precision. | i. Existence of Pan Am 103 conspiracy<br>ii. Participation of Qaddafi (declarant)<br>iii. Participation of Mr. Al-Marimi (party)<br>iv. During and in furtherance – that conspiracy continued after the accomplishment of the bombing, and that gratitude furthered some continuing objective |
| 20 | We left about a quarter of an hour later after ʿAbdullah Al-Sanūsī had been tasked with looking after us and granting all our requests. | i. Existence of Pan Am 103 conspiracy<br>ii. Participation of unidentified declarant, presumably Qaddafi<br>iii. Participation of Mr. Al-Marimi (party)<br>iv. During and in furtherance – that conspiracy continued after the accomplishment of the bombing, and that Senusi's attention furthered some continuing objective |
| 21 | Also, since 1988 I had been verbally banned by ʿAbdullah Al-Sanūsī from travelling abroad. | i. Existence of Pan Am 103 conspiracy<br>ii. Participation of Senusi (declarant)<br>iii. Participation of Mr. Al-Marimi (party)<br>iv. During and in furtherance – that conspiracy continued after the accomplishment of the bombing, and that this prohibition furthered some continuing objective |
| 22 | so ʿAbdullah Al-Sanūsī asked to see me and permanently withdrew my passport in order to avoid (the risk of) my falling into the hands of a foreign power. | i. Existence of Pan Am 103 conspiracy<br>ii. Participation of Senusi (declarant)<br>iii. Participation of Mr. Al-Marimi (party)<br>iv. During and in furtherance – that conspiracy continued after the accomplishment of the bombing, and that this prohibition and information furthered some continuing objective |

**CONCLUSION**

While the Court must consider the challenged out-of-court statements in deciding whether the government has met its burden to admit them under the coconspirator hearsay exemption, it should afford them no weight. Because the government cannot proffer substantial independent evidence regarding the alleged conspiracy, the Court should not admit the challenged statements under Rule 801(d)(2)(E).

Respectfully submitted,

**ABU AGILA MOHAMMAD MAS'UD KHEIR AL-MARIMI**

By: ________/s/______________________

Whitney E.C. Minter
Va. Bar #47193
Brooke Sealy Rupert
Va. Bar #79729
Assistant Federal Public Defender
Attorney for Mr. Al-Marimi
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0855 (telephone)
(703) 600-0880 (facsimile)
Whitney_Minter@fd.org (email)

Laura Koenig
Va. Bar #86840
Assistant Federal Public Defender
Attorney for Mr. Al-Marimi
701 E. Broad Street, Suite 3600
Richmond, Virginia 23219
(804) 343-0800 (telephone)
(804) 648-5033 (facsimile)
Laura_Koenig@fd.org (email)