UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 22-cr-392 (DLF)** |
| | : | |
| **ABU AGILA MOHAMMAD MAS'UD KHEIR AL-MARIMI,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S RESPONSE TO DEFENSE PLEADING REGARDING CO-CONSPIRATOR STATEMENTS

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, in response to the Court's June 15, 2026, Minute Order, respectfully submits this response to the defense pleading regarding co-conspirator statements, ECF 497. As explained in further detail below, the evidence supports admission of the statements that the government proffers under Federal Rule of Evidence 801(d)(2)(E) under multiple theories.

First, the evidence establishes that the defendant was a member of a conspiracy with the declarants to attack U.S. and Western civilians with violence, and that conspiracy began before the La Belle Discotheque bombing and did not end with the attack on Pan Am Flight 103. As the defendant put it, "we were in a state of mobilization against America and the West."

Second, regardless of the precise scope of the criminal conspiracy, the defendant was engaged in a joint enterprise that allowed him to carry out his duties as a member of the ESO.[1] That work necessarily required collaboration with others, including those in his chain of command

[1] The government uses the term "lawful joint enterprise" at points in this pleading to refer to the defendant's work in the ESO generally to mirror the language from D.C. Circuit case law highlighting the fact that statements made by joint venturers that do not necessarily share a criminal purpose are admissible to the same extent as statements made by criminal co-conspirators. The government does not concede that the everyday work of the ESO was "lawful."

and those with whom he worked on ESO operations, to succeed. The defendant could not have accomplished his work alone, nor does the available evidence support an inference that he did. The joint venture necessary for the defendant to accomplish his job also began before the attack on the La Belle Discotheque and ended after the bombing of Pan Am Flight 103. Accordingly, all statements made by the defendant's co-conspirators in the ESO joint venture that were during and in furtherance of that joint venture are admissible under Rule 801(d)(2)(E).

## I. LEGAL STANDARD

Federal Rule of Evidence 801states that any statement "offered against an opposing party" is "not hearsay." Fed. R. Evid. 801(d)(2). That definitional exclusion applies not only to statements "made by the party" himself, R. 801(d)(2)(A), but also includes statements "made by the party's coconspirator during and in furtherance of the conspiracy," Rule 801(d)(2)(E). Nearly every challenged statement contained within the defendant's statement is admissible on this basis. The law is clear that, despite being called the "co-conspirator" exception, Rule 801(d)(2)(E) is not limited to statements of those joined together in a *criminal* agreement. Rather, as the D.C. Circuit has ruled and reaffirmed, "Rule 801(d)(2)(E) allows for admission of statements by individuals acting in furtherance of a lawful joint enterprise." *United States v. Brockenborrugh*, 575 F.3d 726, 735 (D.C. Cir. 2009) (citing *United States v. Gewin*, 471 F.3d 197, 202 (D.C. Cir. 2006); *Weisz*, 718 F.2d at 433).

Three requirements must be established for the admission of a co-conspirator statement: (1) a conspiracy or joint enterprise existed; (2) the declarant and the defendant against whom the statement is offered were members of the conspiracy or joint enterprise; and (3) the statements were made in furtherance of the conspiracy or joint enterprise. *See, e.g., Bourjaily v. United States,* 483 U.S. 171, 175-76 (1987); *United States v. Perholtz*, 842 F.2d 343, 356 (D.C. Cir. 1988). Each

of these elements need only be proven by a preponderance of the evidence, *see Brockenborrugh,* 575 F.3d at 735, and can be shown by evidence that is not itself admissible, *see* Fed. R. Evid. 104(a); *United States v. Khatallah*, 278 F. Supp. 3d 1, 4-5 (D.D.C. 2017) (citing *Bourjaily*, 483 U.S. at 176). The determination must, however, be based at least partially on some independent evidence of the conspiracy, that is, on evidence other than the statements whose admissibility is in question. *See Gewin,* 471 F.3d at 201 (citation and internal quotation marks omitted). The required independent evidence may take many forms, "including contemporaneous acts suggestive of the charged conspiracy and/or corroborative of the contents of the purported co-conspirator statements." *See United Staes v. Bailey*, 2022 WL 4379059 at *2 (D.D.C. 2022), *citing United States v. Gatling*, 96 F.3d 1511, 1520-21 (D.C. Cir. 1996). There is no limit, other than privilege, to the type of independent evidence a Court can consider. *See* Fed. R. Evid. 104(a) (in deciding preliminary questions of admissibility, "the court is not bound by evidence rules, except those on privilege"); *see also Bourjaily*, 483 U.S. at 178-79. The Court of Appeals reviews admission of evidence under Rule 801(d)(2)(E) for clear error. *See, e.g.*, *Brockenborrugh*, 575 F.3d at 735.

It is not necessary that every co-conspirator know each other or know each other's roles. It is sufficient that each member knowingly participates in the conspiracy with the intent to commit its object. *See*, *e.g.*, *United States v. Carson*, 455 F.3d 336, 366-67 (2006), *citing United States v. Childress,* 58 F.3d 693, 709-10 (D.C. 1995) and *United States v. Tarantino*, 846 F.2d 1384, 1392-93 (D.C. Cir. 1988).

Statements that meet the co-conspirator exemption are admissible even against a defendant who joined the conspiracy after the words were uttered. *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 393 (1948) ("With the conspiracy thus fully established, the declarations and acts of the various members, even though made or done prior to the adherence of some to the conspiracy

become admissible against all as declarations or acts of co-conspirators in aid of the conspiracy"); *see also* Wright & Miller, Fed. Prac. & Proc., § 6779 ("Statements can be admitted under Rule 801(d)(2)(E) even if the party against whom the evidence is offered did not join the conspiracy until after the statements were made. The courts explain that a party takes the conspiracy as he found it, and invoke the well-established principle that statements of coconspirators before a defendant joins the conspiracy are nonetheless admissible against him") (cleaned up). The First Circuit has likened joining a conspiracy to a crewmember boarding a train: "When a party knowingly steps aboard, he is part of the crew, and assumes conspirator's responsibility for the existing freight—or conduct—regardless of whether he is aware of just what it is composed." *United States v. Baines*, 812 F.2d 41, 42 (1st Cir. 1987).

The D.C. Circuit has noted that many types of statements can be considered to be in furtherance of the conspiracy:

> A statement is made "in furtherance of a conspiracy" when it can reasonably be interpreted as encouraging a [coconspirator] or other person to advance the conspiracy, or as enhancing a [coconspirator] or other person's usefulness to the conspiracy.... Such statements include those that keep a coconspirator updated on the status of the business, motivate a coconspirator's continued participation, or provide background information on key conspiracy members.

*United States v. Celis*, 608 F.3d 818, 843 (D.C. Cir. 2010) (*citing United States v. Carson*, 455 F.3d 336, 366-67 (D.C. Cir. 2006). A past narrative may also be admissible if it is part of continuing activity that is necessary to the conspiracy. *United States v. Perholtz*, 842 F.3d 343, 357 (D.C. Cir. 1998).

## II. FACTS

At the heart of this pleading is whether various statements, nearly all of which were made to the defendant from approximately 1986 to 1989, are admissible as co-conspirator statements under Fed. R. Evid. 801(d)(2)(E). In this section, the government will proffer evidence sufficient

for the Court to find the existence of a conspiracy by a preponderance of the evidence. It does not represent the totality of that evidence – indeed, the Court can preliminarily admit co-conspirator statements, subject to connection through proof of conspiracy at trial. *See*, *e.g.*, *United States v. Gewin*, 471 F.3d 197, 201 (D.C. Cir. 2006). This proffer does, however, include a significant quantum of the evidence that has been presented to the Court through the sworn testimony of both Jamal (specifically, the portions of the defendant's statement on which the government relies) and Supervisory Special Agent Todd Tunstall (extrinsic evidence collected during the investigation). It also contains a proffer of portions of the testimony expected from the government's expert witness Alison Pargeter, whose expert notice the Court has considered. The Court can, accordingly, make the requisite findings on the below proffer alone.

Following Muammar Qaddafi's rise to power in Libya in 1969, he positioned himself as Libya's dominating force, and he ruled through repression and fear, along with the politics of revenge: those who challenged him were dealt with ruthlessly. *See* ECF 363-1 (Pargeter Notice) at 3.[2] The Jamahiriya Security Organization (JSO), also referred to as the External Security Organization (ESO) was established as an instrument of the Libyan government in the late 1970s, and it served at Libya's intelligence and security service. *Id.* at 8. Leaders of that organization included Said Rashid, who stated to Qaddafi, "I am your dagger, I am your sword, I am your pistol, I am your machine gun. If you order me to shoot my children, I will do it myself before you can

[2] References to the Pargeter notice are to the original notice, filed at ECF 363-1. Although the Court ruled some of the statements recounted in that notice inadmissible at trial under Rule 403, the Court should nonetheless consider them in determining whether the challenged statements are admissible. *See* Fed. R. Evid. 104(a) (in deciding a preliminary question about whether evidence is admissible, "the court is not bound by evidence rules, except those on privilege"). For portions of the notice where the Court found that Ms. Pargeter's opinion was not supported by sufficient facts (*e.g.*, Libyan security forces vs. ESO), the government has relied on the "Libyan security forces").

even blink." *Id.* at 9-10. The leadership also included Abdullah Senussi, Qaddafi's brother-in-law, who was especially close to Qaddafi and one of his most trusted aides. *Id.*

In 1984, Qaddafi stated, in a public speech, "If America exports terrorism, we will export terrorism to it. We are able to export terrorism to the heart of America. We are able to physically liquidate and burn and destroy inside America." The U.S. was not the only Western nation to receive Qaddafi's ire: after the United States and France intervened to stop a Libyan-backed group of commandoes in Tunisia, Libya allowed angry mobs to attack and burn the French embassy and consulate. *Id.* at 4. The United Kingdom broke off diplomatic relations with Libya after elements in the Libyan People's Bureau in London fired into a crowd of protesters, killing a policewoman. *Id.* at 11.

In 1986, following an exchange of fire in the Gulf of Sidra off the coast of Libya in which Libyan forces suffered losses, Qaddafi described the United States's actions in that conflict as "organized terrorism," and warned, "[i]f there is an act of aggression against Libya, it will be considered the beginning of the end." Pargeter Notice at 6. Qaddafi had previously asserted that the Gulf of Sidra was protected by a "line of death" that other countries were forbidden from crossing. *Id.*

Twelve days later, a bomb exploded at the La Belle Discotheque in West Berlin, killing two American servicemen and a Turkish woman, along with injuring scores more. *Id*. at 6-7. In the days leading up to that attack, Rashid directed the defendant to travel to East Germany and meet up with a man Rashid described as a security official at the Libyan Embassy there, Ali Kashlaf. Statement 1.[3] The defendant then traveled to East Germany, in response to that order, with a man

[3] Statement numbers refer to the numbering from the chart of challenged statements submitted with the government's supplemental filing on hearsay, ECF 491, and its notice of

named Abdulhakim Shadi. ECF 232-2 at 4. Outside of the defendant's statement, evidence exists that he traveled to East Germany with Shadi. *See* Exs. 603, 608 (Stasi records of visa requests and hotel stays), which the Court has provisionally admitted; Feb. 11, 2026, Hr'g Tr. (a.m.) at 66-69, 73-76 (SSA Tunstall explaining those exhibits).

Kashlaf met the defendant upon his arrival to East Germany. *See* ECF 232-2 at 4. Once they were inside the Embassy, Kashlaf informed the defendant that he was to prepare an explosive package for use against an American target. Statement 2. The defendant asked Kashlaf for the proper materials, and he received from Kashlaf a plastic explosive, a detonator, and a timing device, which the defendant used to construct a bomb. ECF 232-2 at 4. He then instructed Kashlaf on how to arm it. *See id.* Later that same day, just after sunset, Kashlaf informed the defendant that he had "handed the matter of interest" to the person who would carry out the task. Statement 4. After the attack, as German broadcasters showed news of the La Belle attack on television, Kashlaf nodded, and as a result the defendant understood that his bomb had been used in the bombing. Statement 5. The defendant explained to Jamal that the force and damage of the bomb he constructed would be very great, especially as the location was inside of a building. ECF 232-2 at 5. The defendant's description of what would have happened to the nightclub is consistent with crime-scene photos. *See* Feb. 11, 2026, Hr'g Tr. (a.m.) at 79-80.

A little over a week after the La Belle attack, the United States carried out airstrikes on Tripoli and Benghazi. Pargeter Notice at 7. The defendant stayed in East Germany after the La Belle attacks because the airport in Tripoli had been shut down as a result of the U.S. airstrikes. ECF 232-2 at 16. Records of Interflug, the East German state airline, establish that the defendant

---

supplemental authority, ECF 496. Where the government cites to the full text of the defendant's statement, ECF 232-2, that citation is to an unchallenged portion of the defendant's statement.

flew back to Tripoli with Shadi on or about April 22, 1986. *See* Exhibit 611, which the Court has provisionally admitted. The U.S. airstrikes drove Qaddafi into a rage of anger and fear. Pargeter Notice at 7. Qaddafi made many public anti-United States statements after those strikes, including that Libya would put a fire under the feet of the United States and that Libya would fight. *Id.* Other senior Libyan officials, including Said Rashid, vowed revenge, and Rashid made a specific threat to kill Americans. *Id.* at 8. The government expects to present testimony at trial that, after the La Belle bombing, Rashid asked an ESO member in Malta whether it was possible to place an unaccompanied bag on board a flight to England.

In August 1988, the defendant, who was then (along with his ESO counterparts) in a state of mobilization against America and the West, participated in an attempt to kill the U.S. Secretary of State at a Pakistani state funeral. *See* ECF 232-2 at 10.[4] The defendant received direction from others in the ESO, and he related to Jamal the ways in which he acted on that direction. *See generally id.* at 10-14. Elsewhere in 1988, at the direction of Abdullah Senussi, the defendant was involved in testing explosive materials that were placed in a radio inside of a suitcase. Ex. 1201-t at 9. In the fall of 1988, the defendant was involved in testing on "a suitcase similar to the one which will be used in the mission." The results of those tests established that "the explosion was powerful and effective," "the quantity which the suitcase contained was enough to achieve the objective of the mission," and "that the use of a radio set as a detonator worked well." They further established that "no foreign body showed up in the suitcase when it was exposed to the scanner and scanned and tested several times in order to be certain." Senussi was present for one of the scanner tests. Ex. 1201-t at 7.

[4] Even if the Court declines to admit either this portion of the defendant's statement, or the documents referenced later in this paragraph, at trial, it should consider the incident and those documents in determining the extent, nature, and goals of the conspiracy. Fed. R. Evid. 104(a).

In the winter of 1988, the defendant was summoned to Senussi's office. ECF 232-2 at 6. In his office, Senussi asked the defendant if the booby-trapped suitcases that Senussi had previously requested to be prepared were finished and ready. *Id.*; *see also* Statement 8. When the defendant replied in the affirmative, Senussi ordered him to take one of those cases and travel with it to Malta. ECF 232-2 at 6; *see also* Statement 9. Senussi also told the defendant that Abdelbaset Ali Al-Megrahi and Lamin Khalifah Fhimah would meet him in Malta. Statement 10. The defendant then in fact traveled to Malta at a time when Megrahi and Fhimah were also both there. *See* ECF 232-2 at 6; Exs. 830 (Maltese immigration card in the defendant's name dated December 7, 1988); 832 (Maltese immigration card in Megrahi's name dated December 7, 1988); 845 (Maltese immigration card in Fhimah's name dated December 4, 1988); Feb. 11, 2026, Hr'g Tr. (a.m.) at 90-98.[5] The defendant knew Megrahi from his time in the ESO, and he met Fhimah for the first time while they were carrying out the operation. ECF 232-2 at 9.

After the defendant's arrival in Malta, he stayed in a hotel pre-arranged by Libya, and a few days later, Megrahi and Fhimah met him in the lobby. *Id.* at 6. They asked the defendant to get up the following morning at 7:00 and to set a timer for the explosion in such a way that the explosion would occur exactly eleven hours later. Statement 11. The defendant was also provided with $500 to purchase clothes to put in the suitcase. *Id.* The defendant carried out his instructions, and he then went to the Maltese airport the following day, and he stood at a place near the platforms for loading luggage, whereupon Megrahi and Fhimah walked in front of him. ECF 232-2 at 7.

[5] The defendant returned to Tripoli on December 9, 1988, and then came back to Malta on December 14. Megrahi and Fhimah also came and went during this period, with Megrahi leaving for Prague on December 9, followed by Zurich. Megrahi's accommodations in Prague were paid for by the Libyan Embassy on this trip. Exs. 907, 908. Megrahi and Fhimah returned to Tripoli before then both returning to Malta on December 20, 1988 – the day before the bombing; the defendant was already there. *See generally* Feb. 11, 2026, Hr'g Tr. (a.m.) at 90-98.

The defendant got the suitcase through the scanner by hiding the detonator and timer in a clever way. *Id.* Fhimah later signaled to the defendant to bring the suitcase, and Fhimah received it and played it on the conveyor belt. *Id.* Forensic analysis following the bombing determined that clothing within the suitcase containing the bomb had been sold almost exclusively in Malta. Feb. 11, 2026, Hr'g Tr. (a.m.) at 100-01. Evidence from Frankfurt and Heathrow Airports establish that on December 21, 1988, a piece of luggage with no associated passenger was transferred from Air Malta Flight 180 to Pan Am Flight 103A in Frankfurt, West Germany, and then onto Pan Am Flight 103 at London-Heathrow Airport. *See* Feb. 11, 2026, Hr'g. Tr. at 112-115. The defendant knew – according to the defense, from his ESO superiors – that Americans would be targeted with his explosive device. *See* Statement 13; ECF 256 at 17 n.5.

After handing the bomb-rigged suitcase to Fhimah, the defendant received a boarding card for a flight to Tripoli and departed Malta. ECF 232-2 at 7. The defendant in fact left Malta on December 21, 1988, headed for Tripoli, on the same flight as Megrahi. *See* Feb. 11, 2026, Hr'g Tr. (a.m.) at 103-105; Ex. 820 (flight manifest showing both the defendant and Megrahi's alias on board); 829 (Maltese immigration showing defendant's departure on December 21, 1988); 837 (Maltese immigration card showing Megrahi, in alias, departing on December 21, 1988).

Following the operation, Senussi met with the defendant and Megrahi, and he thanked them for the success of the operation. ECF 232-2 at 9; Statement 17. A few months after that, the defendant, Fhimah, and Megrahi traveled to Benghazi to meet with Qaddafi, who praised them and thanked them for carrying out a great patriotic act against the Americans. ECF 232-2 at 9; Statement 19.

Following the Pan Am Flight 103 attack, the ESO continued to target U.S. and Western civilians in terror attacks. For example, in 1988 and 1989, Fhimah and other members of the ESO

conducted reconnaissance on UTA Flight 772, Exs. 1201-t at 5[6] and 1210, and elements of the ESO later successfully placed a bomb on board that flight, causing it to crash in Niger, killing all 170 people on board (including 40 French and seven United States citizens). Multiple members of the ESO were tried *in absentia* by the French authorities, including Abdullah Senussi, and convicted for their role in the offense.

The above facts, which include the defendant's unchallenged statements to Jamal, extrinsic evidence collected during the investigation, and the challenged statements, establish that a conspiracy existed from at least 1986 to 1989 to harm U.S. and Western civilians and that the challenged statements were made in furtherance of that conspiracy.

## III. ARGUMENT

### A. The government's evidence establishes that a conspiracy existed and the defendant joined it.

The government's proffer above delineates four types of evidence on which the Court can find that the government has proven the existence of a conspiracy by a preponderance of the evidence: (1) the statements made to the defendant by various members of the Libyan government from approximately 1986 through 1989 (collectively, the "challenged statements"); (2) the defendant's statement to Jamal from the fall of 2012 that outlines the actions he and others took during that timeframe and that reveals his own state of mind during that timeframe; (3) extrinsic evidence establishing the travel of the defendant and others; and (4) Alison Pargeter's expected testimony explaining the structure and purpose of the ESO and other Libyan security services, along with Qaddafi's and other senior ESO leaders' statements about the United States and the West during the mid-late 1980s. The proffer also includes some expected testimony at trial. The

[6] Although the document reflected in the translations at Ex. 1201-t, pp. 1-4, is unsigned, the travel itineraries in that document match flight coupons recovered that bear an alias of Fhimah,

proffer thus establishes three independent sources, in addition to the challenged statements, that prove the existence of a conspiracy to harm U.S. and Western civilians by a preponderance of the evidence, in addition to any others that may be adduced at trial.

The evidence also establishes that, along with the ESO's efforts to commit violence against the West, that entity also functioned as a government agency in the more ordinary sense, engaged in all manner of tasks related to the security of Libya. The proffer therefore also establishes a "lawful joint venture" in which the defendant participated along with his superiors and colleagues within the Libyan government.[7]

1. There Existed a Conspiracy was to Harm U.S. and Western Civilians

The most important question, in determining the scope of a conspiracy, is "whether the conspirators share a common goal," which common goal can be identified at a high level of generality and be ongoing in nature. *United States v. Tarantino*, 846 F.2d 1384, 1393 (D.C. Cir. 1988) (identifying "the possession and distribution of narcotics for profit" as a valid "common goal" of a conspiracy) *see also United States v. Graham*, 83 F.3d 1466, 1471 (D.C. Cir. 1996) (same).

Here, the defendant and the various declarants shared a "common goal," at three levels of generality:

First and most narrowly, the defendant and the declarants were part of conspiracies to commit specific operations, such as the bombing of the La Belle Discotheque and Pan Am Flight 103. The defense appears to have all but conceded the existence of these conspiracies. *See* ECF

[7] The proffer also establishes, to the extent the Court declines to find that there was an overarching conspiracy to harm U.S. and Western civilians, separate conspiracies to attack Pan Am Flight 103 and the La Belle Discotheque. The defendant's pleading all but concedes that these conspiracies existed. *See* ECF 497 at 12-13 (Statements 4, 5, 11) (conceding that statements were made in furtherance of conspiracy if conspiracy established).

497 at 12-13 (conceding that Statements 4, 5, and 11, were in furtherance of La Belle and Pan Am Flight 103 conspiracies, provided that the existence of those conspiracies is established).

Second, and more generally, the defendant and the declarants were part of a conspiracy within Libya's government to commit violent attacks against civilians of the United States and other Western nations that leader Qaddafi perceived as Libya's enemies.

Third, the defendant and the declarants were part of a joint venture to carry out the general operations of the ESO. Even if not a criminal "conspiracy," such a partnership for a common purpose is a valid basis for admission of statements under Rule 801(d)(2)(E) under the D.C. Circuit caselaw as discussed herein.

The defense argues that only the first, narrowest conspiracy is evidence on these facts. *See* ECF 497 at 11. However, as explained below, the evidence readily supports the existence of one ongoing conspiracy, not just separate narrow ones. On this question – distinguishing between single and multiple conspiracies – the D.C. Circuit has identified the relevant factors as including "interdependence between the alleged participants in the conspiracy; and, though less significant, overlap among alleged participants." *Graham*, 83 F.3d at 1472 (citing *Tarantino*, 846 F.2d at 1393). Moreover, D.C. Circuit "case law makes clear that a conspiracy's purpose should not be defined in too narrow or specific terms." *United States v. Gatling*, 96 F.3d 1511, 1520 (D.C. Cir. 1996) (finding a single conspiracy with a purpose of obtaining money in exchange for Section 8 vouchers, despite differences in *modus operandi* and some personnel between operations to obtain those vouchers in Washington, D.C. and Chicago). It is worth noting that the foregoing cases arose in the context of whether the government had presented sufficient evidence to sustain a conspiracy conviction at trial, often in the face of defense claims that the government's evidence showed multiple conspiracies. In this case, where the Court must only be satisfied of any conspiracy's

existence by a preponderance of the evidence and need not be concerned with whether the proof of that conspiracy varies from any count charged in the indictment, the government's burden is considerably lower.

The evidence as laid out above amply demonstrates by a preponderance of the evidence that members of the ESO, including the defendant, Senussi, Rashid, Kashlaf, Megrahi, and Fhimah were engaged in a conspiracy, as guided by Qaddafi, to attack the United States and Western civilians at the time each of them made the statements at issue. It was Qaddafi's intent, as evidenced by his public statements, to strike at American and Western civilians whose countries he viewed as disrupting Libya's foreign policy. Two of Qaddafi's closes advisors – Rashid and Senussi – had outsized roles in the ESO (the defendant referred to Senussi as the one in "total control"). The defendant's statement establishes that *he too* conceptualized the conspiracy as one against "America and the West." *See* ECF 232-2 at 10.

The challenged statements, in context with the defendant's statement to Jamal, amply demonstrate that the conspiracy's goals were broader than just the Pan Am Flight 103 and La Belle attacks and that the defendant was a member of the conspiracy.[8] After the defendant arrived in East Germany in 1986, he was informed by Kashlaf that he would be required to prepare an explosive package for use against an American target. ECF 232-2 at 5. The defendant reported to Jamal that he was "prepared psychologically and mentally to perform this task," indicating that the defendant knew that the work of the ESO included this type of task and was not surprised. *Id.* The defendant was further knowledgeable enough about the conspiracy of which he was a member

[8] To be clear, even if the Court were to find that each attack represented a separate conspiracy, the evidence that the defendant and the speakers joined each of the conspiracies as to which they made statements is ample, and statements made by co-conspirators in furtherance of each of them would be admissible under Fed. R. Evid. 801(d)(2)(E).

to know to ask Kashlaf – nominally only the security officer at the Embassy – for the necessary materials to carry out the task that he was psychologically and mentally prepared to undertake. *Id.* In response to the defendant's question, Kashlaf produced explosives and a detonation timing device. *Id.* That Kashlaf had such materials readily available in the Embassy supports an inference that they were in regular use by the ESO.[9]

Qaddafi's public statements following the U.S airstrikes on Libya demonstrate that the conspiracy to attack U.S. interests was not over following La Belle. Indeed, it intensified, with Qaddafi stating that Americans should not be treated as human and Rashid vowing to kill tens of Americans for every Libyan killed in the raid. By August 1988, members of the conspiracy, including the defendant, were involved in a plot to assassinate the sitting U.S. Secretary of State, and the defendant described that "*we* were in a state of mobilization against America and the West," and added, "there was a strong feeling in favor of carrying out any act against the Americans." ECF 232-2 at 10 (emphasis added). This statement amply demonstrates the defendant's understanding of the common understanding and common goal of the conspiracy.

In the fall and winter of 1988, the defendant was involved, at Senussi's behest, in testing suitcase bombs stuffed with radios. Ex. 1201-t at 7, 9. Just a few months later, Senussi directed the defendant to take a booby-trapped radio and travel with it to Malta for what would become the attack on Pan Am Flight 103. The defendant stated that, prior to the attack, he knew that Americans would be targeted with the explosive device, Statement 14, which demonstrates the ongoing nature of the conspiracy to attack American interests.

[9] This inference, along with the inference that the defendant knew the terroristic nature of the conspiracy he joined, is supported by an exchange later in the defendant's statement, in which he states that explosive materials reached embassies abroad "easily, in diplomatic bags." *See* ECF 232-2 at 5.

After the Pan Am Flight 103 attack, when the defendant and his co-conspirators visited Qaddafi, he thanked them for carrying out a patriotic act against the Americans, Statement 19, which also supports an inference that a common goal of the conspiracy was to effectuate Qaddafi's interests by attacking American and Western civilians. Indeed, that conspiracy continued after the Lockerbie attack: In 1989, members of the ESO, including Fhimah, conducted reconnaissance on a French civilian airliner, and then ultimately did attack that airliner (resulting in Senussi's conviction *in absentia*), causing the deaths of 170 people (including seven U.S. citizens).

The evidence, which includes the challenged statements, the unchallenged portions of the defendant's statement to Jamal, and extrinsic evidence including travel records, ESO records, and the expected testimony of Alison Pargeter, amply demonstrates that the defendant, Said Rashid, Ali Kashlaf, Abdullah Senussi, Abdelbaset Ali Al-Megrahi, Lamin Khalifah Fhimah, and Muammar Qaddafi, shared a common purpose to attack U.S. and Western civilians during the timeframe of the statements in question. That satisfies the "most important" question in the Court's analysis – whether the conspirators shared a common goal. *Tarantino*, 846 F.2d 1384, 1393 (D.C. Cir. 1988). They were also interdependent: the defendant could not have built the bomb for La Belle without Rashid's say-so or Kashlaf supplying the materials. He could not have built the bomb for Lockerbie without Senussi's say-so, or without Megrahi and Fhimah telling him when to set it or Fhimah accepting the suitcase from him. There was also overlap – Rashid was involved in ordering the timers that ultimately brought down Pan Am Flight 103 as explained in further detail below, and he also asked for a study on the feasibility of getting an unaccompanied English airliner from Malta. Fhimah conducted reconnaissance in support of the attack on UTA Flight 772, and Senussi participated in it. This interdependence and overlap of participants support a conspiracy finding. *See*, *e.g.*, *id.*

The out-of-circuit precedent[10] cited by the defense in *United States v. Gigante* supports the government's view of the admissibility of the challenged statements. *Gigante* was an organized-crime case involving multiple mafia families. *See* 166 F.3d 75, 82 (2d Cir. 1999). Recognizing the "conspiratorial ingenuity" of this arrangement, the *Gigante* court explained that Rule 801(d)(2)(E) must be construed broadly to address "the full extent of" conspiracies that include numerous participants collaborating on an ongoing basis for an overarching unifying purpose rather than to commit a discrete object offense. *Id.* That is exactly the case here with the Qaddafi regime's use of the apparatus of the state to carry out Qaddafi's interests in a criminal manner by targeting civilians of Western countries.

In *Gigante*, the Second Circuit held that simple membership in a group of mafia families would not support the admission of any member of those families speaking about any crime: there must be "a conspiracy with some specific goal in addition to a general conspiracy to be members of the mafia." *Id.* at 83. The statements that the Second Circuit ruled were erroneously admitted are easily distinguishable from those that the government seeks to use here. One such statement was Gigante's *refusal* to authorize a murder of a man named Corky Vadosta, which was committed by the Genovese family, of which Gigante was the boss. *Id.* Those statements were excludable because there was no evidence that Gigante ever joined a conspiracy to murder Vadosta where he had refused his permission for that particular crime to move forward. Here, the government is offering no such statements where any of the declarants refused to authorize an operation. The government is also not offering statements regarding any crime ever committed by the ESO,

[10] The D.C. Circuit has never adopted the reasoning of *Gigante*; to the contrary, the Circuit's well-established jurisprudence on lawful joint ventures constitutes an implicit rejection of the *Gigante* court's reasoning that a "specific criminal goal" must predicate the admission of statements under Rule 801(d)(2)(E).

another worry of the *Gigante* court. The government is only offering statements from those who had agreed to carry out attacks against U.S. and Western civilians, which is precisely the type of statements whose admission the *Gigante* court sanctioned. *See id.* at 82 (admitting statements from other co-conspirators stating that they needed to seek his permission to commit two murders, where there was evidence from which one could infer that Gigante was involved in approving those murders). The declarants here are not far-flung ESO members who happen to belong to the same organization as the defendant and were discussing otherwise-unrelated events; to the contrary, they are his direct superiors and colleagues who made the statements at issue *to him*.

The *Gigante* court ruled that statements would be admissible if the government showed "a conspiracy with some specific goal in addition to a general conspiracy to be members of the mafia." This common-sense ruling dovetails with the D.C. Circuit's holding that the "most important" question in determining whether a conspiracy existed is whether the conspirators shared a common goal and, if so, what that goal was. *See Tarantino*, 846 F.2d at 1393; *see also Graham*, 83 F.3d at 1471; *Gatling,* 96 F.3d at 1520. Here, because the speakers in the challenged statements shared the common goal of committing acts of violence against the United States and its civilians, along with those of its Western allies, the challenged statements should be admitted.

Moreover, regardless of the scope of the criminal conspiracy, the facts proffered above also establish that the defendant was in a joint enterprise to carry out his ESO duties. *See United States v. Brockenborrugh*, 575 F.3d at 735 (citing *United States v. Gewin*, 471 F.3d at 202; *Weisz*, 718 F.2d 413, 433 (D.C. Cir. 1983)). "[T]he [co-conspirator statement] doctrine is not limited to unlawful combinations. Rather, the rule, based on concepts of agency and partnership law and applicable in both civil and criminal trials, 'embodies the long-standing doctrine that when two or more individuals are acting in concert toward a common goal, the out-of-court statements of one

are . . . admissible against the others, if made in furtherance of the common goal.'" *Gewin*, 471 F.3d. at 201 (quoting *Weisz*, 718 F.2d at 433). The proffer above amply demonstrates that the defendant was in a joint enterprise with his superiors and colleagues to carry out Qaddafi's foreign policy through the ESO, regardless of whether those foreign policy objectives were criminal.

2. The Statements are Admissible Against the Defendant because he Joined the Conspiracy.

As explained above, statements that meet the co-conspirator exemption are admissible even against a defendant who joined the conspiracy after the words were uttered. *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 393 (1948) ("With the conspiracy thus fully established, the declarations and acts of the various members, even though made or done prior to the adherence of some to the conspiracy become admissible against all as declarations or acts of co-conspirators in aid of the conspiracy"); *see also* Wright & Miller, Fed. Prac. & Proc. Evid., § 6779 ("Statements can be admitted under Rule 801(d)(2)(E) even if the party against whom the evidence is offered did not join the conspiracy until after the statements were made.[11] The defendant has effectively

[11] The government agrees with the defense that it does not appear that the D.C. Circuit has weighed in on this specific issue. And while defense is correct that *Gypsum Co.* predates the Federal Rules of Evidence, it is nonetheless controlling law. The defense is incorrect when it states that the "rule in other circuits seems to 'significantly predate' the modern Rule 801(d)(2)(E)." *See* ECF 497 at 12 n.3. Every Circuit other than the D.C. Circuit has considered the issue since the Federal Rules of Evidence were enacted, and each and has determined that co-conspirator statements made prior to a defendant joining a conspiracy are admissible against him, so long as he joined that conspiracy at some point. *See, e.g.*, *United States v. Melo*, 954 F.3d 334, 345 (1st Cir. 2020); *United States v. Tremusini*, 688 F.3d 547, 555 (8th Cir. 2012); *United States v. Handlin*, 366 F.3d 584, 590 (7th Cir. 2004); *United States v. Lampley*, 68 F.3d 1296, 1301 (11th Cir. 1995); *United States v. Mkhsian*, 5 F.3d 1306, 1312 (9th Cir. 1993), *overruled on other grounds by United States v. Keys*, 133 F.3d 1282, 1287 (9th Cir. 1998); *United States v. Rocha*, 916 F.2d 219, 240 (5th Cir. 1990); *United States v. Brown*, 943 F.2d 1246, 1255 (10th Cir. 1991) (citing cases from the First, Second, Third, Fourth, Fifth, Seventh, Eighth, Ninth, and Eleventh Circuits); *United States v. Cassity*, 631 F.2d 461, 464 (6th Cir. 1980). It is accordingly settled law that it is irrelevant when co-conspirator statements were made relative to the defendant joining the conspiracy. They are admissible so long as they were made during and in furtherance of the conspiracy and the defendant joined the conspiracy at some point.

conceded that he joined the conspiracy at the moment he learned about the involvement of explosives. *See* ECF 497 at 12 (Statement 1) (arguing that "subsequent statements indicate [] he did not learn about an explosive package until days later) & 14 (Statement 11) (conceding that an instruction to set a timer for an explosion was during and in furtherance of the conspiracy if existence conspiracy was established). Thus, any statements made by the defendant's co-conspirators during the existence of a conspiracy and in furtherance of it, even if uttered before he joined, are admissible against the defendant.

Regardless, there is ample evidence from which the Court can find by a preponderance of the evidence that the defendant was a member of the conspiracy at the time all challenged statements were made. The nature of the defendant's work in the mid-late 1980s, as recounted throughout his statement, was the construction and use of explosives. In just his statement to Jamal, the defendant recounted four completed or aborted terror attacks – La Belle, Lockerbie, the Pakistani President's funeral, and an attempt on the Egyptian President's life at the African Summit – for which the defendant served as a bomb technician. He also related that he spent time in the ESO training members Ghanaians in the use of explosives. It is a reasonable inference from the defendant's statement that when he was sent on a work trip abroad during this period by Said Rashid, as recounted in Statement 1 and others, that he knew that he was being directed to carry out an attack involving explosives, and his joining of the conspiracy – to the extent he had not yet joined – is evidenced by his following Rashid's directives and traveling to East Germany.[12]

[12] Even if the Court finds that the defendant had not yet entered into a criminal conspiracy at the time of the Rashid statement, that statement would be admissible under the "lawful joint venture" doctrine because the defendant and Rashid shared the common goal of carrying out the functions of the ESO, and Rashid's statement was unquestionably made in support of that shared goal.

The defendant's pre-existing knowledge in this regard is demonstrated by his statement to Jamal. When Ali Kashlaf informed the defendant that he was to prepare an explosive package to be used against an American target, the defendant was already "prepared psychologically and mentally for this task." ECF 232-2 at 4. He knew, after being informed of the specific assignment, that he should ask Kashlaf for the necessary materials, as evidenced by the fact that he did so. *See id.* There is no reasonable explanation for why the defendant would know to ask the security officer at an embassy abroad for materials to construct a bomb unless he had prior knowledge that when he traveled abroad for work, that work would involve construction of bombs at embassies. Indeed, the defendant demonstrated later in his statement that he knew that explosive materials would be brought to Libyan embassies abroad in diplomatic bags "easily." *See* ECF 232-2 at 5. There is accordingly ample evidence supporting a finding that the defendant had joined the conspiracy prior to reaching East Germany and speaking to Kashlaf. *See*, *e.g.*, *United States v. Carson*, 455 F.3d 336, 366 (D.C. Cir. 2006) (Defendant's "status as a conspirator may 'be inferred from circumstantial evidence.'"), *quoting Gatling*, 96 F.3d 1511, 1518 (D.C. Cir. 1996).

After La Belle, there is no question that the defendant was on notice that his bombs would be used to mount terror attacks, including against U.S. interests. Later in 1986, the defendant participated in an aborted attempt to assassinate the Egyptian President. ECF 232-2 at 24-25. As of August 1988, the defendant described himself and his ESO colleagues as being "in a state of mobilization against America and the West." *Id.* at 10. It is difficult to conceive of a clearer statement of the purpose and shared goal of the conspiracy. A few short months later, after conducting tests involving explosive materials secreted in radios within suitcases and determining whether those materials could be successfully passed through an airport scanner, Ex. 1201-t at 7 and 9, the defendant found himself in Senussi's office, being ordered to retrieve a booby-trapped

suitcase and travel with it to Malta. Even without the history laid out above, the reference to booby-trapped suitcases in Senussi's directive establishes that the defendant knew the broad contours of the operation he would be asked to undertake at that point. With the history, there is no other plausible explanation than that the defendant had already joined the conspiracy before going to Senussi's office.[13]

3. <u>Defendant's Statement, Extrinsic Evidence, and Alison Pargeter's Testimony Provide Sufficient Independent Evidence.</u>

The defense does not contest the government's position that the Court can consider the defendant's statement to Jamal as independent evidence that establishes the existence of a conspiracy.[14] There is no limit, other than privilege, to the type of independent evidence a Court can consider. *See* Fed. R. Evid. 104(a) (in deciding preliminary questions of admissibility, "the court is not bound by evidence rules, except those on privilege"); *see also Bourjaily*, 483 U.S. at 178-79 (confirming that Rule 104(a) is the proper provision under which to evaluate the admissibility of co-conspirator statements). Indeed, there are multiple types of evidence that make up the government's proffer of facts above. A summary chart of some of those facts follows. As the Court can see, the vast majority of evidence on which the government relies is admissible evidence, but even for those that may not be admitted at trial, the Court should still consider them for its Rule 104(a) analysis.

[13] At the very latest, if the Court finds a specific Pan Am 103 conspiracy, as opposed to a conspiracy to attack United States and Western civilians, the defendant joined it at the point he was answering Senussi's questions. Regardless, the statement would be separately admissible as one made in furtherance of a joint venture – namely, an agreement between Senussi, the defendant, and others for the defendant to travel to Malta with a specified suitcase to fulfill his ESO duties.

[14] The defense contends, instead, that the Court should give the statement no weight. The government disagrees for the reasons previously stated.

In the chart below, the challenged statements are italicized. Evidence independent of the challenged statements appears in standard text. Of the 45 pieces of evidence summarized below, only 11 consist of the challenged statements themselves.

| **Evidence in Support of Conspiracy** | **Source** | **Citation** |
|---|---|---|
| Qaddafi's Ruling Style | Pargeter | Pargeter Notice at 3 |
| Loss of Libyan armed forces in Gulf of Sidra and Qaddafi's response | Pargeter | Pargeter Notice at 6-7 |
| Defendant is psychologically and mentally prepared to use explosives against American target | Defendant's Statement | ECF 232-2 at 4 |
| *Said Rashid directs the defendant to travel to East Germany* | *Challenged Statement* | *Statement 1* |
| Defendant travels to East Germany | Defendant's Statement | ECF 232-2 at 4 |
| Defendant travels to East Germany | Documentary Evidence | Exhibits 603, 608; Feb. 11, 2026, Hr'g Tr. (a.m.) at 66-69, 73-76 |
| Defendant meets with Kashlaf | Defendant's Statement | ECF 232-2 at 4 |
| *Kashlaf instructs defendant to prepare an explosive package for use against an American target* | *Challenged Statement* | *Statement 2* |
| Defendant asks Kashlaf for proper materials, uses them to construct a bomb | Defendant's Statement | ECF 232-2 at 4 |
| Defendant instructs Kashlaf on how to arm bomb | Defendant's Statement | ECF 232-2 at 4 |
| *Kashlaf nods during German broadcasts about La Belle* | *Challenged Statement* | *Statement 5* |
| Defendant knows explosives are easily transported to embassies abroad in diplomatic bags | Defendant's Statement | ECF 232-2 at 5 |
| Defendant describes the force and damage of the bomb he constructed for the La Belle attack | Defendant's Statement | ECF 232-2 at 5 |
| Crime scene photos match the defendant's description | Tunstall Testimony | Feb. 11, 2026, Hr'g Tr. (a.m.) at 79-80 |
| Defendant returns to Tripoli from East Germany following the La Belle attack | Documentary Evidence | Exhibit 611 |
| Qaddafi's and Rashid's reactions to U.S. airstrikes on Libya | Pargeter | Pargeter Notice at 6 |

| | | |
|---|---|---|
| Defendant's August 1988 mindset is that he and ESO counterparts are "in a state of mobilization against America and the West" | Defendant's Statement | ECF 232-2 at 10 |
| Defendant participates with ESO members in aborted plot to kill sitting U.S. Secretary of State | Defendant's Statement | ECF 232-2 at 10-14[15] |
| Defendant conducts tests at Senussi's direction on explosive materials that were placed in a radio inside of a suitcase | Documentary Evidence | Ex. 1201-t at 9 |
| Defendant conducts tests on a suitcase establishing that explosion was powerful, would achieve the mission, and that no foreign body showed up on the scanner | Documentary Evidence | Ex. 1201-t at 7 |
| *Defendant possesses knowledge that bomb that would later be used on Pan Am Flight 103 would be used against an American target* | *Challenged Statement* | *Statement 13* |
| *Senussi asks whether booby trapped suitcases are finished and ready* | *Challenged Statement* | *Statement 8* |
| *Senussi orders defendant to travel to Malta with suitcase* | *Challenged Statement* | *Statement 9* |
| *Senussi informs defendant that Megrahi and Fhimah would meet him in Malta* | *Challenged Statement* | *Statement 10* |
| Defendant travels to Malta the day after meeting with Senussi, carrying the prepared suitcase | Defendant's Statement | ECF 232-2 at 6 |
| Defendant travels to Malta at a time when Megrahi and Fhimah were there | Documentary Evidence | Exhibits 830, 832, 845; Feb. 11, 2026, Hr'g Tr. (a.m.) at 90-98 |
| Defendant knew Megrahi from time at ESO and met Fhimah while carrying out the operation. | Defendant's statement | ECF 232-2 at 9 |
| In Malta, defendant stays at a hotel pre-arranged by Libya | Defendant's statement | ECF 232-2 at 6 |
| Defendant flies back to Tripoli and returns to Malta | Documentary Evidence | Feb. 11, 2026, Hr'g Tr. (a.m.) at 90-98. |

[15] The Court is of course permitted to rely on the challenged statements within the defendant's recitation of this incident in making its preliminary determination to the same extent that it can rely on the challenged statements about La Belle and Pan Am Flight 103.

| | | |
|---|---|---|
| Megrahi travels to Prague and Zurich in December 1988, with accommodations in Prague paid by Libyan Embassy | Documentary Evidence | Ex. 907-08, Feb. 11, 2026, Hr'g Tr. (a.m.) at 90-98. |
| Megrahi and Fhimah meet with defendant in lobby of hotel | Defendant's statement | ECF 232-2 at 6 |
| *Megrahi and Fhimah instruct defendant how to set the bomb and provide him money to buy clothes* | *Challenged statement* | *Statement 11* |
| Defendant carries out Megrahi's and Fhimah's instructions | Defendant's statement | ECF 232-2 at 7 |
| Defendant arranges detonator in such a way as to not be detected by airport security | Defendant's statement | ECF 232-2 at 7 |
| Defendant hands the bomb-rigged suitcase to Fhimah after receiving Fhimah's signal | Defendant's statement | ECF 232-2 at 7 |
| Defendant receives a boarding card and flies back to Tripoli on morning of bombing | Defendant's Statement | ECF 232-2 at 7 |
| Defendant flies on the same flight as Megrahi to Tripoli | Documentary Evidence | Ex. 820, 829, 837; Feb. 11, 2026, Hr'g Tr. (a.m.) at 103-105 |
| Clothing in bomb-rigged suitcase largely originated in Malta | Forensic Analysis | Feb. 11, 2026, Hr'g Tr. (a.m.) at 100-01 |
| Bomb-rigged suitcase travels without an accompanying passenger from Malta to Frankfurt to London | Documentary Evidence | Feb. 11, 2026, Hr'g Tr. (a.m.) at 112-15 |
| *Senussi thanks defendant and Megrahi for success of operation* | *Challenged Statement* | *Statement 17* |
| Defendant, Megrahi, Senussi, and Fhimah meet with Qaddafi | Defendant's Statement | ECF 232-2 at 9 |
| *Qaddafi thanks defendant and co-conspirators for a great patriotic act against Americans* | *Challenged Statement* | *Statement 19* |
| *Senussi bans defendant from traveling abroad* | *Challenged Statement* | *Statement 21* |
| ESO members conduct reconnaissance on UTA Flight 772 | Documentary Evidence | Exhibit 1201-t at 5 |
| ESO members place a bomb on UTA flight 772, killing 170, including 7 U.S. citizens | Open-source reporting | *E.g.*, "Libyans sentenced for French bombing," BBC March 10, 1999.[16] |

[16] Available at http://news.bbc.co.uk/2/hi/294306.stm (last visited June 25, 2026).

Separately, as previously discussed, even if the Court does not find the existence of an ongoing conspiracy to harm westerners as delineated above, the evidence above nonetheless demonstrates that the defendant was in a joint venture with all of the declarants at issue to carry out his duties as a member of the ESO, regardless of whether those duties constituted a criminal conspiracy. *See*, *e.g.*, *Gewin*, 471 F.3d at 201 (Rule 801(d)(2)(E) permits statements of co-joint venturers, regardless of whether the purpose of the agreement was lawful or unlawful).[17] Accordingly, the Court should admit each of the statements the government offers under Rule 801(d)(2)(E) regardless of how it defines the conspiracy.

**B. The Challenged Statements Were Made by Co-Conspirators**

The proffered evidence establishes by a preponderance of the evidence that each of the declarants was a co-conspirator of the defendant. It is not necessary to show that a co-conspirator "was a principal member of the conspiracy or that he had a relationship with every conspiracy member." *United States v. Carson*, 455 F.3d 336, 365 (D.C. Cir. 1995). A co-conspirator's status as such may be inferred from circumstantial evidence and from his knowing participation in a joint objective. *See id.* at 366, *citing United States v. Gatling*, 95 F.3d 1511, 1518 (D.C. Cir. 1996) and *United States v. Childress*, 58 F.3d 693, 710 (D.C. Cir. 1995).

[17] For the reasons stated above, the out-of-circuit precedent cited by the defense, *United States v. Gigante*, 166 F.3d 75, 82-83 (2d Cir. 1999), is inapposite on these facts. The government is not seeking to admit statements from every ESO member on every topic relevant to the ESO, which was the *Gigante* Court's worry. The government is instead seeking to admit those statements which the defendant himself has conceded – by relaying them to Jamal – were necessary for him to carry out his duties or that otherwise related to his duties. Under these facts, the Court can and should find that each of the challenged statements that the government offers under Rule 801(d)(2)(E) supports a joint venture to allow the defendant to carry out his job functions within the ESO.

1. Said Rashid was a Member of the Conspiracy

Said Rashid summoned the defendant to his office, ECF 232-2 at 4, and ordered the defendant to travel to East Germany. Statement 1. That alone establishes that he was a co-conspirator, both in the criminal sense and in the "lawful" joint venture sense. He previously stated to Qaddafi, in 1980, "Master Leader, I am your dagger, I am your sword, I am your pistol, I am your machine gun. If you order me to shoot my children, I will do it myself before you can even blink." Pargeter Notice at 10. The government expects to present evidence at trial that in 1985, Rashid was a part of a group of Libyan officials who met with representatives of the Swiss firm "MEBO," and provided the specifications for timers that they wanted to order from MEBO. Forensic analysis would later show that one of the timers produced by MEBO in response to that order was used to trigger the explosion that brought down Pan Am Flight 103. Forensic analysis also indicated that the bomb was secreted in a specific model of Toshiba radio-cassette recorder. The Toshiba employee who managed the contract for that type of recorded with Libya testified at the Scottish trial that the chairman of the Libyan company that contracted to import those radios was Said Rashid.[18] The government also expects to present evidence at trial that, prior to Lockerbie, but after La Belle, Rashid asked an ESO member in Malta whether it was possible to place an unaccompanied bag on a flight to England. Rashid's status as a member of the conspiracy applies to Challenged Statements 1 and 3.

[18] A copy of that transcript will be submitted to the Court via USAfx. Although the government does not expect that the witness who testified to that fact at the Scottish trial will be available to travel to the United States, the Court should nonetheless consider the testimony in assessing the preliminary evidence of the conspiracy under Rule 104(a).

2. Ali Kashlaf was a Member of the Conspiracy

When Rashid directed the defendant to travel to East Germany, he told him he would be meeting with Ali Kashlaf, a man Rashid described as the security officer at the Libyan Embassy. Statement 1. Kashlaf then indeed met with the defendant upon his arrival in East Germany. ECF 232-2 at 4. In the embassy, Kashlaf informed the defendant that he was to prepare an explosive package for use against an American target, Statement 2, and supplied the explosive and timing materials to build that bomb to the defendant. ECF 232-2 at 4. Later that day, Kashlaf informed the defendant that he had handed the matter of interest to the person who would carry out the task, and after the attack, he nodded as German broadcasters showed news of the La Belle attack. Statements 4 and 5. The above recitation of evidence includes both the challenged statements, and the defendant's unchallenged personal observations. These facts also should be evaluated in light of the totality of the government's proffered evidence, all of which establish by a preponderance that Kashlaf was a member of the conspiracy – both the criminal conspiracy and the ESO "lawful joint venture" for the defendant to carry out his duties – at the time he uttered the challenged statements. Kashlaf's status as a member of the conspiracy applies to Statements 2, 4, and 5.

3. Abdullah Senussi was a Member of the Conspiracy

Just months prior to the attack on Pan Am Flight 103, the defendant was conducting tests involving placing explosive materials inside of radios packed in suitcases and determining whether a foreign body would show up on a scanner when packed in a suitcase. Ex. 1201-t at 7, 9. These tests were carried out either at Senussi's direction or with him present. *Id.* The defendant described Senussi as the ESO leader "in total control." ECF 232-2 at 3. Alison Pargeter establishes that Senussi, along with Rashid, were in "the Blood Group," given absolute power to commit any operation abroad. Pargeter Notice at 8. Senussi was "especially close to Qaddafi and was one of his most trusted aides, holding various senior posts over the years." *Id.* at 9. Months after the

explosive tests described above, Senussi summoned the defendant to his office, ECF 232-2 at 6, inquired about the booby-trapped suitcases, Statement 8, and then ordered him to travel to Malta with one. Statement 9. The following day, the defendant traveled to Malta, carrying the prepared suitcase. ECF 232-2 at 6. Three or four days after the Pan Am Flight 103 attack, Senussi met with the defendant and Megrahi and thanked them for the success of the operation, Statement 17, and he was waiting for the defendant, Megrahi, and Fhimah, on the day they met with Qaddafi a few months later. ECF 232-2 at 9. Senussi was present for Qaddafi thanking the conspirators for performing a patriotic act against the Americans. Statement 19. Post-attack, Senussi banned the defendant from traveling abroad and later withdrew his passport. Statements 21 and 22. There is ample evidence from which to conclude that Senussi was both a member of the criminal and "lawful joint venture" conspiracies, and thus all challenged statements uttered by him are admissible. Senussi's membership in the conspiracy applies to Statements 8-10, 17, 21, and 22.[19]

[19] The defense claims that the government bears the burden of proving that Senussi was a member of the conspiracy for Statements 7 and 11. ECF 497 at 13-14. Although the government has met that burden, the defense's position that Senussi's membership must be shown for these statements is curious, as Senussi is not the declarant for either. For Statement 7, the declarant is Muftah Abdulkarim, and although one could argue that Abdulkarim's statement contains, by implication, an inference that Senussi had summoned the defendant, that fact is unchallenged by the defendant. *See* ECF 232-2 at 6 ("Yes, I recall it was in 1988 and in the winter that I was summoned by ˁAbdullah Al-Sanūsī to attend his office in the Falāḥ district, 'The Studies Centre.' I was informed of this by the Head of the Section, Muftāḥ ˁAbdulkarīm.") (blue highlighting original to ECF 232-2, indicating non-objection to the fact that the defendant was summoned by Senussi). For Statement 11, which was made in Malta, the only reasonable inference is that the statement was made by Megrahi, Fhimah, or a combination. *See id.* at 6-7 ("After three or four days in the hotel ˁAbdulbāṣit Al-Magraḥī and Al-ˀAmīn Fḥīma both came to me and I met them in the hotel lobby, where I was asked to get up the following morning at seven o'clock in order to set the timer of the explosion inside the suitcase in such a way that the explosion would occur exactly eleven hours later. He handed me the sum of 500 American dollars to buy some clothes to put in the suitcase instead of my own clothes, which I did.) (blue highlighting original to ECF 232-2).

4. Abdelbaset Ali Al-Megrahi and Lamin Khalifah Fhimah were Members of the Conspiracy

Senussi – the ESO leader in total charge, according to the defendant – informed the defendant that Megrahi and Fhimah would meet him in Malta. Statement 10. That did in fact happen, as evidenced by the Maltese immigration records described above and the defendant's statement. *See* ECF 232-2 at 6. Megrahi traveled during the crucial period between the defendant's first trip to Malta on December 7, 1988, and the bombing: he went to Prague (where Semtex was manufactured and where his accommodation was paid for by the Libyan government), Zurich (the home of the company that manufactured the timer used to control the detonation, where Megrahi maintained shared office space), and to Tripoli and then back under a pseudonym. *See generally* Feb. 11, 2026, Hr'g Tr. (a.m.) at 90-98. On the date of the bombing, the defendant saw both Megrahi and Fhimah pass in front of him before Fhimah signaled to the defendant to bring the bomb-rigged suitcase. ECF 232-2 at 7. After the defendant did so, Fhimah placed the suitcase on the conveyor belt, *id.*, and the defendant departed for Tripoli on the same flight as Megrahi. *See id.*; Feb. 11, 2026, Hr'g Tr. (a.m.) at 103-105; Ex. 820, 829, 837. Megrahi was present when Senussi thanked the co-conspirators, and both Megrahi and Fhimah were present when Qaddafi did so. ECF 232-2 at 9; Statement 19. There is ample evidence from which to conclude that Megrahi and Fhimah were both a member of the criminal and "lawful joint venture" conspiracies, and thus all challenged statements uttered by them are admissible. Megrahi's and Fhimah's membership applies to Statements 11, possibly 16, and 18.

5. Muammar Qaddafi was a Member of the Conspiracy

Qaddafi's rule of Libya was "deeply personalized and authoritarian," Pargeter Notice at 3, and "those who challenged him were dealt with ruthlessly." *Id.* at 2. In a 1984 speech, Qaddafi stated, "If America exports terrorism, we will export terrorism to it. We are able to export terrorism

to the heart of America. We are able to physically liquidate and burn and destroy inside America." *Id.* at 6. One of the functions of the Libyan security forces– all of which ultimately reported to Qaddafi – was to carry out acts of violence in foreign countries. Pargeter Notice at 10.

After the conflict between U.S. and Libyan forces in the Gulf of Sidra, Qaddafi described the U.S. actions as "organized terrorism," and added, "[i]f there is an act of aggression against Libya, it will be considered the beginning of the end." Pargeter Notice at 6. Twelve days later, the defendant – ordered by Rashid, a member of the "Blood Group" who referred to himself as Qaddafi's dagger, sword, pistol, and machine gun – and others carried out the La Belle bombing.

Following the U.S. airstrikes in the wake of La Belle, Qaddafi flew into a rage of anger and fear, and his politics of revenge were on full display. *Id.* at 7. In one speech, Qaddafi stated that "Yankees" should not be treated as human. In another, he said that his army "will spread out to all corners of the globe and destroy the American presence everywhere." Given Qaddafi's near-total control over Libyan life and the apparatus of the state, it is exceedingly unlikely that either his top lieutenants or foot soldiers in the ESO were unaware of his desire for revenge or their role in carrying out that revenge. Senussi, who ordered the defendant to travel to Malta with the booby-trapped suitcase, and who oversaw the defendant's pre-operational testing, was "especially important" to Qaddafi. He was Qaddafi's brother-in-law and one of his most trusted aides. Pargeter Notice at 9. The chances that Senussi, Rashid, and Qaddafi did not have an understanding that (1) the ESO was to carry out Qaddafi's foreign policy through violence, and (2) that violence should include attacks on U.S. and Western civilians, is practically nil. Because Qaddafi shared a common goal with the ESO co-conspirators discussed above, along with the defendant, he was a member of the conspiracy. *See*, *e.g.*, *United States v. Tarantino*, 846 F.2d 1384, 1393 (D.C. Cir.

1988). (The most important question, in determining the scope of a conspiracy, is "whether the conspirators share a common goal").[20]

But if there were any doubt about Qaddafi's role in the conspiracy, his actions after the Pan Am Flight 103 attack put those doubts to rest. He thanked and praised his co-conspirators for "performing a great patriotic act against the Americans" and, according to the defense, "presumably" tasked Senussi with looking after the defendant, Megrahi, and Fhimah, and granting their requests. *See* ECF 497 at 16; Statements 19 and 20. Had the attack on Pan Am Flight 103 not been in line with the goals of the conspiracy, Qaddafi would not have thanked and praised the defendant and other participants. Indeed, given Qaddafi's closeness to Senussi, it is unlikely that the operation went forward without Qaddafi's sign-off. But even in the absence of that, it is unlikely someone like Senussi would have remained in his post, let alone been thanked and praised, had the operation not been in furtherance of the conspiracy. There is ample evidence to show that Qaddafi is a member of the criminal conspiracy, but even if he was not, by virtue of his status as head of the Libyan state to whom the ESO reported, he would be a co-conspirator in the "lawful joint venture" of ensuring that the defendant fulfilled his job functions in the ESO. Qaddafi's membership in the conspiracy applies to Statements 19 and possibly 20.

6. <u>Muftah Abdulkarim and Others Joined the Conspiracy</u>

Muftah Abdulkarim told the defendant to report to Senussi's office. As discussed above, *supra* n. 19, the defendant does not object to the fact that he was summoned by Senussi to his office, so the only statement at issue is a pure directive statement by Abdulkarim. The defendant

[20] Whether defendant knew Qaddafi had joined the conspiracy is immaterial. It is not necessary to show that a co-conspirator "was a principal member of the conspiracy or that he had a relationship with every conspiracy member." *United States v. Carson*, 455 F.3d 336, 365 (D.C. Cir. 1995).

described Abdulkarim as the "head of the section," Statement 7, so he is a member of the ESO. The surrounding context of the unchallenged parts of the defendant's statement establishes this fact as well: it is unlikely that someone who was not a member of the ESO would be summoning the defendant to Senussi's office, especially where Senussi was about to send the defendant on a terrorist mission. If nothing else, Abdulkarim is a member of the ESO "lawful joint venture" that permits the defendant to accomplish his job, and to the extent that Abdulkarim's statement is otherwise hearsay at all, it is admissible under Rule 801(d)(2)(E) on that basis.

Statements 13, 16, and 20 have potentially unidentified declarants.[21] That does not preclude their admission under Rule 801(d)(2)(E). *See United States v. El-Mezain*, 664 F.3d 467, 505 (5th Cir. 2011) (holding, "consistent with those of our sister circuits" that "anonymous statements may be admissible under Rule 801(d)(2)(E) if sufficient evidence is presented to connect the declarant with the conspiracy at issue") (citing *United States v. Martinez,* 430 F.3d 317 (6th Cir. 2005); *United States v. Smith*, 223 F.3d 554, 570 (7th Cir. 2000); *United States v. Dynalectric Co.*, 859 F.2d 1559, 1582 (11th Cir. 1988); *United States v. Zuniga–Perez*, 69 Fed. Appx. 906, 913 (10th Cir. 2003) (unpub.)). The government has presented sufficient evidence to connect any anonymous declarants to the conspiracy at issue. Statement 13 ("but I did know that Americans would be targeted with this explosive device") is a statement of the defendant's knowledge, which is admissible under Rule 801(d)(2)(A), but the defense has asserted that the context makes it clear that the declarant is a member of the ESO. *See* ECF 491 at 10 (Statement 13) & n.5.[22] If the defense position is correct, the declarant of this statement was both a member

[21] Statement 16 – regarding Megrahi's and Fhimah's positions – likely came from them, but the defendant's statement does not definitively state that. The defense states that the declarant for Statement 20 is "presumably" Qaddafi.

[22] Although the defendant assumes that "Mr. Al-Marimi learned this information from an unspecified source, almost certainly hearsay," that is far from certain. It is entirely plausible that

of the ESO and knew enough of the plan to communicate the target to the defendant. That person was thus a member of the conspiracy. If the declarant of Statement 16 (Megrahi's and Fhimah's positions) was Megrahi or Fhimah, they were members of the conspiracy for reasons stated above. If it were by some other member or affiliate of the ESO, that person would be a member of the ESO joint enterprise that allowed the defendant to do his job.[23] The same is true of Statement 20 ("ʿAbdullah Al-Sanūsī had been tasked with looking after us and granting all our requests"). If this declarant is not Qaddafi, it is someone with a role in the ESO to ensure that its employees who have just been praised by Qaddafi are taken care of. This would qualify that person for membership in the ESO joint enterprise that allows the defendant to accomplish his job functions.

**C. The Challenged Statements Were Made During and In Furtherance of the Conspiracy**

All of the challenged statements were made in during and furtherance of the conspiracy, as they were all statements that can be reasonably be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, as enhancing a co-conspirator or other person's usefulness to the conspiracy, as keeping a co-conspirator updated on the status of the business, to motivate a co-conspirator's continued participation, or provide background information on key conspiracy members. *See*, *e.g.*, *United States v. Celis*, 608 F.3d 818, 843 (D.C. Cir. 2010), *citing United States v. Carson*, 455 F.3d 336, 366-67 (D.C. Cir. 2006). Those statements made after the attack on Pan Am Flight 103 were made during the course of both the conspiracy to attack U.S. and Western

---

the defendant inferred the bomb would target Americans based on his understanding of U.S.-Libya relations and on the "mobilization against America" that was then taking place. Regardless, Rule 602 does not apply here, and the relevance of this statement is that the defendant believed it, so it does not matter what was the basis of the defendant's knowledge.

[23] Separately, the defendant interacted with and observed Megrahi and Fhimah in their day-to-day roles, including the fact that Fhimah accepted the bags from a position that only airline employees had access to. He thus has firsthand knowledge of their roles.

civilians, and to fulfill the defendant's role in the ESO joint enterprise. They were thus made both during and in furtherance of those conspiracies.

1. Statements Regarding the La Belle Attack

The defense does not contest whether the statements made prior to the commission of the La Belle Attack (Statements 1-4) were made during and in furtherance of the conspiracy, assuming that the government can establish the existence of a conspiracy involving the defendant and declarants.[24] *See* ECF 497 at 12-13. The defendant also does not challenge whether Kashlaf nodding, which took place after the attack, was during the conspiracy; he maintains only that the government must connect Kashlaf's intent in nodding with the statement being in furtherance of the conspiracy. *See* ECF 497 at 13, Statement 5. The defendant's effective concession that Statements 1-4 were made in furtherance of the conspiracy is wise: those statements, which direct the defendant to take certain actions and/or inform him of the status of the conspiracy, are precisely the types of statements whose admission are routinely upheld as co-conspirator statements. *See, e.g.*, *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988) ("If the statement [] can reasonably be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy, then the statement is in furtherance of the conspiracy and may be admitted"); *United States v. Carson*,

---

[24] As to Statements 1-3, the defendant states only that the government must establish that the defendant joined the conspiracy beforehand and that the declarants were participants in it. For the reasons stated in Part III.B.2, *supra*, when the defendant joined is immaterial, so long as he joined at some point, and in any event, the evidence establishes by a preponderance that he had joined before meeting with Rashid, but at the *very* latest when he agreed to go to Germany at Said Rashid's direction. The participation of the declarants was established in Part C, *supra*. Finally, the defendant was in a joint venture to carry out his ESO duties with at least Rashid and Kashlaf at the time of their statements, regardless of whether that joint venture was criminal in nature. Under any of those theories, the statements that were made in furtherance of the conspiracy before the Kashlaf mentioned explosives are admissible against the defendant under Rule 801(d)(2)(E).

455 F.3d 336, 367 (D.C. Cir. 2006) (Statements including "those that keep a coconspirator updated on the status of the business" are in furtherance of the conspiracy) (cleaned up).

Although the defendant disputes it, Kashlaf nodding during the German broadcasts was also a statement made in furtherance of the conspiracy. It is unclear what the defendant means when he says that the government must prove "Kashlaf's intent in nodding." D.C. Circuit case law establishes that a statement is admissible if it "can plausibly be interpreted" or "reasonably be interpreted" as being in furtherance of the conspiracy. *See United States v. Edmund*, 52 F.3d 1080, 1110-1111 (D.C. Cir. 1995); *Celis*, 608 F.3d at 843 (citing *Edmond*). What is clear is that the defendant took Kashlaf's nod as communicating to him that the news reports were showing the target of the explosive charge the defendant prepared. Kashlaf's nod can thus plausibly and reasonably be interpreted as keeping the defendant updated on the status of the business, which is a statement in furtherance. *See*, *e.g.*, *Carson*, 455 F.3d at 367. The fact that Kashlaf's nod took place shortly after the attack and that the listener – here the defendant – was also a co-conspirator only strengthens that analysis. *See*, *e.g.*, *Tarantino*, 846 F.2d at 1412 ("[W]here the recounting took place soon after the events at issue, and where [the listener] was a participant in the overall conspiracy ... [the] reports helped keep [the listener] current on the status of the business." Kashlaf's nod was in furtherance of the conspiracy and thus admissible.[25]

2. Statements Regarding the Attack on Pan Am Flight 103

Much like with statements related to the La Belle attack, the defendant has effectively conceded that Statements 7-11, which relate to the attack on Pan Am Flight 103, but which were

[25] If Kashlaf did not in fact intend to convey to the defendant that his bomb was used in La Belle, as the defendant's position seems to imply, then Kashlaf nodding his head is not hearsay at all, as the government would not be introducing evidence of the nod for the truth of what Kashlaf was trying to assert (if anything) .

made before it, were uttered during and in furtherance of the conspiracy, assuming that the government's evidence establishes the existence of a conspiracy between the defendant and the declarants. *See* ECF 497 at 13-14 (not challenging the "furtherance of" prong for any of those statements and conceding both prongs for Statement 11). As with the La Belle statements, when the defendant joined the conspiracy is immaterial (but in any event he joined prior to the statements for the reasons in Part III.B.2, *supra*), and the government has established that the declarants joined the conspiracy for the reasons stated in Part III.C, *supra*. The defendant's concession is again wise, as all of those statements direct or invite the defendant to take action that is in furtherance of the conspiracy. Such statements are classic co-conspirator statements. *See*, *e.g.*, *Tarantino*, 846 F.2d at 1412.

The rest of the challenged statements regarding Pan Am Flight 103 can be divided in three categories: (1) Statement 13, which establishes the defendant's prior knowledge that the target would be American; (2) Statement 16, which establishes the defendant's prior knowledge of Megrahi's and Fhimah's positions, and (3) Statements 17-22, which are statements or actions taken by co-conspirators after the completion of the attack on Pan Am Flight 103. The government will address each category in turn.

As the government has argued, Statement 13, "but I did know that Americans would be targeted with this explosive device" contains no out-of-court statement other than his own recitation of his own knowledge. It is thus admissible under Rule 801(d)(2)(A). But because the defense has contended that it must have come from a member of the ESO, the government offers this analysis. As noted above, *see supra*, Part III.C.6, if this statement from the defendant does indeed include an implicit embedded statement from a member of the ESO, that person must have been a member of the conspiracy. For the statement to have provided the defendant with prior

knowledge that Americans would be targeted with the device, it must also have been made in furtherance of the conspiracy – it divulged a part of the plan itself.[26]

Statement 16 is a statement regarding the defendant's knowledge of Megrahi's and Fhimah's professional positions. Provision of information regarding the identities and positions of individuals that someone will be working with in a joint venture – in other words, background information that allowed the defendant to know how to do his job – whether criminal or not, further that joint venture. *See*, *e.g.*, *United States v. Walls*, 70 F.3d 1323, 1327 (D.C. Cir. 1995) (statement providing background information on key players was in furtherance of the conspiracy) (abrogated in part on other grounds by *United States v. Booker*, 543 U.S. 220 (2005)); *Carson*, 455 F.3d at 367 (provision of background information on key conspiracy members is in furtherance of conspiracy); *Edmond*, 52 F.3d at 1111 (statements providing background information about one drug dealer to another were in furtherance of the conspiracy because they provided background information to a key player, which enabled him to carry out his duties); *Tarantino*, 846 F.2d at 1413 (provision of information about past fraudulent loan transactions to co-conspirator bookkeeper were background information provided to a key player, thereby helping him carry out

[26] The defendant also states that "this statement and the meaning of the translated word 'knew' is at best ambiguous." ECF 497 at 14 n.4. The government notes that the defense did not include an objection to this translation in the objections it filed at ECF 462-4. Regardless, if the defense thinks that the translated word should be given any reading other than its plain meaning, they have not offered what the Court should read it as, or why.

In the same footnote, the defendant states, citing Fed. R. Evid. 602, that "the question of the statement's presumed unreliability grows more significant." The government could not disagree more. What matters for the defendant's intent is what he believed in his own mind, regardless of why he believed it. Additionally, although the parties had previously believed that the D.C. Circuit had not weighed in on this question, the D.C. Circuit has in fact ruled that "these rules [prohibiting opinions and requiring testimony to be based on firsthand knowledge] are inapplicable to declarations admissible under the co-conspirator exception to the hearsay rule." *United States v. Haldeman*, 559 F.2d 31, 110 (D.C. Cir. 1976). In so holding, the Circuit cited to the same advisory committee notes on which the government relies in support of its position that Rule 602 does not apply to statements of a party opponent. *Id*.

his duties). Here, for the defendant to be able to effectively work with Megrahi and Fhimah (whether in carrying out a criminal conspiracy or his "lawful" duties within the ESO), he would need to know what each of their roles were. The provision of that background information is thus in furtherance of the conspiracy.

Statements 17-22 are statements made by co-conspirators following the conclusion of the attack on Pan Am Flight 103. As established above, *see supra*, Part III.B.1, the conspiracy to attack U.S. and Western interests continued after the bombing of Pan Am Flight 103 ended. But even if the Court disagrees with that premise, the joint enterprise of the ESO continued: The defendant still had a role to play within the ESO of carrying out Qaddafi's foreign policy in the manner directed by his superiors. Under either formulation of the conspiracy, Qaddafi and Senussi thanking and praising those who carried out the attack on Pan Am Flight 103 are in furtherance of the conspiracy. *See*, *e.g.*, *United States v. Celis*, 608 F.3d 818, 843 (D.C. Cir. 2010) (statements that "motivate a conspirator's continued participation" are in furtherance of the conspiracy), *quoting Carson*, 455 F.3d at 366-67. The D.C. Circuit has also specifically noted that "recounting past violent acts to members of a violent gang is a statement in furtherance of the conspiracy because it provides useful information on the conspiracy's activities and motivates conspiracy members' continued participation." *United States v. Moore*, 651 F.3d 30, 84 n.21 (D.C. Cir. 2011), *citing Carson*, 455 F.3d at 367. It is not hard to see how being thanked by Senussi for his work and being praised by Qaddafi for his patriotic act against the Americans would motivate the defendant to continue engaging in his duties at the ESO.[27] That applies regardless of whether the encouragement was in support of an ongoing conspiracy to attack American and Western civilians,

[27] Statement 18, where Megrahi directs the defendant to prepare to travel – ultimately to meet Qaddafi – was in furtherance of one of the trip to motivate the defendant to continue engaging in his duties.

or the more mundane joint enterprise of the defendant carrying out his functions as a member of the ESO. The same is true of the statement that Senussi should take care of the defendant and grant his requests, Statement 20.

Statements 21 and 22 both related to the defendant being banned from travel by Senussi. Doing so was in furtherance of the ongoing conspiracy – whether "lawful" joint venture or the criminal conspiracy to attack Western civilians, for (among other things) the self-evident reason that the defendant was no good to the ESO if he was in custody – he could then no longer participate as a conspirator. The statements were made as both the criminal and lawful joint ventures were ongoing, rather than after they ended, and thus they were in furtherance of the conspiracy, as they enhanced the defendant's usefulness to the conspiracy and motivated his continued participation. *See Celis*, 608 F.3d at 843.[28]

[28] Based on its context, Statement 22 appears to have been made in 1995 or later. *See* ECF 232-2 at 9. There is no indication that the criminal conspiracy to attack U.S. and Western interests had ended by then, but even if it had, the joint enterprise of the ESO continued, and the defendant could not fulfill his role in that joint venture if he fell into the hands of a foreign power. The statement was thus at a minimum made in furtherance of the ESO joint venture.

## CONCLUSION

For the above reasons, along with those already stated, the challenged statements that the government offers under Fed. R. Evid. 801(d)(2)(E) should be admitted.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By: ***/s/ Erik Kenerson***
ERIK M. KENERSON (OH Bar No. 82960)
CONOR MULROE (NY Bar No. 5289640)
BRITTANY KEIL (D.C. Bar No. 500054)
Assistant United States Attorneys
JEROME J. TERESINSKI (PA Bar No. 66235)
Special Assistant United States Attorney
601 D Street NW, Washington, D.C. 20530
(202) 252-7201 // Erik.Kenerson@usdoj.gov

KATHLEEN CAMPBELL (MD Bar No. 9812170031)
JENNIFER BURKE (MD Bar No. 9706250061)
Trial Attorneys, Counter Terrorism Section
National Security Division
950 Pennsylvania Avenue NW, Washington, D.C. 20530