**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No. 22-cr-392 (DLF)** |
| | **:** | |
| **ABU AGILA MOHAMMAD** | **:** | |
| **MAS'UD KHEIR AL-MARIMI,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

**RESPONSE TO DEFENDANT'S SUPPLEMENT REGARDING THE TESTIMONY OF
BRIAN CUTLER**

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, respectfully submits this response to the defense supplement regarding

the testimony of Brian Cutler. For the reasons stated herein, as well as those in the government's

motion to exclude Dr. Cutler's testimony and its reply in support thereof, and in consideration of

Dr. Cutler's testimony at the *Daubert* hearing, Dr. Cutler's testimony should be excluded.

**ARGUMENT**

Prior to Dr. Cutler's testimony at the *Daubert* hearing, the Court asked the defense to point

it to specific portions of the literature cited by Dr. Cutler that underpin its contention that the

literature provides an adequate basis to support the uses the defense wants to make of Dr. Cutler's

testimony. The defense pleading, which provides copious citations to and quotations from various

articles, fails to assuage the concerns the Court raised at the May 27, 2026, hearing. The sources

do not, for example, speak to any effect that the number of interviewers in the room may have. *See*

5/27/2026 Hr'g Tr. at 26. They do not provide any scientific backing for the four-to-six-hour

length-of-interview benchmark at which the risk of false confession allegedly increases. *See id.* at

35-36. Dr. Cutler's lack of knowledge of this specific case fatally undermines the relevance and

reliability of his testimony. And, taken as a whole, there are serious questions as to whether – even

taking the articles at face value – they would hold scientific water under the facts of this case. The Court should find that Dr. Cutler's proposed testimony passes neither the *Daubert* test nor Federal Rule of Evidence 702 test, and his testimony should be excluded.

### A. Dr. Cutler's Notice Meets Neither *Daubert* nor Rule 702.

There are multiple fatal flaws to the approach the defendant takes with respect to Dr. Cutler's proffered testimony. Two such flaws cross multiple topics from the defendant's notice and the studies he cites in ECF 488. The government will address those overarching issues first. First, the literature cited by the defense mostly studies interrogation techniques closely associated with the "Reid Technique" and similar interrogation tactics. — There is no evidence that Jamal employed this technique or any similar strategy (and even defense has conceded there is no evidence he was trained on it). Second, Dr. Cutler either has not evaluated, or believes he cannot evaluate, whether any of the so-called risk factors he identifies are actually present in this case.

1. The Literature's Reliance on the Reid Technique Renders that Literature Inapplicable Here.

The Reid Technique is premised on the notion that investigators should conduct an informational interview first, then determine whether they believe the interviewee is lying. If there is a determination that the interviewee is lying, then the investigator is trained to switch to an interrogation. *See*, *e.g.*, Kassin (2008) at 250 (.pdf p.2).[1] The research on which Dr. Cutler relies is focused almost exclusively on this second stage – the "interrogation." Dr. Cutler confirmed as much during the *Daubert* hearing:

---

[1] For ease of reference, citations to articles are to the title of the .pdf versions provided by the defense. Page references include both the page of the original article and the .pdf page number.

Separately, for the reasons stated *infra*, the Reid Institute's manual and other assorted materials cited by the defense do not support Dr. Cutler's proposed testimony.

Q. And it's the interrogation portion of that that your research and what you are relying on focuses on; correct?

A. That's correct.

Q. It wouldn't apply to that initial, I'll call it, information-gathering interview portion? Only to interrogation?

A. That's correct.

5/27/2026 Hr'g Tr. at 99. As defense counsel conceded, "there is no information [that the defense has seen] that Jamal has been trained on the Reid technique." *Id.* at 20.  Dr. Cutler similarly conceded that he has no information on whether Libyan law enforcement officers are trained to gather information or to interrogate or some combination. *Id.* at 99. The literature's focus on analysis of the Reid Technique is evident from the defendant's most recent filing: The word "Reid" appears 16 times, and "Inbau" – the primary author of the Reid Technique training manual – appears an additional 24 times. The word "interrogation" appears 107 times, which is salient because the literature distinguishes between an "interview" and an "interrogation" *See*, *e.g.*, Kassin (2008) False Confessions at 250 (.pdf p.2) ("Typically, the confrontational process of interrogation is preceded by an information-gathering interview conducted by police to determine if a suspect is guilty or innocent"). The literature cited by the defense – indeed, just the portions of the articles quoted in ECF 488 – is rife with references to the Reid Technique allegedly increasing the likelihood of false confessions, but there is no indication that the authors of the papers – or Dr. Cutler – claim that the findings of that literature are generalizable beyond Reid-style interrogation.

There is nothing in the record to suggest that Jamal was conducting an "interrogation" as that term is used in the false-confession literature. The unchallenged testimony is that Jamal was assigned to interview the ESO operatives about a Libyan plane crash and any role they may have played in the revolution that ousted Qaddafi, not to interrogate them about other operations they

carried out in the ESO. *See* Jamal Depo. Vol. I at 43-44. And Dr. Cutler agreed that the first question that elicited an incriminating response from the defendant – "Have you ever participated in the carrying out of any intelligence operations or of any other kind outside of Libya?" – was not coercive. *See* 5/27/2026 Hr'g Tr. at 101.

Putting that aside, however, even if the Court takes the studies at issue at face value – which it should not, for the reasons explained *infra* – those studies' focus on attempting to establish that the tactics used by investigators trained in the Reid technique raise the risk of false confessions ensures that they fail the *Daubert* and Rule 702 tests. In this case, there is no evidence in the record that the investigator at issue – Jamal – was trained on the Reid technique or used tactics that are similar to those espoused by the Reid trainers.

2. <u>Dr. Cutler's Lack of Familiarity with this Case Renders his Testimony Inadmissible under *Daubert*.</u>

The defense has made the deliberate strategic choice not to present Dr. Cutler's view of whether the evidence in this case establishes that any "risk factors" were present in the defendant's statement. *See* 5/27/2026 Hr'g Tr. at 44-45 ("And that's a part of why, you know, from our perspective, *we don't want Dr. Cutler dealing with the weeds of exactly what was said in this case*, because the facts are in hot contest. Right? We don't agree on what happened. Jamal has a version. I don't believe it. So that's why we've taken the tactic we've taken") (emphasis added). If the defense is aware of an alternative version of the defendant's statement, it has neither proffered that evidence, nor has it given notice of any analysis Dr. Cutler would testify to. The defense wants to essentially have its cake and eat it too: It does not want Dr. Cutler to opine on the statement taken by Jamal, it does not want to proffer an alternative version, and it wants to simply ask Dr. Cutler to provide background generalized principles, while asking the jury to essentially speculate as to

whether any of the risk factors existed in this case. The Court should not indulge this desire for cake.

The defense contends that "without uncontroverted evidence documenting the circumstances of a confession such as a video of the entire interrogation, false confession experts *do not opine about whether a particular risk factor is present in a particular defendant's* case because whether a particular risk factor is present in a particular defendant's case is within the province of the factfinder—here, the jury." ECF 453 at 2 (emphasis added). The defense is asking the Court to allow the jury to determine, based on an expert's testimony, whether risk factors were present when the expert himself is apparently unwilling or unable to offer his opinion on that topic. That is precisely the type of expert notice on false confessions that was excluded in *United States v. Redlightning*, 624 F.3d 1090, 1110-11 (9th Cir. 2010), and with respect to Dr. Cutler specifically in *United States v. Rodriguez-Soriano*, 2017 WL 6375970 (E.D. Va. 2017).

In *Rodriguez-Soriano*, Judge O'Grady's careful analysis excluded Dr. Cutler's scientific opinions as unreliable under *Daubert's* reliability prong, and we ask the Court to follow his analysis. Additionally with respect to the question of whether the testimony would assist the trier of fact as required both by *Daubert* and Rule 702, Judge O'Grady also found "that the risk of misleading the jury substantially outweighs whatever marginal probative value such testimony might offer. This is particularly true given that Dr. Cutler's testimony would be entirely generalized and not specific to this case, as described above." *Id.* at *3. The expert notice given in that case, like Dr. Cutler's notice in this case, offered no analysis of whether the risk factors he would testify about were present in that case. *See United States v. Rodriguez-Soriano*, No. 1:17-cr-197-LO (E.D.

5

Va.), Doc. 44-1.[2] The Court should follow Judge O'Grady's lead, and exclude Dr. Cutler's testimony here too.

The defense has cited another case, arising in New Mexico, in which Dr. Cutler's testimony was permitted. That case supports the government's contention that Dr. Cutler's notice is too generalized to pass muster here. In *United States v. Santiago Martinez*, No. 21-cr-1934 MV, Doc. 173 (D.N.M. 2025) (hereinafter *Martinez* Ruling), the court issued an opinion admitting Dr. Cutler's testimony at trial.[3] The defense cites to that case in support of the proposition that "whether a particular risk factor is present in a particular defendant's case is within the province of the factfinder." ECF 453-2 at 2. The *Martinez* ruling contains no such holding. In that case, Dr. Cutler would have testified that "Mr. Martinez encountered 81 interrogation tactics before ultimately making inculpatory statements, and that Mr. Martinez's confession is significantly contaminated from details first introduced by law enforcement during the interrogation." *Martinez* Ruling at 4 (internal quotation marks omitted). That court specifically permitted Dr. Cutler to testify that the defendant "encountered 81 interrogation tactics, which is a strong amount of coercive pressure, in the interrogation in this case." *Martinez* Ruling at 11. The Court did not leave the factfinder to sort through vague background testimony and determine whether the factors discussed may be present. In the *Martinez* case, Dr. Cutler reviewed the materials specific to that case, applied the principles of purported false-confession science to them, and proffered an opinion

---

[2] Although the notice there was significantly shorter than the notice in this case, that is not surprising given that it was filed prior to the 2022 amendments to Fed. R. Crim. P. 16 that required a "complete statement" of the opinions an expert would give.

[3] The defendant in that case pled guilty after the Court issued its opinion, so Dr. Cutler did not actually testify at trial.

that he believed specific risk factors were present in the interview, demonstrating that he is capable of doing so [4]

Dr. Cutler has not undertaken any similar analysis here, whether that be as a result of the defense's strategic choices or because of his own belief that he cannot render an opinion on this record. As the Court noted at the hearing,

> [T]here are plenty of instances in which judges have said this is not developed enough to admit at least the more generalized testimony. And so there really is this struggle of how to permit the defense to admit what is truly relevant to the facts of this case and also how to do that in a way that's not confusing to the jury. So when Dr. Cutler comes here and he talks about vague generalities, it has the risk to really be confusing to the jury. So that's why I'm pushing you on specifically how does the study back up what you want Dr. Cutler to say.

5/27/2026 Hr'g Tr. at 32. The defense has not done so. As demonstrated above and below, the Court should not permit the defense to use Dr. Cutler's testimony to encourage the jury to speculate about what risk factors may have been present where there is no evidence that Dr. Cutler himself is willing or able to opine that any such factors were present. *See Redlightning*, 624 F.3d 1090, 1111; *Rodriguez-Soriano* 2017 WL 6375970 at *3.

### B.  Dr. Cutler's Proffered Opinions on Isolation are not Supported by the Literature.

The sources cited by the defendant on the topic of isolation do not support a finding that Dr. Cutler's testimony passes *Daubert* or Rule 702. The defense appears to want to present testimony related to so-called isolation for two reasons: (1) the defense believes it was coercive that no one else was allowed in the room with the defendant and Jamal during the interview, and

---

[4] Offering analysis of whether specific so-called risk factors are present in a given interview is not out of the norm for Dr. Cutler. For example, in *Brown v. City of Chicago*, No. 1:19-cv-4082-MV (N.D. Ill.), Dr. Cutler offered 19 pages of analysis specific to the interrogation at issue there. *Id.*, Doc. 173, at 25-44.

(2) because the defendant was held in a so-called "secret prison, he would not have been able to communicate with the outside world." 5/27/2026 Hr'g Tr. at 23-24.

Regarding the first, as the Court noted at the hearing, the defense argument regarding the number of people in the room boils down to the fact that there was one federal agent, rather than two, in the room. The second half of the defense argument relates to the fact that the defendant was allegedly not able to communicate with the outside world, which as the Court noted is how every interview in the United States is conducted. *See id.* at 24. The Court specifically asked whether Dr. Cutler would testify, "[W]hen you have one rather than two agents, that this can increase the likelihood of a false confession? That's the kind of testimony he's going to be able to offer?" Counsel replied, "Exactly." *Id.* at 26-27.  None of the studies cited by Dr. Cutler speak to the number of agents in the room, and certainly not to the notion that having one agent is more coercive than two. *See* ECF 488 at 1-7.

Neither the articles nor Dr. Cutler's testimony support the defense's second contention regarding the effect of the "secret prison." With the exception of the Holt-Lunstad (2015) study, which dealt with the effects of chronic isolation (and which the government contends is irrelevant to this context),[5] all of the multi-interrogation studies cited discuss the alleged effect on suspects of removing them from family and interviewing them in a specially constructed interrogation room at the police station. *See* ECF 488 at 3 ("To ensure privacy and control, and to increase the stress associated with denial in an incommunicado setting, interrogators are trained to remove suspects from their familiar surroundings and question them in the police station—often in a special interrogation room") and 5 ("The purpose of this setup is to remove the suspect from familiar

---

[5] Indeed, Dr. Cutler agreed on cross-examination that the Holt-Lunstad study "wouldn't necessarily apply to the type of isolation we're talking about – putting someone in a room for a matter of hours with a couple of investigators." 5/27/2026 Hr'g Tr. at 102.

surroundings and isolate him or her, denying access to known people and settings, in order to increase the suspect's anxiety and incentive to extricate himself or herself from the situation").[6] None of the studies cited speak the defendant's ability to communicate with the outside world from his detention facility, which is what the defense wants to use Dr. Cutler's testimony for.

To illustrate how the studies cited by the defense do not provide any scientific backing for his proffered use of them, consider the following hypothetical. A murder happens in 2022 and initially goes unsolved. In 2023, a defendant is caught robbing a liquor store, arrested, and eventually convicted. He begins serving a sentence in a prison facility. That facility becomes that person's home for the duration of his sentence. In 2025, DNA analysis links the defendant to the 2022 murder, and detectives decide to question the defendant. When the detectives conduct that interview, the defendant's home would be the prison facility. He would have already been effectively separated from his family and friends, and the vast majority of his social support would come at that point from his follow inmates or others at the prison. In that hypothetical, the relevant question to ask regarding whether isolation for the interview was coercive would not be whether

---

[6] The defense also cites to a 1992 paper by Richard Ofshe, *Inadvertent Hypnosis During Interrogation: False Confession Due to Dissociative State; Mis-Identified Multiple Personality and the Satanic Cult Hypothesis*. That case involved a case study of a single defendant, and its facts are properly limited to the specific circumstances of that case. As the title implies, a major focus of that paper was the use of a hypnotic induction technique during the interrogation. Dr. Ofshe notes in his introduction that a psychologist who participated in the interview of the defendant in that case "failed to notice that following the relaxation procedure, [the defendant] demonstrated dramatically heightened suggestibility and trance logic." Ofshe (1992) at 130 (.pdf 7). When Dr. Ofshe then attempted to experimentally induce a false confession from the defendant, he noted that by the time of the experimental stage, the defendant "had over 2 months practice at inducing trance and generating images." *Id.* at 148 (.pdf 25). Prior to Dr. Ofshe's involvement, the defendant in that case was also interrogated in at least 23 separate sessions with detectives – and a psychologist – over a five-month period during which he was kept in solitary confinement. *See id.* at 139 (.pdf 16). The extreme outlier facts of Dr. Ofshe's article are not generalizable to the population in general, and in any event speak much more to extreme tactics and the use of "inadvertent hypnosis," rather than the type of isolation the defense proffers here.

isolating the defendant from his friends and family was coercive, but whether isolating him from the general prison population was. Dr. Cutler admitted at the hearing that he did not cite any studies that look at what effect that might be. 5/27/2026 Hr'g Tr. at 112.

The lack of any studies on the effect of interviewing someone who is in general prison population at the time of the interview alone should demonstrate there is no scientific backing for Dr. Cutler's opinion regarding isolation in this context. But the use to which the defense wants to put Dr. Cutler's opinion – to argue that the secret nature of the defendant's detention facility increased the risk of false confession – has not been supported by one iota of the scientific research it cites. Dr. Cutler confirmed at the hearing that when he refers to the studies supporting an inference that isolation can be a risk factor for false confessions, he means isolation during the interrogation itself, not any isolation that may have occurred at a facility prior to the interrogation. *See id.* at 101-02. He also confirmed that he cited no study that causally links isolation with the risk of false confession, nor any study that isolates whatever effect isolation may have on the risk of a false confession. *Id.* The pin cites provided by the defendant on this topic provide nothing to contradict Dr. Cutler's testimony on these points. His proposed testimony on this point thus fails both *Daubert* and Rule 702's requirements that an expert opinion be based on sufficient facts or data, be the product of reliable principles and methods, and that it reflect a reliable application of the principles and methods to the facts of the case.

### C. Dr. Cutler's Proffered Opinions on Interrogation Length are not Supported by the Literature.

The defense has not demonstrated a scientifically valid link between the length of interrogation and risk of false confession. It certainly has not established, even assuming that there is some scientific validity behind this opinion generally, that the interview at issue here came anywhere near the line that would trigger this risk factor. It should thus be excluded. To begin, as

Dr. Cutler conceded at the hearing, the research he cites cannot draw a causal link between length of incarceration and the risk of false confession, and he has not cited any experimental studies that attempt to isolate the effect of the length of interrogation. 5/27/2026 Hr'g Tr. at 104.[7] Three of the studies cited by the defense – two of which advise interrogators to terminate an interview after 3-4 hours, and another that warns generally against conducting "excessively long interrogations," were authored by individuals associated with the Reid Institute. But Dr. Cutler has previously admitted that "The Reid Institute is a private organization, and they maintain that their research leads to that, but they don't publish their research in the public domain. So I really can't comment on their research that they claim to have conducted." *United States v. Trabelsi*, Case No. 06-cr-89 (RDM), *Dabuert* Hearing Testimony, Doc. 684, at 77-78. At most, Dr. Cutler can say that investigators trained in the Reid Technique are trained to cut off investigation after 3-4 hours, but because he is unfamiliar with *why* the Reid Institute came to that number, he cannot base his opinion that length of time is a risk factor on Reid Institute instructions.

The rest of the studies cited by the defense in this section are archival studies that Dr. Cutler admits do not establish a causal relationship between interview length and risk of false confession. Even if they did provide some insight, however, it is unclear whether that insight they would apply on the facts of this case, and thus the opinion should be excluded under *Daubert* and Rule 702 because it is not more likely than not that those opinions will aid the factfinder in understanding the evidence or determining a fact at issue. Drizin and Leo (2004) concluded that "[t]he average

---

[7] Government counsel asked Dr. Cutler, "And you've not cited, anyway, in your notice any experimental studies that attempt to isolate the effect of length of incarceration; correct?" Dr. Cutler answered, "that's correct." In context, it is clear that both counsel and the witness were referring to length of interrogation, not incarceration. Regardless, the defense's filing at ECF 488 makes it clear that it is not relying on any experimental studies that try to isolate the effects of interrogation length.

length of interrogation was 16.3 hours, and the median length of interrogation was twelve hours" in known false-confession cases. ECF 488 at 8. Kassin (2007) concluded that the average interrogation time is 1.6 hours, which stood in stark contrast to known cases of false confession where the confession came after "many hours of interrogation." Leo (1996) concluded that the length of the interrogation is tied to its success,[8] *id.* at 10, but made no attempt to determine which confessions (if any) in the study were false. Leo 1996 at 291 (.pdf 26) n.71. Blair (2005) coded as "coercive" interrogations that exceeded six hours in length, but offered no scientific basis for choosing that number, other than citing to "guidelines reported by Leo," an apparent reference to the 1996 Leo study. Blair (2005) at 135 (.pdf 10).

Davis and Leo (2012) list a host of factors that they believe can impair rational decision making and exertion of one's will, including "extremely lengthy and/or stressful interrogations," but they make no attempt to define what constitutes what is an extremely lengthy interrogation, and indeed most of the discussion centers around about the effects of other matters, like glucose depletion and sleep deprivation. To the extent the study has scientific validity, it is for its conclusions on glucose depletion and sleep deprivation, not for an ill-defined and unsupported link between length (without any other confounding factors) and risk of false confession. The Leo & Davis (2010) article cited by the defense – in addition to being a case study on one case and not necessarily generalizable – demonstrates that to the extent the study establishes risk factors, those

---

[8] There are two fundamental problems with relying on this finding to underpin an expert opinion that the length of an interrogation is a risk factor for false confession. The first is Dr. Leo's definition of "success": It includes not only a full confession, but also statements where a suspect admitted to something that the police found "incriminating," but not to any elements of the crime, and statements where a suspect admitted to some, but not all, of the elements of the offense. Leo 1996 at 280 (.pdf 15). The second, and more problematic issue, is that in coding whether an interrogation was "successful," Dr. Leo included among the "unsuccessful" interrogations those in which the suspect invoked his *Miranda* rights. The dataset thus included "interrogations" that included no interrogation at all.

risk factors are things like glucose depletion, sleep deprivation, and other tactics not present on the record in this case, and not interview length in and of itself. *See* Leo & Davis (2012) at 13 (suspect interviewed overnight after having not eaten since 9:00 the prior morning, was falsely told he failed a polygraph, was not permitted to sleep during the interview, and was interrogated by a detective previously demoted for coercing a false confession). The defense has not cited a single study indicating that the risk of false confessions rises as a function of time alone.

Even assuming some scientific validity to the general proposition that length of interrogation increases the risk of false confessions, the literature cited by the defense stands for the proposition that after a certain point (sometimes articulated as four hours, sometimes as six), the risk of false confession rises above a baseline level, and then the risk is usually because some other coercive tactic was present at that point and not just length alone. Regardless, the uncontradicted record in this case is that Jamal's interview of the defendant consisted of a verbal interview on one day, followed by a formal memorialization interview a couple of days later. Jamal Depo. Tr. Vol. II at 30-31. Jamal also testified that the formal interview spanned two days. Depo. Tr. Vol. VI at 11. There is no indication that any of those sessions approached even four, let alone six or more hours. It is worth noting that, when researchers like Dr. Cutler discuss the length of an interrogation, they mean only the time when the suspect is isolated for the purposes of interrogation. If a suspect is questioned for two hours, goes home for the night, and comes back the next day for another two hours, the research considers those to be two two-hour interrogations, rather than one four-hour interrogation. 5/27/2026 Hr'g Tr. at 104-05. Accordingly, even if the scientific research supported the conclusion that after a certain length of interview, there is an increased risk of false confessions, Dr. Cutler's opinion based on that research would not be admissible under Rule 702 or *Daubert* on the facts of this case.

13

### D. Dr. Cutler's Proffered Opinions on Accusatory Tactics are not Supported by the Literature.

The literature cited by the defense in its section on "accusatory tactics" varies wildly from its pre-hearing proffer on the relevance of Dr. Cutler's testimony on this point. As the defense proffered before the hearing, it hopes to elicit from Dr. Cutler the opinion that certain interviewing techniques can be accusatory and coercive, even if phrased in the form of a question:

> What I think the literature says, and I think what Dr. Cutler would say, if questioned, is that just because someone may ask a question that has a question mark at the end rather than saying, like, "you did this," that by itself does not mean that it is not an accusatory tactic.

5/27/2026 Hr'g Tr. at 36. Defense counsel continued to give her view of what might constitute an accusatory tactic: "But if there is a —like if the person says, 'This is what I did,' and a person pushes back and says, 'Well, how is that possible?' that by itself can be an accusatory tactic, from my understanding." *Id.* Defense counsel then proffered some questions that, in her view, the Court could find "accusatory" after hearing from Dr. Cutler. *Id.*[9]

Neither Dr. Cutler's testimony at the *Daubert* hearing nor the studies proffered by the defense support the opinions that the defense wants to elicit from him or the findings that they would ask the Court or jury to make regarding the presence of accusatory tactics. Each study cited by the defense in this section speaks not to whether certain tactics are accusatory, but to the likelihood that an interrogator will use allegedly accusatory tactics. Kassin (2003) experimentally

---

[9] Those questions appear on pdf pp. 12 and 13 of the defendant's statement, after the non-coercive first question by Jamal and after detailed follow-up questioning regarding the attacks on Pan Am Flight 103 and the La Belle Discotheque. *See* 5/27/2026 Hr'g Tr. at 37; ECF 232-2 at 12-13. Ironically, the defense has moved to exclude this portion of the defendant's statement – which deals with the Pakistani President's funeral – under the Federal Rules of Evidence. If the defense wants the fact finder to use them as evidence of coercion at all, the factfinder would need to actually receive them as evidence.

tested whether interrogators who believe a suspect is guilty of a crime will use more accusatory tactics. ECF 488 at 14.[10] Linden (2018) studied whether a police officer's decision to apprehend a suspect triggers confirmation bias during an interrogation." *Id.* at 15. Kassin 2005 tested whether law enforcement officers or college students were better at judging whether confessions by inmates were true or false. *Id.* at 18.[11] None of the studies cited here speak to the effect of any accusatory tactic that was plausibly used by Jamal in this case, and as such the studies cannot support the admissibility of Dr. Cutler's opinions under *Daubert* or Rule 702.

Dr. Cutler's testimony and the research into accusatory tactics also do not support, on their own terms, the use the defense wants to make of them. The research into false confessions has generally divided interview strategies into an initial information-gathering interview, during which the investigator decides if the suspect is lying, and then a later interrogation if the investigator determines the suspect is lying. *See*, *e.g.*, 5/27/2026 Hr'g Tr. at 98-99. Dr. Cutler conceded that the research does not apply to information-gathering, only to interrogation. *Id.* at 99. The uncontradicted testimony is that Jamal was sent to interview the defendant about a Libyan plane crash and the 2011 revolution that ousted Qaddafi. The uncontradicted evidence is that he believed the ESO operatives' denials about involvement in the plane crash and that he let stand the defendant's and others' denials of violent participation in the revolution. There is nothing in the

---

[10] This study was conducted entirely with U.S. undergraduate students. Those playing the role of interrogator were told either that 80 percent that those they interview would be innocent or 80 percent would be guilty. They were also told that the goal was to obtain a confession, and that the secondary goal was to get to the bottom of what happened. 5/27/2026 Hr'g Tr. at 107.

[11] The defense also cites to Inbau 2013, the Reid Technique training manual. ECF 488 at 14. The defense's only description of the manual's topic on this question is the manual's citation to a laboratory study a "good example of the misleading nature of behavior produced by accusatory questioning." It does not further describe the study at issue, nor has that study been cited by Dr. Cutler in his notices or provided by the defense. The citation to Inbau should thus not factor into the Court's analysis.

record on which a reasonable juror could find that the defendant engaged in interrogation as the literature defines that term, let alone any evidence on which the Court could make such a finding. Indeed, Dr. Cutler agreed that the first question that elicited an incriminating response from the defendant – "Have you ever participated in the carrying out of any intelligence operations or of any other kind outside of Libya?" – was not coercive. *See* 5/27/2026 Hr'g Tr. at 101.

### E. Dr. Cutler's Proposed Opinions on Rapport Building are not Supported by the Literature.

When Dr. Cutler described the science of rapport-building at the *Daubert* hearing, he stated, "Rapport is known to increase the amount of information that interviewees produce. So for example, bystander eyewitnesses or in employment settings, rapport leads to more information." 5/27/2026 Hr'g Tr. at 83. Neither Dr. Cutler nor the studies cited by the defense state that rapport building of this type leads to more *false* information. In fact, Vallano & Schreiber Compo (2015), which the defense cites at ECF 488 at 23-25, actually concluded that, with respect to criminal suspects, the "same mechanisms [that result from rapport building] may result in an increase of true confessions by rendering the guilty more comfortable to confess *and the innocent more comfortable to maintain their innocence and resist any suggestions of guilt*" (emphasis added).[12] Vallano & Schreiber Compo (2015) at 93 (.pdf 9).

---

[12] The defense seems to acknowledge a split of scientific opinion on the effect of rapport building on the likelihood of producing a false confession. *See* ECF 488 at 25 ("while some studies indicated that rapport-building had the potential to increase the accuracy of confessions, other studies pointed to the opposite—particularly when rapport-building was used in conjunction with other interrogation techniques known to increase the risk of false confessions"). That alone should establish that that Dr. Cutler's proposed testimony on rapport building is not widely accepted within the scientific community. Rapport building alone, as opposed to rapport building used "in conjunction with other interrogation techniques known to increase the risk of false confessions" has not been demonstrated to be a risk factor supported by the research, and the defense cannot show its use in this case at all, let alone its use in connection with other interrogation techniques known to increase the risk of false confessions.

The other studies cited by the defense do not establish a scientific underpinning for Dr. Cutler's proposed testimony regarding rapport building as a risk factor that meets the requirements of *Daubert* or Rule 702. In one such study, Burger (2006), the experimenters looked at whether, for example, giving someone a stick of gum or a bottle of water would make it more likely that the students would return the favor later. The favors and returns in that study were minor and were generally of the same magnitude (*e.g.*, giving someone a bottle of water once and seeing if they returned that favor later). *See* 5/27/2026 Hr'g Tr. at 108. The experiment did not test the types of differentials in "favor return" that are orders of magnitude apart, like those that would be in play in an interrogation, such as a confession to a crime in return for permission to use the bathroom or to have some food. *See id.* In another study (Wright, et. al., 2015) allegedly studying the effect on rapport, the experimenters excluded those who did not respond to the rapport, *id.* at 109, which would have the effect of skewing the results towards those predispositioned to respond to rapport. [13]

The closest Dr. Cutler came in in the *Daubert* hearing to offering an opinion that rapport is a risk factor for to false confessions was his testimony that "if a suspect comes to believe that the interrogator will, in some way, help them in exchange for inculpatory information or any information, they may be more likely to produce that information, when rapport has been established." 5/27/2026 Hr'g Tr. at 83-84. As discussed above, the studies cited by the defense do not support a conclusion that rapport building increases the likelihood of false confessions in an interrogation setting, and in any event, there is no evidence that Jamal offered the defendant help in exchange for information or that the defendant would have reason to believe that Jamal would

---

[13] The first "study" that the defendant cites in support of his conclusion that rapport building is a risk factor is the discussion of a psychometric instrument to detect and quantify coercion in videotaped confession. ECF 388 at 20. But the portions of the study cited by the defense do nothing to establish *why* Dr. Cutler or his colleagues believe rapport-building to be a risk factor. It thus cannot support admission of that testimony under *Daubert*.

(or even could) help him, or that Jamal minimized his role as a law enforcement agent. The testimony must be excluded under both *Daubert* and Rule 702.[14]

### F. Dr. Cutler's Proposed Opinions on Relevant Psychological Principles are not Supported by the Literature.

The studies that the defense cites under this heading do not support the use that the defense proffered at the hearing that it would make of this evidence. Counsel stated that the conditions under which Jamal was held "could lead a jury to readily infer that the circumstances surrounding that might foster obedience and compliance, as well as fear and anxiety. And those pieces have been shown over time to impact or increase the risk of a false confession." 5/27/2026 Hr'g Tr. at 40. The Court responded, "I understand the argument. I just think you will need more in the record for the Court to think this then becomes relevant than we've got right now. That's just my tentative conclusion here." *Id.* at 40-41. Nothing in either Dr. Cutler's testimony or the studies he cited provide enough of that record to overcome the Court's skepticism. The only attempt to link obedience to a risk of false confession is the Milgram experiment and updates on it from the 2000s. Nothing in Dr. Cutler's notice or testimony links a willingness to deliver a shock, which was at issue in the Milgram experiment, with the likelihood that someone will falsely confess. The

---

[14] In both the May 22, 2026, revised expert notice and its post-hearing brief, the defense purports to rely on the lack of a video recording in support of Dr. Cutler's opinions regarding rapport-building. *See* Revised Expert Notice at 4; ECF 488 at 28-33. None of the studies cited by Dr. Culter regarding the recording of interviews even remotely touch on rapport building. Dr. Cutler has not been noticed as an expert in when an interview should be videotaped, and even if he had been, there is no indication that such an opinion would be permissible. Separately, the government notes that none of the aforementioned studies looked at the accuracy of a statement produced by reading each word of it back to the interviewee, making corrections as needed, and affording the interviewee an opportunity to sign the resulting statement. Those studies are not applicable on the facts of this case. The Court should preclude any testimony from Dr. Cutler regarding the recording of interviews. As the Court noted at the hearing regarding the lack of recording and how it affects whether a written question can be deemed accusatory, "You can certainly argue that at trial but I don't know that that's necessarily an expert opinion." 5/27/2026 Hr'g Tr. at 38

defense has certainly not demonstrated any linkage between the Milgram experiment and those like it and any notion that conditions of confinement like those complained of by the defendant would foster an obedience of the type that would likely induce someone to falsely confess.

That lack of a link is all the more relevant here where the alleged coercive conditions were not created by Jamal: They were the conditions of confinement created by the militia that held the defendant, and he was removed from those conditions for purposes of the interview. If there was scientific research on whether someone who was incarcerated at the time of their interview was more likely to falsely confess, one would expect that research to come up in the context of inmates serving a sentence who are interviewed about other crimes. As previously discussed, Dr. Cutler did not cite any studies looking at whether someone residing in a general prison population at the time of an interview is more likely to falsely confess. *Id.* at 112. Without any such link, the proposed testimony on obedience passes muster under neither *Daubert* nor Rule 702.

Dr. Cutler's proposed testimony on self-regulation fares no better. Dr. Cutler conceded that the vast majority of studies on self-regulation and self-control are not about interrogations. 5/27/2026 Hr'g Tr. at 110. The studies the defendant cites rely on factors not present on this record, such as high dispositional anxiety, lengthy and aversive interrogation, chronic distress intolerance, acute fatigue and discomfort, or youth, mental illness, or sleep deprivation. ECF 488 at 37-40.[15] Other studies rely on factual scenarios that are nothing like those at play here. For example, the

---

[15] The defense states, "In this chapter, the authors thoroughly review and discuss case studies, literature, and experiments finding that emotional distress, discomfort, fatigue, sleep deprivation, and glucose depletion (***particularly in those suspects with chronic impairments in glucose tolerance like diabetes***) separately can cause interrogation-related regulatory failure." ECF 488 at 39 (emphasis in original). Dr. Cutler's expert notice did not proffer an opinion on any link between impairments in glucose intolerance and the risk of false confessions, and his testimony at the *Daubert* hearing was that he was not aware of any personal risk factors that the defendant had. 5/27/2026 Hr'g Tr. at 88.

2008 Leo study, referenced at ECF 488 at 44, concluded that "detectives seek to persuade a suspect that he is indisputably caught and that the most viable way to mitigate his punishment and escape his situation is by confessing." The defendant would have no reason to think that Jamal could mitigate his punishment by confessing to Pan Am Flight 103 and La Belle, but not to the types of crimes that the new government would care about, such as acts of violence against Libyans committed during the revolution. There is also no evidence that the defendant was offered some short-term relief, "such as being allowed to sleep, eat, make a phone call, go home, or, in the case of drug addicts, feed a drug habit" in exchange for his admissions. *See* ECF 488 at 46. The lack of any such facts on this record renders Dr. Cutler's testimony, which relies on those inapplicable studies, inadmissible under *Daubert* and Rule 702.[16]

Finally, as Dr. Cutler testified at the hearing, psychological principles can be culturally dependent, 5/27/2026 Hr'g Tr. at 94, and he cannot say one way or the other whether the studies on which he relies can be generalized to North Africans or to the world population at large:

> Q. So, since you said you've not followed this particular development, you just can't say one way or the other whether the results you've talked about could be generalized to the world at large?
>
> A. That's correct.
>
> Q. And specifically, you're not aware of any studies that look at whether the results you've talked about are generalized -- generalizable to, say, North Africans; correct?

---

[16] Even on its own terms, Dr. Cutler's testimony does not establish that any self-regulation failure was a risk factor for this defendant on these facts. As Dr. Cutler agreed, because the defendant was an intelligence operative for decades, his self-regulation would likely deplete less quicky than the average citizen. *See* May 26, 2027, Hr'g Tr. at 110-111. Moreover, even if the defendant's self-regulation depleted on any given day during which he interacted with Jamal, it would have been restored overnight and during lunch breaks when the defendant had an opportunity to eat and sleep. *See id.* at 111, 117 (stating, on redirect examination, "[p]rolonged stress can deplete self-regulation, but taking breaks, sleeping, eating can restore self-regulation").

A. I don't know of any research that has examined that specifically.

5/27/2026 Hr'g Tr. at 97. This lack of generalizability is compounded by the fact that most of the experimental studies on which he relies rely themselves on Western undergraduate students. So, we do not know whether their results generalize to those with more life experience or without educational credentials, in addition to not knowing whether they generalize to the world population. Because Dr. Cutler does not even know whether the psychological principles (or any other portions of his notice derived from experiments or studies of Western law enforcement) on which his notice applies are applicable to the world generally or to North Africans specifically, they must be excluded under *Daubert* and Rule 702.

### G. Dr. Cutler's Proposed Opinions on Contamination Errors are not Supported by Literature.

The defendant's notice proffers two different types of alleged contamination errors: one is the contamination itself, where an investigator allegedly leaks details to the defendant, who parrots them back, and the second is the alleged effect those errors can have on other aspects of the investigation. Beginning with the first, the studies cited by the defense stand only for the proposition that contamination errors can happen. The first two studies cited by the defendant were conducted by a law professor and published in law reviews, not by a social psychologist in peer-reviewed scientific journals. *See* ECF 488 at 48-50. The essay by Detective James Trainum is limited to a single anecdote from one of his cases. *Id.* at 51. None of the sources cited establish the circumstances which make such errors more or less likely, and neither they nor Dr. Cutler's testimony at the hearing provide the factfinder with any framework for how to determine whether a contamination error is likely to have occurred. Dr. Cutler agreed that studies are archival – they cannot show causation, and the existence of contamination does not make any particular confession more likely to have been false. 5/27/2026 Hr'g Tr. at 113. For all these reasons, Dr.

Cutler's proposed testimony regarding contamination by investigators does not pass the *Daubert* test or Rule 702.

Separately, Jamal's uncontradicted testimony was that, prior to the interview, the only details he knew of Lockerbie were what was in the news, which was limited to an explosion of a Pan American aircraft in Scotland and accusations that many countries did the attack. Jamal Depo. Tr. Vol. I at 74. Prior to the interviews, he had seen no source connecting the defendant to the Pan Am Flight 103 attack, nor generally what the defendant had allegedly done during his time in the ESO. *Id.* at 75. Dr. Cutler agreed that under these circumstances, it would be impossible for an investigator to contaminate a confession with true information. *See* 5/27/2026 Hr'g Tr. at 113. Nothing in the record indicates that Jamal contaminated his interview of the defendant, and allowing Dr. Cutler to invite the jury to speculate that he did so under the guise of Dr. Cutler's academic credentials would violate both *Daubert* and Rule 702.

The studies cited by the defense in support of its contention that a false confession can contaminate other parts of the investigation are also inapplicable on these facts. The case will not involve eyewitness identifications (other than Jamal) – this is not a case that depends on a stranger eyewitness to a street crime identifying the perpetrator, which is what the Hasel 2009 study cited by the defense explored. *See* ECF 488 at 52-53. It will also not involve polygraph evidence, which was the subject of the Elaad 1994 study. *See id.* at 54. The case will involve fingerprint analysis, but the study that the defendant cites there does not support Dr. Cutler's proposed testimony.

As an initial matter, Dror (2006) is the only such study cited by Dr. Cutler, and it had a sample size of six fingerprint examiners. That is exceedingly small and likely dooms Dr. Cutler's opinion in reliance on it under *Daubert* to begin with. In that study, six fingerprint examiners were each asked to evaluate eight sets of fingerprints. Unbeknownst to the examiners, each of them had

previously found four of those sets to be a match and another four to be an exclusion. As a result, the six examiners carried out a total of 48 examinations. Prior to carrying out the examinations that were the subject of the study the examiners were provided "biasing" information about half of the fingerprint sets they were to examine. The "biasing" information was one of two types: (1) a statement that the suspect confessed, or (2) a statement that the suspect was incarcerated at the time of the offense. Dror (2006) at 608 (.pdf 9). That latter "biasing" information, if believed, would remove all doubt as to whether the defendant could have committed the crime. The information about a confession, in contrast, would not necessarily remove all doubt (even if believed, a confession does not establish that every fingerprint recovered at a crime scene would belong to the defendant, for example).

The defense pleading gets multiple facts incorrect about this study, and it presents others without important context. First, the defense claims that the inconsistent results "were spread *evenly* among the participants." ECF 488 at 55 (emphasis added). The study actually found only that the inconsistencies were "spread between the participants." Dror (2006) at 610 (.pdf 11). The very next sentence of the study states, "[t]he inconsistent decisions were by four of the six experts, but one expert made three inconsistent decisions while each of the other three made only one inconsistent decision." *Id.* That is the opposite of an even spread.

Second, the defense omits that *none of the analysts changed an exclusion to an identification based on having received information about a confession*. Four of the six inconsistencies were (1) changes from inculpatory to exculpatory, and (2) made after receiving information providing the suspect with an ironclad alibi. *See* Dror (2006) at 610 (.pdf 11). The other two inconsistencies were made after having received no "biasing information," *id.*, so they are irrelevant to the Court's analysis of the admissibility of any testimony about biasing errors. A

chart summarizing the findings from this study is reproduced below, and it clearly illustrates that the study does not reinforce any testimony that false confessions can bias fingerprint analysis.

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| Past Decision | individualization | individualization | individualization | individualization | exclusion | exclusion | exclusion | exclusion |
| Level of Difficulty | difficult | difficult | not difficult | not difficult | difficult | difficult | not difficult | not difficult |
| Contextual Information | none | suggest exclusion | none | suggest exclusion | none | suggest individualization | none | suggest individualization |
| | | | | | | | | |
| Expert A | consistent | consistent | consistent | consistent | consistent | consistent | consistent | consistent |
| Expert B | change to exclusion | consistent | consistent | consistent | consistent | consistent | consistent | consistent |
| Expert C | consistent | change to exclusion | consistent | consistent | consistent | consistent | consistent | consistent |
| Expert D | consistent | change to exclusion | consistent | change to exclusion | change to individualization | consistent | consistent | consistent |
| Expert E | consistent | change to cannot decide | consistent | consistent | consistent | consistent | consistent | consistent |
| Expert F | consistent | consistent | consistent | consistent | consistent | consistent | consistent | consistent |

If the defense has a good-faith basis to believe any forensic examiners were biased in this case, they are free to pursue those lines of cross-examination if they so choose. But Dr. Cutler's proposed testimony in that regard is neither supported by the studies he cites, nor is it permissible testimony. Allowing Dr. Cutler's opinion on this topic, like all the others, would invade the jury's province and charge to evaluate witness credibility.

24

## CONCLUSION

For the above reasons, as well as those previously cited, the Court should preclude Dr. Cutler's proposed testimony.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:   */s/ Erik Kenerson*_____
ERIK M. KENERSON (OH Bar No. 82960)
CONOR MULROE (NY Bar No. 5289640)
BRITTANY KEIL (D.C. Bar No. 500054)
Assistant United States Attorneys
JEROME J. TERESINSKI (PA Bar No. 66235)
Special Assistant United States Attorney
601 D Street NW, Washington, D.C. 20530
(202) 252-7201 // Erik.Kenerson@usdoj.gov

KATHLEEN CAMPBELL (MD Bar No. 9812170031)
JENNIFER BURKE (MD Bar No. 9706250061)
Trial Attorneys, Counter Terrorism Section
National Security Division
950 Pennsylvania Avenue NW, Washington, D.C. 20530

25