**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 22-cr-392 (DLF)** |
| | : | |
| **ABU AGILA MOHAMMAD MAS'UD KHEIR AL-MARIMI,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S RESPONSE TO**
**DEFENANT'S MOTION *IN LIMINE* REGARDING**
**FORMER TESTIMONY BY UNAVAILABLE WITNESSES**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Response to the defendant's Motion *In Limine* Regarding Former Testimony by Unavailable Witnesses [ECF 528]. For the following reasons, the motion should be denied.

## FACTS

Pan Am Flight 103 was a U.S. aircraft carrying numerous U.S. citizens destroyed within the territorial jurisdiction of Scotland. The investigation into the bombing was accordingly conducted both by U.S. and Scottish authorities. There was extensive investigative coordination and sharing of evidence and between the sovereigns. In the early 1990s, under their respective laws, each sovereign brought criminal charges against Abdelbaset al-Megrahi and Lamin Khalifah Fhimah. The U.S. case remains pending in this district, case no. 91-cr-0645.

For years after the announcement of charges against Megrahi and Fhimah, the Libyan government refused to surrender them to either the United States or Scotland for prosecution. Ultimately, Libya agreed to transfer custody of the defendants for trial by the Scottish authorities

within the territory of a third country, the Netherlands. The location of the trial was a former military base known as "Camp Zeist."

During preparations for the Camp Zeist trial, U.S. law enforcement and prosecutors continued to assist the Scottish authorities by sharing evidence and coordinating the appearances of U.S.-based witnesses. Representatives of the U.S. Department of Justice attended the Camp Zeist trial.

The defense now seeks to admit, as hearsay under Federal Rule of Evidence 804(b)(1), unspecified portions of the roughly 14,000-page transcript thar resulted from the Camp Zeist trial.

## ARGUMENT

### A. The United States did not "control" the Scottish authorities who litigated the Camp Zeist trial.

The defense correctly identifies the principal D.C. Circuit case on point, *United States v. Carson*, 455 F.3d 336 (D.C. Cir. 2006). Under *Carson*, the defense's motion must be denied because the Scottish trial of Megrahi and Fhimah was neither a "tool" of, nor a "sham and a cover" for, a U.S. prosecution.

In *Carson*, a defendant tried to offer, under Rule 804(b)(1), prior testimony taken by Maryland state prosecutors during a Maryland grand jury proceeding. The D.C. Circuit held that the testimony was inadmissible, for two independently sufficient reasons. As relevant for present purposes, the court held that "Maryland and the United States are separate sovereigns and, in the absence of evidence that the United States controlled the Maryland investigation, they should not be treated as the same party for purposes of Rule 804(b)(1)." *Id.* at 380. The court went on to explain that "control" in this analysis has a specific meaning, adopted from double-jeopardy jurisprudence. Sovereigns are considered the same party for both double-jeopardy and 804(b)(1) purposes in the "unusual circumstances" where the separate sovereign is "'merely a tool of the

[U.S.] federal authorities" or if "its prosecution had been a 'a sham and a cover for a [U.S.] federal prosecution.'" *Id.* at 381 (quoting *United States v. Rashed*, 234 F.3d 1280, 1282 (D.C. Cir. 2000)). But "[e]xtensive law enforcement and prosecutorial cooperation between two sovereigns does not make a trial by either a sham." *Id.* (quoting *Rashed*, 234 F.3d at 1282). At least one other circuit has held the same. *See United States v. Peterson*, 100 F.3d 7, 12 (2d Cir. 1996).

The defense asserts that the facts here satisfy *Carson*'s control test. *See* ECF 528 at 7 n.2 ("[The substantial cooperation between the United States and Scotland during and before the Camp Zeist trial satisfy *any standard*. . . ." (emphasis added)). But they make no effort to defend that position, and appear unwilling even to state the conclusion they want the Court to adopt: that the Scottish prosecution was a "tool of" or "sham and a cover for a [U.S.] federal prosecution."

The facts here do not come close to satisfying the *Carson* standard. The defense points to a "high degree of international cooperation between the United States and Scotland." ECF 528 at 2. But, as noted above, "extensive law enforcement and prosecutorial cooperation between two sovereigns" does not mean that one sovereign controls the other, either for purposes of double jeopardy or Rule 804(b)(1). *Rashed*, 234 F.3d at 1284 (citing *Bartkus v. People of State of Ill.*, 359 U.S. 121, 122 (1959)) (double jeopardy); *Carson*, 455 F.3d at 381 (Rule 804(b)(1)). All of the examples of that cooperation cited by the defense show that the U.S. "participation" in the Scottish prosecution was limited to the provision of evidence and pre-trial interviews of witnesses upon request. *See* ECF 528 at 2. This is assistance, not control; and such assistance between sovereigns is routine when crimes transcend national boundaries. Nor does the physical presence of U.S. personnel at Camp Zeist support any inference that they controlled the conduct of the trial. Citing a newspaper article, the defense describes the American prosecutors as sitting "with the Scottish advocates," ECF 528 at 2, but as the transcripts reveal, the U.S. lawyers were seated in "the back

row of the Crown benches," next to "a printer machine there with some paper stuck in it."[1] This is a position from which to observe the trial, not control it.

Moreover, the United States had its own separate case against Fhimah and Megrahi. *See* D.D.C. no. 91-cr-0645. When the defense states that the U.S. prosecutor was "instrumental in conducting grand jury proceedings and crafting the indictment," ECF 528 at 7, they are referring to U.S. grand jury proceedings and a U.S. indictment, all of which was preparatory to a putative U.S. trial. It was always the U.S. government's first preference to gain custody of the suspects for trial in U.S. court. And as the D.C. Circuit has explained, the U.S. government's preference for a domestic prosecution is a factor weighing strongly against a finding that the foreign prosecution was a sham and cover. *See Rashed*, 234 F.3d at 1284.

All the above is further confirmed by a publicly available account of the negotiations that led to the Camp Zeist trial, authored by David Andrew, a former Legal Advisor to the U.S. Department of State who had a lead role in those negotiations. *See* David R. Andrew, "A Thorn on the Tulip – A Scottish Trial in the Netherlands: The Story Behind the Lockerbie Trial." 36 Case W. Res. J. Int'l L. 307 (2004).[2] Among other things, that article makes clear that the U.S. government viewed itself as having an interest in prosecuting Fhimah and Megrahi that was separate from Scotland's and, from the U.S. standpoint, no less important. According to Andrew, the "first" issue that "needed to be resolved" was:

> guarantee[ing] that the U.S. indictments would not be compromised by a third country trial. DOJ was willing to let the Scots take the first crack at trying the two but did not want to be seen as compromising their indictments. We determined there

[1] USAO-000015969.

[2] *Available at* https://scholarlycommons.law.case.edu/cgi/viewcontent.cgi?article=1395 &context=jil.

> was no international double jeopardy concept, but politically it was important that the U.S. indictments remain viable.

*Id.* at 313. To that end:

> [A] very significant issue was the U.S. role at the Scottish trial. We were concerned that the Scottish prosecutors might want the U.S. prosecutors to take a more active role in the trial which might legitimately raise the issue of double jeopardy should we want to try the individuals in a U.S. court. We ended up providing what evidence we had and the U.S. prosecutors simply monitored the trial.

*Id.* Nothing in the various quotations offered by the defense – which involve the U.S. authorities' providing evidence to the Scots and sending prosecutors to be physically present in court – is inconsistent with Andrew's description of the U.S. role in the trial. It shows that the United States did not exercise any degree of "control," let alone the high degree of control required under the rigorous sham-and-cover standard applicable here. Indeed, Andrew's account shows that the U.S. authorities purposely avoided any influence over the Scottish prosecution because they understood the legal arguments that might someday follow if there was any basis to allege "control."

It finally bears noting that, after his conviction and a relatively brief period of imprisonment, Megrahi was granted compassionate release by the Scottish authorities. The United States government expressed "strong and consistent opposition" to Megrahi's "release or transfer under any scenario,"[3] but Scotland released him anyway, a decision criticized by the then-President, then-Attorney General, and then-Secretary of State of the United States.[4] While these

[3] U.S. Department of State Press Release: "U.S. Letter Regarding Continued Detention of Megrahi" (July 27, 2010), *available at* https://2009-2017.state.gov/r/pa/prs/ps/2010/07/145141.htm.

[4] Reuters, "Obama calls Lockerbie bomber release a mistake" (Aug. 20, 2009), *available at* "https://www.reuters.com/article/world/us/obama-calls-lockerbie-bomber-release-a-mistake-idUSTRE57J334/.

events took place some years after the trial concluded, they still buttress the conclusion that the United States did not control the Scottish prosecution.

Faced with *Carson*'s control test that forecloses their theory, the defense argues that the Court "should not feel bound" by that test because it "arguably is *dicta.*" ECF 528 at 7 n.2. That is incorrect. *Carson* identified the separate-sovereigns issue as alternative basis for affirming the result below. "[I]t is well-established that an alternative holding is not dicta but rather binding precedent." *Karem v. Trump*, 404 F. Supp. 3d 203, 211 (D.D.C. 2019) (citing, *e.g.*, *Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 673 (D.C. Cir. 2013)). Moreover, the *Carson* court hardly treated the separate-sovereign issue as a throwaway. Quite the opposite, the court described separate sovereignty as the "more simple" reason for exclusion of the prior testimony and spent four paragraphs explaining the standard and why the defendant's arguments fell "far short" of satisfying the applicable standard. 455 F.3d at 380-81.

In sum, *Carson* is binding, its reasoning is sound, and it conclusively bars the defense from admitting Camp Zeist testimony under Rule 804(b)(1).

**B. The Court should require the defense to identify witnesses whose testimony they will seek to offer.**

The defendant's motion should be denied based on the analysis above. But if the Court is inclined to consider the issue further, it should order the defense to identify the specific portions of the prior trial transcript they wish to introduce.

The defense's current motion -- to admit unspecified "former testimony" from a 36-week trial spanning more than 14,000 transcript pages -- is too vague for the government to meaningfully contest beyond the *Carson* analysis above. As the defense notes, the questions of motive and opportunity are "fact-specific" ones, ECF 528 at 3 (quoting *United States v. Ausby*, 436 F. Supp. 3d 134, 146 (D.D.C. 2019)), which means they are impossible to analyze without reference to the

specific facts at issue. On the question of motive, for example, the Scottish prosecutors at Camp Zeist had no obligation to prove the central fact at issue in this U.S. trial: that Mr. Al-Marimi was the bombmaker. If a Camp Zeist witness gave testimony suggesting some other person held that role, the Scottish prosecutors there would have had no motive to refute that testimony. (To be clear, we are aware of no such testimony: this is only a hypothetical example.)

It is unclear whether the defense is seeking tactical advantage by concealing which prior testimony they intend to offer, or if they just haven't yet decided what they want to use. Whatever the explanation, the effect is the same: depriving the Court of the full ability to resolve a potentially important pretrial issue.

In other contexts, the defense has noted that they are under no obligation to preview their case. That may be true as a general matter, but at the same time a criminal trial is not "a poker game in which players enjoy an absolute right always to conceal their cards until played." *Williams v. Florida*, 399 U.S. 78, 82 (1970). It is therefore "hardly a novel proposition that defendants in criminal cases may be required to disclose elements of their defenses in advance of trial. *United States v. Poindexter*, 725 F. Supp. 13, 33 (D.D.C. 1989). To the contrary, "disclosure of defense strategy is routine in criminal proceedings." *United States v. Millner*, 13-cr-15, 2015 WL 3440547, at *1 (E.D. Ky. May 28, 2015). *See, e.g.*, *id.* at *4 (explaining that "fairness to all parties and to the public" required defendant to reveal aspects of defense strategy when justifying materiality of documents requested in discovery).

The defendant's initial appearance was December 12, 2022. The trial is currently scheduled to begin on August 26, 2026. That means that, as of the date of this filing, the parties are approximately 97% of the way through the pretrial phase of this case.[5] Throughout the years of

[5] 42 days remaining out of 1,360.

preparation for trial, the government has been extraordinarily transparent with the defense and proactive about raising issues early. For example, roughly one year before the anticipated start of trial, the government filed a motion *in limine* to determine the admissibility of approximately 106 documentary exhibits spanning numerous parts of the case. This approach, in the government's view, helps ensure that the trial can be conducted efficiently and fairly.

Criminal litigation is of course inherently asymmetrical. Nonetheless, given the complexity of this case and the late stage of the proceedings, it is time for the defense to start showing some of their cards. It is already clear that their arguments are likely to raise novel issues. The Court, the parties, the jurors, and the interests of justice would all benefit from those issues being properly raised in sufficient time to be thoroughly considered and resolved in advance.

## CONCLUSION

For the above reasons, the Court should deny the defendant's motion.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By: ***/s/ Conor Mulroe***

CONOR MULROE (NY Bar No. 5289640)
ERIK M. KENERSON (OH Bar No. 82960)
BRITTANY KEIL (D.C. Bar No. 500054)
Assistant United States Attorneys
JEROME J. TERESINSKI (PA Bar No. 66235)
Special Assistant United States Attorney
601 D Street NW, Washington, D.C. 20530
(202) 740-4595 // Conor.Mulroe@usdoj.gov

KATHLEEN CAMPBELL (MD Bar No. 9812170031)
JENNIFER BURKE (MD Bar No. 9706250061)
Trial Attorneys, Counter Terrorism Section
National Security Division
950 Pennsylvania Avenue NW, Washington, D.C. 20530