**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:22-cr-392 (DLF)** |
| | ) | |
| **ABU AGILA MOHAMMAD** | ) | |
| **MAS'UD KHEIR AL-MARIMI,** | ) | |
| **Defendant.** | ) | |

**MR. AL-MARIMI'S RESPONSE TO
THE COURT'S JULY 31, 2026 MINUTE ORDER**

Pursuant to the Court's July 31, 2026 Minute Order, Mr. Al-Marimi clarifies his position regarding the application of the ancient documents hearsay exception and the Confrontation Clause to the Scottish evidence tags, including those depicted in Government Exhibit series 211 and 213. Mr. Al-Marimi also discusses the downstream effects should any or all evidence tags be excluded.[1]

The government must lay adequate foundation that items of purported crash debris (in whatever form relied on, including photographic depictions of debris and forms later relied on by experts) were in fact recovered from the crash site following the crash. For certain items of evidence, this will require multiple showings because some items that the government seeks to introduce were discovered within other items collected at the crash site. An example is the connection between PT/35(b)—the portion of circuit board—and PI/995—the shirt collar in which it was found. On January 13, 1989, the shirt collar was found at the crash site. It was logged into evidence on January 17, 1989, but was not examined for several months. When Dr.

---

[1] This combined response encompasses all the additional briefing that the defense offers to follow-up on the discussion at the July 30, 2026 hearing.

1

Hayes examined the fabric in May of that year, he purportedly found the portion of the circuit board embedded within it. Accordingly, the government must lay a foundation for the recovery of the shirt collar from the scene, *and* for the discovery of the circuit board.

The government's proffers at the July 30, 2026 hearing indicate that in most cases, the government does not intend to call a live witness to testify from personal knowledge about an item's recovery. The government plans to do so for a handful of items, but for the most part, it instead will seek to rely on the testimony of supervisory and summary witnesses regarding the procedures for the collection of crash debris and the storage of evidence by the Scottish police, in conjunction with the information recorded on the evidence tags. 7/30/26 Tr. at 76–78, 83–87 (forecasting "one to two witnesses" who found specific items). Thus, in many cases, the government will ask the Court and the jury to extrapolate from general testimony that each debris item's nature and recovery are established by its evidence tag.

This approach is flawed. *See* 7/30/26 Tr. at 92–93 (explaining the "logical extreme" of this approach and how "the evidentiary chain falls apart"). First, as the Court suggested at the July 30, 2026 hearing, this use of the evidence tags depends on the truth of the information recorded on them. Second, the relevant statements are not admissible as ancient documents or any other exception to the rule against hearsay. Third, not only are the tags hearsay, they are testimonial hearsay and therefore barred by the Confrontation Clause independent of the rules of evidence. So, the government cannot offer these tags as evidence and cannot rely on them in

2

lieu of live testimony by knowledgeable witnesses to establish foundation.

Finally, if the government cannot show that the items of debris are from the crash site, then those items of debris are not relevant to this prosecution, and the Court should exclude their use in any form. In particular, any testimony from Mr. Feraday or other witnesses that relies on review or comparison of physical evidence is irrelevant if there is no foundation laid to show it was found at the scene of the crash.

## I.　　The statements are offered for their truth.

In the government's response and surreply (ECF 495, 531-1) responding to Mr. Al-Marimi's motions *in limine* on the government's trial exhibits (ECF 483, 523), the government argued the evidence tags are not offered for the truth of the matters asserted on them. Instead, the government argued, they will be offered "to show the accuracy and thoroughness of the recordkeeping and investigation." ECF 495, at 28. The government asserted that this use does not turn on the accurate recording of the information in the tags. *Id.*; ECF 531-1, at 2–3.

The government backed off from this position at the July 30, 2026 hearing.[2] Indeed, while the government initially pointed to other ways to authenticate evidence apart from the evidence tags—§ 3505 certificates, Rule 901(8), testimony by a person with knowledge—none of those alternatives apply to the crash debris at issue here

---

[2] 7/30/26 Tr. at 78 ("But you want to introduce this for the truth, that it was found and tagged on this date." "Yes."); Tr. at 85 ("Because if you're introducing it for a non-truth matter, the tags can be redacted, right? . . . I don't think that's what the government wants." "Correct."); Tr. at 90 ("But not redacted? You want the tags with the writing to go back [to the jury]?" "Yes.").

for which the government does not intend to produce a knowledgeable witness regarding the recovery of the debris. Thus, the government is relying on the truth of the information recorded on the evidence tag to authenticate the debris and connect the chain of custody, as well as to support the reliability of the Scottish evidence-handling procedures in general.

## II. The ancient documents exception cannot extend to documents prepared by law enforcement as part of an investigation, and the exception moreover is not firmly rooted in the common law.

There is no dispute that the evidence tags at issue were prepared before January 1, 1998 and, thus, are old enough to qualify as ancient documents. *See* Fed. R. Evid. 803(16). Apart from any issues relating to the authentication of the tags,[3] there are two reasons why the Court should not admit the tags as ancient documents.

First, in a criminal case, law enforcement investigative records created during the investigation of the criminal case should not be admissible simply because an arbitrary amount of time has passed. As Mr. Al-Marimi has argued in prior briefing, the ancient documents exception is premised on the age of the documents lending reliability to their contents, a premise that only holds when the "age affords assurance that the writing antedates the present controversy." Fed. R. Evid. 803, Advisory Committee Notes. Here, the tags were not prepared independent from and antecedent to the controversy; they were prepared to document information about debris and other evidence following the crash. Locking up investigative materials and

---

[3] In his declaration, Scottish Detective Superintendent Paul Grainger expressly declined to address the "special procedures" that applied "to the collection and process of physical evidence and debris from the crime scene in Scotland and England." ECF 495-2, at 2 n.1.

waiting cannot be the basis for their reliability, as time does nothing to make those records more reliable or less investigative. Additionally, there is no clear limiting principle to separate the evidence tags here from other law enforcement documents like narrative reports or witness statements.[4]

While the Court in this case has conditionally admitted other types of documentary evidence as ancient documents—mostly records from various businesses—it has not admitted any criminal investigative records prepared by law enforcement in a strictly investigatory capacity. Mr. Al-Marimi maintains that the Stasi records at issue in the Rule 404(b) litigation were also investigative or quasi-investigative due to the Stasi's functions and the roles of the officers who created the documents, but even those records are different in kind from evidence tags attached to evidence of an alleged crime to support a chain of custody for future legal proceedings. There is no preventive or surveillance function that might apply here, for example, like the one the government asserted with respect to the Stasi.

Law enforcement records receive special treatment under the hearsay rules, even when the rules do not expressly contemplate a carve out. The public records exception in Rule 803(8) excludes matters observed by law enforcement personnel in a criminal case as well as the factual findings of an investigation if used against a

---

[4] The defense has not located any case admitting law enforcement investigative records as ancient documents. Cases that have applied the ancient documents exception to police records have done so when the records reflected internal administrative matters for the law enforcement organization, such as employment records, and did not concern the investigation of the crime for which a defendant was on trial. *See, e.g.*, *United States v. Firishchak*, 468 F.3d 1015, 1020–22 (7th Cir. 2006) (former Nazi collaborator's employment records); *United States v. Koziy*, 728 F.2d 1314, 1317 n.2, 1322 (11th Cir. 1984) (same).

criminal defendant. Fed. R. Evid. 803(8)(A)(ii) & (iii). In *Melendez-Diaz*, the Supreme Court addressed the business records exception, noting that documents "kept in the regular course of business may ordinarily be admitted at trial despite their hearsay status" pursuant to Rule 803(6). *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 321 (2009) But the Court observed "that is not the case if the regularly conducted business activity is the production of evidence for use at trial." *Id.* (discussing *Palmer v. Hoffman*, 318 U.S. 109 (1943)). It held that "police reports generated by law enforcement officials" and lab analysts' certificates do not "qualify as business or public records" because they are "calculated for use essentially in the court, not in the business." *Id.*; *see also United States v. Fuller*, 761 F. Supp. 3d 125, 139 (D.D.C. 2025) (rejecting potential business records because they were "created for the purpose of use in litigation"). The same logic extends to the evidence tags, which Scottish police used to create and later prove a chain of custody for the crash debris.

Second, the tags contain layers of hearsay. At the July 30, 2026 hearing, the government proffered that the tags were generally filled-in by investigators around the time the physical debris was recovered, with other signatures added "when the item is handled by that person." Tr. at 82. The tags indeed overwhelmingly feature multiple signatures. Each tag, then, repeats separate assertions by different declarants about their handling of the evidence. The Court previously recognized that a Stasi list of purported visa requests contained a separate layer of hearsay for the underlying requests; here too, each tag constitutes a collection of other assertions by others. If the tag were instead a witness testifying in court, it would be testifying that

6

John said he found the item, Jane said she transported it, Jack said he put it in storage, and so on. Separately, Mr. Al-Marimi maintains that there is no guarantee the government's proffered procedures were followed in every instance, such that no one ever filled out a tag based on secondhand information.[5] *See* Tr. at 96.

Last, Mr. Al-Marimi emphasizes that the issue of whether the evidence tags are admissible under the modern hearsay rules as ancient documents is separate from whether they are hearsay for purposes of the Confrontation Clause. The Supreme Court has explained that the Confrontation Clause "bars only the introduction of hearsay—meaning, out-of-court statements offered 'to prove the truth of the matter asserted.'" *Smith v. Arizona*, 602 U.S. 779, 785 (2024) (quoting *Anderson v. United States*, 417 U.S. 211, 219 (1974)). The question is whether a statement *is* hearsay under that definition, focusing on its utility, and not whether it would be admissible under the rules of evidence. *See Crawford v. Washington*, 541 U.S. 36, 61 (2004) ("[W]e do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence[.]"). Here, the statements clearly *are* out-of-court statements offered for their truth, and that is true regardless of whether the modern rules of evidence would admit them as ancient documents.[6]

---

[5] As noted at the hearing, there is at least one critical instance in which a tag was modified from the initial description: the evidence tag from PI/995. 7/30/26 Tr. at 96. That tag, which originally read "cloth," was later written over to state "debris."

[6] The ancient documents exception is not one of the few that "had taken shape by the late 18th century: dying declarations, regularly kept records, co-conspirator declarations, evidence of pedigree and family history, and various kinds of reputation evidence." Br. of U.S. as *amicus curiae*, *Crawford v. Washington*, 2003 WL 22228005, at *13 n.5; *see Crawford*, 541 U.S. at 56 (endorsing that list).

### III.    The statements are testimonial.

The Confrontation Clause forbids testimonial hearsay absent a prior opportunity for cross-examination. The focus on "testimonial" statements comes from the original meaning of the Confrontation Clause. The Sixth Amendment protects an accused's "right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford*, the Supreme Court defined "witnesses" as those "who bear testimony," and "testimony" as "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." 541 U.S. at 51. Whether a statement is testimonial turns on its primary purpose, a test that arose later.[7] ECF 567, at 4. The "precise formulation of this primary purpose test varies across the Supreme Court's caselaw." *Id.*; *see Smith*, 602 U.S. at 784 (collecting variations).

Under any variation of the primary purpose test except the most extreme that has never been endorsed by a majority of justices,[8] the evidence tags qualify. *See Smith*, 602 U.S. at 802 (prepared with a "focus on court"); *Michigan v. Bryant*, 562 U.S. 344, 358 (2011) ("a primary purpose of creating an out-of-court substitute for trial testimony"); *Davis v. Washington*, 547 U.S. 813, 822 (2006) (made "to establish

---

[7] Justice Gorsuch argued for a broader interpretation of the Confrontation Clause in his concurrence in *Smith*. He noted that a "witness" could mean any "person who gives or furnishes evidence" or all those who "bear testimony" by "explicitly or implicitly . . . relat[ing] a factual assertion or disclos[ing] information." *Smith*, 602 U.S. at 806 (Gorsuch, J., concurring) (citations omitted).

[8] At the July 30, 2026 hearing, the Court was rightly skeptical of the government's arguments based on the test rejected by five justices in *Williams v. Illinois*, 567 U.S. 50 (2012), that asks whether the primary purpose of the statement was to accuse a targeted individual. *See* 7/30/26 Tr. at 102 ("I don't think it has to be a targeted individual. We can agree to disagree on the cases."); *Williams*, 567 U.S. at 120, 135 ("But in all except its disposition, [the plurality] opinion is a dissent: Five Justices specifically reject every aspect of its reasoning and every paragraph of its explication.").

or prove past events *potentially* relevant to later criminal prosecution") (emphasis added); *Crawford*, 541 U.S. at 52 ("made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial").

The information recorded on the tags reflects the critical first link on the chain of custody for each item collected by the Scottish police during the investigation into the crash. Per the government's proffer, the Scottish investigators were instructed to comb the countryside, police tags in hand, searching for crash debris. Whenever investigators found an item, they collected it, and it received a tag assigning it an evidence number, documenting its location, who found it, and when, and serving as a custody log as the item was handled by others. At the first step, the person who found it purportedly signed his or her name, attesting to the descriptions recorded on the tag. Some of the tags specifically contemplated information about "police crime/offence no.", "production in case against", and the "nature/locus of crime". *See, e.g.*, Gov. Exh. 211.16. The foundational testimony for the admission of physical evidence linking the evidence to a crime falls squarely in the heartland of testimonial statements about "historical events" that is undoubtedly subject to the Confrontation Clause. *See Melendez-Diaz*, 557 U.S. at 317 (rejecting government's argument that confrontation right excludes testimony describing scientific testing because it is not "testimony recounting historical events").

For sure, the evidence tags are unlike the types of statements the Supreme Court has found or suggested to be nontestimonial. *See Smith*, 602 U.S. at 801 n.5,

9

802 (addressing records created primarily "to comply with laboratory accreditation requirements or to facilitate internal review and quality control"; notes "written simply as reminders to self"; and "books and journals, surveys, and economic or scientific studies" not prepared for any evidentiary purpose). Critically, the tags were not made "under circumstances objectively indicating that the primary purpose . . . is to enable police assistance to meet an ongoing emergency." *Davis*, 547 U.S. at 822; *see also Ohio v. Clark*, 576 U.S. 237, 246–48 (2015) (holding child's statements to teacher about ongoing abuse were nontestimonial). Even before the investigators discovered evidence that the crash was caused by an explosive device (i.e., plastic explosive residue), the creation of evidence tags was intended to record past facts for future use by the police—they were police tags, listing the name of the local police department across the top. While the situation was undeniably devastating, there was no basis to think that any threat still existed equivalent to ongoing abuse.

The Court previously concluded that other statements by a forensic investigator were not testimonial based on (1) the timing of the statements prior to "any indication that a criminal prosecution would follow," and (2) the informal nature of the statements in the form of printouts of test results with no certificate, summary, or identification marks other than a heading and potentially initials. ECF 567, at 6–10. Here, the evidence tags are themselves the final form the information at issue would take—who found certain items and where was not a component of any subsequent testing as with raw data or preliminary findings. When each investigator purportedly noted the information, he or she would have understood that it

10

represented a solemn representation that the information was accurate that would endure scrutiny in a subsequent court proceeding. Mr. Al-Marimi also maintains that the timing of the statements relative to the alleged discovery of plastic explosive residue is a minor consideration given the other surrounding circumstances, including the use of police tags, the tags directly referring to criminal activity, and the involvement of law enforcement investigators. In any event, after December 28, 1988 at the latest, a criminal prosecution was reasonably foreseeable.

The government contends that the purpose of the tags was administrative and related to internal police recordkeeping. ECF 531-1, at 4. It points to the large quantity of items collected and argues the volume means no reasonable observer would believe "each item recovered would someday be offered in a criminal trial" or that "more than a tiny fraction" would "become directly relevant to a future criminal prosecution . . . ." *Id.* It is not clear from what authority the government derives the requirement that a declarant believe each item of evidence collected and discussed in out-of-court statements will be used in a prosecution; the police collect evidence in every case that will never be admitted at trial, but they know and hope that *some* of the evidence will be.[9] The fact that much of the items collected in this case will not

---

[9] The government later cites *United States v. Seregin*, 568 F. App'x 711, 718 (11th Cir. 2014), an unpublished case, for a different proposition. *Seregin* held that a custody receipt that contained a valuation of seized property prepared by U.S. Customs and Border Protection was not testimonial because it was a public record, maintained in the normal course of CBP business, and had a primary purpose of documenting the items seized separate from any criminal investigation or prosecution. *Id.* The panel relied on *United States v. Caraballo*, 595 F.3d 1214, 1229 (11th Cir. 2010), which is even further afield; that case involved an I-213 immigration form that collected biographical information about a noncitizen to track "the entry of aliens into the United States." Both cases are distinguishable.

11

be admitted at trial says nothing about the testimonial nature of the evidence tags associated with the items that the government seeks to admit. *See* 7/30/26 Tr. at 104 ("[T]o do a thorough criminal investigation, you have to collect everything."). Separately, while the government is correct that the focus of the primary purpose test is on the purpose of the specific statement at issue, *id.*, the nature of the surrounding investigation is among the circumstances that bear on that question. *See Davis*, 547 U.S. at 822.

At the July 30, 2026 hearing, the government again argued that the tags were administrative and intended to catalog evidence internally to assist with the investigation. 7/30/26 Tr. at 101. Of course, the end goal of the investigation in each officer's mind would be a court proceeding against those responsible. The government alternatively suggested in passing that another purpose of the tags was to reunite items with owners or family members seeking to claim the items. *Id.* at 105. Even assuming that to be true for the sake of argument, the tags the government seeks to admit in this case do not reflect that purpose. The tags depicted in the 211 and 213 series concern crash debris purportedly from the airplane—pieces of warped and fractured metal that are not items anyone would ever seek to claim.

The government also referred to subsequent written statements by Scottish investigators that address the collection of evidence. These statements communicate the same information as the evidence tags, often quoting the descriptions and location information written on the tags, but take the form of a first-person narrative. The government argues these statements are more formal than the evidence tags and

12

suggests their purpose was to establish past facts for future court proceedings. Mr. Al-Marimi agrees the narrative statements are testimonial in nature. But so are the evidence tags. They convey the exact same information and have the same primary purpose. The Confrontation Clause does not permit law enforcement to make or take a testimonial statement, recycle it in a more formal presentation, then use that to justify the admission of the earlier testimonial statement. Relaying a testimonial statement in another testimonial statement does not make the first nontestimonial.

In these circumstances, the Court should find the evidence tags to be testimonial and subject to the Confrontation Clause's requirements. The tags cannot substitute for live witness testimony absent prior cross-examination.

IV. **Without the evidence tags or equivalent in-court testimony, the evidence associated with the evidence tags lacks established relevance and cannot be presented to the jury in any form.**

To be admissible at trial, evidence must be relevant. Fed. R. Evid. 401 & 402. "When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist." Fed. R. Evid. 104(b). "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901.

The chain of custody rule is a "variation of this principle" and "requires that a prosecutor seeking to introduce seized evidence must establish a chain of custody from the time the items were taken to show that they are in substantially the same condition as when they were seized." *United States v. Turpin*, 65 F.3d 1207, 1213 (4th Cir. 1995) (internal citations and quotations omitted). Accordingly, while the

13

prosecution need not present testimony from "everyone who laid hands on the evidence[,]" some "steps in the chain of custody are so crucial" as to require a "live" witness. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 n.1 (2009).

The original acquisition of physical evidence is a crucial step in the chain of custody. "It is generally recognized that tangible objects become admissible in evidence only when proof of their original acquisition and subsequent custody forges their connection with the accused and the criminal offense." *United States v. Mitchell*, 816 F.3d 865, 971 (D.C. Cir. 2016) (quoting *United States v. Mejia*, 597 F.3d 1329, 1335 (D.C. Cir. 2010)). The government bears the burden of establishing that an item is what it purports to be and has the necessary connections to the case. *Id.* While a complete chain of custody need not always be proved, a break in the chain "can be serious enough" to foreclose admission, and there always must be "ample corroborative evidence as to [the evidence's] acquisition and subsequent custody." *Id.* at 872 (quoting *Mejia*, 597 F.3d at 1336).

Without the evidence tags or live witness testimony by the person who originally recovered an item of debris, the government has no evidence about the acquisition of the items and cannot establish that they were actually part of the crash debris from Pan Am 103. It cannot show with sufficient corroborative evidence who obtained the items, when and where they were obtained, or how many different persons handled them before their entry into the Scottish evidence storage system (described in ECF 495-2). Supervisory or sector-level testimony by witnesses who were not present at the time the items were purportedly recovered is no substitute

14

because those witnesses are necessarily speculating that the procedures they are familiar with were followed in each instance by the people who collected and documented the debris.

What is left, then, is physical evidence with no provable connection to this case. The government cannot rely on such evidence in any form because, on top of inadequate authentication, the evidence is irrelevant. If debris cannot properly be connected to the charged offenses in this case, then it is not probative of any material fact. And a photo of irrelevant physical evidence is just as irrelevant as the item depicted in the photograph. So, too, is an expert opinion about irrelevant physical evidence. When the government's explosives expert, Allen Feraday, opined based on items purportedly collected from the crash site, the relevance of his opinions was premised on those items provably coming from the crash site.  The same holds true for other witnesses who would testify about the physical items: the relevance of their testimony relies on these exhibits being, in fact, items recovered from the crash site. If the government cannot show they are, then the witnesses' testimony about items they have later encountered is not relevant to this case.

The Court should exclude any evidence related to or reliant on unauthenticated debris at trial.

## CONCLUSION

The Court should exclude the evidence tags as hearsay and/or testimonial hearsay implicating Mr. Al-Marimi's confrontation rights. It should hold the government to authenticating the items of alleged crash debris through live witnesses

15

subject to cross-examination. Should the government fail to authenticate any item, the Court should prevent the government from using that irrelevant item in any form.

Respectfully submitted,

**ABU AGILA MOHAMMAD
MAS'UD KHEIR AL-MARIMI**

By: _____/s/_____
Whitney E.C. Minter
Va. Bar #47193
Brooke Sealy Rupert
Va. Bar #79729
Assistant Federal Public Defender
Attorney for Mr. Al-Marimi
1650 King Street, Suite 500
Alexandria, Virginia   22314
(703) 600-0855 (telephone)
(703) 600-0880 (facsimile)
Whitney_Minter@fd.org (email)

Laura Koenig
Va. Bar #86840
Assistant Federal Public Defender
Attorney for Mr. Al-Marimi
701 E. Broad Street, Suite 3600
Richmond, Virginia  23219
(804) 343-0800 (telephone)
(804) 648-5033 (facsimile)
Laura_Koenig@fd.org (email)

16